1   WILLIAM D. CONNELL, Cal. State Bar No. 89124
    SALLIE KIM, Cal. State Bar No. 142781
2   GCA LAW PARTNERS LLP
    1891 Landings Drive
3   Mountain View, CA  94043
    (650) 428-3900
4   (650) 428-3901 [fax]

5   Attorneys for Defendant QAD Inc.

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                        [San Francisco Division]

10

11  VEDATECH, INC., a Washington State
    Corporation, and VEDATECH K.K., a          Case No.  04-cv-1249-VRW   [ECF]
12  Japanese Corporation, and MANI
    SUBRAMANIAN, an Individual,
13
            Plaintiffs,
14
              vs.
15                                              [Case No.  04-cv-1403-VRW]
    ST. PAUL FIRE & MARINE INSURANCE           [Case No.  04-cv-1818-VRW]
16  COMPANY, et al.,
17          Defendants.
18  ─────────────────────────────────

19  MANI SUBRAMANIAN, as an individual
    etc.,
20                                              Case No.  08-cv-1426-JSW   [ECF]
            Plaintiff,
21
              vs.
22
    ST. PAUL FIRE AND MARINE
23  INSURANCE COMPANY, et al. (including
    QAD INC., a Delaware Corpora-tion with
24  principal place of business in California),
25          Defendants.
26

27          ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES
28              SHOULD BE RELATED [L.R. 3-12 and 7-11]

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE THAT, pursuant to Civil Local Rules ("Civil L.R.") 3-12 and 7-

3    11, QAD INC. ("QAD"), defendant in **Case Nos.  04-01249-VRW and 08-cv-1426-JSW**,

4    respectively, hereby moves the Court for a determination as to whether the following matter, filed

5    on March 12, 2008:

6         **MANI SUBRAMANIAN, as an individual etc., Plaintiff, v. ST. PAUL FIRE AND**
         **MARINE INSURANCE COMPANY, a Minnesota Corporation, et al. (including**
7         **QAD INC., ), Defendants, Case No. 08-01426-JSW,** (the "NEW ACTION"),

8    should be related to the following, earlier-filed matters, to wit:

9         **(1)  Vedatech Inc., a Washington State Corporation, and Vedatech K.K., a**
         **Japanese Corporation, and Mani Subramanian, an Individual, Plaintiffs, v. St.**
10        **Paul Fire & Marine Insurance Company, a Minnesota Corporation, et al,,**
         **Defendants, Case No. C-04-01249-VRW , filed on March 30, 2004;**
11
         **(2)   ST.PAUL FIRE AND MARINE INS et al., Plaintiffs, v. VEDATECH**
12        **INTERNATIONAL INC., et al. Defendants, Case No. 04-1403-VRW,  Petition for**
         **Removal filed on April 12, 2004;** and,
13
         **(3)   ST.PAUL FIRE AND MARINE INS et al., Plaintiffs, v. VEDATECH**
14        **INTERNATIONAL INC., et al. Defendants, Case No. 04-1818-VRW,  Petition for**
         **Removal filed on May 7, 2004.**
15

16        Case Nos. 04-01249-VRW, 04-01403-VRW, and 04-01818-VRW, are collectively referred

17   to herein as the "EARLIER ACTIONS."

18        **STATEMENT OF POTENTIAL RELATIONSHIP BETWEEN THE ACTIONS**

19        Civil L.R. 3-12(b) states, in pertinent part:  "Whenever a party knows or learns that an

20   action, filed in or removed to this district is (or the party believes that the action may be) related to

21   an action which is or was pending in this district as defined in Civil L.R. 3-12(a), the party must

22   promptly file in the earlier-filed case an Administrative Motion to Consider Whether Cases Should

23   be Related, pursuant to Civil L.R. 7-11."  Civil L.R. 3-12(a) states that "[a]n action is related to

24   another when: (1) The actions concern substantially the same parties, property, transaction or

25   event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and

26   expense or conflicting results if the cases are conducted before different Judges."

27        The history and substance of the EARLIER ACTIONS are set forth in detail in the Order of

28   the Court, The Hon. Vaughn R. Walker, Chief Judge Presiding, entered in each of those matters on

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

Administrative Motion to Consider Whether Cases
Should Be Related                              - 1 -

1    June 22, 2005 [*see, e.g.*, Docket Item No. 163 in Case No. 04-01249-VRW], which dismissed Case

2    No. 04-01249-VRW pursuant to motions of all defendants under Rule 12(b)(6), Fed.R.Civ.Proc.,

3    and ordered that the other matters be remanded to state court.

4         A true and correct copy of that Order is attached hereto as Exhibit A.  A true and correct

5    copy of the complaint in the NEW ACTION, filed on March 12, 2008, and assigned to The Hon.

6    Jeffrey S. White, as Case No. 08-01426-JSW [Docket No. 1], is attached hereto as Exhibit B.  QAD

7    believes that the NEW ACTION is related to the EARLIER ACTIONS, under the provisions of

8    Civil L.R. 3-12, and should be re-assigned to Chief Judge Walker – i.e., the Judge presiding in the

9    earlier-filed cases -- based on the following considerations:

10         **1.**     **PLAINTIFF'S ADMISSION** --  The NEW ACTION does not just "concern

11    substantially the same parties, property, transaction, or event" as the EARLIER ACTIONS, it

12    essentially ***duplicates*** Case No. 04-01249-VRW.  Plaintiff basically admits as much by entitling the

13    purported First Cause of Action: "To SET ASIDE THE ORDER AND JUDGMENT entered

14    simultaneously in 04-01249-VRW, 04-1403-VRW, and 04-1818-VRW [i.e., the EARLIER

15    ACTIONS] on June 22, 2005 and December 27, 2007 respectively."   (See Exhibit B, pg. 40, lines

16    2-3)  Furthermore, Plaintiff states expressly in his NEW ACTION complaint that it "is … related to

17    04-1249 VRW, 04-1403-VRW, and 04-1818-VRW [the EARLIER ACTIONS]."  (See Exhibit B,

18    pg. 2, lines 21-22 ( ¶ 3)).[1]  Plaintiff already sought to overturn the June 22, 2005 Order by

19

20    _____

21    [1]   The complaint in the NEW ACTION was filed on March 12, 2008, almost three months ago, but has not
yet been formally served on any defendant.  Given Plaintiff's admission that this case is related, his failure
to file the required Civil L.R. 3-12 motion promptly after filing the complaint and learning of its initial

22    assignment to someone other than Chief Judge Walker is inexplicable.  Plaintiff appears to have deliberately
not done so for some reason.  Accordingly, as set forth in the accompanying Declaration of William D.

23    Connell, QAD's counsel contacted Mr. Subramanian by e-mail on May 29, 2008, to inquire whether he
intended to make the required motion promptly.  Mr. Subramanian responded by telephone on May 30, but

24    declined either to explain why he had not yet made the motion or to provide any specific detail as to when or
how he intended to comply with this requirement.  Mr. Subramanian followed up on that telephone call with

25    an e-mail on May 31, 2008, in which, following his ritual recitation of abusive, baseless, and irrelevant
charges against QAD and its counsel, he repeated an "assurance" that he "will comply with all the rules to

26    the best of my abilities and understanding and as soon as I can complete all research and preparations
sufficient to permit me to take any further steps with confidence and courtesy," but still provided no details

27    indicating compliance was imminent. Mr. Subramanian took no action in the following week in this regard,
and, accordingly, QAD has concluded that any attempt to obtain a stipulation in this respect from Mr.

28    Subramanian, if not futile, would, at a minimum, most likely result in additional, unwarranted effort and
delay.  As a result, it is filing this motion now to avoid further delay.

Administrative Motion to Consider Whether Cases
Should Be Related

- 2 -

1   appealing it to the Ninth Circuit, where his appeal was rejected in its entirety (Memorandum

2   Opinion, July 19, 2007, in Case No. 05-16405)  He then filed a petition for an *en banc* rehearing

3   before the Ninth Circuit, and that petition, too, was denied.  Accordingly, following return of the

4   mandate from the Ninth Circuit, the Court entered Judgment on the earlier Order on December 27,

5   2007. (Case No. 04-01249-VRW, Docket No. 181).

6       QAD submits that the NEW ACTION is a misguided -- if not a patently frivolous and

7   improper -- attempt by Plaintiff simply to re-litigate issues on which he was defeated at every point

8   in the EARLIER ACTIONS.  Any purported new "facts" or legal theories put forth in the NEW

9   ACTION are illusory.  In any event, by Plaintiff's own admission, the NEW ACTION is manifestly

10  related to the EARLIER ACTIONS and, as such, should be re-assigned to Chief Judge Walker,

11  who was, and remains, the Judge presiding over the EARLIER ACTIONS.

12      **2.    PARTIES** – Mani Subramanian, *pro se* plaintiff in the NEW ACTION, is a *pro se*

13  party in each of the EARLIER ACTIONS as well.  Various Vedatech corporate entities are also

14  aligned with Mr. Subramanian in each of the EARLIER ACTIONS, and Mr. Subramanian purports

15  to be pursuing claims in the NEW ACTION "in his representative/derivative capacity on behalf of

16  Vedatech."  (See Exhibit B, pg. 7, lines 5-8, ¶ 27)

17      Three of the named defendants in the NEW ACTION are also named parties in one or more

18  of the EARLIER ACTIONS, including QAD, St. Paul Fire & Marine Insurance Company (St.

19  Paul"), and Randall Wulff.  Each of the other defendants named in the NEW ACTION is related in

20  some manner to these three defendants and/or has also been previously named as a defendant by

21  Mr. Subramanian in litigation relating to both the EARLIER ACTIONS and the NEW ACTION.

22  Thus, for example, defendant William D. Connell has been attorney of record throughout this

23  litigation for defendant QAD Inc., while defendant Roland B. Desilets is General Counsel of

24  QAD.[2]  Similarly, defendant Greenan, Pfeffer, Sallander & Lally LLP are attorneys of record for

25  defendant St. Paul in the EARLIER ACTIONS.  Finally, defendants John Doordan and Lai Foon

26

27  ───────────────────

28  [2]   In addition, Mr. Connell was named as a defendant (although now dismissed) in another case filed by Mr.
    Subramanian currently pending before Chief Judge Walker and involving some of the same parties –
    **Subramanian v. QAD Inc.**, Case No. 06-03050-VRW.

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

Administrative Motion to Consider Whether Cases
Should Be Related                                    - 3 -

1    Lee, as well as Arthur Andersen LLP, were defendants (now dismissed) in Mr. Subramanian's

2    underlying state court action relating to these disputes.  In sum, while the NEW ACTION includes

3    some additional parties not expressly named in the EARLIER ACTIONS, each defendant in the

4    NEW ACTION is related to parties and/or subject matter in the EARLIER ACTIONS.

5         **3.      TRANSACTIONS** and **EVENTS** -- The Court's June 22, 2005 Order sets forth in

6    detail the complicated history of the EARLIER ACTIONS. (See Exhibit A)  Briefly, in 2004,

7    Plaintiff and a Vedatech corporate entity sued St. Paul, QAD, and Wulff, among others, in Case

8    No. 04-01249-VRW.  The complaint alleged, *inter alia*, claims for fraud, conspiracy to commit

9    fraud, and unfair competition (all of which are also purported claims in the NEW ACTION), as

10   well as claims relating to insurance coverage disputes between Mr. Subramanian/Vedatech and St.

11   Paul.  All of these claims, in turn, arose out of a 2004 mediation, conducted by defendant Randall

12   Wulff in connection with ongoing state court litigation involving many of these same parties.

13   Plaintiff, seeking to void the settlement, claimed defendants had covertly conspired and colluded to

14   obtain his (and Vedatech's) consent to this mediation and then caused a settlement to be reached

15   between St. Paul and QAD on terms he and Vedatech opposed.

16        On defendants' motions to dismiss Case No. 04-10249, St. Paul's motions to remand Case

17   Nos. 04-1403-VRW and 04-1818-VRW, and for imposition of various sanctions against Mr.

18   Subramanian/Vedatech and/or Vedatech's counsel, the Court's June 22, 2005 Order dismissed all

19   but one of Plaintiff's causes of action in Case No. 04-01249,[3] remanded the other actions, and

20   imposed various sanctions, costs and fees in favor of St. Paul and Wulff and against Plaintiff

21   personally and Vedatech's counsel.[4]

22

23

---

24   [3]   The remaining claim is the bad faith insurance claim by Plaintiff against St. Paul in Case No. 04-01249-
     VRW, which has been stayed pending resolution of the remanded state court actions
25   [4]   Significantly, in reaching this result, the Court described Plaintiff's behavior as "reprehensible" and
     called his repeated unsuccessful attempts to have his state law claims heard in federal court a "removal
26   rampage."  Exhibit A, 2005 WL 1513130, at *4.  The Court stated that "no amount of leniency" could
     "excuse the frivolousness" of these repeated filings, which caused "continuous and unnecessary congestion"
27   of the Court's docket.  Id. at *11.  It further found that "the only way to deter Subramanian" was to impose
     sanctions of $1,000 per page for any future frivolous filings, including any "new frivolous cause of action."
28   Id. at *11.

Administrative Motion to Consider Whether Cases          -  4  -
Should Be Related

1    On December 27, 2007, following Plaintiff's unsuccessful appeal of the June 22, 2005

2    Order, which the Ninth Circuit affirmed in all respects, this Court entered Judgment in the

3    EARLIER ACTIONS, a true and correct copy of which is attached as Exhibit C hereto.

4    Significantly, after Plaintiff's failure to pay any of the sanctions, costs, or fees by the January 30,

5    2008 deadline stated in the Judgment, St. Paul and Wulff recently filed motions for a debtor's

6    examination and for an Order to Show Cause Re: Contempt in the EARLIER ACTIONS.  In

7    response, and notwithstanding his March 12, 2008 filing of the NEW ACTION, Plaintiff has filed

8    Motions for Relief from Judgment, under Rule 60, Fed.R.Civ.Proc., in the EARLIER ACTIONS,

9    seeking substantially similar relief to at least some part of the relief sought in the NEW ACTION.

10    In the NEW ACTION Plaintiff simply attempts to re-package virtually identical factual

11    claims in new (and, indeed, sometimes not even new) legal "theories" to avoid the effect of the

12    Court's earlier Order and Judgment.   As such, the NEW ACTION is not just related, but is little

13    more than a frivolous repetition of the EARLIER ACTIONS.

14    **4.    JUDICIAL ECONOMY** --  First, Chief Judge Walker has already invested the

15    considerable time necessary to analyze and explain the convoluted underlying litigation and

16    disputes between the parties on which the claims in the NEW ACTION are based.  Second, Chief

17    Judge Walker continues to be presented with disputes related to those very matters through, *inter*

18    *alia*, Plaintiff's own Motions now filed in the EARLIER ACTIONS.  Given the manifestly

19    duplicative nature of Mr. Subramanian's NEW ACTION, it would obviously be "an unduly

20    burdensome duplication of labor and expense" were another Judge to be burdened with the task of

21    becoming familiar with these matters at this late stage.  Moreover, the potential for conflicting

22    results is clear if the NEW ACTION remains assigned to a different Judge even as Chief Judge

23    Walker considers determination of various pending motions in the EARLIER ACTIONS.

**CONCLUSION**

24

25    Based on the foregoing, QAD submits that the criteria set forth in Civil L.R. 3-12 have been

26    met, that Case No. 08-01426-JSW is related to Case No. 04-01249-VRW, as well as Case Nos. 04-

27    01403-VRW and 04-01818, and that immediate reassignment of Case No. 08-01426 to Chief Judge

28    Walker is appropriate and warranted under Civil L.R. 3-12.

Administrative Motion to Consider Whether Cases
Should Be Related

- 5 -

1

2   Dated: June _10_, 2008

3                                                    WILLIAM D. CONNELL
                                                     SALLIE KIM
4                                                    GCA LAW PARTNERS LLP

5                                                    By: __/s/  William D. Connell___.
                                                              William D. Connell
6

7                                                    Attorneys for Defendant QAD Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Administrative Motion to Consider Whether Cases        –  6  –
Should Be Related

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA 94043
(650)428-3900

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

Only the Westlaw citation is currently available.

N.D. California.
VEDATECH, INC, Vedatech KK, Mani
Subramanian (an individual), Plaintiffs,
v.
ST PAUL FIRE & MARINE INSURANCE CO, Qad
Inc, Qad Japan KK, Randall Wulff (an
individual), Defendants.
No. C 04-1249 VRW, 04-1818 VRW, 04-1403
VRW.
United States District Court.

June 22, 2005.

Christina M. Gonzaga, Law Offices of James S.
Knopf, San Mateo, CA, for Plaintiffs.

Mani Subramanian, Palo Alto, CA, pro se.

Enoch Wang, John Phillip Makin, Nelson Hsieh,
James Steven Greenan, Greenan, Peffer, Sallander &
Lally, San Ramon, CA, William D. Connell, General
Counsel Associates, LLP, Mountain View, CA,
Douglas R. Young, Roderick M. Thompson, Farella,
Braun & Martel, LLP, San Francisco, CA, for
Defendants.

ORDER

WALKER, Chief J.

*1 Mani Subramanian (Subramanian) owns
Vedatech, Inc and Vedatech KK (collectively
"Vedatech") and appears in the cases at bar in
*propria persona*. Subramanian and Vedatech have
brought suit against defendant QAD Inc (QAD)
which moves in No 04-1249 to dismiss
Subramanian's and Vedatech's first amended
complaint (FAC) pursuant to FRCP 12(b)(6) and
41(e). Doc # 44. Next, defendant QAD Japan K K
(QADKK) also moves in 04-1249 to dismiss the FAC
pursuant to FRCP 12(b)(5) and (b)(6). Id. Defendant
Randall Wulff (Wulff) moves in 04-1249 the court to
dismiss the FAC pursuant to FRCP 12(b)(6) and
41(e). Doc # 52. Next, defendant St Paul Fire &
Marine Insurance Company (St Paul) moves in 04-
1249 to dismiss the FAC pursuant to FRCP 12(b)(6).
Doc # 45. Additionally, all defendants seek sanctions
pursuant to FRCP 11 or 28 USC § 1927. (04-1249
Docs 86, 97, 106). Subramanian and Vedatech seek

sanctions pursuant to FRCP 11 against Wulff. (04-
1249 Doc # 61). Finally, St Paul seeks to remand Nos
04-1403 and 04-1818 to Santa Clara superior court.
(C-04- 1818 Docs 7, 19) (C-04-1403 Docs 11, 40).

I
A
*The First Action*
 On January 26, 1998, QAD and QADKK filed suit
against plaintiffs Vedatech Inc and Vedatech KK
(collectively "Vedatech") and Mani Subramanian
("Subramanian"), owner of all Vedatech entities, in
the Santa Clara superior court (hereinafter, the "first
action"). The first action arose out of contractual and
tort disputes between QAD, QADKK, Vedatech and
Subramanian regarding QAD's hiring (and firing) of
Vedatech and Subramanian to develop computer
software in Japan. The substance of the allegations in
the first action need not be recited in depth. Suffice it
to say, QAD's and QADKK's allegations were
premised entirely on state law.

B
*The Second Action*
 In September 1999, Vedatech and Subramanian filed
their own action in the Santa Clara superior court
against QAD, QADKK, Arthur Anderson LLP, Foon
Lee and John Doordan alleging fourteen causes of
action including, but not limited to, breach of
contract, fraud, constructive fraud, negligent
misrepresentation, trade libel and state unfair
competition (hereinafter, the "second action"). Like
the first action, all claims in the second action were
premised entirely on state law. In the second action,
Vedatech and Subramanian alleged that these
defendants conspired to sabotage (and did sabotage)
Vedatech and Subramanian's contractual performance
of developing software for QAD and QADKK in
Japan. QAD and QADKK filed a counterclaim in the
second action essentially duplicating their affirmative
allegations in the first action. The first and second
actions were consolidated in late 2001 and assigned
to Judge Jack Komar (hereinafter, the "consolidated
action").

C
*The Third Action*
 Between 1997 and 2000, St Paul issued Vedatech
various policies of comprehensive general liability
insurance. Accordingly, on January 14, 1999,
Vedatech and Subramanian tendered to St Paul the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

defense of Vedatech and Subramanian in the first action. St Paul agreed, under a reservation of rights, to provide a defense for Vedatech and Subramanian in the first action (where they were defendants) on May 5, 1999. Moreover, the language of the insurance policy stated, in pertinent part, that "St Paul may, at [its] discretion, investigate any 'occurrence' and settle any claim or suit that may result." St Paul explicitly declined to defend Vedatech and Subramanian regarding the cross-claims filed by QAD and QADKK in the second action.

**\*2** After almost five years of defending Vedatech and Subramanian in the first action, it became clear to St Paul that the events giving rise to the first action occurred entirely in Japan. St Paul's insurance policy with Vedatech and Subramanian, however, provided only domestic coverage. Unsurprisingly, a dispute arose between Vedatech and Subramanian and St Paul regarding liability coverage and indemnity issues under the insurance agreement. Based upon these disputes, on February 8, 2002, St Paul filed an action for declaratory relief (hereinafter, the "third action") in the Santa Clara superior court against Vedatech and Subramanian seeking a judicial determination regarding the scope of St Paul's duty to defend and indemnify Vedatech and Subramanian in the *entire* consolidated action. Vedatech and Subramanian then began asserting that St Paul's duty to defend extended to the second action as well.

 Not to be outdone, Vedatech and Subramanian filed a counterclaim against St Paul alleging a pattern of unfair competition in denying benefits, breach of contract and bad faith. Also in the counterclaim, Vedatech and Subramanian asserted, for the first time, that St Paul had a duty to fund the *prosecution* of Vedatech and Subramanian's affirmative claims in the second action. On June 26, 2002, Subramanian individually removed the third action to this court on the basis of diversity jurisdiction. On October 21, 2002, however, Judge Fogel remanded the third action pursuant to [28 USC § 1446](#) because Vedatech had not joined Subramanian in the petition for removal. See C-02-3061, Doc # 31 (Remand Order). This brief stint in Judge Fogel's court was only the first time, but far from the last, that these parties would darken this court's doors.

### D
#### *Court-Ordered Mediation of Consolidated Action*
 In the meantime, Judge Komar set the consolidated action for trial on May 3, 2004, in state court. While Subramanian appeared *pro se*, Vedatech was represented at all times by counsel, namely Christina

Gonzaga (Gonzaga) of the Law Office of James S Knopf. On January 13, 2004, Judge Komar *verbally ordered* all parties to the consolidated action (including St Paul as Vedatech's insurer) to attend mediation before Wulff, a private mediator. C 04-1249 VRW, Doc # 87, Ex F at 17:13-14 (transcript) (Judge Komar stated: "Right now, I'm *ordering* you [Vedatech and Subramanian] to go to mediation") (emphasis added). Judge Komar chose Wulff based upon St Paul's representation that Wulff was a very skilled mediator whom St Paul had previously worked with on other mediation proceedings. On March 4, 2004, Judge Komar, *in writing,* ordered all parties to attend the Wulff mediation on March 12, 2004. Id, Ex H (Med Order).

 On March 12, 2004, the mediation was held before Wulff with all parties attending. At the mediation, all parties were required to sign a confidentiality agreement that provided, in pertinent part, that "all parties agree that the mediator \* \* \* ha[s] no liability for any act or omission in connection with the mediation." Doc # 54, Ex A (Conf Agreement). Subramanian signed the confidentiality agreement on his own behalf and Gonzaga (as well as James Knopp) signed the agreement on behalf of Vedatech. Id. Although Subramanian altered the wording of portions of the document, those changes did not alter the relevant language quoted above.

**\*3** The mediation commenced at 9:30 am and continued until 4:00 pm when Subramanian and Vedatech's attorneys abruptly left the mediation. But St Paul (as Vedatech's insurer), QAD and QADKK elected to continue the mediation and eventually reached a settlement of the consolidated action (the "settlement agreement"). Under this agreement, QAD and QADKK agreed to release and dismiss, with prejudice, the entire first action (as well as all counterclaims asserted by QAD and QADKK in the second action). Doc # 46, Ex A (Sett Agreement). In consideration of this dismissal, St Paul agreed to pay QAD and QADKK the sum of $500,000. Id at 3. This agreement was signed and executed by QAD, QADKK and St Paul on March 25, 2004. Id at 6-7. Moreover, the settlement agreement specifically provided that Vedatech and Subramanian could continue to litigate their affirmative claims against QAD and QADKK in the second action. Id. Whether St Paul was contractually obligated to fund such prosecution was, of course, a hotly contested issue in the third action.

### E
#### *The Fourth Action*

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

To say that Vedatech and Subramanian were unhappy with the settlement agreement would be an understatement. Specifically, they were unhappy with the settlement agreement to the extent it apparently relieved St Paul from its duty (a duty St Paul vigorously disputes in the third action) of having to prosecute Vedatech's and Subramanian's affirmative claims in the second action. Vedatech and Subramanian turned their anger into action and on March 30, 2004, they filed a lawsuit, in federal court, alleging seven causes of action against St Paul, QAD, QADKK, Wulff and 50 "Doe" defendants (hereinafter, the "fourth action"). This action, based on diversity jurisdiction, was assigned to the undersigned. C 04-1249 VRW Doc # 1. Vedatech and Subramanian filed their first amended complaint on June 15, 2004. Doc # 36 (FAC). The FAC is currently the operative complaint in the fourth action.

The seven "causes of action" pled in the FAC include: (1) declaratory judgment, (2) injunctive relief, (3) fraud, (4) constructive fraud, (5) negligent misrepresentation, (6) insurance bad faith and (7) unfair competition. The sum and substance of Vedatech and Subramanian's 49-page (sometimes unintelligible) FAC appears to be that St Paul, QAD, QADKK, Wulff and 50 unknown defendants covertly conspired and colluded to get Vedatech and Subramanian to "consent" to mediate the consolidated action. Doc # 36 at 19 (stating that Vedatech and Subramanian were "tricked into 'consenting' to mediation before Wulff"). Once this fraudulent plan came to fruition and the mediation took place, the defendants further conspired in an effort to settle the consolidated action on terms that were not in Vedatech and Subramanian's best interests. Id at 9 (stating that St Paul "formulated a strategy for using the secrecy of mediation as a cover for engaging in collusive and bad faith negotiations with QAD * * * and Wulff"). As discussed above, the settlement agreement was not "favorable," according to Vedatech and Subramanian, because it "weaken[ed] Vedatech's [and Subramanian's] legal representation for the affirmative claims" involved in the second action. Id at 19. The FAC was signed by Subramanian, on his own behalf, and Gonzaga, as counsel for Vedatech. All defendants, save the unknown "Doe" defendants, have separately moved for dismissal of the FAC on various grounds. These dispositive motions are currently before the court.

## F
### The Removal Rampage
**\*4** Vedatech and Subramanian's anger did not end with the filing of the fourth action in federal court:

The settlement agreement sent Vedatech and Subramanian on what can only be described as a removal rampage. As described in depth below, from March 15, 2004, to May 6, 2004, Vedatech and Subramanian filed *four* petitions for removal in this court; two petitions involved the consolidated action (the action subject to the settlement agreement) and two petitions involved the third action.

### 1
### Removal # 1
On March 15, 2004, before St Paul and QAD had finalized the settlement agreement, Vedatech and Subramanian removed the consolidated action to this court. The removal petition was assigned to Judge Hamilton. C-04-1035 PJH. Vedatech and Subramanian purportedly removed the consolidated action pursuant to 28 USC § 1446(b), asserting that federal question jurisdiction had arisen on March 10, 2004. In support of the removal, they offered an interrogatory response from QAD and QADKK in which QAD claimed that it reserved all of its rights, including copyrights, in the software that Vedatech and Subramanian had created in Japan. According to Vedatech and Subramanian, this interrogatory response revealed that the basis for QAD's state law claims in the consolidated action was, in actuality, the Copyright Act, 17 USC § § 101 et seq. Since the consolidated action, according to Vedatech and Subramanian, would now require an interpretation of the federal Copyright Act, the consolidated action was removable pursuant to 28 USC § 1446(b).

### 2
### Removal # 2
Additionally, on April 12, 2004, Vedatech and Subramanian removed the third action to this court pursuant to 28 USC § 1446(b). This removal petition, which contained nine exhibits and totaled hundreds of pages, was assigned to Judge Conti. C 04-1403 SC. Vedatech and Subramanian's "removal logic" goes as follows: For St Paul to prevail in the third action (the insurance declaratory relief action), St Paul would be required to "litigate the issues in the underlying cases [i e, consolidated action]," which, as asserted by Vedatech and Subramanian, were now removable pursuant to 28 USC § 1446(b). Thus, according to Vedatech and Subramanian, because the consolidated action now raised a federal question (i e, application of the Copyright Act) and because St Paul would necessarily have to litigate this federal question to prevail in the third action, the third action itself was now removable.

3

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

*Remand # 1*

 On April 29, 2004, Judge Hamilton remanded the consolidated action finding: (1) the consolidated action raised no federal question and thus the court lacked subject matter jurisdiction and (2) even if subject matter jurisdiction existed, the removal was untimely. C 04-1035, Doc # 43 (Remand Order). Vedatech and Subramanian appealed Judge Hamilton's April 29, 2004, remand order to the United States Court of Appeals for the Ninth Circuit. C-04-1305, Doc # 48 (Not App). On August 16, 2004, the Ninth Circuit dismissed Vedatech and Subramanian's appeal pursuant to 28 USC § 1447(d).

4

*Removal # 3 and Remand # 2*

 **\*5** Not content to wait for the Ninth Circuit, Vedatech and Subramanian on May 6, 2004, filed a new petition for removal of the consolidated action pursuant to 28 USC § 1446(b). This new petition was *63* pages long and contained 146 paragraphs purporting to demonstrate that Judge Hamilton had clearly erred in remanding the consolidated action and again argued that federal jurisdiction existed in the consolidated case pursuant to 28 USC § 1446(b). The new removal petition was assigned to Judge Ware. Judge Hamilton, however, intervened on May 26, 2004, and related the second removal petition to the first petition. C-04-1806 PJH, Doc # 15 (Related Case Order). QAD and QADKK filed yet another motion to remand, Doc # 16, and Vedatech and Subramanian immediately sought to have Judge Hamilton *recused* from adjudicating the motion to remand. Judge Hamilton denied the recusal motion and again heard oral arguments on the motion to remand the consolidated case. On July 16, 2004, Judge Hamilton remanded the consolidated action for the second time. In her order, Judge Hamilton stated: "As was true when this same action was [first] removed * * *, the present notice of removal does not establish the existence of a federal question." Doc # 45 (Remand Order). Moreover, Judge Hamilton stated that "should the removing parties remove this action yet another time, the court will invite the QAD parties * * * to file a motion for sanctions under [FRCP] 11." Id.

 Vedatech and Subramanian appealed Judge Hamilton's second remand of the consolidated case to the Ninth Circuit. Doc # 47. The Ninth Circuit, however, dismissed this appeal on August 16, 2004, citing 28 USC § 1447(d). Astonishingly, on August 30, 2004, Vedatech and Subramanian filed a petition for rehearing en banc of the Ninth Circuit's August 16, 2004, order dismissing their appeal of both of

Judge Hamilton's remand orders. On February 16, 2005, the petition for rehearing en banc was denied and on February 23, 2005, Vedatech and Subramanian filed a motion to stay the Ninth Circuit's mandate. As of the date of this order, the motion to stay is still pending before the Ninth Circuit. The court will not speculate whether Vedatech and Subramanian intend to petition the Ninth Circuit's order to the United States Supreme Court for certiorari.

5

*Removal # 4*

 Falling further down the rabbit hole, on May 7, 2004, Vedatech and Subramanian filed a second petition for removal in the third action, which, as described above, had *already been removed* and assigned to Judge Conti for remand determination. C-04-1403 SC. What is more, Judge Conti had not yet remanded the third action to state court; St Paul's motion to remand was still pending before Judge Conti. The second petition for removal of the third action was assigned to Judge Fogel. C-04-1818 JF. The second petition for removal of the third action was signed by Subramanian and Gonzaga.

E

*Present Status of Litigation*

 **\*6** In an attempt to corral this removal beast, on July 2, 2004, the undersigned related the fourth action (04-1249 VRW) and *both* of Vedatech and Subramanian's petitions for removal of the third action (04-1403 VRW and 04- 1818 VRW). The court has received St Paul's motion to remand, Vedatech and Subramanian's opposition and St Paul's reply. C-04-1403, Docs 11, 25, 30. Accordingly, the issue whether to remand the third action has been fully briefed, is currently before the court and is ripe for adjudication.

 In the meantime, Vedatech and Subramanian filed a motion to impose sanctions pursuant to Rule 11 against Wulff in the fourth action. Doc # 61. Wulff opposes this motion. Doc # 63. This motion is also before the court.

 On September 16, 2004, the court heard oral arguments regarding (1) the three motions to dismiss the FAC, (2) St Paul's motion to remand the third action and (3) Vedatech and Subramanian's motion for Rule 11 sanctions against Wulff. Doc # 83. At oral argument, the court invited St Paul, QAD, QADKK and Wulff to file motions for sanctions pursuant to 28 USC § 1927 and Rule 11 against Vedatech and Subramanian. Id. All three have since

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

filed such motions. It is also worth noting that less than one month after the hearing, on October 9, 2004, Gonzaga filed a motion to withdraw as Vedatech's attorney. (04-1249 Doc # 90) (04-1403 Doc # 47) (04-1818 Doc # 27). The court denied this request on October 15, 2004. (02-1249 Doc # 95) (04-1403 Doc # 47) (04-1818 Doc # 27). On March 16, 2005, Gonzaga (having apparently left the Law Offices of James Knopf) and Knopf himself filed a second motion to withdraw as Vedatech's attorney. (02-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). This second motion is currently pending.

Accordingly, for the sake of clarity, the court will summarize the motions that are currently pending before this court. First, St Paul moves this court to remand the third action to state court. (04-1403 Docs 11, 40) (04-1818 Docs 7, 19). Second, QAD, QADKK, St Paul and Wulff separately move to dismiss the FAC in the fourth action. (04-1249 Docs 44, 45, 52). Third, Vedatech and Subramanian request sanctions against Wulff pursuant to FRCP 11. (04-1249 Doc # 61). Fourth, St Paul, QAD, QADKK and Wulff request sanctions pursuant to FRCP 11 and costs and fees pursuant to 28 USC § 1927 against Vedatech and Subramanian. (04-1249 Docs 86, 97, 106) (St Paul 04-1403 Doc # 52) (St Paul 04- 1818 Doc # 32).

Gonzaga and Knopf move to withdraw as counsel of record for Vedatech. (04-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). Additionally, Gonzaga and Knopf have filed a motion to strike portions of Subramanian and Vedatech's opposition to their second motion to withdrawal. (04-1249 Doc # 154) (04-1403 Doc # 71) (04-1818 Doc # 55). Subramanian and Vedatech have filed a motion requesting additional oral argument. (04-1249 Doc # 112) (04-1403 Doc # 63) (04-1818 Doc # 43).

Taking a deep breath, the court proceeds to attempt to resolve these disputes.

## II

### Motion to Remand

**\*7** As discussed above, Vedatech and Subramanian's first petition for removal of the third action (a state declaratory relief action regarding insurance contracts) is based on one single piece of logic: "the removability of the underlying [consolidated action] attaches *mutatis mutandis* to the removability of the insurance case [third action]." C 04-1403, Doc # 6 (Rem Pet) at 5. Moreover, the second petition for removal states that "the [consolidated action] [is] completely preempted by [the Copyright Act]. This,

in turn, justifies removal of this derivative action [third action]." C 04- 1818, Doc # 1 (Rem Pet) at 5.

The court expresses no opinion regarding whether Vedatech and Subramanian's logic is correct. Assuming arguendo that this logic is correct, it is clear that the absence of a federal question in the consolidated action would render the third action unremovable. As mentioned above, this court (per Judge Hamilton) has not once, but *twice,* held that the consolidated action contains no federal question sufficient to confer removal jurisdiction pursuant to 28 USC § 1446(b) and has *twice* remanded the consolidated action to state court. In fact, Subramanian and Vedatech have been threatened with sanctions by Judge Hamilton should they try again to remove the consolidated action to this court.

Accordingly, the question whether a federal question exists in the consolidated action has been answered in the negative by Judge Hamilton--*twice.* Under plaintiffs' own logic, because there is no federal question in the consolidated action, this court must remand the third action for lack of subject matter jurisdiction pursuant to § 1447(c).

Moreover, even if Judge Hamilton's remands were in error (which clearly they were not) and even if the consolidated action between QAD, QADKK, Vedatech and Subramanian hinged entirely on the adjudication of the Copyright Act, this court would *still* lack subject matter jurisdiction over the third action.

As discussed above, the third action is an action for declaratory relief brought by St Paul. St Paul seeks a judicial determination whether it has a duty to defend Vedatech in the consolidated action if the events underlying the consolidated action occurred in Japan. This is a matter governed completely by California law. Under California law, "it has long been a fundamental rule of law that an insurer has a duty to defend an insured if [the insurer] becomes aware of, or if the third-party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Insurance Exchange, Inc.,* 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (citing *Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 276, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)). Accordingly, whether St Paul is under a duty to defend Vedatech in the consolidated action is determined by comparing the facts alleged in the consolidated action complaint and the language of the insuring agreement between St Paul and Vedatech. Even if the underlying claims were federal copyright

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

claims (which they are not), resolution of the third action would hinge on whether the insuring agreement's scope was broad enough to encompass federal copyright claims arising from events that occurred in Japan. This analysis in no way involves interpretation of the Copyright Act; it is simply a matter of state contract interpretation.

 **\*8** Further, although Vedatech and Subramanian are diverse from St Paul, they cannot base their two petitions for removal on this fact; 28 USC 1446(b) requires a defendant to file a petition for removal within thirty days of the point when diversity jurisdiction is established. Vedatech's and Subramanian's petitions were filed more than two years after St Paul initiated the third action in state court.

 No federal question exists in the third action and thus Vedatech and Subramanian's removal pursuant to 28 USC § 1446(b) was improper. Accordingly, St Paul's motion to remand 04-1403 and 04-1818 is GRANTED and the court REMANDS these cases to the Santa Clara superior court pursuant to 28 USC § 1447(c).

 St Paul requests that the court order Vedatech and Subramanian to pay St Paul's reasonable attorney fees and costs incurred in these motions to remand. 28 USC § 1447(c) provides in relevant part: "An order remanding the case may require payment of just costs and any actual expenses, including attorney [ ] fees, incurred as a result of the removal." As this court stated in *Moore v. Kaiser Foundation Hospitals, Inc.,* 765 F.Supp. 1464, 1466 (N.D.Cal.1991), aff'd 981 F.2d 443 (9th Cir.1992):

> As a matter of public policy, the party forced to bring a motion to remand an improperly removed case generally should be fully reimbursed for its costs in remanding the case whether the removal was in bad faith or otherwise. The court's award of fees in this case is not a punitive award against defendants; it is simply reimbursement to plaintiffs of wholly unnecessary litigation costs the defendants inflicted. Attorney fees spent to remand an improperly removed case without bad faith cost just as much as fees spent to remand a case removed in bad faith.

 The court orders the remand of this case and, accordingly, finds that an award of reasonable attorney fees is appropriate. To determine a reasonable attorney fee award, the court employs the lodestar method, under which the court multiplies the number of hours the prevailing party reasonably

expended on the litigation by a reasonable hourly rate. *Yahoo!, Inc. v. Net Games, Inc.,* 329 F Supp 2d 1179, 1182 (N.D.Cal.2004). "[T]o convert the data provided by fee applicants to a 'reasonable attorney fee,' the court first compares the requested number of hours to the number of hours that 'reasonably competent counsel' would have billed." Id at 1188.

 St Paul requests 108.5 hours for services performed by attorneys in connection with (1) the preparation and filing of both motions to remand, (2) its reply to Vedatech's and Subramanian's opposition to its motions to remand and (3) preparation for the September 16, 2004, hearing. Doc # 98, Ex A. Having considered the nature of the complex legal questions created by Vedatech's and Subramanian's voluminous and repetitive removal petitions and memoranda, as well as the quality of the attorneys' work, the court finds the claim for 108.5 hours of attorney time to be reasonable in preparing and defending its motions to remand in these cases.

 **\*9** The court now turns to determining a reasonable hourly rate. More than one methodology exists to make this determination. In *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354 (D.D.C.1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C.Cir.1984) the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience. The *Laffey* methodology is useful when an unusually large fraction of either senior or junior attorney time is necessary, and spent, by counsel on behalf of a client. The *Laffey* methodology allows the court to reflect in the fee award the disproportion of the time spent by senior or junior attorneys at a rate commensurate with such attorneys' market hourly rate. Cf *In re HPL Technologies Inc, Securities Litigation,* 2005 U.S. Dist LEXIS 7244 (ND Cal 2005) (Walker, J). In this case, 13.3 hours were spent by James Greenan who claimed a billing rate of $250/hour and 96 hours by Enoch Wang who claimed a $185/hour billing rate. St Paul requests total fees of $20,738.75. Doc # 162 at 2; Doc # 98, Ex A.

 A "blended hourly rate" rather than the *Laffey* methodology would appear sufficient in this case to reflect the market rate for counsel's services. This is because "[t]he purpose of using prevailing market rates is to estimate the hourly rate reasonably competent counsel would charge[,] * * * [and] not to determine whether or not a specific attorney could command a specific hourly rate in the market." The court concludes, therefore, that "the average market rate in the local legal community as a whole is a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

better approximation of the hourly rate that would be charged by reasonably competent counsel than the actual billing rate charged by a single attorney." *Yahoo!,* 329 F Supp 2d at 1185.

 In several of the court's previous orders, the court has calculated an average market rate in the local legal community as a whole using public data from the United States Census Bureau and Bureau of Labor Statistics ("BLS"). See, e g, *Yahoo!,* 329 F Supp 2d 1179; *Allen v. BART,* 2003 WL 23333580 (N.D.Cal.2003); *Gilliam v. Sonoma City,* 2003 WL 23341211 (N.D.Cal.2003). In *Yahoo!,* the court explained that:

> The BLS provides data on the hourly wages earned by attorneys * * *. To estimate the hourly rates billed to clients, the court first calculated the ratio of net receipts to gross receipts from data compiled by the Census Bureau. This ratio was used to approximate the overhead costs that would be incorporated in the hourly rates billed to clients. The court then divided the BLS wage data ($w$ ) by the ratio of net receipts ($nr$ ) to gross receipts ($gr$ ) to determine an estimated average market rate ($r$ ) * * *.

Id at 1189.

 This methodology is represented by the following equation: r = w / (nr/gr). Stated another way, the average market rate r = w * (gr/nr). The most recent census data describing gross and net receipts by law partnerships are located in "Statistical Abstract of the United States: 2004-2005" ("2004 Statistical Abstract"). See United States Census Bureau, *Statistical Abstract of the United States:* 2004-2005, tbl 718, available at http://www.census.gov/statab/www/. The 2004 Statistical Abstract provides gross and net receipts for the year 2001. For law partnerships, gross receipts totaled $91 billion and net receipts totaled $32 billion. This yields a ratio of net receipts to gross receipts of 0.351. Even though these data are four years old, it is adequate for present purposes because law firm economics should not vary significantly over such a short period.

 **\*10** The most recent data available from the BLS describing hourly wages in the San Francisco area are located in "November 2003 Metropolitan Area Occupational Employment and Wage Estimates San Francisco, CA PMSA," available at http://www.bls.gov/oes/current/oes_7360.htm# b23-0000 ("2003 BLS Wage Estimates"). The BLS provides wage estimates for "Legal Occupations" in the year 2003. The BLS's estimates for lawyers are a median hourly wage of $65.01/hr and a mean hourly wage of $70.23/hr. Id. As in *Yahoo!,* the court selects the higher of the median or mean hourly wage because it is more favorable to the party seeking the grant of attorney fees. Id at 1191.

 Dividing the most recent mean hourly wage for lawyers, $70.23/hr, by the most recent ratio of net to gross receipts, 0.351, yields an estimate of $200/hr (rounded down from $200.08/hr) as the average market rate for lawyers in the San Francisco area. This, of course, is fairly close to the claimed hourly rate of St Paul's counsel. It should not be surprising that a large insurance company would not allow itself to be overcharged for attorney services and indeed it appears that St Paul has done just that. In any event, the court finds that a reasonable or market value attorney fee for the work of St Paul's counsel is: 108.5 hours at $200/hr, yielding a total of $21,700. Accordingly, $20,738.75, the amount requested by St Paul, is a reasonable attorney fees award; indeed, it is actually almost $1,000 *less* than the court's calculation of a market value fee. Given the unitary nature of both petitions for removal, Vedatech and Subramanian are jointly and severally liable for the full amount of St Paul's attorney fees. *Kona Enterprises, Inc. v. Estate of Bishop,* 229 F.3d 877, 888-89 (9th Cir.2000); see also *Pekarsky v. Ariyoshi,* 575 F.Supp. 673, 676-77 (D.Hawai'i 1983) (Schwarzer, J).

 Finally, the court turns to St Paul's motion for sanctions pursuant to FRCP 11(c)(1)(A). This is an appropriate instance in which to impose FRCP 11 sanctions, as filing a frivolous removal petition can be grounds for imposition of Rule 11 sanctions if there is no "good faith argument" for removal. *Hewitt v. City of Stanton,* 798 F.2d 1230, 1233 (9th Cir.1986); accord *Midlock v. Apple Vacations West, Inc,* 2005 U.S. App LEXIS 6718 (7th Cir2005).

 The court will liberally construe the phrase "good faith argument" and thus will not sanction Vedatech and Subramanian for the filing of the *first* petition of removal (although Vedatech and Subramanian will, as discussed above, pay St Paul's costs on attorney fees associated with the first petition). No amount of leniency, however, can excuse the frivolousness of the *second* petition for removal of the third action. As discussed above, when Vedatech and Subramanian removed the third action for the second time, Judge Conti had not adjudicated the *first* removal. Accordingly, there was no action to remove from the state court, as this court had jurisdiction over the third action as soon as it was removed the first time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 8
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

28 USC § 1446(d). To make matters worse, the second petition (which is hundreds of pages in length) essentially duplicates the meritless arguments enumerated in the first petition. Accordingly, to call the second petition frivolous would be an understatement. The question is not whether the court should impose sanctions, the question is how much.

 **\*11** Rule 11 applies to *pro se* plaintiffs like Subramanian. *Warren v. Guelker,* 29 F.3d 1386, 1390 (9th Cir.1994). In determining whether to sanction a *pro se* plaintiff, however, the Ninth Circuit urges district courts to use caution. Id. But even exercising extreme caution, the court determines sanctions are appropriate against Subramanian. "Rule 11 is intended to \* \* \* *deter* [ ] [parties] who submit motions or pleadings which cannot reasonably be supported in law or fact." *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir.1986) (emphasis added). Subramanian has repeatedly abused the federal removal statutes and shows no signs of stopping this practice. He has filed not one, but *four* frivolous petitions for removal, causing continuous and unnecessary congestion of this court's docket. Moreover, this court (per Judges Hamilton, Fogel, Conti and the undersigned) has expended a large amount of judicial resources in adjudicating these petitions. Clearly, the only way to deter Subramanian from engaging in this behavior again is to invoke the monetary penalties of Rule 11.

 The reprehensible conduct engaged in by Subramanian is magnified when it is applied to Gonzaga, an attorney. It is clear that Gonzaga (throughout this litigation) has simply signed off on a myriad of frivolous motions and pleadings drafted by Subramanian--including all four petitions for removal. As an officer of this court, Gonzaga owes a duty not to file papers that are procedurally defective and substantively indefensible. The second petition for removal of the third action alone demonstrates that Gonzaga has *egregiously* breached her duty to this court. The only method to deter Gonzaga from engaging in this type of reckless legal representation where she simply signs off on motions drafted by a *pro se* litigant is to invoke Rule 11.

 In determining the appropriate amount of sanctions, the court is guided by the touchstone of Rule 11: Deterrence. As between Subramanian and Gonzaga, the court concludes it is Subramanian who needs to be deterred more from filing in the future frivolous motions, petitions and complaints. It is clear from Gonzaga's motion to withdraw as counsel for Vedatech that she is suffering the consequences of

simply allowing Subramanian to run the show in this litigation; the court doubts Gonzaga will make this error in judgment again. Accordingly, the court SANCTIONS Gonzaga $5,000 pursuant to Rule 11.

 Turning to Subramanian, the court concludes that although a sanction pursuant to Rule 11 is required to deter future frivolous filings, the large amount of attorney fees and costs already imposed on Subramanian to compensate St Paul and the amount that will be imposed on him to compensate Wulff, see *infra* Part III(B), will certainly serve the function of deterring similar filings in the future. Accordingly, the court SANCTIONS Subramanian $1,000 pursuant to Rule 11. Subramanian is admonished, however, that the court will not hesitate to impose much harsher Rule 11 sanctions should he continue to engage in the conduct described in this order. If Subramanian files in this court (1) another frivolous petition for removal, (2) any frivolous motions in these cases, (3) a new frivolous cause of action or (4) any other filing worthy of Rule 11 sanctions, the court will impose sanctions at $1,000 per page of each filing.

 **\*12** Pursuant to FRCP 11(c)(1)(2), Gonzaga and Subramanian's sanctions are to be paid to the court on or before July 25, 2005.

 Finally, to the extent St Paul seeks sanctions relating to Vedatech and Subramanian's filing of the FAC (as opposed to the two removal petitions), St Paul's motion is DENIED.

### III
### *Motions to Dismiss*
 As mentioned above, in apparent anger over the settlement reached between St Paul, QAD and QADKK regarding the consolidated action, on March 30, 2004, Vedatech and Subramanian filed the fourth action in this court. Doc # 1. On June 15, 2004, Vedatech and Subramanian filed the FAC. Doc # 35. Named as defendants in the FAC are: (1) St Paul, (2) QAD, (3) QADKK, (4) Wulff and (5) 50 "Doe "defendants. Id. The 49-page, 160-paragraph FAC is truly a frightful piece of legal work. The FAC (1) makes dozens of unintelligible factual assertions; (2) is fraught with arguments, unsupported conclusions and case law citations; (3) contains two portions written as if the FAC were an opposition to a motion to dismiss and (4) even contains an internet article concerning mediation.

 The complaint lists seven "causes of action": (1) declaratory judgment; (2) injunctive relief; (3) fraud

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

and conspiracy to commit fraud; (4) constructive fraud and conspiracy to commit constructive fraud; (5) negligent misrepresentation; (6) breach of covenant of good faith and fair dealing; and (7) state unfair competition. As a preliminary matter, the court must dismiss one of these seven claims out of hand. Vedatech and Subramanian's "second cause of action" is titled "INJUNCTIVE RELIEF." Id at 28. Under California law, however, "[i]njunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted." *Shell Oil Co., Inc v. Richter, 52 Cal.App.2d 164, 168, 125 P.2d 930 (1942)* (citing *Williams v. Southern Pacific R R Co., 150 Cal. 624, 89 P. 599 (1907)*). Accordingly, Vedatech and Subramanian's claim for injunctive relief is dismissed pursuant to FRCP 12(b)(6).

All defendants (save the Doe defendants) move to dismiss the FAC in its entirety under various state and federal rules.

A
*Wulff's Motion to Dismiss*

Vedatech and Subramanian allege five causes of action against Wulff: (1) declaratory judgment; (2) fraud; (3) constructive fraud; (4) negligent misrepresentation and (5) state unfair competition. In sum, Vedatech and Subramanian appear to allege that Wulff was not a neutral mediator but instead was biased in favor of St Paul which had used his services previously. Because Wulff was apparently biased towards St Paul, he (1) "tricked" Vedatech and Subramanian into signing the mediation confidentiality agreement, (2) did not terminate the mediation when Vedatech and Subramanian exited and (3) conspired with St Paul and QAD to create a settlement that harmed Vedatech and Subramanian. The court concludes that Wulff is immune from the claims asserted against him in the FAC.

**\*13** California law, which this court is required to apply in diversity actions pursuant to *Erie Railroad Co v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)*, grants "quasi-judicial immunity" to persons who "fulfill quasi-judicial functions intimately related to the judicial process." *Howard v. Drapkin, 222 Cal.App.3d 843, 847, 271 Cal.Rptr. 893 (1990)*. In *Howard,* the parties to an underlying custody dispute stipulated that a psychologist could act as an independent fact-finder and make non-binding recommendations regarding allegations of physical and sexual abuse to the judge presiding over the dispute. *Id at 848, 271 Cal.Rptr. 893.* This stipulation was ultimately signed by the court and

converted into an order. Id. The child's mother subsequently disagreed with the psychologist's findings and recommendations, asserting that the psychologist (1) was abusive during the six-hour mediation-like setting, (2) negligently prepared her findings so as to include false statements and omit critical information and (3) failed to disclose certain conflicts of interest and lack of expertise in child abuse matters. Id.

Based upon such allegedly inappropriate behavior, the mother filed a civil lawsuit against the psychologist, pleading causes of action for (1) fraud, (2) negligent misrepresentation, (3) professional negligence, (4) intentional infliction of emotional distress and (5) negligent infliction of emotional distress. The psychologist filed a general demurrer, contending that she enjoyed quasi-judicial immunity from the mother's suit. *Id at 850, 271 Cal.Rptr. 893.* The trial court agreed and sustained the demurrer and the California court of appeal affirmed.

The *Howard* court began by stating that "under the concept of quasi-judicial immunity, California courts have extended absolute immunity to persons other than judges if those persons act in a judicial or quasi-judicial capacity." *Id at 852-53, 271 Cal.Rptr. 893.* Such persons include court commissioners, grand jurors, administrative law hearing officers, arbitrators and prosecutors. *Id at 853, 271 Cal.Rptr. 893.* Moreover, the court explicitly rejected the idea that only "public" officials enjoyed quasi-judicial immunity, for "if there were so, then arbitrators would not be protected by * * * [such] immunity." *Id at 854, 271 Cal.Rptr. 893.* The court further noted "the relevant policy considerations of attracting to an overburdened judicial system the independent and impartial services and expertise upon which that system necessarily depends." *Id at 857, 271 Cal.Rptr. 893.* Accordingly, the court held that all "nonjudicial persons who fulfill quasi-judicial functions intimately related to the judicial process should be given absolute quasi-judicial immunity for damage claims arising from their performance of duties in connection with the judicial process." Id.

"Without [this] immunity, such persons will be reluctant to accept court appointments or provide work product for the courts." Id. Moreover, "in order to best protect the ability of neutral third parties to aggressively *mediate* and resolve disputes, a dismissal at the very earliest stage of the proceedings is critical to the proper functioning and continued availability of these services." Id at 905 (emphasis added).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

**\*14** Quite appropriately, Wulff cites *Howard* in support of his motion to dismiss all claims against him in this case. It is very telling that Vedatech and Subramanian's 25-page opposition to Wulff's motion to dismiss devotes only two pages squarely to addressing the *Howard* decision (while various and unintelligible other references to *Howard* are sprinkled throughout). Doc # 65 at 15-17. Inexplicably, Vedatech and Subramanian devote twelve pages of their opposition to reciting (unnecessarily) the status of quasi-judicial immunity under *federal* law (i e, statutes and Supreme Court decisions). Id at 3-14, 271 Cal.Rptr. 893 (concluding that "[i]t is clear that federal law is conclusively against the grant of any such immunity to private commercial mediators such as defendant Wulff."). But it is *state* law, not federal law, that controls this court's analysis in diversity cases. See *Erie,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

Vedatech and Subramanian's opposition makes, in essence, two arguments why *Howard'* s logic does not mandate the dismissal of all claims against Wulff. First, they argue that *Howard,* insofar as it extended quasi-judicial immunity to "neutral third-party participants in the judicial process" was "unnecessary dictum," and thus is not binding on this court under *Erie.* Doc # 65 at 16. At one point, Vedatech and Subramanian even make the assertion that *Howard'* s extension of quasi-judicial immunity "is double-dicta." Id at 15. Next, Vedatech and Subramanian argue that "it is clear * * * that the California Supreme Court itself is highly unlikely to uphold the [*Howard* ] decision, and most certainly not for the extension of immunity to private commercial mediators." Id at 2, 271 Cal.Rptr. 893. The court finds both arguments to be wholly without merit.

Far from being "unnecessary dictum" or "double dicta," *Howard'* s holding that "nonjudicial persons who fulfill quasi-judicial function * * * should be given absolute quasi-judicial immunity" was the court's *ratio decidendi.* In fact, the court devoted thirteen of the opinion's seventeen pages to the discussion of quasi-judicial immunity. Moreover, *Howard* was not appealed to the California Supreme Court and thus the assertion that *Howard* will not be "upheld" by the California Supreme Court is not only unpersuasive, but plainly wrong. Nor do Vedatech and Subramanian offer any convincing explanation why the California Supreme Court would disapprove of the reasoning in *Howard.* Indeed, *Howard* has been binding California precedent for over 14 years and a search of subsequent treatment of *Howard* by

California courts does not reveal a *single* instance of negative treatment among the 22 cases which have cited it.

Under *Howard,* Wulff is immune from all claims asserted against him in the FAC. Accordingly, the court GRANTS Wulff's motion to dismiss with prejudice pursuant to 12(b)(6). Because the court finds Wulff immune from the claims asserted in the FAC, it is unnecessary to decide whether communications made by Wulff during mediation are protected by Cal Civ Code § 47(b) or whether Vedatech and Subramanian have failed to exhaust state ADR-grievance remedies pursuant to Cal R Court 1622.

### B

*Rule 11 Sanctions Against Wulff*

**\*15** On August 12, 2004, Vedatech and Subramanian filed a motion for sanctions pursuant to FRCP 11 against Wulff, his attorneys Douglas Young and Jessica Nall and the entire law firm of Farella, Braun & Martel LLP (Farella). Doc # 61.

Throughout Wulff's motion to dismiss the FAC, Wulff refers to himself as a "court-appointed" mediator, thus deserving of *Howard'* s immunity. Vedatech and Subramanian claim each time this label precedes Wulff's name, a "bad faith misrepresentation" to this court has occurred because the Santa Clara superior court never "appointed" Wulff as a mediator.

Vedatech and Subramanian never specify which part of Rule 11 Wulff has allegedly violated, but since the sanctions are directed at Wulff's defenses, the court presumes Rule 11(b)(2) is the relevant provision. Rule 11(b)(2) prohibits claims and defenses that are not "warranted by existing law or by a nonfrivolous argument for the extension or modification" of such law.

Far from being unwarranted by existing law, Wulff's claim that he was a court-appointed mediator is objectively true. Judge Komar's March 4, 2004, order states that all parties are to attend mediation before Wulff. Vedatech and Subramanian, however, argue that this order does not make Wulff court-appointed: "This order does not in any way 'appoint' Mr Wulff as a mediator, is not directed to Mr Wulff in any way or manner whatsoever, and does not create any official relationship between the Court and Mr Wulff." Doc # 61 at 6. Thus, because Judge Komar's order was directed to the parties, rather than Wulff himself, Wulff is not "court-appointed" even though all parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

were ordered to mediate before him. Rule 11 sanctions cannot be based upon such meaningless word play.

 Further demonstrating the baseless nature of this Rule 11 motion, Subramanian himself recognizes that *Howard'* s grant of immunity applies to mediators *regardless* whether the mediator has been court-appointed. See Doc # 87 (Nall Decl), Ex C (9/16/04 Transcript) at 54:25-55:2 (acknowledging that *"Howard v. Drapkin* does not necessitate that the mediator be a court-appointed mediator in order to qualify under its reasoning for absolute immunity.")

 Vedatech and Subramanian's motion to impose Rule 11 upon Wulff and his attorneys is DENIED.

 The court may award to the person who prevails on a motion under Rule 11 reasonable expenses, including attorney fees, incurred in presenting or opposing the motion. See Advisory Committee Notes to 1993 Amendments to FRCP 11. Because courts may award fees to a party that prevails on a Rule 11 motion, "a cross motion under Rule 11 should rarely be needed." Id. As the target of, and prevailing party on Vedatech's and Subramanian's Rule 11 motion, Wulff is entitled to an award of attorney fees. The court will employ the same calculation method explained above in awarding St Paul its attorney fees under § 1447(c). See *supra* Part III.

 Wulff requests 197.8 hours for services performed by attorneys at Farella in  (1) researching and drafting an opposition to Vedatech's and Subramanian's motion for Rule 11 sanctions, (2) preparing for and attending oral argument on the Rule 11 motion and (3) researching and drafting Wulff's counter-motion for sanctions. Doc # 87 (Nall Decl) at 3-4. The court finds this to be an unreasonable expenditure of attorney resources.

 **\*16** Among the factors to be taken into account in the reasonable hours component of the lodestar calculation is (1) the novelty and complexity of the issues and (2) the quality of the attorneys' work. *Morales v. City of San Rafael,* 96 F.3d 359, 364 (9th Cir.1996). Vedatech's and Subramanian's Rule 11 motion is essentially five pages in length and the alleged grounds for sanctions are hardly novel or complex. And while the quality of the attorneys' work is high, Wulff is not entitled recover for extraordinary hours incurred by a legal dream team; he is entitled to recover for the number of hours a reasonably competent counsel would have billed. Additionally, the court does not doubt that the Farella attorneys

spent a large amount of time preparing and strengthening Wulff's defense; Wulff is a former Farella partner. The fact that Wulff's attorneys worked almost 200 hours, however, does not make this number of hours reasonable.

 Indeed 197.8 hours represents about one-tenth of a lawyer's annual billable hours. Put in this context, the unreasonableness of this extraordinary number of hours is evident. After reviewing (1) Vedatech's and Subramanian's Rule 11 motion, (2) Wulff's opposition, (3) the time needed to prepare oral argument and (4) Wulff's counter-motion for sanctions, the court concludes that it would take a reasonable lawyer about two weeks of billable time-- or 75 hours-- effectively to oppose Vedatech's and Subramanian's Rule 11 motion. Multiplying this reasonable number of hours by the average market rate for lawyers in the San Francisco area calculated above, the court concludes that Wulff is entitled to $15,000 (75 hours x $200/hour). Accordingly, Vedatech and Subramanian are jointly and severally liable to Wulff for $15,000 incurred in opposing the unnecessary Rule 11 motion.

 Additionally, Wulff moves for sanctions against Vedatech and Subramanian pursuant to 28 USC § 1927. Doc # 86. Wulff bases his § 1927 cross-motion on Vedatech and Subramanian's "obstinate refusal to acknowledge the effect of" *Howard.* Id at 6, 271 Cal.Rptr. 893.

 "Any * * * person * * * who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct." 28 USC § 1927. As this court has stated: The purpose of § 1927 is "to deter attorneys from multiplying legal proceedings unnecessarily, and to compensate attorneys forced to endure such proceedings." *Winfield v. Beverly Enterprises,* 1994 U.S. Dist LEXIS 2855, *10 (ND Cal 1994) (Walker, J). Sanctioning a party under § 1927 requires a "finding of recklessness or bad faith." *Barber v. Miller,* 146 F.3d 707, 711 (9th Cir.1998). "Bad faith is present when a [party] knowingly or recklessly raises a frivolous argument." *Estate of Blas v. Winkler,* 792 F.2d 858, 860 (9th Cir.1986). Finally, "section 1927 sanctions may be imposed on a *pro se* plaintiff." *Wages v. IRS,* 915 F.2d 1230, 1235-36 (9th Cir.1990).

 **\*17** The court agrees that Vedatech and Subramanian, recklessly *and* in bad faith, multiplied

the legal proceedings against Wulff by recklessly raising frivolous arguments regarding the inapplicability of *Howard.* Wulff *repeatedly* and *clearly* informed Vedatech and Subramanian of *Howard'*s holding regarding quasi-judicial immunity and urged Vedatech and Subramanian to dismiss Wulff from the current suit. Vedatech and Subramanian refused and instead chose to make substantively indefensible attempts to distinguish *Howard.* First, they argued that Wulff was not "court appointed," as was the psychologist in *Howard.* This argument, however, has since been repudiated by Vedatech and Subramanian. Doc # 128 at 7 (admitting that "the psychologist in *Howard v. Drapkin* was not 'court-appointed'). Next, Vedatech and Subramanian argued that this court should not follow *Howard* because (1) the holding regarding quasi-judicial immunity is mere "dictum," and (2) the California Supreme Court is imminently preparing to overrule *Howard.* These legal contentions are unwarranted by existing law. As discussed above, there is *no indication* that this fourteen-year-old decision, relied upon by numerous lower courts, is about to be overruled by the California Supreme Court; Vedatech and Subramanian's conclusory assertion to the contrary is baseless and not offered in good faith. Finally, calling *Howard'*s quasi-judicial immunity holding "dictum" evidences a fundamental ignorance (either intentional or reckless) of the ability to read case law. This ignorance, however, is no defense to Wulff's cross-motion for fees and costs. See *Temple v. WISAP USA,* 1993 U.S. Dist LEXIS 18453, *19 (D Neb 1993) ("Mistaken judgment, ignorance of law or personal belief with regard to what the law should be," does not negate the filing of a legally baseless document).

No doubt Vedatech and Subramanian wish *Howard* did not exist or that its holding could be characterized as dictum. These personal beliefs, however, do not constitute good faith legal arguments. The court concludes that Wulff should never have been forced into defending himself against Vedatech and Subramanian's vexatious, frivolous and legally deficient claims in the FAC; he should have been dismissed from the outset. Vedatech and Subramanian, however, "unreasonably and vexatiously" multiplied the proceedings in this case against Wulff as prohibited by § 1927.

Accordingly, the court GRANTS Wulff's motion for § 1927 sanctions. Wulff states that his attorneys billed 290.9 hours for services performed and $2,300 in costs incurred in researching and drafting his motion to dismiss the FAC. Doc # 87 at 4. All attorneys at Farella who worked on Wulff's case, however, charged a uniform "reduced rate" of $225/hour. Id. Accordingly, Wulff claims he incurred $67,752.50 in attorney fees, costs and expenses associated with defending against the FAC (290.0 hours x $225/hour = $65,452.50 + $2,300 in costs = $67,752.50). This amount seems too high. This is confirmed by Wulff's request for only one-third of this amount, $22,584.16 or, alternatively, $70/hour ($22,584.16--$2,300 = $20,284.16 / 290.9 = $69.73/hour). Id at 5, 271 Cal.Rptr. 893.

**\*18** Farella does not fully explain the steep discount from their claimed normal billing rates. This seems to confirm that counsel's so-called normal billing rates are the starting point for negotiations concerning fees. In any event, in this case, the court need not explore all the details as the amount claimed by Wulff appears reasonable. Applying the $200/hr average market rate (not the $225/hour rate of the Farella attorneys) to the requested $20,284.16 for attorney fees, it appears Wulff's request for fees is tantamount to seeking compensation for 101.42 hours reasonably expended in defending against the FAC ($20,284.16/$200 = 101.42).

Having considered the tangled and complicated nature of the legal and factual issues raised by Vedatech's and Subramanian's 49-page FAC, as well as the quality of the attorneys' work product, the court finds the claim for 101.42 hours of attorney services and $2,300 in legal research and duplicating costs to be reasonable in preparing and defending Wulff's motion to dismiss the hefty FAC. Accordingly, the court finds the following award of attorney fees and costs justified: 101.42 hours at $200/hour, yielding $20,284. The court then adds the $2,300 incurred in duplication and legal research, yielding the requested total of $22,584.

Accordingly, pursuant to § 1927, the court finds Subramanian and Vedatech jointly and severally liable to Wulff for $22,584 in attorney fees, costs and expenses incurred in defending against the FAC.

### C
### *St Paul's and QAD's Motions to Dismiss*
St Paul, QAD and QADKK all move to dismiss the FAC in its entirety pursuant to FRCP 12(b)(6). Docs # 44 (St Paul Mot), # 45 (QAD/QADKK Mot). Because the legal arguments offered by St Paul and QAD in support of their individual motions substantially overlap and because Vedatech and Subramanian address both motions in a single opposition memorandum, Doc # 66, the court will

Not Reported in F.Supp.2d                                                                                        Page 13
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

address these two dispositive motions in tandem.

### 1

FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Although a plaintiff is not held to a "heightened pleading standard," the plaintiff must provide more than mere "conclusory allegations." *Swierkiewicz v. Sorema NA,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (rejecting heightened pleading standards); *Schmier v. United States Court of Appeals for the Ninth Circuit,* 279 F.3d 817, 820 (9th Cir.2002) (rejecting conclusory allegations).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle [her] to relief." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); see also *Conley,* 355 U.S. at 45-46. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See *In re Silicon Graphics Inc. Sec Lit.,* 183 F.3d 970, 980 n10 (9th Cir.1999). But "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001) (citing *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994)).

**\*19** Review of a FRCP 12(b)(6) motion to dismiss is generally limited to the contents of the complaint, and the court may not consider other documents outside the pleadings. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir.2001). The court may, however, consider documents attached to the complaint in connection with a motion to dismiss. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Additionally, the court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." See *Lapidus v. Hecht,* 232 F.3d 679, 682 (9th Cir.2000) (internal quotation omitted).

### 2

### *Declaratory Relief*

In their first cause of action, Vedatech and Subramanian ask this court for a declaratory

judgment pursuant to 28 USC § 2201. Regarding St Paul, Vedatech and Subramanian seek fourteen judicial declarations. Doc # 35 (FAC) at 25-27. This lengthy list of requested declarations, in essence, requests this court to declare that: (1) the settlement agreement with QAD is null and void; (2) St Paul had no authority to enter into this agreement and (3) St Paul has acted in bad faith and breached its fiduciary duties to Vedatech and Subramanian in entering into the settlement agreement. Regarding QAD and QADKK, Vedatech and Subramanian ask this court to declare that: (1) QAD and QADKK cannot rely upon the settlement agreement as a defense to Vedatech and Subramanian's affirmative claims in the second action and (2) any release of claims (affirmative or counterclaims) by QAD and QADKK under the settlement agreement are final.

The court begins by noting the contradictory nature of these requested declarations; Vedatech and Subramanian ask the court to declare the settlement agreement non-binding on Vedatech and Subramanian, but then request the court declare it binding and final on QAD and QADKK. More importantly, however, the court notes the duplicative nature of these declarations--the issues underlying these declarations (e g, the validity of the agreement, St Paul's authority to enter into the agreement and the presence of bad faith) are *all* squarely before the Santa Clara superior court in the twice-remanded consolidated action and in the now-remanded third action. Whether the settlement agreement is binding, void, unconscionable or the product of bad faith are all arguments that can be made to Judge Komar, the judge who will actually be the one to enforce the settlement agreement in the consolidated action. Moreover, Vedatech and Subramanian recognize this fact in their opposition by stating: "Any effect of any order preventing QAD and St Paul from proceeding with their 'settlement,'" will be *exactly the same as an order that may be obtained within either of the underlying cases."* Doc # 66 at 6-7. The court agrees with Vedatech and Subramanian's assertion.

Accordingly, Vedatech and Subramanian are asking the court to issue a declaratory judgment regarding certain contractual rights they, St Paul, QAD and QADKK *may* or *may not* have in two pending state court cases. It is clear that Vedatech and Subramanian are wary regarding whether Judge Komar will decide to enforce the settlement agreement. This apprehension, however, is insufficient to justify this court exercising its discretion to issue declaratory relief. The Ninth Circuit has made clear that the purpose of declaratory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 14
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

relief in federal courts is not to "provide insurance against [a] state court deciding the * * * issues less favorably than a district court." *Exxon Shipping Co. v. Airport Depot Diner, Inc.*, 120 F.3d 166, 169 (9th Cir.1997). "Declaratory relief is not authorized so that lower federal courts can sit in judgment over state courts, *and it is not a substitute for removal." Id at 170* (emphasis added). See also 26 CJS Declaratory Judgments § 120 ("The declaratory judgment procedure should not be employed by federal courts to control state action, or to bring into the federal courts actions which are pending in the state courts.").

**\*20** Under *Exxon*, Vedatech and Subramanian cannot avoid Judge Komar's adjudication of issues squarely before him in state court by seeking declaratory relief in federal court. Accordingly, the court refuses to exercise its discretion in issuing declaratory relief and GRANTS St Paul's, QAD and QADKK's motions to dismiss with prejudice Vedatech and Subramanian's first cause of action for declaratory relief.

### 3
### *Fraud*

Next, Vedatech and Subramanian assert causes of action for fraud against St Paul, QAD and QADKK. Doc # 35 (FAC) at 31-35. Vedatech and Subramanian contend that St Paul intentionally "failed to disclose the nature and details of [its] prior contacts and relationship with Wulff." Id at 32. St Paul intentionally withheld this information, according to Vedatech and Subramanian, to "induce them to attend the mediation under terms that were favorable to [St Paul, QAD and QADKK] and harmful to [Vedatech and Subramanian]." Id at 33. Moreover, QAD and QADKK "became aware of [St Paul's] fraudulent schemes during the mediation," but "with an intent to harm Vedatech [and Subramanian] * * * QAD participated in the ongoing fraudulent scheme * * * rel[ying] upon the idea that the cloak of secrecy in mediation can be used to engage in fraudulent and collusive schemes * * *." Id at 35. Finally, Vedatech and Subramanian assert that they indeed relied upon these fraudulent omissions when they "consented" to attend the mediation and thus the fraud has caused them "heavy damages." Id at 34.

To prevail on a claim for fraud in California, Vedatech and Subramanian must prove by a preponderance of the evidence that: (1) St Paul, QAD and QADKK made a knowingly false representation; (2) the false representation was made with the intent to deceive or induce reliance by Vedatech and

Subramanian; (3) Vedatech and Subramanian justifiably relied on these false representations; and (4) they incurred damages resulting from the fraud. *Smith v. Allstate Insurance Co.,*, 160 F Supp 2d 1150, 1152 (S.D.Cal.2001) (citing *Wilkins v. Nat'l Broadcasting Co.,* 71 Cal.App.4th 1066, 84 Cal.Rptr.2d 329 (1999)). Additionally, alleged material omissions (as alleged in this case) may constitute a "false representation" under the first element of fraud "when the defendant[s] had exclusive knowledge of material facts not known to the plaintiff[s]." *Wilkins,* 71 Cal.App.4th at 1082, 84 Cal.Rptr.2d 329.

The court cannot grant St Paul's, QAD's and QADKK's 12(b)(6) motion to dismiss unless it appears beyond doubt that Vedatech and Subramanian can prove no set of facts in support of their fraud claim which would entitle them to relief. *Hughes,* 449 U.S. at 9.

Vedatech and Subramanian claim that St Paul, QAD and QADKK concealed a material fact (known only to them) when they failed to disclose that Wulff had conducted prior mediations for St Paul. Assuming that St Paul withheld such information, under *Wilkins,* such an omission could meet the first element of a fraud claim. Next, they claim that these omissions and representations were made to induce Vedatech and Subramanian to consent to mediation before Wulff and thus the second element of a fraud claim could be proven. Vedatech and Subramanian's own submissions to the court, however, show that they can prove no set of facts that would meet the third and fourth elements of a fraud claim. Vedatech and Subramanian assert that they "were unaware of the information that was deliberately withheld from them, and relied upon these misrepresentations * * * in consenting" to attend mediation before Wulff. Doc # 35 at 34. No facts can support this assertion for, quite simply, it is not true. Vedatech and Subramanian did not "consent" to mediate before Wulff; they were ordered--*twice*--by Judge Komar to attend the Wulff mediation. Judge Komar first ordered Vedatech and Subramanian to attend this mediation on February 6, 2004. Doc # 84, Ex 6 (Med Order) ("It is ORDERED that Mani Subramanian is required by the Court to appear in person at mediation with St Paul and QAD parties in front of Randall Wulff * * *. Failure to appear at the mediation will bring Mr Subramanian in contempt of the Court * * *."). What is more, it was Vedatech and Subramanian, not any of the defendants, that supplied the court with a copy of Judge Komar's February 6, 2004, order. On March 4, 2004, Judge Komar again

ordered the parties to attend mediation before Wulff. Doc # 46, Ex B (2d Med Order). Accordingly, Vedatech and Subramanian cannot prove facts showing their attendance at the mediation was *based upon* justifiable reliance on defendants' alleged omissions; their attendance was based upon court order. Because they can offer no facts to prove this third element of fraud, Vedatech and Subramanian have failed to state a cause of action for fraud.

**\*21** Because St Paul, QAD and QADKK cannot be held liable in tort for fraud, it follows that none can be liable for conspiracy to commit fraud. "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort. A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Allied Equipment Corp. v. Litton Saudi Arabia Limited,* 7 Cal.4th 503, 511, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) (internal quotations and citation omitted).

 For these reasons, St Paul's, QAD's and QADKK's motions to dismiss with prejudice the FAC's claims of fraud and conspiracy to commit fraud are GRANTED.

### 4
### *Constructive Fraud*

 Next, Vedatech and St Paul assert a cause of action for constructive fraud against St Paul. Doc # 35 at 36. For the reasons discussed above in connection with dismissal of the fraud claims, Vedatech and Subramanian have failed to state a claim for constructive fraud.

 "Unlike actual fraud, constructive fraud depends on the existence of a fiduciary relationship of some kind * * *. The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." *Younan v. Equifax, Inc.,* 111 Cal.App.3d 498, 516-17n14 (1980). Vedatech and Subramanian assert that St Paul owed them a fiduciary duty as an insurer and thus element one is met (QAD and QADKK have no fiduciary relationship with Vedatech and Subramanian). Next, they claim that St Paul failed to disclose its prior connections with Wulff with the intent to deceive Vedatech and Subramanian into consenting to attend the mediation (element two and three). The fact that Judge Komar *ordered* Vedatech and Subramanian to attend the Wulff mediation, however, prevents them from

proving facts to support the last element of constructive fraud. Again, Vedatech and Subramanian's attendance at the mediation was not the product of reliance on any alleged omission by St Paul; *the attendance was court-ordered.*

 For the same reasons discussed above in relation to conspiracy to commit fraud, Vedatech and Subramanian cannot state a cause of action for conspiracy to commit constructive fraud. See *supra* Part IV(C)(3). St Paul's motion to dismiss with prejudice the FAC's claim of constructive fraud and conspiracy to commit constructive fraud is GRANTED.

### 5
### *Negligent Misrepresentation*

 Next, Vedatech and Subramanian assert a cause of action against St Paul for negligent misrepresentation. Doc # 35 at 39. The allegations underlying this claim are the same omissions used to form the basis for the fraud and constructive fraud claims (i e, failure to disclose St Paul's prior connection with Wulff). In California, however, negligent misrepresentation requires a "positive" assertion or representation which is false; representation by omission is not sufficient. *Byrum v. Brand,* 219 Cal.App.3d 926, 942, 268 Cal.Rptr. 609 (1990). See also *Sharp v. Hawkins,* 2004 U.S. Dist LEXIS 22928, * 11 (ND Cal 2004) (stating that under California law, "omissions or non-disclosure * * * standing alone are insufficient to sustain a claim for negligent misrepresentation." (citing *Byrum,* 219 Cal.App.3d at 942, 268 Cal.Rptr. 609)).

**\*22** Because Vedatech and Subramanian's claim for negligent misrepresentation is based upon non-disclosures, the court GRANTS St Paul's motion to dismiss with prejudice the FAC's claims for negligent misrepresentation.

### 6
### *Insurance Bad Faith*

 Next, Vedatech and Subramanian assert a cause of action against St Paul for  "insurance bad faith (breach of covenant of good faith and fair dealing)." Doc # 35 at 40-42. In support of this claim, Vedatech and Subramanian offer the court a laundry list of alleged bad faith acts committed over a period of years by St Paul. Id. The court, however, need not determine whether Vedatech and Subramanian have stated a cause of action for "insurance bad faith," for even if such a claim has been stated, the court must abstain from adjudicating this claim pursuant to *Colorado River Water Conservation District v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

*United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

 As ordered above, the third action is remanded back to state court (State Docket No 1-02-CV-805197). See *supra* Part III. In the third action, St Paul seeks a judicial declaration regarding the scope of its duty to defend Vedatech and Subramanian in relation to the consolidated action as well as other issues surrounding the insurance policy. Vedatech and Subramanian filed a counterclaim in the this action alleging "insurance bad faith." In fact, just prior to removing the third action to this court, Vedatech and Subramanian filed their 112-page fourth amended cross-complaint against St Paul in state court. See 1-02-CV-805197, Doc # 121. Moreover, in asserting the claim for insurance bad faith, the FAC *directs* the court's attention to the *state court* fourth amended cross-complaint in the third action to detail fully the bad faith allegations against St Paul. Doc # 35 (FAC) at 40. Because the court has now remanded the third action back to state court, there are now two "insurance bad faith" claims asserted by Vedatech and Subramanian against St Paul; one is in state court and the other is in federal court.

 As this court has recently stated, "the *Colorado River* doctrine permits [dismissal of a case] in the interests of wise judicial administration when substantially similar claims are pending in state court." *Le v. County of Contra Costa*, 1999 U.S. Dist LEXIS 19611, *2 (ND Cal 1999) (Walker, J) (citations omitted). "The threshold question is whether the state and federal suits are substantially similar." Id at 3 (citing *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir.1989)). "If so, the factors to consider are: (1) the desirability of avoiding piecemeal litigation; (2) the inconvenience of the federal forum; (3) the order in which jurisdiction was obtained; (4) the source of the governing law and (5) whether the state court proceedings could adequately protect the federal plaintiff's rights." Id (citing *Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir.1997)). Additionally, the court may consider whether the plaintiff in the federal action has engaged in forum shopping. *Silvaco Data Systems, Inc. v. Technology Modeling Associates, Inc.*, 896 F.Supp. 973, 975 (N.D.Cal.1995) (citing *Nakash*, 882 F.2d at 1417).

 **23** Here, the combination of these factors make a compelling case for abstention under *Colorado River*. First, the state and federal suits involve the same parties and claims and arise out of the same conduct. California law regarding contracts and insurance will govern both cases. Piecemeal litigation would certainly result if the federal action were to proceed. The state court obtained jurisdiction first; well over two years prior to the federal court. The convenience factor is neutral. With respect to the rights of Vedatech and Subramanian, the court is convinced that the state court is up to the task of deciding state law claims arising from an alleged breach of the duty of good faith and fair dealing. Finally, to say that Vedatech and Subramanian have engaged in forum shopping would be an understatement; they are desperate to obtain a federal forum to prevent the state court from enforcing the settlement agreement, and they have employed several inappropriate means to attain this forum. These reasons, plus an obvious advancement of judicial economy, convince the court it should abstain from adjudicating Vedatech and Subramanian's claim for insurance bad faith to avoid duplicative state proceeding.

 "[D]istrict courts *must* stay, rather than dismiss, an action when they determine that they should defer to the state court proceedings under *Colorado River.*" *Coopers & Lybrand v. Sun-Diamond Growers of California*, 912 F.2d 1135, 1138 (9th Cir.1990) (emphasis added). Accordingly, the court DENIES St Paul's motion to dismiss the claim for insurance bad faith. Rather, the court STAYS adjudication of this claim pending the resolution of Vedatech's and Subrmanian's fourth amended counterclaim in the third action in the Santa Clara superior court.

 Vedatech and Subramanian shall file with the court a status report within 30 days of disposition of the insurance bad faith claim in state court. Failure timely to file such a report shall be deemed a failure to prosecute and result in dismissal of this action. To be clear, Vedatech and Subramanian are *not* to file any other memoranda relating to this cause of action save the above described status report.

7

*Unfair Competition*

 Finally, Vedatech and Subramanian assert a claim for unfair competition against St Paul, QAD and QADKK pursuant to Cal Bus & Prof Code § 17200 et seq. Cal Bus & Prof Code § 17203 provides, in pertinent part, that:

 any person who * * * has engaged * * * in unfair competition may be enjoined * * *. The court may make such orders or judgments * * * as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 17
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

For the purposes of the current claim, the term "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." Cal Bus & Prof Code § 17200.

According to Vedatech and Subramanian, St Paul, QAD and QADKK have engaged in a "pattern of behavior that is unlawful, unfair or fraudulent," including (as with most other claims in the FAC): (1) St Paul's failure to disclose its prior contacts with Wulff, (2) fraudulently obtaining Vedatech and Subramanian's "consent" to attend the mediation and (3) QAD and QADKK learning of such deception and failing to disclose it in order to "benefit to the tune of $500,000." Doc # 35 (FAC) at 42-46. In essence, Vedatech and Subramanian claim that St Paul and QAD engaged in unfair competition by fraudulently obtaining Vedatech and Subramanian's consent to attend mediation and the resulting injury was the settlement agreement between St Paul, QAD and QADKK which (1) deprived Vedatech and Subramanian of their right to pursue affirmative claims against QAD and QADKK and (2) unjustly enriched QAD and QADKK by $500,000 which belonged to Vedatech and Subramanian.

**\*24** The FAC seeks restitution from QAD and QADKK in the amount of $500,000 and requests (nebulously) the court to order St Paul to disgorge "all benefits that are due to Vedatech under the California Unfair Competition laws." Vedatech and Subramanian are careful to frame all requested relief in the form of equitable remedies, as § 17203 does *not* allow damages to be recovered. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). For several reasons, Vedatech and Subramanian can prove no set of facts to support this cause of action and thus the claim must be dismissed pursuant to FRCP 12(b)(6).

First, as the court discussed above, no fraudulent or unfair practice on the part of St Paul, QAD or QADKK caused Vedatech and Subramanian to attend the mediation; attendance was court-ordered my Judge Komar--twice. Next, assuming arguendo that the alleged non-disclosures did trick Vedatech and Subramanian into attending the Wulff mediation, they cannot prove that the resulting settlement agreement (the geneses of all ensuing "damages") was, in the words of § 17203, "acquired by means of such unfair competition." The settlement agreement explicitly states that "it is not intended to impair the prosecution by Vedatech of any and all affirmative claims that may exists with respect to the First or Second Action * * *." Doc # 35 (FAC), Ex A (Sett

Agreement) at 5 ¶ 8. Moreover, as mentioned above, the settlement agreement was not entered into until *after* Vedatech and Subramanian left the mediation. If Vedatech and Subramanian were not present when the settlement agreement was negotiated, it follows that the settlement agreement could not have been acquired by the means of St Paul, QAD and QADKK's alleged fraudulent scheme to trick Vedatech and Subramanian into attending the mediation.

Finally, even if St Paul, QAD and QADKK engaged in unfair practices (which the court assumes solely for this motion) and even if these practices tricked Vedatech and Subramanian into attending the mediation (which clearly they did not), Vedatech and Subramanian can prove no facts showing that they are entitled to any equitable relief. First, Vedatech and Subramanian's nebulous assertion that they are entitled to require St Paul to "disgorge all such benefits that are due" to Vedatech and Subrmanian is conclusory and unwarranted and thus does not suffice to state a cause of action. St Paul received *nothing* via the settlement agreement that the court can order them to disgorge (if anything, St Paul was forced to pay $500,000). Nor can Vedatech and Subramanian prove that they are entitled to restitution of the $500,000 which was paid to QAD and QADKK by St Paul. "[R]estitution [is an order] compelling a [ ] defendant to return money obtained through an unfair business practice to those persons * * * *who had an ownership interest in the property * * *.*" *Korea Supply Co.*, 29 Cal.4th at 1144-45, 131 Cal.Rptr.2d 29, 63 P.3d 937. Vedatech and Subramanian, however, have pled no facts showing that they have any ownership interest in the $500,000 St Paul paid to QAD and QADKK. Rather, the FAC simply states that St Paul paid QAD and QADKK the $500,000 "from funds that [were] held in trust for the Vedatech parties." Doc # 35 at 47. This legal conclusion, however, is not supported by any facts pled in the FAC and legal conclusions, standing alone, cannot suffice to state a cause of action. See *Sprewell*, 266 F.3d at 988 ("the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

**\*25** For the numerous and substantial reasons discussed above, St Paul's, QAD's and QADKK's motions to dismiss with prejudice the FAC's seventh cause of action for unfair competition are GRANTED.

IV

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 18
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

*QAD and QADKK Motion for Sanctions*

Finally, QAD and QADKK move this court to sanction Vedatech and Subramanian pursuant to FRCP 11. The court, however, has already sanctioned Vedatech, Subramanian and Gonzaga for the improper behavior each has demonstrated throughout this litigation and the court does not believe any further Rule 11 sanctions are appropriate at this time. Additionally, QAD and QADKK move for sanctions pursuant to § 1927. The court does not believe such sanctions are appropriate. QAD and QADKK have not had to defend two frivolous petitions for removal (at least not in the present action) as St Paul has had to do, nor have QAD and QADKK had to defend a frivolous Rule 11 motion as Wulff has had to do. QAD and QADKK were named in the FAC, they filed a motion to dismiss and the motion is now being adjudicated. No doubt QAD and QADKK have incurred costs and fees in defending against the FAC. But every defendant incurs costs and fees. The costs and fees awarded to St Paul and Wulff above did not stem from simply being named in the FAC and having to defend themselves.

QAD and QADKK's motion to sanction is DENIED.

**V**

In sum, the court GRANTS St Paul's motions (04-1403 Docs 11, 40) (C-04-1818 Docs 7, 19) to remand and REMANDS Nos 04-1818 and 04-1403 to Santa Clara superior court. The court ORDERS Vedatech and Subramanian to pay $20,738.75 to St Paul pursuant to 28 USC § 1447(c). Additionally, the court GRANTS St Paul's motion for Rule 11 sanctions (04-1249 Doc # 97) (04-1403 Doc # 52) (04-1818 Doc # 32) and SANCTIONS Subramanian $1,000 and SANCTIONS Gonzaga $5,000. These sanctions are payable to the court on or before July 25, 2005.

The court GRANTS Wulff's motion to dismiss (04-1249 Doc # 52). The court DENIES Vedatech's and Subramanian's motion for Rule 11 sanctions against Wulff (04-1249 Doc # 61). The court ORDERS Vedatech and Subramanian to pay Wulff $15,000 for fees and costs incurred in opposing the Rule 11 motion. Additionally, the court GRANTS Wulff's motion for sanctions pursuant to § 1927 (04-1249 Doc # 86) and ORDERS Vedatech and Subramanian to pay $22,584 to Wulff.

QAD's and QADKK's motions to dismiss with prejudice all claims asserted against them are GRANTED (04-1249 Doc # 44). QAD and QADKK's motion for sanctions are DENIED (04-

1249 Doc # 106). St Paul's motion to dismiss the FAC is GRANTED IN PART (04-1249 Doc # 45). The court STAYS adjudication of Vedatech's and Subramanian's claim for insurance bad faith against St Paul.

Hence, every action and claim (save one) to which Vedatech is a party has been either remanded or dismissed and the one remaining claim has been stayed pending state court resolution. Accordingly, the court does not find it appropriate to rule on Gonzaga's and Knopf's second motion to withdraw as counsel for Vedatech. If they still wish to withdraw as counsel, they should address their arguments to the Santa Clara superior court. Accordingly, the second motion to withdraw is DENIED as moot (04-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). Gonzaga and Knopf's motions to strike are DENIED as moot. (04-1249 Doc # 154) (04-1403 Doc # 74) (04-1818 Doc # 55). Subramanian and Vedatech's motion for further oral argument are DENIED as moot. (04-1249 Doc # 112) (04-1403 Doc # 63) (04-1818 Doc # 43). Finally, Subramanian and Vedatech's request to remain an e-filer in 04-1403 is DENIED as moot.

**\*26** The clerk shall administratively close the file. This does not represent a final adjudication but an administrative convenience for the court. Upon receipt of the state court's order resolving the insurance bad faith claim in the state court, the clerk shall re-open the file upon a request of one of the parties.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

MANI SUBRAMANIAN
(Local California Contact Address)
c/o Robert Oca
P.O.Box 12231
San Francisco, CA 94112
*Telephone:* (206) 222-2341
*Facsimile:* (206) 222-2341
*Email:* prosedefendant@yahoo.com

Plaintiff

# UNITED STATES DISTRICT COURT
## for the NORTHERN DISTRICT OF CALIFORNIA

**MANI SUBRAMANIAN**, as an individual and citizen of Washington, and as a derivative action plaintiff;

         Plaintiff,

    vs.

**ST.PAUL FIRE AND MARINE INSURANCE COMPANY,** a Minnesota Corporation, *and* **QAD INC.,** a Delaware Corporation with principal place of business in California, *and* **ARTHUR ANDERSEN LLP,** a limited liability partnership headquartered in Chicago, Illinois, *and* **ANDERSEN WORLDWIDE SC,** a Societe Cooperative headquartered in Geneva, Switzerland, *and* **JOHN DOORDAN**, an individual and citizen of California, *and* **LAIFOON LEE**, an individual and Citizen of California, *and* **ROLAND DESILETS**, an individual and citizen of New Jersey, *and* **WILLIAM D. CONNELL,** an individual and citizen of California, *and* **GREENAN, PFEFFER, SALLANDER and LALLY LLP,** a limited liability partnership headquartered in California, *and* **RANDALL WULFF**, an individual and citizen of California, *and* DOES 1-50;

        Defendants.

Case No.:  08-1426

<u>**COMPLAINT**</u> [to] [for]

1. **SET ASIDE JUDGMENT AND ORDER entered concurrently in the three cases 04-1249 VRW, 04-1403 VRW and 04-1818 VRW, on December 27, 2007 and June 22, 2005, on the basis that the defendants therein obtained the judgment and order by fraud on the court; [see e.g., FRCivP rule 60(d)(1)]**

2. **Civil RICO [18 U.S.C. §§1964 et seq.];**

3. **FRAUD and CONSPIRACY TO FRAUD;** *and*

4. **UNFAIR COMPETITION**

5. **Violation of constitutional rights**

*including*

\* <u>**DEMAND FOR JURY TRIAL**</u>

\* <u>**Certification of Interested Parties**</u>

**Complaint**       Page 1 of 54

Plaintiff SUBRAMANIAN alleges as follows:

**JURISDICTION**

1.      The district court has jurisdiction both under its original jurisdiction ("federal question") and independently under the diversity statutes:

1.1      This action is brought under the *United States Code, Title 18, Part 1, Chapter 96* ("Racketeer Influenced and Corrupt Organizations"), *18 U.S.C. §§ 1961-1968*, and as permitted by *18 U.S.C. §1964(c)*.   Accordingly, there is jurisdiction under *28 U.S.C. §1331*.  The district court also has supplemental jurisdiction over any state law claims under *28 U.S.C. §1367(a)*.

1.2      There is also independent jurisdiction under *28 U.S.C. §1332 (a)(3)* ("citizens of different States and in which citizens or subjects of a foreign state are additional parties") .  Complete diversity exists between plaintiffs and each and every one of the defendants.  The amount in controversy well exceeds US$ 75,000.

**VENUE**

2.      Venue is proper in the Northern District of California as required under the provisions of *28 U.S.C. §§ 1391-1392,* and *18 U.S.C. §1965* (see section below "THE PARTIES").

**INTRADISTRICT ASSIGNMENT AND RELATED CASES**

3.      As an excepted category under *ND Civil L-R 3-2(c)*, this case is eligible for district-wide assignment.  This case is also related to 04-1249 VRW, 04-1403 VRW, and 04-1818 VRW, all of which were assigned to the San Francisco division.

**THE PARTIES**

**[Plaintiff] SUBRAMANIAN**

4.      Individual plaintiff Mani Subramanian ("SUBRAMANIAN") is a citizen of the State of Washington.

**[Defendant] ST.PAUL FIRE AND MARINE INSURANCE COMPANY**

5.      Defendant St.Paul Fire and Marine Insurance Company ("ST.PAUL") is a corporation organized under the laws of the State of Minnesota with its principal place of business in Minneapolis, Minnesota.

6.      ST.PAUL provides insurance coverage to individual and corporate clients all across the United States, including conducting regular and substantive business in the State of California, directly and through various agents in California.

**[Defendant] QAD INC.**

7.      Defendant QAD Inc. ("QAD") is a Delaware corporation, with its principal place of business in Carpinteria, California.

**[Defendant] ROLAND DESILETS**

8.      Defendant Roland Desilets ("DESILETS"), an individual, has been Executive Vice President, General Counsel and Secretary for QAD since April 2001, when he rejoined QAD after spending one year as Vice President and General counsel of Atlas Commerce. DESILETS initially joined QAD in 1993, serving as Regional General Counsel until 1998 when he was named Corporate General Counsel.  DESILETS works out of the Mount Laurel, New Jersey offices of QAD, and from information and belief, is a citizen of New Jersey and a resident thereof.

**[Defendant] JOHN DOORDAN**

9.      Defendant John Doordan ("DOORDAN"), an individual, joined QAD in 1986, and served in various executive management positions.  In 1996 he was appointed vice president, sales—business development, and since then has served in various position as an officer and/or executive and/or member of the senior management team at QAD. DOORDAN, from information and belief is a citizen of California and a resident thereof.

**[Defendant] LAI FOON LEE**

10.      Defendant Lai Foon Lee ("LEE"), an individual, joined QAD in April 1997, and started out by assisting with QAD's preparations for an initial public offering that took

place in August 1997.  In August 1997 LEE was appointed Interim Controller of QAD Inc., and in November 1997 became Vice-President of Finance.  In March 1998 LEE left QAD and, from information and belief, served at various other companies, such as eOne Global (Vice President and Controller), Novell, Inc. (Vice President, Finance), Volera, Inc., (Vice President, Finance), Weyerhauser Forestlands International, Neurogen, Inc. (Vice President, Finance), and Seagate Technology, Inc. (Executive Finance Director).  From information and belief, LEE is currently a citizen and resident of California.

### [Defendant] ARTHUR ANDERSEN LLP

11.    Defendant Arthur Andersen LLP "ANDERSEN-US" is a Limited Liability Partnership of the State of Minnesota with its principal place of business in Minneapolis, Minnesota.

### [Defendant] ANDERSEN WORLDWIDE SC

12.    Defendant Andersen Worldwide SC ("ANDERSEN-WW") is a Societe Cooperative, based in Geneva, Switzerland, and is the controlling entity behind ANDERSEN-US.  Following the criminal indictment of ANDERSEN-US, ANDERSEN-WW sold off various parts of its "one firm", including the Japanese operations to third parties such as KPMG (now "Bearing Point"), etc.

### [Defendant] WILLIAM D. CONNELL

13.    Defendant William D. Connell ("CONNELL") is a partner in GCA Law Partners LLP, and has been attorney for QAD Inc. and QAD Japan K.K. in related matters at least from January 1998, and additionally being an attorney for QAD Japan Inc., DOORDAN and LEE at least since December 1999.  From information and belief, CONNELL is a citizen and resident of California.

### [Defendant] GREENAN, PFEFFER, SALLANDER & LALLY LLP

14.    Defendant Greenan, Pfeffer, Sallander & Lally LLP ("GPS") is a limited liability partnership operating out of San Ramon, California.  At least since February 2002, GPSLLP has represented ST.PAUL as its attorneys in related litigation.

**[Defendant] RANDALL WULFF**

15.     Defendant Randall Wulff ("WULFF") is an individual residing in Piedmont, in Alameda County, California.  WULFF conducts business as a private "mediator" and works out of offices in Oakland, Alameda County, California, under the business name of Wulff, Quinby, Sochynsky.

**DOE DEFENDANTS**

16.     The identity of the DOE defendants 1-50 are unknown or not determinable with certainty at this point in time.  Plaintiffs wish to amend the complaint as necessary as such defendants are identified.  From information and belief, such DOE defendants are responsible for some or all of the causes of action and the injuries set out herein.  The term Defendants shall refer to the named defendants and the DOE defendants collectively.

**NON-PARTIES**

**VEDATECH**

17.     Vedatech K.K. ("VEDATECH") is a Japanese corporation. SUBRAMANIAN is the beneficial owner of all the shares of VEDATECH and has been, at all relevant times, the Representative Director of VEDATECH under the Commercial Code of Japan. SUBRAMANIAN and other Vedatech entities that are parties to one or more actions referred to herein shall be collectively referred to as the "Vedatech parties".

**QAD JAPAN K.K.**

18.     QAD Japan K.K. ("OLD-QAD-JAPAN") is a Japanese corporation incorporated in Yokohama, Japan in July 1994 with QAD Inc. owning 1999 shares and SUBRAMANIAN owning 1 share.

**QAD JAPAN INC.**

19.     QAD Japan Inc. ("NEW-QAD-JAPAN") was incorporated as a Delaware corporation in October 1997.  It was set up expressly for the purpose of secretly taking over the business of OLD-QAD-JAPAN and facilitating QAD's improper attempts to escape contractual obligations to VEDATECH and SUBRAMANIAN.

**UNITED STATES FIDELITY & GUARANTY COMPANY ("USF&G")**

20.    United States Fidelity and Guaranty Company ("USF&G") is a corporation organized under the laws of the State of Maryland, with its principal place of business in Baltimore, Maryland.

21.    USF&G is engaged in the business of providing insurance coverage to individual and corporate clients all across the United States, and conducts, directly and through various agents, regular and substantive business in the State of California.

**GCA LAW PARTNERS LLP**

22.    GCA Law Partners LLP ("GCA") is a limited liability partnership headquartered in Mountain View, California, formerly known as General Counsel Associates, LLP.  Defendant CONNELL is a partner at GCA and has been a partner in GCA at least from January 1998.

**SALLIE KIM**

23.    Sallie Kim, ("SALLIE") is a partner at GCA and joined CONNELL in his activities relevant to this action around, if not before January 2004.  SALLIE's exact role in the activities detailed in this action are not clear at the time of filing this Complaint, apart from her general role in supporting and assisting CONNELL.

**COBLENTZ, PATCH, DUFFY & BASS LLP**

24.    Coblentz, Patch, Duffy & Bass LLP ("CPDB") is a limited liability partnership headquartered in San Francisco, California.  CPDB have been the attorneys for defendant ANDERSEN-US at least since 2000-2001.

**FARELLA, BRAUN & MARTEL LLP**

25.    Farella, Braun & Martel LLP ("FBM") is a limited liability partnership headquartered in San Francisco, California.  FBM have been the attorneys for defendant WULFF at least since March 2004.  Defendant WULFF is a former partner at FBM.  The exact role of FBM's attorneys Mr. Ingersoll or Mr. Young in the activities detailed herein are not known other than their role in assisting and taking actions on behalf of WULFF.

## ASSIGNMENT OF CLAIMS

26.    In December 2006, and again in March 2008, VEDATECH assigned all accrued and assignable causes of action and all *choses in action* regarding any pending actions regarding QAD and others, to SUBRAMANIAN.

27.    To the extent that any cause of action stated herein is found to be not assignable by VEDATECH to SUBRAMANIAN, plaintiff also or additionally claims in his representative/derivative capacity on behalf of VEDATECH which is having trouble finding affordable representation for this complex matter in the San Francisco area.

## TABLE OF PRIOR ACTIONS

28.    The following table references the paragraph numbers below where the various related actions are first referenced (VT refers to one or more of the Vedatech parties)

| ACTION (as referenced below at paragraph nos.) | FILED BY (MONTH-YEAR) | State Court / Federal Court Case Numbers |
|---|---|---|
| **JP-FIRST-ACTION (53)** followed by **JP-SECOND-ACTION (57)** | QAD (Oct-1997) VT (Dec-1997) | |
| **QAD-FIRST-ACTION** (consolidated with) **VT-COUNTER-ACTION** **(60, 61, 68, 70)** | QAD (Jan-1998) VT (Sep-1999) | CV 771638 / removed: 98-20792 consolidated with   CV 784685 / removed: 99-21241 Remanded by stipulation: Apr-00 Removed as 04-1036;  04-1806   Remanded: May-04/Aug-05 |
| **ST.PAUL-DEC-ACTION (98)** **(In the district court as the)** **INSURANCE-CASE (145)** | ST.PAUL (Feb-2002) | CV 805197 / removed: 02-03061   Remanded: Oct-02 |
| | | Removed as 04-1403 /1818 VRW |
| **MEDIATION-CASE (145)** | VT (Mar-2004) | Original case: 04-1249 VRW |
| **COPYRIGHT/ MALICIOUS PROSECUTION ACTION (160)** | VT (May-2005) | Original case:  06-3050 VRW |

## STATEMENT OF THE CLAIM

**The QAD – VEDATECH contractual relationship**

29.     VEDATECH, in the period 1993-1997 under the terms of a written agreement concluded in March 1994, assisted QAD in entering the competitive Japanese market for complex "supply chain management" software (then under the product series MFG/PRO).

30.     The consideration for VEDATECH involved, in addition to discounted payments for services, a promise of a share of "implementation" services relating to the software that was sold in Japan, which necessarily involved QAD promoting and supporting VEDATECH as a partner for such services.  By its very nature, the agreement involved QAD realizing its consideration first, the software being sold, and then, in the ensuing years, for VEDATECH to reap the benefit of the agreement in terms of follow-on service business.

31.     In addition, SUBRAMANIAN was appointed as Representative Director of QAD Japan K.K.

**1996 - DOORDAN and the genesis of the first scheme**

32.     In 1996, QAD started preparations to "to go public" [i.e., make an Initial Public Offering, "IPO"] that eventually materialized in August 1997.  Starting from mid-1996, QAD started "upgrading" its executive management with many outside hires, as a consequence of which old-timers were either forced to resign or, as it was with DOORDAN, to take up positions that they, in their own assessment, did not consider attractive.

33.     DOORDAN decided that it was in his own best interest to make himself the key manager for QAD's Japanese operations and control the budget allocations for Japan and that could be best accomplished by terminating the QAD-VEDATECH relationship,. DOORDAN developed a relationship with a large systems integrator in Japan, Nomura Research Institute ("NRI") and presented them to QAD as a better alternative to VEDATECH.  DOORDAN even got the president of NRI's Hong Kong subsidiary, one Mr. Isao Takatori, to write a letter to QAD's CEO recommending that the relationship with VEDATECH and SUBRAMANIAN be terminated.  DOORDAN also recruited various ex-employees of QAD Japan K.K. to lobby QAD Inc. to replace the VEDATECH relationship.

**Breach of Contract**

34.    On April 16, 1997, DOORDAN sent a letter purporting to terminate the contractual relationship with VEDATECH by reference to terms that were either not to be found or were inconsistent with the written agreement between QAD and VEDATECH. DOORDAN stated that the agreement would no longer be honored beyond July 31, 1997.

35.    QAD at this time promised VEDATECH that a new agreement to govern the relationship between the parties would be negotiated before July 31, 1997.

**LEE's entry into the scheme**

36.    LEE joined QAD in April 1997, and immediately saw the current chief financial officer Barbara Whatley as an impediment to her progress within QAD.  In order to bolster her own position within QAD, LEE recruited ANDERSEN-US to undertake various "audits" of QAD's subsidiaries in order to showcase how she could bring discipline into what she alleged were lax financial controls in place under Barbara Whatley.

37.    DOORDAN recruited LEE to his cause of terminating the VEDATECH and SUBRAMANIAN relationships.  LEE did not disappoint.

**Attempts to force a signed "release" from SUBRAMANIAN (and VEDATECH)**

38.    First, in June 1997, LEE attempted to intimidate SUBRAMANIAN into signing a release of liability for QAD arising from the termination of VEDATECH's and SUBRAMANIAN's services by QAD, for "zero" consideration.  The draft of this was prepared by DESILETS who was now recruited into DOORDAN and LEE's developing scheme.  LEE threatened various consequences for not signing the offered "release".

39.    When that failed, LEE arranged for a bogus "audit" of QAD Japan K.K. in July 1997.  This audit could not find anything improper in the management of QAD Japan K.K.—so LEE and ANDERSEN-US cooked up a controversy over a payment in July 1997.

40.    Briefly, the "audit" payment-brouhaha boils down to this:  unknown to SUBRAMANIAN and VEDATECH, LEE and DOORDAN had ordered the withholding of valid and approved payments to VEDATECH [in "escrow"] in order to put undue pressure on SUBRAMANIAN to sign a "release".  In addition, DOORDAN, LEE, and DESILETS

hoped to force VEDATECH to transfer intellectual property rights in some "Japanized" ("Localized") software to QAD. Unfortunately, not enlightening SUBRAMANIAN to this scheme resulted in the innocent payment of a portion of such invoices, thwarting this secret "squeeze" plan. In order to put further pressure on SUBRAMANIAN, and to recruit further support for the evolving DOORDAN-LEE-DESILETS scheme within QAD Inc., LEE pressured ANDERSEN-US to modify its "audit" report to flag the July 1997 payment as a "diversion" of funds [i.e., innuendo that there was something improper about the payment].

**DOORDAN, QAD, LEE and DESILETS knew their actions were improper**

41.    DOORDAN clearly realized the "risks" involved with the approach they were taking. DOORDAN informed Karl Lopker, the CEO of QAD, on July 21, 1997 in writing that was *not* copied to SUBRAMANIAN or VEDATECH, that one risk was that:

> …Vedatech suffers business disruption by missing payroll this week and alleging QAD non-payment as cause. Vedatech might make legal claim against QAD as early as this week's end. My [i.e., DOORDAN's] estimate is that such a claim would be sizable – more than 1 million USD.

42.    DOORDAN clearly was also aware of the problems with the attempt to force a "release" for no consideration, by describing SUBRAMANIAN's objections to the release as: "…*a retroactive imposition of new conditions on an "old" and "existing" agreement.*"

**QAD Inc. roped into the DOORDAN-initiated scheme**

43.    DOORDAN and DESILETS further induced VEDATECH to provide services beyond July 31, 1997, and promised to get approval for a new contract for VEDATECH from QAD's executive management ("E-Team") by the end of August 1997. DOORDAN and DESILETS had no any intention to perform any of these promises, and indeed they were proceeding with the explicit goal of sabotaging any prospects of any new agreement.

44.    In the event, the new agreement did not materialize, and QAD did not pay for the services that it ordered beyond July 31, 1997, nor did it honor its unperformed obligations under the original contract, which was improperly terminated to begin with.

45.    At or around the time of this August 1997 E-Team meeting, QAD [through its chief executive officer, Karl Lopker, and other members of the E-Team] was persuaded to join DOORDAN, LEE and DESILETS in their activities to replace VEDATECH and

SUBRAMANIAN in favor of an interim management team for Japan headed by DOORDAN (as he had wanted all along) and attempt to bring in other partners such as NRI.

46.     LEE achieved her goal of being promoted and was made Interim Controller of QAD in August 1997, in the crucial month when QAD went ahead with its IPO.  In November 1997, LEE was made Vice President of Finance for the publicly traded QAD.

**The DN-Enterprise**

47.     Since DOORDAN himself had estimated that QAD was exposed to "risks" in the order of USD 1 Million arising from his inappropriate methodology for "terminating" the VEDATECH relationship, QAD, DESILETS (who in turn recruited and managed CONNELL and GCA), and DOORDAN, with the active participation of LEE (who in turn recruited ANDERSEN-US and ANDERSEN-WW), started on a path, continuing to this day, to eliminate such "risks" by various means that were in violation of criminal laws of Japan and the United States, and in violation of the constitutional and statutory rights of VEDATECH and SUBRAMANIAN under the U.S. Constitution and the United States Code.

48.     The key member organizations in this "DN-enterprise" are, QAD, NEW-QAD-JAPAN, ANDERSEN-US, ANDERESEN-WW, GCA (from January 1998 [possibly much earlier]), CPDB (from 2000 or earlier), QAD Brazil Inc., and QAD Australia Pty.  The key ring-leaders [managers, decision-makers] that manipulated the resources of this enterprise were DOORDAN, DESILETS, LEE, and CONNELL, who in turn received cooperation from others (such as SALLIE from 2003).  This association of individuals and business entities will be referred to as the "DN-Enterprise" in this Complaint.

49.     The DN-Enterprise's legitimate function was to defend any lawsuits arising from the disputes from the breakdown of the QAD-VEDATECH relationship.  On the other hand, the defendants that were members of this enterprise used it to also engage in racketeering activities designed to intimidate VEDATECH and SUBRAMANIAN from pursuing any such legal remedies and causing financial, economic and business harm that will weaken VEDATECH and SUBRAMANIAN sufficiently to force them to abandon all such legal rights and remedies.  From the beginning, the core strategy for the misuse of the DN-Enterprise by such defendants has included the following actions:

a.   Finding ways to deny competent legal representation for VEDATECH and SUBRAMANIAN by "conflicting out" in one way or another, or intimidating attorneys that VEDATECH and SUBRAMANIAN retain;

b.   Finding ways to "compromise" any attorneys that VEDATECH and SUBRAMANIAN hired or may hire by offering them jobs or other incentives, or libeling and spreading false information about VEDATECH and SUBRAMANIAN to such attorneys;

c.   Finding ways to deny insurance coverage for the defense of any action that QAD brings against VEDATECH and/or SUBRAMANIAN;

d.   Finding ways to cause financial distress to VEDATECH and SUBRAMANIAN so that they cannot hire competent legal representation;

e.   Engaging in bank fraud to prevent funds belonging to and/or payable to VEDATECH and/or SUBRAMANIAN from reaching the same, and promote other fraudulent schemes that involved mail fraud and wire fraud;

f.   Providing false testimony, hiding and/or destroying evidence, and otherwise obstructing the judicial process in order to deny Vedatech parties a fair trial;

g.   Use the dual position of DESILETS as both "general counsel" and also an Executive Vice President of QAD, to improperly claim "attorney-client" privilege for information that would establish fraudulent and criminal behaviour by QAD, or other members of the DN-Enterprise.

h.   Use attorney-client privileges afforded by GCA and CONNELL's licenses to hide fraudulent activities designed to provide the objectives outlined herein.

i.   Causing business disruption for VEDATECH and SUBRAMANIAN by contacting their customers, employees and business partners in an attempt to dissuade them from doing business with VEDATECH and SUBRAMANIAN.

j.   Fraudulently withhold discovery information, including even information that is the subject of a motion to compel, and fraudulently "redacting" information

from documents that are disclosable even when there is no basis or any claim of privilege to justify such redaction in order to conceal critical information (such as proof of insurance coverage or copyright infringement by QAD).

k.     Other fraudulent and improper behavior as detailed herein;

**QAD's long history of abuse of the judicial process**

50.     An example of QAD's willingness to use litigation as a means of punish a business with whom they develop a dispute, and provide false testimony in resultant proceedings can be found in the sharp criticism of QAD's fraudulent behavior in the decision of the Seventh Circuit in *QAD v ALN Associates*, 974 F.2d 834 (7th Cir., 1992).  See also underlying decisions at 770 F.Supp. 1261, (1991) at pp.1270-1271, *QAD v ALN Associates, Inc*. (1990 U.S.Dist. LEXIS 17535, N.D.Ill.), and 1990 U.S. Dist. LEXIS 7458 (N.D.Ill.)

**August 1997 – September 1997**

51.     QAD, DOORDAN and LEE used the Tokyo affiliate of ANDERSEN-WW to commit bank fraud by falsifying consent of SUBRAMANIAN [and the "seal" of QAD Japan K.K.] and opening a secret bank account with the Tokyo Mitsubishi bank in an attempt to force SUBRAMANIAN to resign by starving QAD Japan K.K of funds.

52.     In addition, NEW-QAD-JAPAN was set up in Delaware in October 1997 [joining the DN-enterprise], and statements were mailed to customers in Japan asking them to make payments to a new bank account of "QAD Japan" [the implication being that the letters were from QAD Japan K.K., the only "QAD Japan" known to these customers].

**October 1997 – November 1997**

53.     QAD filed an action in October 1997 in the Yokohama District Court against SUBRAMANIAN which QAD immediately withdrew after the Judge in Japan started asking uncomfortable questions regarding QAD's fraudulent banking schemes and related issues.

54.     QAD then sent a letter threatening VEDATECH's then Japanese attorney who was assisting the Vedatech parties, about "conflicts" because that attorney had done one trademark search for QAD by request of SUBRAMANIAN!  Because of such intimidation, the attorney withdrew, and the Vedatech parties had to retain another set of attorneys.

**Complaint**        Page 13 of 54

**December 1997 – January 1998**

55.    In December 1997, after filing false papers with the Yokohama Legal Affairs Bureau regarding a bogus "shareholders meeting" of QAD Japan K.K. that QAD conducted in Yokohama, Japan, QAD sent out statements to various customers asking them to stop dealing with SUBRAMANIAN and VEDATECH.

56.    These and other active efforts by QAD, DESILETS, DOORDAN, LEE, NEW-QAD-JAPAN and their agents seriously impaired VEDATECH and SUBRAMANIAN from offering any services relating to the QAD products and further damaged VEDATECH and SUBRAMANIAN's business relationships with such customers.  This in turn led to financial damages to VEDATECH and SUBRAMANIAN, which as intended by the DN-Enterprise, compromised the ability of VEDATECH and SUBRAMANIAN to retain effective counsel in California when QAD sued there.

**Progress of the Japanese action(s)**

57.    A new set of actions started in Japan in the December 1997 – January 1998 period, but unbeknownst to VEDATECH and SUBRAMANIAN, QAD was preparing to file an action against VEDATECH and SUBRAMANIAN in state court in California.

58.    In preparing to file such a lawsuit, QAD, DOORDAN and DESILETS discussed possible ways of canceling or limiting QAD's insurance policies that would cover SUBRAMANIAN against these very same actions and would have helped provide for defense of such claims against SUBRAMANIAN because of his position as the Representative Director of QAD Japan K.K.   QAD has concealed details of such activities.

59.    In addition, legal proceedings in Japan were ongoing in Japan in January 1998.  Rather than bring their claims within those proceedings in Japan, QAD deliberately prepared to and did drag VEDATECH and SUBRAMANIAN into litigation in California, knowing fully well that the costs of responding to a lawsuit in California would be an enormous and ruinous financial drain for VEDATECH and SUBRAMANIAN.

///

///

**The QAD-FIRST-ACTION**

60.    In January 1998, QAD did file such a lawsuit against SUBRAMANIAN and Vedatech Inc. [a Washington state affiliate of VEDATECH,] in the Santa Clara County Superior Court as CV 771638 (the "QAD-FIRST-ACTION"), which was commenced with the sole purpose of harassing plaintiff and VEDATECH in a forum not only convenient for QAD but where QAD knew the costs of litigation would soon make it financially ruinous for VEDATECH and SUBRAMANIAN.

61.    The QAD-FIRST-ACTION was removed to the federal district court on diversity grounds in July-August 1998 under Case No.98-cv-20792.

**Fraudulent withholding of insurance information – first round**

62.    QAD, DESILETS and CONNELL, in or around June 1999, failed to disclose QAD's insurance information under the "initial disclosure" provisions of the Fed R. Civ. Proc., rule 26, specifically, as was later discovered, to prevent SUBRAMANIAN from being able to utilize coverage available to SUBRAMANIAN under QAD's own policies arising from his former position as Representative Director of QAD Japan K.K.

**January 1999 – June 1999**

63.    When Bogle and Gates LLP, the law firm representing Vedatech Inc., in the QAD-FIRST-ACTION collapsed [following a mass migration of senior partners to another firm Dorsey & Whitney LLP], DESILETS attempted to discuss "opportunities" with the [former] attorneys at Bogle & Gates who had represented VEDATECH in an attempt to prevent them from continuing representation of VEDATECH or representing SUBRAMANIAN from their new law practices.

**June 1999 – December 1999**

64.    When Morrison & Foerster LLP ("MORRISON") took over representation of Vedatech Inc., in or around June 1999, DESILETS, wrote a letter to MORRISION attempting to "conflict" them out for representing Union Bank in a prior matter where Union Bank was *adverse* to QAD.  While this ridiculous attempt at compromising the legal

representation of plaintiff and/or his small business failed, it is illustrative of the relentless targeting of the attorneys of Vedatech parties by DESILETS and CONNELL.

65.    In addition, after QAD refused to provide a single document in response to discovery requests from MORRISON, Magistrate Judge Trumbull issued an order compelling QAD to provide such documents and answer interrogatories.  QAD simply and completely ignored the deadline set by the Judge.

66.    In releasing a few documents after the Court-set deadline in October 1999 and then a small dribble [filtered and selectively culled with many pages missing] later in January-February 2000, and that too, after threats of motions for sanctions, QAD, DESILETS and CONNELL fraudulently "redacted" portions of such internal discussions within QAD in order to continue to hide the possible availability of such insurance defense coverage from SUBRAMANIAN and hide other evidence of fraud and wrongdoing such as QAD's activities regarding [criminal] copyright infringement.

67.    QAD then engaged in a long protracted stonewalling exercise lasting into 2004 and beyond regarding the disclosure of such information, before "unredacting" some documents and providing partial insurance information about coverage relevant to SUBRAMANIAN.  By then, it was too late for meaningful pursuit of coverage possibilities.

**The VT-COUNTER-ACTION**

68.    In September 1999, VEDATECH filed a lawsuit in the Santa Clara County Superior Court asserting its counterclaims against the FIRST-ACTION as Case No. CV 784685.  CONNELL, claiming to be acting for NEW-QAD-JAPAN but not QAD [a bad faith proposition], removed it to the federal district court as Case No. 99-cv-21241.

69.    In April 2000, both the FIRST-ACTION and the VT-COUNTER-ACTION were remanded by stipulation of the parties back to state court.

70.    In December 2001, the State Court consolidated these two actions for all purposes including trial, so that there was only one action, the FIRST-ACTION proceeding in state court from that point in time.

///

**Tender of defense of FIRST-ACTION to ST.PAUL**

71.    Even at the very outset, by December 1998, it was clear to the Vedatech parties that any litigation in California would not be affordable without insurance support.  In or around January 1999, the defense of the FIRST-ACTION was tendered to ST.PAUL.

**ST.PAUL's refused to assign defense counsel in spite of "accepting" tender**

72.    In or around April 1999, ST.PAUL purported to accept the tender under a "reservation of rights" and invoked *California Civil Code section 2860* [improperly and incorrectly] in refusing to appoint defense counsel who should be fully paid for by St.Paul. Instead, St.Paul promised to pay "independent counsel" [at that time Bogle & Gates LLP] for the defense of the FIRST-ACTION, and promptly set out to prove the promise hollow.

**ST.PAUL's refusal to reimburse properly or at all for "independent counsel"**

73.    First, ST.PAUL did not wish to pay the rates charged by the "independent counsel", even as it forced the Vedatech parties to continue to rely exclusively upon such outside counsel (expressly by its refusal to assign *any* defense counsel from its side).

74.    Second, ST.PAUL, even with respect to the partial payments that it did make, delayed such payments for such a long time that the Vedatech parties could not afford to retain any reputable firm for any length of time, as all of them demanded prompt payments, usually within a month of invoicing.

**The "independent counsel" saga**

75.    First, Bogle and Gates LLP essentially collapsed in or around May 1999.  The Vedatech parties could not continue to retain MORRISON, who took over the case from Bogle and Gates in or around June 1999, beyond October 1999, because of ST.PAUL's refusal to reimburse either at their rates, or for their full services.

76.    The Vedatech parties attempted to find firms willing to work at lower and further lower rates to satisfy ST.PAUL, but ST.PAUL's refusal to reimburse even for the charges incurred with such firms with lower billing rates, led to severe financial difficulties for VEDATECH and SUBRAMANIAN.

///

**QAD's "counterclaims" in the VT-COUNTER-ACTION**

77.    In 2000, QAD asserted counterclaims in the VT-COUNTER-ACTION, which essentially duplicated the FIRST-ACTION, but this time asserted against VEDATECH.

78.    VEDATECH tendered defense of these counterclaims to ST.PAUL, which refused to accept tender on the explicit basis that VEDATECH, the Japanese corporation was not a named insured in the policies involved.

79.    Contrary to misleading statements by ST.PAUL, neither VEDATECH nor SUBRAMANIAN has ever "tendered" its affirmative claims to ST.PAUL.  ST.PAUL and its attorneys have unfailingly promoted this fraudulent statement to improperly influence decisions in the course of these several actions.

80.    The Vedatech parties have simply taken the position that (a) VEDATECH, the Japanese corporation *is* covered under the relevant policies;  (b) especially and specifically given the consolidation of the VT-COUNTER-ACTION into the FIRST-ACTION, as a matter of law, the so-called "affirmative claims" are in the nature of counterclaims to the original FIRST-ACTION, so that ST.PAUL's acceptance of tender of the FIRST-ACTION should cover expenses incurred in participating in the consolidated action;  to be more specific the reason for a separate counter-action by VEDATECH was dictated in large part by QAD deliberately suing Vedatech Inc., a Washington Corporation, instead of VEDATECH, a Japanese corporation in order to ensure that its forum-shopping exercise in dragging the dispute to California even when Japanese proceedings were afoot could not be challenged easily;  ST.PAUL knew and knows that this was a perfectly legitimate and appropriate litigation strategy, that the new action was in the nature of counterclaims to the QAD-FIRST-ACTION, but simply used this as one more excuse to deny and delay benefits to a small business customer;  and (c) under governing California law, e.g., *State of California v Pacific Indemnity Co.,* 63 Cal. App. 4th 1535, ST.PAUL cannot parse the costs of the "affirmative claims" when the activities relating to the same are clearly are inseparable from the defense of the FIRST-ACTION and when it is undisputed that ST.PAUL must defend the "entire action", in this case, the entire consolidated action.

**The SP-Enterprise**

81.    The VEDATECH claims were managed by Diane Holtog ("HOLTOG") working at the ST.PAUL's Fremont, California, offices, later handled by Mr. Joseph Tancredy ("TANCREDY").

82.    To formalize the denial of benefits to the Vedatech parties, ST.PAUL joined forces with GPS [from an unknown date before February 2002], whose attorneys James Greenan ("GREENAN"), John Makin ("MAKIN") and Enoch Wang ("WANG") were primarily responsible for the conduct of the ST.PAUL matters with respect to VEDATECH. The key members involved in this SP-Enterprise are ST.PAUL, USF&G, GPS, Mr. James Greenan ("GREENAN", attorney at GPS), Mr. Enoch Wong ("WANG", attorney at GPS who has since left the firm), Diane Holtog of ST.PAUL and Joseph Tancredy of ST.PAUL and the claims adjustment executive at St.Paul.

83.    The key member organizations in this "SP-enterprise" are, ST.PAUL, USF&G, and GPS.  The key ring-leaders [managers, decision-makers] that manipulated the resources of this enterprise were HOLTOG, TANCREDY, GREENAN, WANG, and MAKIN, who in turn received cooperation from others.  This association of individuals and business entities will be referred to as the "SP-Enterprise" in this Complaint.

84.    The SP-Enterprise's legitimate function was to get declaratory relief regarding the insurance claims arising from the underlying QAD-FIRST-ACTION.  On the other hand, the defendants that were members of this enterprise used it to also engage in racketeering activities designed to intimidate VEDATECH and SUBRAMANIAN from pursuing their benefits under the policies, and prevent them from pursuing any legal remedies against ST.PAUL, and causing financial, economic and business harm that will weaken VEDATECH and SUBRAMANIAN sufficiently to force VEDATECH and SUBRAMANIAN to abandon all such legal rights and remedies.  From the beginning, the core strategy for the misuse of the SP-Enterprise by such defendants has included the following actions:

    a.    Withhold and delay reimbursements for defense costs so that the "independent counsel" would not be sufficiently funded by VEDATECH and SUBRAMANIAN, and by such means, compromise VEDATECH and SUBRAMANIAN's defense to the "ST.PAUL-DECL-ACTION".

    b.    Compromise the "independence" of any such "independent counsel" by directly paying and thus developing a direct relationship with and control over such "independent counsel".

    c.    Utilize misrepresentations and other abuse of process to obtain quick "declaratory relief" and resist bad faith claims;

    d.    Other actions as described herein.

**Disclosure of the ST.PAUL relationship to QAD**

85.    In 1999, in contrast with QAD's fraudulent concealment of its own insurance information, Vedatech Inc. disclosed to QAD, its insurance policy with ST.PAUL and its tender of the defense of the FIRST-ACTION to ST.PAUL.

86.    Although QAD's first set of attempts to deny insurance coverage to SUBRAMANIAN [by fraudulently concealing information about QAD's own insurance policies that might provide such coverage for the FIRST-ACTION,] had been effective, QAD still had a real problem with ST.PAUL providing even insufficient defense support to SUBRAMANIAN and VEDATECH.

**QAD and DESILETS decide to compromise ST.PAUL**

87.    Accordingly, unknown to VEDATECH and SUBRAMANIAN, QAD, DESILETS (and possibly CONNELL) immediately set out to weaken any support that ST.PAUL may be providing VEDATECH and SUBRAMANIAN

88.    For at least some periods preceding April 2001, QAD had placed its commercial general liability coverage ("CGL" policies) with the Chubb Group of Insurance Companies ("Chubb").  For example it is known that Chubb issued CGL policies to QAD covering periods from November 20, 1999 to November 20, 2000 [possibly including up to January 20, 2001], and from January 20, 2001 to January 20, 2002.

89.     In or around April 2001, the defendants involved in the DN-Enterprise and SP-Enterprise decided to form the DN-SP-Enterprise by secretly pooling costs and resources, and by defeating potential claims by VEDATECH and SUBRAMANIAN against QAD and ST.PAUL, even though ST.PAUL was supposed to defend VEDATECH from QAD.

**QAD bribes ST.PAUL**

90.     To this end, QAD secretly started placing policies with ST.PAUL without either ST.PAUL or QAD informing VEDATECH or SUBRAMANIAN, with the first such known policy being issued in July 2001, but backdated to April 2001.  It is not known if QAD cancelled the parallel, but previously issued, Chubb policy for that first year.

91.     QAD was issued form interrogatories in April 2001 in the state court, asking again for insurance information, and from April 2001 through July 2007, QAD, DESILETS and especially CONNELL deliberately and intentionally stonewalled and fraudulently concealed their relationship with ST.PAUL.

92.     QAD has continued this CGL policy with ST.PAUL secretly and continuously since then through at least August 2007, and most likely continuing beyond that.

93.     The premiums on these policies are not known, but from information and belief, would most likely be in the range of $150,000 - $250,000 a year.  In other words, in the period from April 2001 to August 2007, QAD has paid ST.PAUL, secretly and without disclosure to VEDATECH or the courts in light of the various disputes, around $1M - $2M (Million) in premiums, with presumably more to come in the following years.

**The DN-SP-Enterprise**

94.     Thus, in addition to the formation of the SP-Enterprise, a third association based essentially on what is effectively a combination of and/or cooperation between the DN-Enterprise and the SP-Enterprise came into force.

95.     The key member organizations in this "DN-SP-enterprise" are, ST.PAUL, QAD, USF&G, GCA, GPS, FBM [from 2004] and affiliated organizations.  The key ring-leaders [managers, decision-makers] that manipulated the resources of this enterprise were DESILETS, CONNELL, HOLTOG, TANCREDY, GREENAN, WANG, MAKIN, and

WULFF [from 2004 or earlier], who in turn received cooperation from others such as SALLIE (from 2003 or earlier). This association of individuals and business entities will be referred to as the "DN-SP-Enterprise" in this Complaint.

96.    The DN-SP-Enterprise's legitimate function could have been to attend to the individual *legitimate* goals of the DN-Enterprise and SP-Enterprise (as detailed above) [subject to proper disclosure of conflicts of interest etc.]. On the other hand, the defendants that were members of this enterprise used it to also engage in racketeering activities designed to intimidate VEDATECH and SUBRAMANIAN from pursuing any legal remedies against ST.PAUL and/or QAD, and causing financial, economic and business harm that will weaken VEDATECH and SUBRAMANIAN sufficiently to force VEDATECH and SUBRAMANIAN to abandon all such legal rights and remedies. From the beginning, the core strategy for the misuse of the DN-SP-Enterprise by such defendants has included the following actions *in addition to* the strategies adopted in the misuse of the individual DN-Enterprise and the SP-Enterprise by such defendants:

a.    QAD continues to place CGL policies with [bribes] ST.PAUL in return for ST.PAUL withdrawing defense or minimizing defense support to VEDATECH and SUBRAMANIAN in the FIRST-ACTION.

b.    The QAD-ST.PAUL relationship is kept secret from VEDATECH, SUBRAMANIAN and the courts.

c.    If the insurance claims of VEDATECH and SUBRAMANIAN could not be defeated in the ST.PAUL-DECL-ACTION, then quickly settle the claims by QAD against VEDATECH and SUBRAMANIAN so that QAD can avoid an action for malicious prosecution and/or can have additional funds to resist the VT-COUNTER-ACTION within the FIRST-ACTION;

d.    Other actions as described herein.

**Worsening effect of ST.PAUL's denial of benefits**

97.    By December 2001, the last "firm" that represented the Vedatech parties [including SUBRAMANIAN], Robinson and Wood, of San Jose, had given formal notice of

intent to withdraw, and ST.PAUL decided to exploit the financial weakness of their insureds to escape their obligations under the relevant insurance policies by filing the ST.PAUL-DECL-ACTION as described above.

### The bogus "declaratory" action

98.     With the bribery scheme of QAD in place, ST.PAUL moved fast under these schemes.  To formalize the denial of benefits to the Vedatech parties, ST.PAUL joined forces with GPS [from an unknown date before February 2002], and prepared and filed a "declaratory relief" action in February 2002 in the Santa Clara County Superior Court as CV 805197, (the "ST.PAUL-DECL-ACTION"), claiming rescission of the insurance policies involved, on an invented and frivolous basis of "misrepresentation".

### SUBRAMANIAN forced to act *pro se*

99.     In May 2002, ST.PAUL's refusal to support the defense of the QAD-FIRST-ACTION promptly bore fruit when the last "firm" representing VEDATECH and SUBRAMANIAN withdrew citing non-payment of fees.

100.     From that point onwards SUBRAMANIAN was forced to act *pro se*, and further forced to retain a sole practitioner [from August 2002] willing to provide representation for the Vedatech corporate parties at the rates offered by ST.PAUL but with SUBRAMANIAN [in addition to doing work regarding his own representation] providing all of the work for the parts that were not funded  by ST.PAUL or otherwise unfunded.

### Progress of the ST.PAUL-DECL-ACTION

101.     The ST.PAUL-DECL-ACTION was removed to the district court in June 2002 on diversity grounds as C-02-cv-03061, but remanded immediately in October 2002 on the basis that the corporate party VEDATECH [which was unrepresented because of Robinson and Wood's withdrawal] did not formally join in the removal petition.

### The unexpectedly strong counterclaims from the Vedatech parties

102.     ST.PAUL believed [and openly boasted with statements to the effect] that it will get a quick judgment on the pleadings and/or summary judgment on its "declaratory relief" action, incidentally fulfilling the terms of its secret deal with QAD.

103.    Unfortunately for ST.PAUL, and for QAD, in June 2002, VEDATECH and SUBRAMANIAN asserted strong counterclaims for insurance bad faith in the ST.PAUL-DECL-ACTION, as they had to.

**The "interim" arrangement of July 2002**

104.    ST.PAUL, in response to the counterclaims and in order to minimize their own exposure to further bad faith claims, agreed to reimburse the Vedatech parties within one month of submission of copies of invoices regarding defense costs but even that only at their stated hourly rate for "independent counsel" of $185/hour (at which the Vedatech parties could only find a sole practitioner for representation of the corporate parties). The bad faith inherent in this is reflected in the fact that ST.PAUL paid GREENAN and other members of GPS for prosecuting this ST.PAUL-DECL-ACTION at a rate higher than what they were offering to VEDATECH, viz., GREENAN and MAKIN charge ST.PAUL at $250/hour and the associate WANG charges ST.PAUL at $185/hour.

105.    ST.PAUL continued to boast that the counterclaims would be defeated soon by demurrer and that their obligations to fund will cease soon.

106.    ST.PAUL, in implementing its scheme to corrupt even the sole practitioner retained as "independent counsel" by VEDATECH, changed its reimbursement policies and started sending reimbursement checks directly to the sole practitioner representing VEDATECH, contrary to the practice until that time in not dealing with such independent counsel directly, and building up a direct relationship with such "independent" counsel.

**Demur, Demur and Demur again…**

107.    From June 2002 to January 2004, ST.PAUL made repeated attempts to demur to the counterclaims of the Vedatech parties in the ST.PAUL-DECL-ACTION, and the last such attempt was defeated in January 2004, when the state court accepted that viable claims for insurance bad faith, fraud and unfair competition, had been set out in the third amended cross-complaint of the Vedatech parties, (but for minor issues with the cause of action for "constructive fraud" and conspiracy thereof, for which permission to amend was given, and which issues were fixed in the Fourth Amended Cross-Complaint in the same action).

108.     At the oral hearing on January 13, 2004, ST.PAUL made its last stand against the pleadings when, WANG, the attorney for ST.PAUL unsuccessfully pushed ST.PAUL's various mischaracterizations and misrepresentations [which ST.PAUL continues to promote]:

7          **MR WANG**:  […] Vedatech has brought these affirmative
8          claims against St.Paul, that are based upon the repetitive
9          allegations that the payments are partial, skimpy, and
10         delayed.
11              Now, the allegation --.
12         **THE COURT**:        It's more than that.  It's more than
13         that.  It's also – it's also alleged that the contract.
14         should be reformed, as it was based upon a mistake or fraud;
15         that Vedatech K.K. was omitted as a named insured;  that it
16         was the intention of the parties to name Vedatech K.K. as
17         insured;  that the premiums were based upon and including
18         Vedatech K.K. as insured.  And it seems to me that they
19         raised the issue.
   […]
1          So I think there's more than just delay in making payment,
2          inadequate payment.  And those two things, alone, with
3          regard to a named insured, could constitute breach of the
4          contract.  It could constitute a breach of the implied
5          covenant [of] good faith and fair dealing, as I mentioned
6          earlier.  And if it was done intentionally, it could
7          constitute actual fraud.  It certainly could be negligence
8          on behalf of the insured's company if those facts turn out
9          to be true.
10         So all we're looking at here, and as I said, it's not the
11         most artful pleading that I've ever read;  in fact, it may be
12         one of the most inartful that I've ever read; but the facts,
13         the ultimate facts, ultimately, I think show up in the
14         pleading.  Okay.

109.     WANG continued to attempt to defeat the counterclaims at this January 2004 hearing, but failed.

15         **MR. WANG**:  […]  There's simply no allegation that even if Vedatech
16         Corporation was the same as Vedatech K.K., that any benefits
17         have been denied by St.Paul in the process of paying for their defense.
18         **THE COURT**:  Well, you denied that they are insured,
19         that they are covered.  Haven't you?
20         **MR. WANG**:  Yes, we have, because they're not listed
21         on a policy;  and that's something that's clear that the court
22         can take notice of.
23         **THE COURT**:  Well, that's an issue in the pleadings.

110.    Mr. Greenan, the partner at GPS representing ST.PAUL, then attempted to persuade the Judge to dismiss the cross-complaint but failed.

### Plan B and the mediation conspiracy

111.    It is at this point that ST.PAUL and QAD rolled out their Plan B, requesting a "mediation" – but what they did not tell the Judge was that they wished to secretly settle QAD's spurious "claims" in the FIRST-ACTION so that ST.PAUL did not have to spend any more monies defending the FIRST-ACTION *even while maintaining the contradictory position that there was no valid insurance policy to begin with and/or that ST.PAUL reserves the rights to get reimbursed for all past disbursements*.  This was so, because, given the pendency of the cross-complaints that Judge Komar had refused to dismiss, they could not afford to simply stop even the partial, skimpy, delayed reimbursements they were making.

### Fraudulent concealment of critical conflict of interest

112.    Neither at his hearing or before this hearing, nor for years after this hearing, did QAD or ST.PAUL ever disclose to either the Judge or the Vedatech parties that (a) ST.PAUL was QAD's insurers, and (b) that QAD and ST.PAUL had a secret understanding regarding a plan to compromise the legal rights of the Vedatech parties, and (c) that ST.PAUL and QAD had agreed to a "Plan B", which could not work without the secrecy of "mediation", and (d) that ST.PAUL and/or GPS had previously worked with WULFF and could depend on him to join [or that WULFF had already joined] the DN-SP-Enterprise.

### "Plan B" of the DN-SP-Enterprise

113.    An underlying understanding of the DN-SP-Enterprise was that in return for QAD placing a multimillion dollar premium commitment with ST.PAUL, ST.PAUL would stop defending the FIRST-ACTION, even partially.  When even this failed because a strong insurance bad faith claim survived three separate demurrers over a period of a year or more, ST.PAUL could not simply withdraw benefits from VEDATECH, since they knew fully well that they were deliberately engaging in insurance bad faith activities.  Accordingly, "Plan B" was engaged with much alacrity, which meant that ST.PAUL and QAD then had to negotiate a settlement of the FIRST-ACTION that was favorable to QAD and ST.PAUL.

**Normal honest settlement discussions posed problems for ST.PAUL and QAD**

114.    Normally, it is not easy for any such negotiations for settlement to be done in secret.  This is because ST.PAUL and QAD were maintaining the façade that ST.PAUL was the Vedatech parties' insurers only, and that they were negotiating at arm's length with QAD. Even more importantly, ST.PAUL would have a duty to disclose all details of any such negotiations to the Vedatech parties and jump several other legal hurdles before any settlement could be negotiated with QAD (such as giving VEDATECH a chance to take over the defense).  But this would defeat the secret goal of saving QAD from a future malicious prosecution action.  ST.PAUL already had some success in pushing the envelope in the Hurvitz v St.Paul case, and they decided to go a lot further.

**A secret "mediation" was the way out**

115.    Accordingly, ST.PAUL and QAD (including and through DESILETS, DOORDAN, CONNELL, GPS, WULFF, ANDERSEN-US) decided that they must have a "mediation" in order to create an opportunity for these parties to engage in free discussions that could be cloaked in secrecy.  In this way, the existence and operation of the DN-SP-Enterprise could be hidden.

**Submission of Plan B at the January 2004 hearing**

116.    GREENAN (attorney for ST.PAUL) first submitted to the Court that the parties had "agreed" in their CMC statements that mediation might be appropriate (in the text below, MR. KNOPF is the attorney for the Vedatech corporate parties):

```
18        MR. GREENAN:  Your Honor.  My suggestion is, as I
19     reviewed the case management conference statements, I noted
20     that there was an agreement on one point, and that is that
21     mediation was something that – that we think would be
22     appropriate;  Mr. Subramanian['s CMC statement, thinks would be
23     appropriate;  …
[…]
26             I would – and I also saw the name on some of the papers
27     of a very skilled mediator:   Randy [WULFF], suggested.  I have
28     had experience with [WULFF], and I have confidence in him.
1             And I would make a suggestion that we – court order
2      parties participate in mediation and find the first available
3      date for [WULFF], if he was acceptable to all parties.
```

4            THE COURT: You respond to that.
5            MR. KNOPF: We are amenable to that arrangement.

**"Stipulation" as a precondition BEFORE the Judge made any orders**

117.    The Vedatech parties would never have indicated mediation as an option in their CMC statements if they had known that ST.PAUL was secretly also QAD's insurers, would not have been amenable to "mediation" as expressed to Judge Komar at the January 13, 2004 hearing before he made any orders, and would not have agreed to the concept of mediation at that hearing.  In addition, the Vedatech parties would not have agreed to ST.PAUL participating in any such mediation with QAD [the Vedatech parties' "amenability" to mediation did not include ST.PAUL nor did it involve the ST.PAUL-DECL-ACTION.  It was meant to address only the QAD-FIRST-ACTION and settlement efforts with QAD.  The Vedatech parties would also have not accepted mediation at that stage had they had known of the extent and nature of ST.PAUL's and/or GPS's prior dealings with WULFF.  ST.PAUL could never have had official sanction from the Court for the cloak of mediation secrecy but for the reliance of the Vedatech parties on the fraudulent misrepresentations of ST.PAUL (and QAD and WULFF).

**The oral "orders" made by the Judge**

118.    In the event, the Judge stated that he was "ordering" mediation subject to the conditions that "all parties agree and so stipulate".  ANDERSEN-US did not agree nor did it stipulate at the hearing and the Judge ordered mediation "*subject to* [the attorney for ANDERSEN-US] *getting approval*".  A bit later, in response to SUBRAMANIAN's concerns the Judge simply repeated that he was ordering "*you*" to go to mediation "*before* [WULFF]".  No written order was ever made confirming these particular statements made by the Judge at the January 13, 2004 hearing:

8            THE COURT:  I'm not going to do anything with the
9     trial date;  **but if all parties agree and so stipulate**, I will
10    order you to mediation before Mr. Wolf.
11           MS QUAN:    I would need to – This conversation,
12    I'd have to consult with Arthur Andersen, if they intend to
13    bring them into this mediation.

14          **THE COURT**:  Well, I'm going to order it subject to
15    your getting approval.  If you have a problem, come back and
16    and tell me about it.
[…]
24          **MR SUBRAMANIAN**:  Your Honor, in my CMC statement
25    in the QAD case, Mr. Greenan had not given us advance notice
26    of his discussions with QAD;  so although we're amenable to
27    mediation, we didn't know that.  But restricting ourselves to
28    the QAD case.
[…]
8           **THE COURT**:  Mr. Subramanian, I'm not going to make
9     any orders…
10          **MR. SUBRAMANIAN**:  Not today, Your Honor.
11          **THE COURT**:  …Trial.
12          **MR SUBRAMANIAN**:  I'm not asking for an order.
13          **THE COURT**:   Right now, I'm ordering you to go to
14    mediation.
15          **MR. SUBRAMANIAN**:  Yes, Your Honor.
16          **THE COURT**:  With Mr. Wolf.  […]

119.   By early February 2004, the Vedatech parties withdrew their consent to

mediation, and then ANDERSEN-US apparently gave consent.  Judge Komar made further

"coercive" orders regarding mediation in February and March 2004 because of his belief, as

he told an attorney for VEDATECH at one of these hearings, that the parties had all agreed to

such mediation, and he was simply implementing such a prior agreement between the parties.

**The coercive mediation orders were a nullity**

120.   Under California law the coercive mediation orders were void since the Court

had not jurisdiction to force any party into mediation.  The March 2004 order for example,

misleadingly states on the cover page as being a "stipulation" but the signature pages clearly

indicate that the Vedatech parties did not join any such proposed "stipulation".  In fact, the

order was made in spite of strong objections from the Vedatech parties.

**Attendance at the mediation**

121.   The Vedatech parties did not know about the conflicts of interest that

ST.PAUL had, the conflicts of interest that WULFF had, and did not know that WULFF and

ST.PAUL would directly target and [attempt to] compromise the attorneys for the Vedatech

corporate parties.  This the reason they did not mount any further challenges to the mediation order after the March 4, 2004 coercive order and the mediation itself on March 12, 2004.

### Conflicts of interest even before the mediation could start

122.    The parties met at the offices of WULFF in Oakland, California on March 12, 2004, before the commencement of the mediation.  WULFF made a short speech and invited the parties to agree to start the mediation if everyone agreed with the general description of the process that he had described.

123.    SUBRAMANIAN attempted to prevent the mediation from starting because, [even without knowledge of the secret relationship between QAD and ST.PAUL and the prior secret relationship between ST.PAUL and WULFF,] SUBRAMANIAN was concerned about the lack of safeguards in the process described by WULFF.  It was clear to SUBRAMANIAN that the inherent conflicts of interest would seriously prejudice the interest of the Vedatech parties.

124.    For example, WULFF's proposal for the mediation involved freedom for anyone to have secret confidential discussions with anyone else, and further suggested that ST.PAUL was free to strike "deals" with the attorneys for the Vedatech corporate parties regarding the unpaid "fees" that ST.PAUL was delaying reimbursement for, if such attorneys would "cooperate" with ST.PAUL and/or WULFF.  Essentially ST.PAUL and WULFF were using the improperly withheld amounts due to VEDATECH as reimbursement to coerce and procure breach of the VEDATECH attorney's ethical and legal obligations to his clients.

125.    In fact, SUBRAMANIAN specifically requested WULFF, ST.PAUL and QAD that the mediation be held as an open three-way session so that ST.PAUL, QAD and the Vedatech parties could attempt to settle this, or at least prevent ST.PAUL from caucusing privately with QAD.  GREENAN, CONNELL rejected this and WULFF also rejected the idea.  This only served to heighten concerns on the part of SUBRAMANIAN.

126.    Furthermore, WULFF, exerted duress and by misrepresenting the extent of disclosure regarding his prior contacts with other counsel, forced the Vedatech parties to sign a document [that WULFF did not sign] regarding the conduct of the mediation.

**Complaint**                     Page 30 of 54

**Phase I of the mediation**

127.    In the event, SUBRAMANIAN signed the proposed document and tentatively agreed to participate in a first phase of the mediation if WULFF would permit the Vedatech parties to attempt to negotiate a settlement with QAD without the involvement of ST.PAUL, given the conflicts of interest and constant attempts to compromise the integrity of the attorneys for the Vedatech corporate parties who had been put on an edge [and softened up] by deliberate withholding of reimbursements to VEDATECH for large sums of past due fee requests.

128.    SUBRAMANIAN specifically told WULFF that the mediation should terminate if the Vedatech parties terminated it.

129.    It was close to noon on March 12, 2004 by the time the "agreement" was signed by the Vedatech parties and the first part of the "mediation" could start.  The mediation attempt with QAD failed and the Vedatech parties left around 4:00 pm on March 12, 2004 after asking WULFF to terminate the entire "mediation".

**Misrepresentations by CONNELL, ST.PAUL and others regarding Phase I**

130.    Contrary to the false characterizations of CONNELL and the attorneys for ST.PAUL, the Vedatech parties in good faith attended the full mediation that was intended by the original CMC proposals – viz., an attempt by the Vedatech parties to settle with QAD. They tried, the efforts failed and there was nothing more to do.  What WULFF and ST.PAUL wanted to do next was to have the attorneys for the Vedatech corporate parties disclose attorney-client confidential information to help ST.PAUL negotiate with QAD, and otherwise have secret negotiations between ST.PAUL and QAD.

131.    SUBRAMANIAN was [rightfully] concerned about the impropriety of these proposed activities and specifically told WULFF about his concerns.  It is for these reasons and under these conditions (i.e., after making a good faith attempt to settle matters with QAD, and realizing the impossibility of any fair settlement with QAD on that day) that SUBRAMANIAN left.  If SUBRAMANIAN had known of the conflict of interest between ST.PAUL and QAD, he would have left in the morning and reported that to Judge Komar.

132.    In addition, WULFF charges around $10,000 a day for his "services". Although QAD and ST.PAUL [for obvious selfish reasons] paid for the first day's services, any sessions lasting into the evening would have cost more money [for overtime etc.] and it was not decided who was going to pay for it.

133.    No order of a Court can force a party to pay a private mediator, exorbitant [and some might say extortionate] rates of $10,000 or more per day, and in fact, for that reason alone the "coercive" mediation orders of Judge Komar were void and null [in addition to the fact that the March 2004 order, ordered the Vedatech parties to sign contracts with the private party WULFF].

134.    In any event, the Vedatech parties did comply fully with the terms of the Order, even though they disagreed with it, and they had every right to terminate the mediation even under the terms of the coercive orders.  There was no controversy or dispute between ST.PAUL and QAD and there was no "mediation" necessary after the termination of the "mediation" by SUBRAMANIAN a little after 4:00 PM on March 12, 2004.

135.    Thus the mediation was lawfully terminated by the Vedatech parties, after good faith participation in the same, and ST.PAUL and QAD and WULFF unlawfully continued to use that as an excuse to strike secret, collusive and unlawful agreements.

136.    Even if the Vedatech parties had stayed back, under the terms of WULFF's "mediation" procedures, ST.PAUL and QAD would have and could have negotiated secretly amongst themselves.  The main purposes of requiring the presence of the Vedatech parties was (a) to provide a justification and cover for the illegal and unlawful activities of ST.PAUL and QAD and WULFF, and (b) to compromise the financially intimidated sole practitioner attorney for the Vedatech corporate parties to breach his attorney-client confidentiality and assist ST.PAUL and QAD in their unlawful activities under the cloak of mediation secrecy.

137.    In fact, a proposition was made to SUBRAMANIAN before he decided to terminate the mediation that the attorney for the Vedatech corporate parties had an independent duty to ST.PAUL that overrode his ethical obligations to the Vedatech corporate parties [a patently unlawful assertion] which would make a mockery of the title of

"independent counsel". This was the result of the corrupting influence of ST.PAUL's direct financial dealings with the sole practitioner attorney. This was another major reason for SUBRAMANIAN's decision to terminate a mediation in which he had participated in good faith all day long in spite of his reservations.

**The secret Phase II of the mediation**

138. After he left in the evening of March 12, 2004 from the offices of WULFF, SUBAMANIAN believed that the mediation had terminated. Neither WULFF, nor QAD, nor ST.PAUL, nor GPS, nor GREENAN, nor WANG informed SUBRAMANIAN or any of the Vedatech parties that they were in any way or manner continuing the "mediation".

139. On the morning of Monday, March 15, 2004, SUBRAMANIAN appeared in the state court before Judge Komar for an ex parte hearing which was attended by WANG on behalf of ST.PAUL. Then around noon on March 15, 2004, WANG and his associates came to the offices of the attorney for the Vedatech corporate parties where they met extensively with SUBRAMANIAN. The stated purpose of the meeting was for WANG to go through the discovery documents produced by QAD to VEDATECH in the QAD-FIRST-ACTION.

140. Neither WANG nor anybody else made any mention of any negotiations that were ongoing between QAD and ST.PAUL [and WULFF].

141. But unknown to the Vedatech parties, ST.PAUL and QAD and WULFF continued negotiations, and as stated in the Courthouse in San Jose in the morning of March 16, 2004, some kind of an oral agreement had been reached between ST.PAUL and QAD that very morning. In fact, CONNELL specifically relied upon this supposed "agreement" to request the state court to nullify the removal notice of the QAD-FIRST-ACTION to the federal district court [which eventually was assigned to Judge Hamilton and remanded].

142. On March 17, 2004, SUBRAMANIAN wrote to GREENAN and CONNELL (and to DESILETS) requesting details of this "oral agreement" since GREENAN had stated on March 16, 2007 that the "agreement" between QAD and ST.PAUL was not in writing yet.

143. No information was provided by ST.PAUL, QAD, GREENAN or CONNELL and they proceeded with their secret deliberations.

**Secretly negotiated "written agreement" executed**

144.     A written "settlement agreement" was executed [concluded] between QAD and ST.PAUL on March 25, 2004 (the "Settlement Agreement").  .

**The Mediation Action and removal of the insurance action**

145.     On March 30, 2004, the Vedatech parties filed an action in this district court as 04-1249 VRW.  The ST.PAUL-DECL-ACTION was removed to federal court in April – May 2004 as 04-1403 VRW and 04-1818 VRW.

146.     The DN-SP-Enterprise then embarked on a series of actions meant to defeat the new mediation action and the removed action by illegal and improper means.

**Fraudulent submissions by Mr. Ingersoll of FBM on behalf of WULFF**

147.     On August 26, 2004, Mr. Andrew W. Ingersoll, who works under the supervision of Mr. Douglas Young at FBM (WULFF's attorneys), filed a declaration in the action 04-1249 VRW [filed as Docket #64 thereof] in which he knowingly and intentionally misrepresented a conversation he had with the ADR administrator Ms. Elizabeth Strickland in the Santa Clara County Superior Court.  His motivation was to "prove" that the Vedatech parties had not exhausted supposedly available administrative remedies in the state court before filing this action [an argument made in this "motion to dismiss"].  Not only are no such remedies available for private and non-court-managed mediation such as that conducted by WULFF, the simple fact is that the declaration of Mr. Ingersoll is false.

148.     SUBRAMANIAN pointed this out by letter to the Judge dated September 26, 2004 and filed on September 29, 2004 at Docket #84 in 04-1249 VRW.

149.     Neither WULFF, nor FBM, nor Mr. Ingersoll have retracted that statement, nor have they provided any qualifications or clarifications

**Further misrepresentations at the September 16, 2004 oral argument**

150.     Neither ST.PAUL nor QAD nor WULFF informed the district court of the fact that ST.PAUL was QAD's insurers from April 2001, and were QAD's insurers at the time of the "mediation" and indeed had renewed their insurance agreement in August 2004, just a month before the oral hearing on September 16, 2004 in the district court.

**Misrepresentations in the written submissions**

151.    These misrepresentations were compounded by further misrepresentations by ST.PAUL, QAD and WULFF in their legal and factual written submissions made in the 04-1249 proceedings both in the period between March 2004 and September 2004, but also in the period after September 2004 and Mar 2005 when, by invitation of the Court, ST.PAUL, QAD and WULFF filed various motions seeking "sanctions" against the Vedatech parties: these misrepresentations being (a) the non-disclosure of the fact that ST.PAUL was QAD's insurers and (b) inherent in the presentation of arguments supporting the "right" of ST.PAUL and QAD to conclude such an "agreement", to participate in such a "mediation", and to conduct secret "negotiations", under the cloak of mediation secrecy or otherwise.

152.    Specifically the misrepresentation extends to the presentation by both QAD and ST.PAUL of the *Hurvitz v St.Paul* case in support of the purported right to so "settle" the matter, whereas that case would be even more inapplicable in a situation where the "insurer" has a serious conflict of interest in representing both sides of the dispute.

153.    In this case, the conflict is even more egregious because of the scheme where ST.PAUL is receiving very large sums in premiums from one party in order to destroy the legal rights of a smaller party whose premiums were considered to be pocket change to ST.PAUL in comparison.  In turn the premiums that ST.PAUL has received from QAD are far greater than the partial "benefits" that ST.PAUL has reluctantly provided for the defense of the QAD-FIRST-ACTION to-date, even after including the amount that ST.PAUL has "paid" QAD in "settling" the claims against the Vedatech parties in that action.

**Misrepresentations in the Court of Appeal**

154.    The misrepresentations of Mr. Ingersoll, and the misrepresentations of ST.PAUL and QAD [and WULFF] hiding the true relationship between ST.PAUL and QAD continued in the written submissions of ST.PAUL, QAD and WULFF in the Court of Appeal and at the oral argument in May 2007.

155.    Neither WULFF, nor FBM, nor INGERSOLL nor YOUNG have ever corrected these misrepresentations nor have they denied that these are misrepresentations.

**Further Misrepresentations in the Court of Appeal by WULFF**

156.    WULFF made further misrepresentations in various motions in the Ninth Circuit regarding the nature of prior orders therein, and, in written briefs, further misrepresented the nature of the orders made in State Court, such as, for example, regarding the nature of the proceedings where Judge Komar graciously and voluntarily recused himself in September 2005 in response to a request for disqualification for cause filed by SUBRAMANIAN. WULFF actually presented this falsely as an example of a misrepresentation by the Vedatech parties, an unfair and untrue and malicious accusation.

157.    The Vedatech parties have corrected this false accusation by WULFF and WULFF has not challenged the correction of the Vedatech parties.

**The "consummation" of the mediation agreement**

158.    QAD, in August 2005, dismissed with prejudice all of its claims against the Vedatech parties pending in the state court in the consolidated QAD-FIRST-ACTION.

**Recusal of Judge Komar**

159.    As noted above, in September 2005, SUBRAMANIAN filed a request for disqualification of Judge Komar for cause in the state court, and Judge Komar, albeit filing a declaration in opposition at first, within hours of doing so, reversed course and most graciously recused himself voluntarily.

**The action for malicious prosecution**

160.    On May 5, 2006, SUBRAMANIAN filed an action in the district court, 06-3050 VRW, detailing claims for malicious prosecution relating to the QAD-FIRST-ACTION and copyright infringement claims. A first amended complaint was filed on July 27, 2006.

161.    The copyright infringement activities of QAD alleged in that action are ongoing and QAD continues to commercially benefit from the same.

162.    On February 21, 2007, the Court dismissed the cause of action for malicious prosecution specifically relying on the "settlement" between ST.PAUL and QAD being consummated [to use QAD's description] in August 2005. Without a reconsideration and

change of decision by the district court or reversal on appeal, the malicious prosecution cause of action is lost forever for the Vedatech parties.

### QAD's refusal to disclose insurance information

163.    In the 06-3050 action, a settlement conference was conducted in August 2006. In the lead up to that conference, QAD first refused to provide any insurance information and after a motion to compel ordering it to produce such information, QAD not only obtained, improperly, a "protective order" regarding such information [which was later clarified to be limited and for the duration of the settlement conference only], but reluctantly disclosed that ST.PAUL had been their CGL insurers since April 2001.  Even at this stage, QAD refused to provide any policy documents for ST.PAUL between August 2003 and August 2004, the very period that covers the preparation for and conduct of the fateful "mediation".

164.    After the ADR process failed in 06-3050 and the insurance information became disclosable under Federal Rules of Civil Procedure rule 26, QAD still stonewalled and after much effort and many letters, reluctantly, in January 2008, QAD provided a copy of a small part of ST.PAUL's insurance policy that confirmed that ST.PAUL did continue and renew the CGL policy for QAD from August 2003 to August 2004.

### WULFF's repeated efforts to inflame and promote bias against *pro se* parties

165.    In oral argument and written submissions both in the district court, and again before the Court of Appeals in the Mediation case, WULFF through his attorneys at FBM (Mr. Young), attempted to corruptly influence the court by denigrating SUBRAMANIAN's status as a *pro se* litigant [putting aside the fact that the continuing inability to afford qualify legal support is directly because of the various activities of these various defendants as detailed herein], in a derogatory and corrupt way, and attempted to stigmatize SUBRAMANIAN and create prejudice in the mind of the court by <u>falsely</u> characterizing the legal disputes as one between SUBRAMANIAN in his *pro se* capacity and Judges and attorneys and the legal profession in general on the other side.  WULFF and his attorneys mocked the statutory right of SUBRAMANIAN to conduct his own case under *28 U.S.C. §1654* as somehow being an improper means of seeking justice and thus corruptly diverted

1   attention away from the merits of the case and diverted attention away from their extensive

2   abuse of the judicial process, and purposefully misled the Court into making orders that

3   disregarded the legal issues and facts underlying the dispute.

4   166.   To give a small but illustrative example, WULFF's attorneys falsely

5   characterized the filings by SUBRAMANIAN in the district court regarding "errata" as

6   somehow being improper or excessively numerous whereas such filings simply corrected

7   spelling mistakes and some minor errors that even the district court did not and could not and

8   would not criticize.  In addition, the number of docket entries was not something that was

9   regarded as being problematic in any way or manner either by the district court or as a matter

10  of law.  Nevertheless, by falsely creating prejudice against a *pro se* party, WULFF's attorney

11  Mr. Young was able to corruptly obtain a judgment that awarded sanctions under 28 U.S.C.

12  §1927 for such "errata".

**Other acts by ANDERSEN-US and ANDERSEN-WW**

13  167.   ANDERSEN-US and ANDERSEN-WW actively assisted QAD, CONNELL,

14  DESILETS and DOORDAN in forcing the "mediation" that would provide an opportunity

15  for QAD, ST.PAUL and WULFF to complete secret negotiations as described above.

16  168.   Further to that, ANDERSEN-US and ANDERSEN-WW actively assisted

17  QAD, CONNELL, DESILETS and DOORDAN by joining in all of their legal submissions

18  in the further progress of the QAD-FIRST-ACTION in the state court.

**Other acts by LEE (in addition to those already detailed above)**

19  169.   LEE assisted QAD in all activities of the DN-Enterprise, e.g., by fraudulently

20  concealing information from plaintiffs in the QAD-FIRST-ACTION, and in the period from

21  August 2005 to May 2006, by providing false declarations that successfully defeated the

22  action against her in the QAD-FIRST-ACTION.  Specifically LEE's declaration under oath

23  is false for the reasons described earlier in these pleadings.  LEE's declaration denies various

24  individual items of the verified complaint, and these denials and each and every one of them

25  are false and fraudulent.  LEE also false suggests that she did not have any role in the

26  decision to terminate SUBRAMANIAN's role in OLD-QAD-JAPAN and that is false.

**Complaint**          Page 38 of 54

**Other facts regarding the defendants' fraud upon the court**

170.    ST.PAUL, QAD, and CONNELL falsely characterized their "authority" to settle the claims settled by the "settlement agreement" both to the district court and to the Ninth Circuit.  First, the "agreement" itself, in reserving ST.PAUL's rights to pursue the ST.PAUL-DECL-ACTION was reserving the right to prove that the underlying insurance agreements are void and/or voidable for fraud [claim for rescission].  As detailed further in the paragraphs under the cause of action for "fraud" below, ST.PAUL not only did not have authority to "settle" without permission from the Vedatech parties, [especially in light of its fraudulent withholding of its status as insurers for QAD], the statement by ST.PAUL, QAD and CONNELL repeatedly to the Court that all they did was to "settle" is a serious misrepresentation which attempted to hide the fundamental problem with the "agreement" – a term of the agreement states that ST.PAUL does not have the authority [or reserves its rights to prove that it does not so have authority] to enter into such an agreement.

171.    Added to this are the various egregious misrepresentations of law already detailed in the submissions of plaintiff to the Court which when uttered by an officer of Court is a misrepresentation of a fact i.e.., they are falsely stating it to be a true proposition of law.

**The question of WULFF's immunity**

172.    Plaintiff disputes that WULFF is eligible for immunity for any federal cause of action, and to the extent plaintiff can get relief from the judgment granting immunity for state law causes of action, disputes immunity for WULFF for any state cause of action also.

173.    It is to be noted that the actions taken by WULFF subsequent to the "mediation" were not in any capacity as a mediator but simply as a civil litigant, so that to the extent that the Court may find any immunity for Wulff for activities regarding any "mediation", they do not apply to the facts alleged herein regarding obstruction of justice etc., and WULFF may not escape liability by means of claiming immunity.

174.    In addition, the "mediation" orders themselves were unlawful, the mediation was lawfully terminated around 4:00 PM on Friday, March 12, 2004, and ST.PAUL and QAD did not have a valid controversy to mediate to justify any "immunity".

# FIRST CAUSE OF ACTION

### To SET ASIDE THE ORDER AND JUDGMENT
### entered simultaneously in 04-1249 VRW, 04-1403 VRW and 04-1818 VRW
### on June 22, 2005 and December 27, 2007 respectively

175.    Plaintiff re-alleges paragraphs 1-174 above.

176.    The actions by ST.PAUL, QAD and WULFF constitute fraud upon the court sufficient to set aside, as a matter of law and/or in equity, the single set of order and subsequent judgment entered in 04-1249 VRW, 04-1403 VRW, and 04-1818 VRW.  QAD, ST.PAUL and WULFF have "attempted to subvert the integrity of the court".  The fraud involves fraud by officers of the Court:  Mr. Ingersoll on behalf of WULFF, both Mr. Ingersoll and Mr. Young in their filings and representations in the district court and the Court of Appeal, CONNELL in his oral representations and written submissions both before the district court and the Ninth Circuit [e.g., hiding knowledge of the insurance agreement between ST.PAUL and QAD], and GPS through its attorneys Mr. Greenan and Mr. Wang in their written and oral submissions in the district court and the Ninth Circuit.  Mr. Wang, for example, although having left GPS, attended the oral hearing in the Ninth Circuit.

177.    The facts described above are sufficient to plead "an unconscionable plan and scheme which is designed to improperly influence the court in its decisions".

178.    No order or judgment obtained under such circumstances should stand in law or equity and the Court is respectfully requested to set aside this order and judgment.

# SECOND CAUSE OF ACTION

### Civil RICO
### *Part I:*  18 U.S.C. §§ 1962 (c)

179.    Plaintiff re-alleges all of the allegations in paragraphs 1-178 above.

180.    Each of the defendants named herein are "persons" under 18 U.S.C. §1962(c);

181.    Each of the three groups of individuals and business entities, the DN-Enterprise, the SP-Enterprise and the DN-SP-Enterprise satisfy the requirement for being an enterprise under 28 U.S.C. §1961(4) "associated in fact although not a legal entity".

182.    All of the three enterprises described herein are involved in various activities that affect interstate and/or foreign commerce in their normal course of business;

183.    The actions taken by each and every one of these defendants satisfy the definition of "racketeering activity" as defined in 28 U.S.C. §1961(1) because they are cognizable offenses enumerated and/or recognized under 28 U.S.C. §1961(1):

**183.1    18 U.S.C. §1512 (relating to corruptly influencing official proceedings)**

*Section 1512 of Chapter 18 of the United States Code, subpart (c)(2)* is engaged with respect to "whoever corruptly…influences…any official proceeding, or attempts to do so".  The acts complained hereinabove by defendants WULFF, QAD, ST.PAUL, DOORDAN, DESILETS, CONNELL, LEE, GPS in providing false statements in their Court filings, in presenting false, misleading and/or fraudulent statements in court proceedings, and related acts described hereinabove fall under this category;

**183.2    18 U.S.C. §1341 (mail fraud);**

The fraudulent schemes detailed herein and the corrupt practices in obstructing justice were all conducted  by means of mail [postal service and private and commercial interstate carriers] and are cognizable under *section 1341 of Chapter 18 of the United States Code*.  The acts complained hereinabove by defendants WULFF, QAD, ST.PAUL, DOORDAN, DESILETS, CONNELL, LEE, and GPS fall under this category.

**183.3    18 U.S.C. §1343 (wire fraud)**

The fraudulent schemes detailed herein and the corrupt practices in obstructing justice were all conducted  by means of wire (fax, internet, telephone) and are cognizable under *section 1343 of Chapter 18 of the United States Code*.  The acts complained hereinabove by defendants WULFF, QAD, ST.PAUL, DOORDAN, DESILETS, CONNELL, LEE, and GPS fall under this category.

**183.4    18 U.S.C §1344 (financial institution fraud /bank fraud);**

The fraudulent schemes detailed herein involving (a) the payment made by ST.PAUL by "check" to QAD regarding the "settlement" "consummated" in August 2005, and (b) the payments made by ST.PAUL to the "independent counsel" directly with an intention

to corrupt their independence, including a payment made in or around March 2005, and (c) the insurance premiums paid by QAD to ST.PAUL for the CGL policies on an annual basis from 2001 through 2007 and presumably continuing beyond that period, and amounting to approximately $200,000 (maybe less, maybe more), constitutes an offense under *section 1344 (2)* which is directed at "whoever knowingly executes, or attempts to execute, a scheme or artifice—to obtain any moneys, funds…owned by, or under the custody of, a financial institution, by means of false or fraudulent pretenses, representations, or promises".  In addition, WULFF's financial transactions payments for his "services", both the initial payment and "overtime" charges for his additional services between March 12, 2004 and March 25, 2004 and perhaps beyond from or on behalf of QAD and ST.PAUL also are cognizable under this section.  The acts complained hereinabove by defendants WULFF, QAD, ST.PAUL, DOORDAN, DESILETS, CONNELL, LEE, and GPS fall under this category.

### 183.5      18 U.S.C. §2319 (criminal infringement of a copyright)

The continuing and repeated copyright infringement by QAD Inc. since at least 1998, involved (a) infringement that is willful and undertaken for commercial and private financial gain by defendant QAD Inc., has involved the reproduction and distribution, including by electronic means, during several periods of 180-day length, of 1 or more copies of the copyrighted works at issue in the related action 06-3050 VRW, and each work has a commercial value of significantly more than $1,000, (b) placing of fraudulent copyright notices in the Japanese-versions of software sold;  (c) fraudulent removals of copyright notices;  and (d) false representations in the copyright applications to the US Copyright Office;  and are violations of *section 2319 of Chapter 18 and section 506(a)(1)(A) and 506(c) and 506(d) and 506(e)  of Chapter 17 of the United States Code*.

184.     All of the racketeering activities described herein involve a pattern in that there are numerous acts in each category described above, always at least two and lasting for

several years, in the case of DN-Enterprise (from at least 1997), SP-Enterprise (from at least 2002 if not earlier), and DN-SP-Enterprise (from 2002 and more significantly, from 2004). In addition, they threaten to continue and in fact are continuing.

185.    Each one of the enterprises and its member entities, also engages in lawful activities such as normal legal work, normal business transactions and other commercial activities that are not characterizable as racketeering activities.

186.    Each of the defendant "persons" have conducted or participated, directly or indirectly in the conduct [and management and control and decision-making] of activities including racketeering activities in each of the enterprises that they are associated with, [with some of them belonging to more than one].

187.    Accordingly, each defendant is liable under 18 U.S.C. §1962(c).

188.    Plaintiff and the corporate Vedatech parties have been damaged in their business because of these activities of the defendants and seek all relief, monetary or otherwise for which they are eligible under the provisions of *section 1964(d)* of this Chapter, including, without limitation, threefold the damages to be proved at trial and the cost of the suit.

189.    One set of items of damage, without limitation is the permanent loss of the right to a malicious prosecution action against QAD [as matters stand now], and the near-permanent loss of the right to monetary damages and restitution in the QAD-FIRST-ACTION [through the VT-COUNTER-ACTION or otherwise] against QAD, DOORDAN, LEE, and other QAD affiliates, [as matters stand now], and the loss and/or delay of the right to damages in related proceedings, or the losses caused by the delay in realising damages for any of these actions even if any of them could be revived, including damages that have already accrued because of the delays and racketeering activities of such defendants.

190.    Another item of damage, without limitation, is the monetary damages incurred already because of the delays suffered in the prosecution of the actions against ST.PAUL, and the delays in the realizing the benefits of the insurance policies.

191.    Further particulars will be provided and proved at trial.

**Civil RICO**
*Part II:* **18 U.S.C. §§ 1962 (d)**

192.    Plaintiff re-alleges all of the allegations in paragraphs 1-191 above.

193.    To the extent any defendant is not directly liable under section 1962(c), they are liable for their role in acting as a conspirator in violating section 1962(c) in that they, and each and every one of them conspired to conduct or participate in the conduct [and management and control and decision-making] of activities including racketeering activities in one or more of the enterprises that they are associated with.

194.    Accordingly, each defendant is liable under 18 U.S.C. §1962(d) to the extent he or she or such business entity is not liable under 18 U.S.C. §1962(c).

195.    Specifically, defendants ANDERSEN-US and ANDERSEN-WW are liable under §1962(d) for their conspiracy regarding the activities complained about in paragraphs 183.1 to 183.4 above.

196.    Plaintiff and the corporate Vedatech parties have been damaged in their business because of these activities of the defendants and seek all relief, monetary or otherwise for which they are eligible under the provisions of *section 1964(d)* of this Chapter, including, without limitation, threefold the damages to be proved at trial and the cost of the suit.

197.    The examples of certain items of damages, without limitation, set out in paragraphs 189-191 are re-alleged and incorporated herein.

**Proximity and no need for reliance in the context of Civil RICO**

198.    Both with respect to damages pleaded under 18 U.S.C. §1962(c) and 18 U.S.C. §1962(d), plaintiff has alleged reliance on the fraudulent conduct and that the damages are the proximate result of such fraudulent activities and the reliance on such fraudulent activities.  Nevertheless, unlike for the common law cause of action for fraud, there is no need for any reliance to be demonstrated or proven in order to be eligible for the damages under the RICO provisions and the damages alleged herein are all, at a minimum, a proximate result of the predicate acts alleged and hence are recoverable as such.

**Statute of Limitations**

199.    The action in 04-1249 tolls any statute of limitations regarding this cause of action, either directly or by means of consolidation of this action with 04-1249 or by means of amendment in that action to reflect this cause of action.  Furthermore, the fraudulent concealment by the defendants of the various causes of action equitably tolls the statute of limitations of this and each and every cause of action that can be stated on the basis of the fact alleged herein.  For example, the fraud regarding ST.PAUL being QAD's insurers was disclosed in parts between July 2007 and January 2008.

**THIRD CAUSE OF ACTION**

**FRAUD**

200.    Plaintiff re-alleges all of the allegations in paragraphs 1-199 above.

201.    The facts alleged above plead with particularity a cause of action for fraud against ST.PAUL, QAD, and WULFF, relating to, *inter alia*, the misrepresentations regarding the non-disclosure of (a) the fact that ST.PAUL was and had been QAD's CGL insurers from April 2001 through at least August 2007 now, and that ST.PAUL was receiving premiums orders of magnitude more than the much smaller amounts it received from the Vedatech parties;  (b) the fact that WULFF and ST.PAUL (and/or its attorneys GPS) had a prior extensive relationship which prevented WULFF from being a true "neutral";

202.    First, ST.PAUL does not have a right to "settle" any case against the Vedatech parties since an insurer in breach of its contractual obligations under the insurance policies cannot exercise rights under the same.  As of January 13, 2004, there already was a *prima facie* case of insurance bad faith against ST.PAUL [as explained by Judge Komar and as established by the failure of ST.PAUL after three demurrers over a period of more than a year to defeat the insurance bad faith claims].

203.    Independently, as a matter of undisputed law, the fact that ST.PAUL has "reserved its rights" means that ST.PAUL does not have a right to settle any action against the Vedatech parties without their consent.

204.    Independently, without giving the Vedatech parties a chance to take over the defense of the QAD-FIRST-ACTION, ST.PAUL did not have a right to settle any claims against the Vedatech parties without their consent.

205.    Independently, because ST.PAUL claims rescission of the underlying insurance agreements in the ST.PAUL-DECL-ACTION, which has not progressed to final judgment yet, unless and until ST.PAUL resolves that matter or drops those claims and explicitly and unconditionally affirms the underlying insurance contracts / policies/ agreements, ST.PAUL cannot even claim a "contractual" right to settle any claims against the Vedatech parties, since ST.PAUL continues to assert that there is no such contract, and other than a contractual right it is unlawful for a third party to "settle" any claims against the Vedatech parties without their consent.  A Judge cannot force a settlement of a party's claims, a party's own attorney cannot without more force a settlement of a party's claims, and it would be outrageous to permit an insurer to settle a party's claim while insisting that the underlying contract is void [and while as has happened here, memorializing that position it the written "settlement agreement"].

206.    All insurance "contractual rights" are qualified by judge-made case law that sometimes severely limit or modify such rights.

207.    Independently, since a "settlement" destroys the constitutional rights of the Vedatech parties under the U.S. Constitution, Seventh Amendment, for a right to a jury trial in a civil matter, absent a contractual or statutory right to "settle", anyone so "settling" any claims against the Vedatech parties would be violating such constitutional rights.

208.    The "settlement agreement" that was agreed to between ST.PAUL and QAD declares that ST.PAUL either did not have a contractual right to "settle" or reserved its rights to nullify such contracts [policies] that purportedly give it the right to "settle".

209.    ST.PAUL has insisted after the mediation, and after August 2005 when this "settlement agreement" was "consummated" that it still wishes to pursue the ST.PAUL-DECL-ACTION including trying to void the insurance agreement that purportedly gave it the right to so "settle".

210.    The Vedatech parties clearly would not have given the consent that was essential to Judge Komar even granting the first [or the later] orders regarding a mediation before WULFF and including ST.PAUL.  In addition, ST.PAUL and WULFF practiced further fraud upon the Court in that while Judge Komar in the state court was presumably giving permission for the adverse parties to settle [QAD vs Vedatech parties] and perhaps [ST.PAUL vs Vedatech parties], ST.PAUL and QAD in reality simply wanted an opportunity to settle matters amongst themselves.

211.    Thus, the fraud alleged permitted ST.PAUL and QAD, with the help of WULFF to conduct negotiations, and in the guise of "settling" the claims against the Vedatech parties, in reality, permitted ST.PAUL and QAD to settle their own problems and fashion a solution that did not need the Vedatech parties' permission to settle.

212.    Without the commitment of this fraud, and without the cloak of a court-sanctioned mediation secrecy, ST.PAUL would have been required, as a matter of law, to offer the Vedatech parties a chance to reject the settlement and forego any further defense, which would not have benefited ST.PAUL at all since it would still have been exposed to a claim for any final judgment in the QAD-FIRST-ACTION.

213.    It is to avoid the restrictions of the law, that ST.PAUL without any intent to "mediate" in any fair way or manner, and with the help of WULFF and QAD [and ANDERSEN-US and ANDERSEN-WW] fraudulently arranged this "mediation".

214.    In addition, ST.PAUL and QAD clearly had a well thought-out, practiced and committed strategy to prevent any availability of funds for the Vedatech parties that could be used to get competent legal help to pursue the claims against QAD and ST.PAUL vigorously.

215.    Thus, representation, knowledge of falsity, intention to induce, actual inducement, and reliance have been pleaded adequately.

216.    But for the fraud, this "mediation" would never have happened, and ST.PAUL would have been forced to follow the lawful procedure for any "settlement", which would have either prevented a "settlement" or left the Vedatech parties with funds sufficient to get competent legal help to pursue their ripe insurance bad faith claims against ST.PAUL.

**Reliance?**

217.    Reliance on the fraud perpetrated by QAD, ST.PAUL and WULFF resulted directly in the orders by Judge Komar.  The question of why or how the Vedatech parties attended the mediation is secondary.   ST.PAUL was not willing to "settle" with QAD without the cloak of mediation secrecy – that cloak of mediation secrecy could not be obtained without the consent of the Vedatech parties.  Without the consent of the Vedatech parties at the January 13, 2004 hearing, none of the orders of Judge Komar, including the later "coercive orders" would have come about.  But for the fraud, in any open attempt by ST.PAUL to "settle" with QAD, the Vedatech parties would have accepted the burden of defense on their own, thus preventing this "settlement" which has compromised or threatens to permanently compromise the action for malicious prosecution against QAD.  But for the fraud, ST.PAUL would not have had any excuse to withhold defense cost reimbursements even for past and past due defense costs.  Accordingly, the fraud perpetrated by ST.PAUL and QAD directly caused the damages that followed.

**Proximate Harm and Damages**

218.    As a consequence of the fraud, ST.PAUL used the settlement as a reason to deny full reimbursement for past defense costs, and further sent two partial refund checks directly to the sole practitioner attorney who promptly filed to withdraw from the case, relying surprisingly mainly on his not being "paid".  These denials of benefits further compromised the Vedatech parties' ability to pursue their claims in the QAD-FIRST-ACTION leading to various additional costs and damages associated with the same, and which will be detailed and proved at trial.  The examples of certain items of damages, without limitation, set out in paragraphs 189-191 are re-alleged and incorporated herein.

219.    As a proximate result of such reliance upon the false promises of these Defendants, Vedatech Parties have sustained heavy damages, and continue to sustain damages, including, but not limited to, (a) loss of their cause of action for malicious prosecution against QAD [unless revised or reversed by the Court];  (b) loss of reimbursement of past defense costs to Vedatech by ST.PAUL which used the "settlement"

as a direct reason to deny further full reimbursement;  (c) losses arising from the compromise of the Vedatech parties' ability to properly retain legal representation because of ST.PAUL's justification of the "Settlement" to deny benefits that were already due, and (d) other costs related to various consequential and satellite litigation necessitated by such fraud, and (e) consequential damages caused by SUBRAMANIAN's inability to conduct other business and other incidental damages, all of which will be detailed further and proven at trial.

220.    The actual damages are in an amount in excess of $75,000, and to be determined at trial.

**Exemplary and Punitive Damages**

221.    The acts and conduct of these Defendants were, and continue to be oppressive, fraudulent, and malicious.  Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.

222.    Defendants' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.   Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

**Statute of Limitations**

223.    The action in 04-1249 tolls any statute of limitations regarding this cause of action, either directly or by means of consolidation of this action with 04-1249 or by means of amendment in that action to reflect this cause of action.  Furthermore, the fraudulent concealment by the defendants of the various causes of action equitably tolls the statute of limitations of this and each and every cause of action that can be stated on the basis of the fact alleged herein.  For example, the fraud regarding ST.PAUL being QAD's insurers was disclosed in parts between July 2007 and January 2008.

///

///

///

///

## FOURTH CAUSE OF ACTION

### (UNFAIR COMPETITION)
### (California Business & Professions Code §§ 17200 et. seq.)

224.    Plaintiff re-alleges all of the allegations in paragraphs 1-223 above.

**Pattern of behavior**

225.    Defendants have engaged in a pattern of unlawful, unfair and/ or fraudulent activities.

**Restitutionary disgorgement of profits**

226.    ST.PAUL is enriched by retaining insurance benefits (monies due for reimbursement of expenses that it still has not reimbursed), and other amounts belonging to the Vedatech parties that it has retained.

**Restitutionary disgorgement of profits**

227.    QAD is enriched by not having to pay VEDATECH for the damages it would have otherwise paid pursuant to the cause of action for malicious prosecution which was compromised by the "settlement" obtained through fraud.

228.    QAD is also enriched by not having to pay VEDATECH for the damages it would have otherwise paid pursuant to liability in the QAD-FIRST-ACTION whose prosecution was compromised by the financial difficulties directly flowing from the fraudulent "settlement" and other unlawful, unfair and fraudulent behaviour detailed herein.

229.    LEE is enriched by not having to pay VEDATECH for the damages she would have otherwise paid pursuant to liability in the QAD-FIRST-ACTION whose prosecution was compromised by the financial difficulties directly flowing from the fraudulent "settlement" and other unlawful, unfair and fraudulent behaviour detailed herein.

230.    DOORDAN is enriched by not having to pay VEDATECH for the damages he would have otherwise paid pursuant to liability in the QAD-FIRST-ACTION whose prosecution was compromised by the financial difficulties directly flowing from the fraudulent "settlement" and other unlawful, unfair and fraudulent behaviour detailed herein.

231.    ANDERSEN-US and ANDERSEN-WW are enriched by not having to pay VEDATECH for the damages it would have otherwise paid pursuant to liability in the QAD-FIRST-ACTION whose prosecution was compromised by the financial difficulties directly flowing from the fraudulent "settlement" and other unlawful, unfair and fraudulent behaviour detailed herein.

232.    These defendants ST.PAUL, QAD, LEE, DOORDAN and ANDERSEN-US are also liable for any and all other remedies available to Plaintiffs under the *California Business and Professions Code §§ 17200 et seq.*

233.    The actual amounts in restitution /disgorgement of profits and other damages prayed for herein are in an amount well in excess of $75,000, and to be determined at trial.

**Statute of Limitations**

234.    The action in 04-1249 tolls any statute of limitations regarding this cause of action, either directly or by means of consolidation of this action with 04-1249 or by means of amendment in that action to reflect this cause of action.  Furthermore, the fraudulent concealment by the defendants of the various causes of action equitably tolls the statute of limitations of this and each and every cause of action that can be stated on the basis of the fact alleged herein.  For example, the fraud regarding ST.PAUL being QAD's insurers was disclosed in parts between July 2007 and January 2008.

**FIFTH CAUSE OF ACTION**

**Violation of Civil and Constitutional Rights**

235.    Plaintiff re-alleges all of the allegations in paragraphs 1-234 above.

236.    To the extent it is deemed or determined that WULFF was acting under "color of any statute, ordinance, regulation, custom, or usage, of" the State of California in conducting the mediation, in his acts preceding the mediation, and/or in his acts subsequent to the mediation, he and those who conspired with him in so acting, including QAD, ST.PAUL, DESILETS, DOORDAN, ANDERSEN-US and ANDERSEN-WW, shall be

liable under 42 U.S.C. §1983 for all injuries arising from the facts detailed herein [or related thereto or discoverable therefrom].

237.    Plaintiff also seek relief from the Court to the maximum extent possible for the compromise to his rights to a jury trial under the Seventh Amendment of the U.S. Constitution arising from the various racketeering and other fraudulent activities described hereinabove, that were compromised in the QAD-FIRST-ACTION and in the related federal actions.  In addition to the extent due process claims can be asserted against one or more of these defendants under the Fourteenth Amendment to the U.S. Constitution, plaintiff wishes to place defendants on notice regarding the same.

**Statute of Limitations**

238.    The action in 04-1249 tolls any statute of limitations regarding this cause of action, either directly or by means of consolidation of this action with 04-1249 or by means of amendment in that action to reflect this cause of action.  Furthermore, the fraudulent concealment by the defendants of the various causes of action equitably tolls the statute of limitations of this and each and every cause of action that can be stated on the basis of the fact alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for judgment against the defendant as follows:

    (1)    For damages, triple damages, and special, exemplary and punitive damages as requested above;

    (2)    for plaintiff's costs of the suit [including attorney's fees] under *18 U.S.C. §1964(c)*;

    (3)    for interest on such amounts;

    (4)    for such, any other and further relief as the Court may deem just and proper.

///

///

///

**Respectfully submitted**.

**Dated:       March 12, 2008**                                    **MANI SUBRAMANIAN**

                                                                    MANI SUBRAMANIAN
                                                                    *Plaintiff*

**NEXT PAGE:     Demand for Jury Trial**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

Administrative Motion to Consider Whether Cases
Should Be Related                          – 9 –

1  James S. Greenan (SBN 53648)
   jgreenan@gpsllp.com
2  Joshua M. Bryan (SBN 225230)
   jbryan@gpsllp.com
3  GREENAN, PEFFER, SALLANDER & LALLY LLP
   6111 Bollinger Canyon Road, Suite 500
4  San Ramon, California 94583
   Telephone: (925) 866-1000
5  Facsimile: (925) 830-8787

6  Attorneys for Defendants
   St. Paul Fire & Marine Insurance Co. and
7  United States Fidelity and Guaranty Company

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  VEDATECH, INC, VEDATECH KK, MANI  )  Case Nos.: C 04-1249 VRW
    SUBRAMANIAN (an individual),       )             C 04-1818 VRW
12                                      )             C 04-1403 VRW
           Plaintiffs,                  )
13                                      )  [PROPOSED] JUDGMENT
        vs.                             )
14                                      )
    ST. PAUL FIRE & MARINE INSURANCE    )
15  CO, QAD INC, QAD JAPAN KK,          )
    RANDALL WULFF (an individual),      )
16                                      )
           Defendants.                  )
17                                      )
                                        )
18  _____)

19

20         IT IS ORDERED AND ADJUDGED, pursuant to the mandate of the Ninth Circuit Court

21  of Appeals' affirming the Order filed in this Court, filed on June 22, 2005 as follows:

22         The Court GRANTS St. Paul Fire and Marine Insurance Company's ("St. Paul") motions

23  to remand (Action No. 04-1403, Doc. Nos. 11 and 40; Action No. 04-1818, Doc. Nos. 7 and 11).

24  The Court REMANDS Action No. 04-1403 and Action No. 04-1818 to Santa Clara Superior

25  Court.

26         The Court ORDERS Vedatech Inc., Vedatech International Inc., Vedatech K.K.

27  (collectively "Vedatech") and Mani Subramanian ("Subramanian") pay attorneys' fees and costs

28  of $20,738.75 to St. Paul pursuant to 28 U.S.C. section 1447(c).  Said sums shall be paid by

Greenan,
Peffer,
Sallander &
Lally LLP

                                        1

1   Subramanian to Vedatech to St. Paul by January 30, 2008.

2   The Court GRANTS St. Paul's motion for Rule 11 sanctions (Acton No. 04-1249, Doc.

3   No. 97; Action No. 04-1403, Doc. No. 52;  Action No. 04-1818, Doc. No. 32) and ORDERS

4   Subramanian to pay $1,000 and Christina Gonzaga to pay $5,000 to the Court by January 30,

5   2008.

6   The Court GRANTS Randall Wulff's ("Wulff") motion to dismiss (Action No. 04-1249.,

7   Doc. No. 52).

8   The Court DENIES Vedatech's and Subramanian's motion for Rule 11 sanctions against

9   Wulff (Action No. 04-1249, Doc. No. 61).

10   The Court ORDERS Vedatech and Subramanian to pay Wulff $15,000 for fees and costs

11   incurred in opposing the Rule 11 motion.  Additionally, the court GRANTS Wulff's motion for

12   sanctions pursuant to section 1927 (Action No. 04-1249, Doc. No. 86) and ORDERS Vedatech

13   and Subramanian to pay $22,584 to Wulff.  Said sums shall be paid by Vedatech and

14   Subramanian to Wulff by January 30, 2008.

15   QAD Inc. ("QAD") and QAD Japan KK's ("QADKK") motions to dismiss with

16   prejudice all claims asserted against them are GRANTED (Action No. 1249, Doc. No. 44).

17   QAD and QADKK's motion for sanctions are DENIED (Action No. 04-1249, Doc. No.

18   106).

19   St. Paul's motion to dismiss the First Amended Complaint is GRANTED except with

20   regard to Vedatech and Subramanian's claims for insurance bad faith against St. Paul (Action

21   No. 04-1249, Doc. No. 45).  The Court STAYS adjudication of Vedatech's and Subramanian's

22   claim for insurance bad faith against St. Paul.

23   Hence, every action and claim (save one) to which Vedatech is a party has been either

24   remanded or dismissed and the one remaining claim has been stayed pending state court

25   resolution.  Accordingly, the court has not ruled on Christina Gonzaga and James Knopf's

26   second motion to withdraw as counsel.  If they wish to withdraw as counsel they should address

27   their arguments to the Santa Clara Superior Court.  Accordingly, the second motion to withdraw

28   of Christina Gonzaga and James Knopf is DENIED as moot (Action No. 04-1249, Doc. No. 148;

Greenan,
Peffer,
Sallander &
Lally LLP

2

1   Action No. 04-1403, Doc. No. 70; Action No. 04-1818, Doc. No. 51).

2       Gonzaga and Knopf's motions to strike are DENIED as moot (Action No. 04-1249, Doc.

3   No. 112; Action No. 04-1403, Doc. No. 63; Action No. 04-1818, Doc. No. 43).

4       Finally, Subramanian and Vedatech's request to remain an e-filer in Action No. 04-1403

5   is DENIED as moot.

6       The clerk shall administratively close the file.  This does not represent a final

7   adjudication but an administrative convenience for the court.  Upon receipt of the state court's

8   order resolving the insurance bad faith claim in the state court, the clerk shall re-open the file

9   upon request and the Court will enter a final Order at that time.

10

11  IT IS SO ORDERED.

12

13  _____

14  United States District Judge

    Dated: December 27, 2007

15

16

17

18

19

20

21

22

23

24

25

26

27

28