1   Douglas R. Young (State Bar No. 073248)
    Roderick M. Thompson (State Bar No. 96192)
2   Jessica K. Nall (State Bar No. 215149)
    Andrew W. Ingersoll (State Bar No. 221348)
3   Farella Braun & Martel LLP
    235 Montgomery Street, 17th Floor
4   San Francisco, CA  94104
    Telephone:  (415) 954-4400
5   Facsimile:  (415) 954-4480
    dyoung@fbm.com
6   rthompson@fbm.com
    jnall@fbm.com
7   aingersoll@fbm.com

8   Attorneys for Defendant
    RANDALL WULFF

9

10                  UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

| | |
|---|---|
| 13   MANI SUBRAMANIAN, as an individual | Case No. 08-cv-1426-VRW |
| 14   and citizen of Washington, and as a derivative action plaintiff, | **DECLARATION OF ANDREW W. INGERSOLL IN SUPPORT OF** |
| 15                Plaintiff, | **DEFENDANT RANDALL WULFF'S MOTIONS TO DISMISS OR, IN THE** |
| 16     vs. | **ALTERNATIVE, FOR SUMMARY JUDGMENT AND/OR  TO STRIKE** |
| 17   ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota | **COMPLAINT** |
| 18   Corporation, and QAD INC., a Delaware Corporation with principal place of business | Date:     October 9, 2008 |
| 19   in California, and ARTHUR ANDERSEN LLP, a limited liability partnership | Time:    2:30 p.m. |
| 20   headquartered in Chicago, Illinois, and ANDERSEN WORLDWIDE SC, a Societe | Dept:    Courtroom 6 |
| 21   Cooperative headquartered in Geneva, Switzerland, and JOHN DOORDAN, an | Judge:  Hon. Vaughn R. Walker |
| 22   individual and citizen of California, and LAIFOON LEE, an individual and Citizen of | |
| 23   California, and ROLAND DESILETS, an individual and citizen of New Jersey, and | |
| 24   WILLIAM D. CONNELL, an individual an citizen of California, and GREENAN | |
| 25   PFEFFER, SALLANDER and LALLY LLP, a limited liability partnership headquartered | |
| 26   in California, and RANDALL WULFF, an individual and citizen of California, and | |
| 27   DOES 1-50, | |
| 28           Defendants. | |

DECL. OF ANDREW W. INGERSOLL I/S/O
WULFF'S MOTION TO DISMISS, ETC.
Case No. 08-cv-1426-VRW

23109\1645722.1

1        I, Andrew W. Ingersoll, declare that the following is true and correct of my own personal

2    knowledge:

3        1.    I am an associate with the law firm of Farella Braun + Martel LLP, counsel for

4    Defendant Randall Wulff ("Mr. Wulff") in the present lawsuit. I am an attorney licensed to practice

5    before all courts of the State of California and the United States District Court for the Northern

6    District of California. I have personal knowledge of the following facts, and if called as a witness, I

7    could and would competently testify thereto.

8        2.    Attached as Exhibit 1 to this declaration is a true and correct copy of the

9    "Confidentiality Agreement," provided to the parties before the March 12, 2004 mediation before Mr.

10   Wulff.

11       3.    Attached as Exhibit 2 to this declaration is a true and correct copy of the "Mediation

12   Procedures" document that was provided to the parties prior to the March 12, 2004 mediation before

13   Mr. Wulff.

14       4.    Attached as Exhibit 3 to this declaration is a true and correct copy of the certified

15   reporter's transcript of audiotape of the May 16, 2007 proceedings before the United States Court of

16   Appeals for the Ninth Circuit in Appeal No. 05-16405.

17       5.    Attached as Exhibit 4 to this declaration is a true and correct copy of the exhibit

18   counsel for Mr. Wulff presented to the appellate panel during the May 16, 2007 oral argument in

19   Appeal No. 05-16405, summarizing the litigation chronology of the four cases discussed in the

20   District Court's June 22, 2005 order.

21       6.    Attached as Exhibit 5 to this declaration is a true and correct copy of an excerpt of the

22   reporter's transcript of the September 16, 2004 proceedings in *Vedatech, Inc. et al. v. St. Paul Fire &*

23   *Marine Insurance Co., et al.*, No. C 04-1249 VRW.

24       The foregoing is true and correct under penalty of perjury under the laws of the United States.

25   Dated: August 4, 2008                    FARELLA BRAUN & MARTEL LLP

26                       By: _____ /s/ _____

27                         Andrew W. Ingersoll

28                       Attorneys for Defendant
                         RANDALL WULFF

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

DECL. OF ANDREW W. INGERSOLL I/S/O
WULFF'S MOTION TO DISMISS, ETC.          - 2 -                    23109\1645722.1
Case No. 08-cv-1426-VRW

# CONFIDENTIALITY AGREEMENT

File Name: _QAD v Vedatech_

File No.: _63-02_

This agreement is entered into on this day, March 12, 2004 only between, Party A: Vedatech K.K., Vedatech Inc. and Mani Subramanian (individually and collectively known as "Client") and Party B:   Randall Wulff and the firm of Wulff, Quinby and Sochynsky (individually and collectively known as the "Mediator").  For the purpose of this agreement, "Parties" or "parties" shall refer collectively to the Mediator and the Client, and "Agreement" and "agreement" shall refer to this Confidentiality Agreement.

In order to promote communication among the parties and the mediator and to facilitate settlement of the dispute, all parties agree that the mediator, and law firm have no liability for any act or omission in connection with the mediation, that they have received and agree to the "Confidentiality" and "Conflicts Check" portions of the Mediation Procedures provided, and further agree as follows:

The mediator is a neutral intermediary who may not act as an advocate for any party. The mediator further agrees not to divulge substantive, confidential information in this process.

All statements made during the course of the mediation are privileged settlement discussions, are made without prejudice to any party's legal position, and are non-discoverable and inadmissible for any purpose in any legal proceeding.

The privileged character of any information is not altered by disclosure to the mediator. Disclosure of any records, reports, or other documents received or prepared by the mediator cannot be compelled.  The mediator shall not be compelled to disclose or to testify in any proceeding as to (i) any records, reports, or other documents received or prepared by the mediator or (ii) information disclosed or representations made in the course of the mediation or otherwise communicated to the mediator in confidence.

Information disclosed to the mediator in private caucus by any party to the mediation is privileged and that disclosure cannot be compelled under any circumstances.  All records, reports, or other documents prepared by the mediator or submitted to the mediator in confidence by any party to the mediation are confidential and disclosure cannot be compelled under any circumstances.

No aspect of the mediation shall be relied upon or introduced as evidence in any arbitral, judicial, or other proceeding, including but not limited to:

(a)  Views expressed or suggestions made by a party with respect to a possible settlement of the dispute;

(b)  Admissions made in the course of the mediation proceedings; and

(c)  Proposals made or views expressed by the mediator or the response of any party.

The parties further agree, however, that this Agreement does not apply to any executed settlement agreement and such settlement agreement may be introduced into evidence in any subsequent proceeding to enforce the terms of the settlement agreement.

The Client if found by a competent Court of Law to be in breach of this agreement with respect to the rights of the Mediator under this Agreement shall be liable for and shall indemnify the Mediator for all costs, expenses, liabilities, and fees, which may reasonably be incurred by the Mediator as a result of such breach.

The Mediator agrees not to assign any rights under this Agreement to any other party.

This agreement and mediation shall be governed by the laws of California and that of the United States.

Dated: ___May 12_____, 200 4 ; and signed before commencement of the mediation by Mr. Randall Wulff for the Mediator and Mr. Mani Subramanian for the Client whose signature appears below.

Please print name:                Signature:

MANI SUBRAMANIAN
for Client

RANDALL WULFF
for the Mediator

James Knopf

Christopher Gonzman

## MEDIATION PROCEDURES

### INITIATING MEDIATION

If all parties have already agreed to mediate, simply call my assistant to discuss preferred dates and locations. If you wish my assistance in obtaining the agreement of others to mediate, call or send to me the name, address and telephone number of the attorney or other representative of each party whose participation is necessary for a comprehensive resolution.

### PRIOR TO THE MEDIATION

The following issues should be addressed:

1.      Parties who must be represented at the mediation for productive negotiations to occur.

2.      Participants on behalf of each party. It is essential that everyone whose decision is necessary for settlement participate. Personal attendance is strongly preferred, although telephone participation can be accommodated.

3.      Information to be exchanged in advance of the mediation session to assist all parties in making realistic settlement decisions during the mediation.

4.      Briefs. Submission of briefs is optional. Briefs should not exceed seven typed pages (plus exhibits). If more pages are required, please notify my assistant and opposing counsel to agree upon an appropriate length. The briefs should be received by the mediator at least five business days in advance of the mediation. I encourage the parties also to exchange briefs with one another. Any particularly confidential information can be provided to me under separate cover.

### AT THE MEDIATION

Generally the mediation will begin with a joint session attended by all participants. Please come prepared to summarize your position during this session. You may utilize whatever presentation you believe most effective, including charts, audio-visual, and oral presentations by counsel and principals. Bear in mind that the goal is not to prove a case but to

clarify your views succinctly for decision makers among the other parties while educating the mediator.

The joint session is followed by private confidential caucuses between the mediator and each party. In caucus, you can discuss information which may assist in working toward a resolution, but which you would prefer not to disclose in direct negotiations. I will play devil's advocate to help all parties gain the most balanced possible evaluation of the matter. Finally, the caucuses provide an opportunity to assess realistic options for resolution, without endangering any party's negotiating posture.

Caucusing will generally continue until an option has been developed which all sides feel is acceptable. At that point, I will summarize the terms of the settlement/ agreement. You may then wish to draft and execute a memorandum stating the key terms.

**FOLLOW-UP**

If a resolution is not reached in the initial mediation session, the parties may elect to authorize follow-up. This can consist of telephone caucusing, further investigation or information exchange among the parties, and/or an additional mediation session.

**CONFIDENTIALITY**

The parties may agree that statements made in the course of joint sessions are privileged settlement discussions. All parties must agree that any statements made or information disclosed to the mediator in private caucus is privileged and that disclosure cannot be compelled under any circumstances. All records, reports, or other documents prepared by the mediator or submitted to the mediator in confidence by any party are confidential and disclosure cannot be compelled under any circumstances.

**FEES AND COSTS**

Generally, a fixed fee per day covers all preparation for the mediation and the mediation sessions. For mediation sessions conducted outside of San Francisco, the mediation fee will include a fixed amount for travel time and expenses. If the research, reading and hearing take more than 10 hours, an additional hourly charge can be billed. If the parties elect to have follow-up services provided by the mediator, a separate fee will be agreed upon.

**CONFLICTS CHECK**

Because of the size of the firm in which I was a partner until January 2000, Farella Braun & Martel LLP, it often occurs that one or more of the parties have had some contact with the firm in the past or currently, either as a potentially "adverse" party or a potentially "interested" party or client. I would have no personal knowledge of the vast majority of these matters in any event, which thus should be irrelevant to my ability to act as a neutral. Therefore, unless requested by a party to do a broader conflicts check, I will limit my conflicts check and disclosures only to those advocative matters involving any mediation party in which I was previously either supervising attorney or attorney-in-charge, while still working at the law firm. Any past professional acquaintance with counsel or prior matters I have mediated for any counsel or parties will not be included in any disclosure being made; I rely on the parties and counsel to advise one another of this, if appropriate.

William Quinby, Yaroslav Sochynsky and I share office and administrative expenses for our offices in Oakland. All three of us are full-time mediators and arbitrators, and we work independently of one another. We are not partners. We do not share revenues or pay each other any referral fees. We are scrupulous not to share any confidential information with each other about our cases in which we serve as mediators or arbitrators. We do not maintain a conflicts database of parties or lawyers for whom each of us has arbitrated or mediated in the past. William Quinby is a former partner in the law firm of Crosby, Heafey, Roach & May. Yaroslav Sochynsky is a former partner in the law firm of Landels, Ripley & Diamond. I disclose this out of an abundance of caution in the unlikely event any party in this matter has had any prior relationships or involvements with either Mr. Quinby or with Mr. Sochynsky, or their former law firms. If there has been any such prior relationship, I am very confident that it would not affect my ability to serve as a completely fair and impartial neutral in this matter.

Finally, all parties should be aware that the fact of my service as a neutral in this matter will not be logged into any conflict register. By agreeing to use my services as a mediator, each party understands that I give no legal advice and am not creating any attorney-client relationship, and further agrees that this shall not preclude or inhibit in any way my former firm's present or future ability to provide representation in matters involving any mediation party. To the extent that the firm works on any matter for or against any party to this mediation, I shall not disclose any confidential information I obtain as a mediator in the course of this proceeding.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1              UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    ---o0o---

4


5   MANI SUBRAMANIAN, as an individual
    and citizen of Washington, and as a
6   derivative action plaintiff,

7                    Plaintiff,        CASE NO.
                                       08-CV-01426 JSW
8        vs.

9   ST. PAUL FIRE AND MARINE INSURANCE
    COMPANY, et al.,
10
                     Defendants.
11   _____/

12

13

14

15   REPORTER'S TRANSCRIPT OF AUDIOTAPE

16

17   **CERTIFIED**

18   **COPY**

19

20

21   REPORTED BY:  HELEN CHIN, CSR NO. 3856, RPR, CM

22

23            NOGARA REPORTING SERVICE
              130 Battery Street, Suite 580
24            San Francisco, California 94111
                    (415) 398-1889
25

REPORTER'S TRANSCRIPT OF AUDIOTAPE

```
 1                      ---o0o---

 2          Argued and Submitted May 16, 2007

 3             San Francisco, California

 4          BEFORE:  B. FLETCHER, SILER, AND

 5             HAWKINS, Circuit Judges

 6                      ---o0o---

 7          MR. SUBRAMANIAN   My name is Mani

 8  Subramanian.

 9          JUDGE HAWKINS:  Speak right up so we can

10  hear you.

11          MR. SUBRAMANIAN:  Yes.

12          My name is Mani Subramanian.  I am the pro

13  se appellant in this matter, and Mr. Oca is kindly

14  representing pro bono the corporate appellants.

15          And I'm thank -- thankful for this

16  opportunity.  If I can please save like half of the

17  time for the rebuttal, as it were, I'd be grateful.

18          And if there's any extra time that you

19  think is necessary, then I'll be thankful if you --

20          JUDGE HAWKINS:  Okay.  The management of

21  the time is up to you and counsel.

22          MR. SUBRAMANIAN:  Yes, I would like to do

23  my best to put it within the time, but in the end if

24  I run out --

25          JUDGE HAWKINS:  Okay.
```

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1                .    MR. SUBRAMANIAN:  I'll try to use up about

2     ten minutes, and given that a lot of the criticism in

3     this case is about my behavior and about the number

4     of docket entries for the cases or multiplications,

5     etc., I would like to please summarize very quickly

6     how we got into this situation.

7                And, Your Honor, I am not a lawyer, but I

8     have a Master's degree in computer science and has

9     started a business in Japan trying to help US

10    companies get into Japan, and I had this degree from

11    Seattle, Washington, so there is a company in

12    Seattle, but the main company that carried on the

13    business was in Japan.

14                So after about three years of a

15    relationship with this QAD company -- rather, they

16    went public in 1997, and they wanted out of the

17    relationship.  From that came a dispute which they

18    brought -- they brought to California by filing a

19    case in state court in January 1998, so I was brought

20    as a defendant.

21                And at that time, I had attorneys from

22    Seattle, a firm called Bogle and Gates.  They were

23    our corporate attorneys, and they started defending

24    the Washington corporation.

25                And we had insurance with St. Paul, so we

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1   tendered defense of this to St. Paul.

2          JUDGE HAWKINS:  And St. Paul agreed to

3   undertake it under a reservation of rights, correct?

4          MR. SUBRAMANIAN:  Yes, your Honor, severe

5   reservation of rights they called it.

6          But even though they approved of Bogle and

7   Gates, they did not want to pay the rates that Bogle

8   and Gates charged, so what ended up happening was

9   that they would pay according to their rates, which

10  were half or less, and they would also strike off

11  various items as unnecessary.  It was kind of like

12  getting reimbursed from a HMO or something, delayed

13  and partial payments and so on, so the small business

14  had to make up the difference.

15         So even though we had this insurance, St.

16  Paul never appointed attorneys from the insurance

17  side.  They only said their acceptance of tender

18  meant that they would pay for these independent

19  attorneys.  Unfortunately, in 1990 --

20         JUDGE HAWKINS:  Did they have the right

21  under the policy to choose counsel?

22         MR. SUBRAMANIAN:  I do not remember seeing

23  any specific language.  I do not believe --

24         JUDGE HAWKINS:  Well, it would be an

25  unusual piece of insurance if it didn't provide that?

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          MR. SUBRAMANIAN:  It's a standard CGL

2     policy, Your Honor.  I don't remember what it

3     specifically said about you had choice.

4          JUDGE HAWKINS:  Counsel can correct us if

5     we're wrong, but we'll assume that St. Paul --

6          MR. SUBRAMANIAN:  They approved of Bogle

7     and Gates --

8          JUDGE HAWKINS:  -- that St. Paul was free to

9     pick its own counsel; it didn't have to --

10         MR. SUBRAMANIAN:  Yes.

11         JUDGE HAWKINS:  -- accept your choice?

12         MR. SUBRAMANIAN:  Yes.

13         They relied upon this California Civil Code

14    2860 and said under that, we only have to pay

15    reasonable charges, so -- but there has been --

16    there's controversy over whether they should have

17    appointed their own counsel or not.

18         But anyway, I did not have full defense

19    basically, so that policy --

20         JUDGE SILER:  What relief are you seeking

21    from this Court?  Now, let's try to figure that out.

22         MR. SUBRAMANIAN:  Yes.

23         Your Honor, the Order of the District Court

24    in this mediation case, I would like this Court to

25    set aside the sanctions -- it's a 12(b)(6) motion --

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1  and reverse the findings that did not even give a

2  chance to amend those pleadings.

3          I think those pleadings were struck out not

4  based on good law, and as a matter of law, on the

5  basis of facts in the complaint, that should go

6  forward.  I would like you to please reassign this

7  case to a different judge and -- if you find it

8  appropriate.

9          And the insurance case, I would like you to

10  keep that case in the District Court and consolidate

11  it with the mediation case so that it can all proceed

12  together.

13          That is my goal and --

14          JUDGE HAWKINS:  Let me briefly outline my

15  understanding of this case.

16          MR. SUBRAMANIAN:  Yes.

17          JUDGE HAWKINS:  Then you or the --

18          MR. SUBRAMANIAN:  Yes.

19          JUDGE HAWKINS:  -- company's pro bono

20  counsel can explain if I'm wrong.

21          MR. SUBRAMANIAN:  Yes, Your Honor.

22          JUDGE HAWKINS:  You have this relationship

23  with the Japanese company, QAD?

24          MR. SUBRAMANIAN:  Yes.  The QAD's -- QAD's

25  a California company.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          JUDGE HAWKINS:  I don't think there's

2    anything controversial, so just let me go through.

3          MR. SUBRAMANIAN:  No.

4          JUDGE HAWKINS:  You had a relationship with

5    a Japanese company.  A dispute arose.  They sued you.

6          You had insurance coverage.    You tendered

7    the defense of the suit brought by QAD to your

8    carrier, and St. Paul stepped in under a reservation

9    of rights, correct?

10          MR. SUBRAMANIAN:  Yes, Your Honor.

11          JUDGE HAWKINS:  But there was discovery

12    taken in that lawsuit, and St. Paul believed that

13    some of that discovery revealed that the acts QAD was

14    complaining of did not occur in the United States,

15    but occurred in Japan.  That was their belief?

16          MR. SUBRAMANIAN:  They're wrong.

17          JUDGE HAWKINS:  I'm not saying they're

18    right.  That was their belief?

19          MR. SUBRAMANIAN:  I believe -- I think --

20    I -- I only want to say, Your Honor, that before the

21    discovery could happen, they brought their dec --

22    action.

23          JUDGE HAWKINS:  Okay.

24          MR. SUBRAMANIAN:  It's not that we had any

25    new information.  We had a sudden -- I guess

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1   (inaudible) -- maybe strong.

2          JUDGE HAWKINS:  Okay.  At some point in

3   time --

4          MR. SUBRAMANIAN:  Some point, without

5   discovery.

6          JUDGE HAWKINS:  -- they were of the belief

7   that the events occurred outside the coverage of

8   their policy, so they filed a declaratory judgment

9   action?

10          MR. SUBRAMANIAN:  There's more.  They also

11   refused to cover the Vedatech Japanese company at all

12   because they said it was not a named party in the

13   insurance policy, so there are a number of reasons.

14   They --

15          JUDGE HAWKINS:  You tried to remove this

16   litigation to Federal Court, and that was

17   unsuccessful?

18          MR. SUBRAMANIAN:  Yes.  I was alone because

19   the last set of sixth attorney had withdrawn for lack

20   of payment and I --

21          JUDGE HAWKINS:  This goes back to state

22   court --

23          MR. SUBRAMANIAN:  State court.

24          JUDGE HAWKINS:  -- and the state court

25   suggests mediation?

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1           MR. SUBRAMANIAN:  The judge conducted the

2    first mediation in 2003, Judge Komar.

3           JUDGE HAWKINS:  I didn't ask what the judge

4    did.

5           There was a suggestion that the matter

6    proceed to mediation, correct?

7           MR. SUBRAMANIAN:  In 2004.

8           JUDGE HAWKINS:  Okay.  And so St. Paul,

9    QAD, and you and your company went into mediation?

10          MR. SUBRAMANIAN:  Yes, sir.

11          JUDGE HAWKINS:  At some point during the

12   mediation, you were dissatisfied with what was going

13   on, and you left?

14          MR. SUBRAMANIAN:  From the beginning, I

15   wanted to leave in the beginning, but then I was

16   given some assurances --

17          JUDGE HAWKINS:  At some point in time, you

18   left, correct?

19          MR. SUBRAMANIAN:  Yes.

20          JUDGE HAWKINS:  And the mediation proceeded

21   between St. Paul and the Japanese company, QAD?

22          MR. SUBRAMANIAN:  It's a California

23   company, Your Honor.

24          JUDGE HAWKINS:  Okay.  And that resulted in

25   a settlement in which St. Paul paid money to QAD and

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    obtained a release for you --

2              MR. SUBRAMANIAN:  Yes.

3              JUDGE HAWKINS:  -- and the company?

4              MR. SUBRAMANIAN:  Yes.

5              JUDGE HAWKINS:  Is that right?

6              MR. SUBRAMANIAN:  Yes.

7              JUDGE HAWKINS:  But part of the release

8    said that it did not cover your affirmative claims

9    that you wanted to state against QAD, right?

10             MR. SUBRAMANIAN:  It says in the --

11             JUDGE HAWKINS:  You were free to pursue

12   those?

13             MR. SUBRAMANIAN:  Yeah.  It says that.

14             JUDGE FLETCHER:  Can I ask one thing?

15             The release -- release -- QAD had to

16   release all claims it had against you in that suit

17   and in the subsequent suit; is that not correct?

18             MR. SUBRAMANIAN:  No, Your Honor.

19             As of March 2004, QAD released all claims

20   up to that point in time, as I understand that

21   document, so it has been argued afterwards that it

22   does not cover subsequent claims, although I don't

23   know if that matters.

24             But that settlement was for the release of

25   the original QAD claim that was brought in

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1  California.

2       JUDGE FLETCHER:  And not the others?

3       MR. SUBRAMANIAN:  Not the ah -- ah --

4  others, but I --

5       JUDGE FLETCHER:  Why --

6       MR. SUBRAMANIAN:  It -- it -- it's a

7  general release that says everything, but it says up

8  to that point in time, and that's my understanding.

9       And so there -- because the reason it came

10 up is, in the QAD case, there was another settlement

11 conference in which QAD refused to give further --

12 confirm that they were releasing all matters up to

13 the future point in time.

14      JUDGE HAWKINS:  After the settlement that

15 St. Paul funded and after you left the -- the

16 mediation, you brought a suit in Federal Court, the

17 complaint now alleging that there was a conspiracy?

18      MR. SUBRAMANIAN:  Yes, Your Honor, among

19 other things.

20      JUDGE HAWKINS:  And -- and that was

21 dismissed under Rule 12?

22      MR. SUBRAMANIAN:  12(b)(6).

23      JUDGE HAWKINS:  What happened next?

24      MR. SUBRAMANIAN:  That's all, Your Honor.

25      And that brought -- what happened, Your

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1   Honor, is going into the mediation -- the reason I

2   was opposed to the mediation -- and this is critical

3   to understanding why all of these things come

4   about -- is that --

5           JUDGE HAWKINS:  Didn't you attempt to

6   remove the state court case to Federal Court a second

7   time?

8           MR. SUBRAMANIAN:  Your Honor, what happened

9   is, the QAD --

10          JUDGE HAWKINS:  Could you start with a yes

11  or no.

12          MR. SUBRAMANIAN:  I filed the second notice

13  of removal, Your Honor, both in the QAD and the

14  insurance case.

15          Your Honor, the QAD case had already been

16  removed to the Federal Court when they announced

17  their oral agreement to settle, and the second notice

18  of removal was simply my way of bringing in new

19  evidence.

20          I thought that there was new evidence since

21  the filing of the first notice of removal, and my

22  understanding is that in a federal jurisdiction

23  matter, when you remove, you are constrained to the

24  evidence at the time of removal, so when that is

25  still in dispute, if new evidence comes, there's no

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1  way to put it before the Federal Court.

2      JUDGE HAWKINS:  You're now inside of ten

3  minutes of your time.  You folks can use it as you

4  wish, but you're into the ten minutes you said you

5  were going to offer counsel --

6      UNIDENTIFIED SPEAKER:  (Inaudible) -- Your

7  Honor.

8      MR. SUBRAMANIAN:  Your Honor, going into

9  the mediation, the reason I did not -- was not happy

10  with the mediation is because there was con -- there

11  were conflicts of interest all over.

12      St. Paul, the attorney Mr. Greenan, who is

13  here and who will address Your Honors, was the

14  attorney defending the counterclaims and prosecuting

15  the insurance declaratory action.

16      There was an adjuster, but they were

17  together.  Their interest was in protecting St. Paul

18  from the bad faith claims, and not in protecting

19  Vedatech parties who were there for the mediation.

20      And the attorney who was representing

21  Vedatech --

22      JUDGE HAWKINS:  You said you were going to

23  take ten minutes.  Use one of those minutes to

24  explain to me how St. Paul's payment of a disputed

25  claim as to coverage --

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          MR. SUBRAMANIAN:  Yes.

2          JUDGE HAWKINS:  -- after gaining you and

3    the company a complete release --

4          MR. SUBRAMANIAN:  Yes.

5          JUDGE HAWKINS:  -- constituted bad faith.

6          MR. SUBRAMANIAN:  Your Honor, they claim in

7    their declaratory action that the policy has been

8    rescinded and it's void, and they have not changed

9    their position to this day.

10         But then they say their right to settle

11   this came because of the policy, No. 1.

12         No. 2, they also -- I wanted my day in

13   court to prove that the claims are purely -- brought

14   were wrong.

15         Under California law, my understanding,

16   Your Honor, is that the insurance company should give

17   a chance for the insured to take over the defense.

18   They can come and say we're paying all these defense

19   costs; we're gonna settle for this.  If you don't

20   like it, then release us because then we will not be

21   responsible for the case anymore.

22         They didn't.  They did it secretly, and

23   that is the bad faith, Your Honor.

24         JUDGE HAWKINS:  Okay.  We'll hear from

25   counsel at this time.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1      MR. OCA:  Thank you, Your Honors.  My name

2   is Robert Oca.

3      Mr. Subramanian was trying to set up for us

4   a -- a major issue in this part of the sanctions, and

5   we were going to show those sactions and -- and bring

6   it back to the other issues, the underlying issues,

7   and that made his behavior --

8      JUDGE HAWKINS:  What were the sanctions

9   for?

10     MR. OCA:  He was sanctioned for

11  challenging -- oh, under the 12(b)(6), the dismissal,

12  he was sanctioned for bringing his claims against Mr.

13  Wulff, and -- and those are dismissed as -- under

14  California law as being -- well, they were immune --

15  the Cal -- Mr. Wulff is immune.  Bringing that on,

16  that was -- he was sanctioned for that.

17     He was sanctioned for attempting to --

18  attempting to amend his other cases in the Federal

19  District Court based on a federal question.

20     He was sanctioned for -- well, those are

21  the two main things and --

22     JUDGE HAWKINS:  One of the -- part of the

23  rationale for the sanctions was attempting to remove

24  a second time a case to Federal Court which were --

25  that -- that had been remanded?

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          MR. OCA:  We're talk --

2          JUDGE HAWKINS:  Am I wrong about that?

3          MR. OCA:  I hope -- that was one of the

4    things he mentioned and -- and Mr. Subramanian had

5    tried to mention that.  He attempted -- I think it

6    was 2004.

7          Counsel was kind enough to make their own

8    chronology.  We had our own, but it was a little too

9    extensive to distribute.

10          When Mr. Subramanian attempted to remove it

11   the first time, he was told that there was no

12   corporate counsel.  It didn't work out.  That was the

13   first time.

14          He attempted again.  He was told it was too

15   late.

16          Those are the two times he -- he attempted,

17   and no -- no subject matter jurisdiction was found,

18   and then -- and then that was it.

19          What the -- the opponents may mention

20   that -- is that this was brought to the Ninth Circuit

21   previously, and Mr. Subramanian attempted to bring it

22   here, but that died in motion, and it was considered

23   a motion for reconsideration and ended there.

24          I don't know where the on bulk reference

25   came from.  Those are those previous attempts.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          JUDGE SILER:  What standard of review do we

2    use here?  Abuse of discretion by the District Court?

3          MR. OCA:  Well, for the sanctions --

4          JUDGE SILER:  Yes.

5          MR. OCA:  -- abuse of discretion --

6          JUDGE SILER:   Are the sanctions partly

7    under Rule 11, partly under 1927?

8          MR. OCA:  Right, Your Honor.

9          He -- Judge Walker mentioned the 1927, and,

10    then of course, under 1927, unreasonably bringing

11    multiple -- multiple -- multiplictiy of things and --

12    and being vexatious.

13          However, as we provided in the excerpts, a

14    lot of the actions we -- took place were, again,

15    mistakes, like the removal, failure to join a

16    corporate party, and then failure to -- well, not

17    failure -- excuse me -- and then opposing motions to

18    dismiss, opposing an MSJ.

19          We were only trying to protect ourselves,

20    so there wasn't this -- we weren't trying to be

21    vexatious.  We weren't trying to dump a big load on

22    to the docket and -- and burden the Court.  We were

23    just trying to get it right.

24          JUDGE SILER:  Were you counsel at the time

25    or is that --

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          MR. OCA:  No, I wasn't, Your Honor.

2          Actually, he couldn't afford any.  Like he

3   said, six attorneys, four major firms, and then it

4   came down to me, and he asked me for his help in this

5   particular matter.

6          Was there another question?  Sorry.

7          JUDGE FLETCHER:  I had understood that --

8   that sanctions for duplicative and many filings was

9   because of the two removals; am I wrong?

10          MR. OCA:  I think that was one of the

11   things that Judge Walker added.  It was a huge order,

12   53 pages, and he didn't -- well, under this latest

13   case of Leider that came up -- and what we're asking

14   here, also, is that the Court will -- will look at --

15   at standards from the Third and Tenth Circuit -- is

16   that Judge Walker didn't look at what happened under

17   those remands.  He -- he didn't -- remands, and --

18   yes, he didn't look at that, and -- and had he looked

19   at that, or at least made an effort, we probably

20   wouldn't have appealed that.

21          They were made in good faith.  There wasn't

22   any -- again, any attempt to burden this Court.  I

23   believe the Leider court used the word veracity.  It

24   doesn't exactly say good faith, but veracity goes to

25   the truthfulness of what happened.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          JUDGE FLETCHER:  Apart from the objection

2    to the sanctions, are all the other issues possibly

3    moot?

4          The -- the case in state court has been

5    dismissed.  There are no claims by QAD against him,

6    and he doesn't have any pending against them.

7          MR. OCA:  The original one -- the original

8    complaint back in, I guess 1999, at that point, I

9    believe QAD did withdraw.  They'll let us know in a

10   minute or not, so that's gone.

11         However, if when-- when the notice of

12   removals were made most recently by Mr. Subramanian

13   and his counsel then, now that sort of left one of

14   the state matters still in limbo, and I believe

15   that's also in the order.  So one of those is still

16   there because I -- I don't know if the cert --

17   certification of the remand made it through all the

18   way, so I think there's one still kind of stuck.

19         JUDGE FLETCHER:  I thought that it was

20   dismissed in state court.

21         MR. OCA:  Oh, no.  That -- there's --

22   there's several cases.

23         There's another one that -- the 1999 -- I'd

24   like to give you their form, but I'm sure they will.

25   They have a nice chronology for you, and it -- it is

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1   a lot to go through, and --and -- but --

2           JUDGE SILER:  How much are the total

3   sanctions against your client?  What are the total

4   sanctions against your client?

5           MR. OCA:  I -- it is -- it's huge.

6           JUDGE SILER:  Can you compute them?

7           MR. OCA:  Well, it was in the five-digit

8   area, and after I saw that, I --

9           JUDGE SILER:  Well, you don't know.  That's

10  all right.

11          MR. OCA:  Yeah.

12          And apparently, it's still compounding

13  another matter should Mr. Subramanian attempt to --

14  to remedy this.

15          Do I have a minute left?  Is that correct?

16          JUDGE FLETCHER:  Yes, you do.

17          MR. OCA:  Okay.  I'll hold that for

18  rebuttal.

19          JUDGE HAWKINS:  Okay.

20          MR. OCA:  Thank you.

21          JUDGE HAWKINS:  Who wants to start on the

22  other side?  Mr. Greenan?  Or Mr. Young?

23          MR. YOUNG:  May it please the Court,

24  Douglas Young for appellee, Randall Wulff.

25          With the appellees, we were going to divide

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    our time equally.

2         But there were no substantive argument made

3    on any of the issues as to Wulff, and so with the

4    understanding and given the rules of advocacy, I

5    intend to make no argument as to the substance with

6    the understanding there will be no argument in

7    rebuttal.

8         I will only address a couple of issues then

9    and cede the rest of my time to my co-counsel.

10        The first is, Your Honors, we do have at

11   the bench for you a chart, a demonstrative chart that

12   we prepared, and I believe the clerk placed before

13   you that we -- I've also given to -- yes, sir, that's

14   correct, Judge Hawkins -- we've also given to counsel

15   and Mr. Subramanian.

16        It is based upon Judge Walker's Order.  It

17   tracks Judge Walker's Order and the docket in the

18   various cases and outlines, I think nicely, how we

19   get here and some of the issues that underlie and

20   support Judge Walker's sanctions in this case.

21        By our count -- and you'll see here as you

22   compare to the docket -- there were five removal

23   efforts here.  There were at least three improper

24   appeals from remand orders.  They were improper under

25   28 USC 1447(b).

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1       By our count, there are approximately 600

2   or so docket entries in total and approxi --

3   approximating 200 or so in this case alone.

4       This is not a situation in reality of a pro

5   se defendant who is any pro se defendant.  If you

6   look at the excerpt of record, page one and

7   following, you will see that he has always employed

8   many lawyers, major law firms on occasion,

9   international law firms on occasion.

10      He has always had at least one attorney at

11  his side and at least two attorneys throughout the

12  litigation in Federal Court here.

13      If you look at the record, the supplemental

14  excerpts of record at Exhibit S, you will see the

15  manner in which he refers to himself.  His e-mail

16  address is pro-se-defendant@Yahoo!.com.

17      We -- we submit that this is a reflection

18  of the fact that this has become something of an

19  avocation for him and something that is inappropriate

20  at every level.

21      The case at this point has resulted in

22  attacks on two District Court judges, a state court

23  judge, some of the counsel here, some of Mr.

24  Subramanian's own counsel, and ultimately upon the

25  mediator.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          In our view, this is not just misguided

2   advocacy; it's vexatious and entirely inappropriate,

3   and the sanctions were appropriate.  We ask that you

4   affirm in every respect.

5          Unless you have questions for me --

6          JUDGE SILER:  Do you know the total amount

7   of the sanctions in the award or is someone else

8   going to address that?

9          MR. YOUNG:  Someone else -- Mr. Greenan is

10  going to address that.

11         JUDGE SILER:  Okay.  I just wondered --

12         MR. YOUNG:  Thank you.

13         JUDGE HAWKINS:  Mr. Greenan, are you next?

14         MR. GREENAN:  Let me answer a couple

15  questions that the Court's been asking and correct

16  some of the answers that Mr. Subramanian gave.

17         The total amount of sanctions against Mr.

18  Subramanian and Vedatech are 44,337 dollars and 75

19  cents, and those -- and there is also an additional

20  5,000 dollars in sanctions against Mr. Subramanian's

21  counsel, Miss Gonzaga.

22         JUDGE FLETCHER:  And what about attorneys

23  fees?

24         MR. GREENAN:  Excuse me?

25         JUDGE FLETCHER:  Attorneys fees.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1          MR. GREENAN:   Well, Your Honor, let -- let

2     me correct that.

3          There's the -- the 20,783 are attorneys

4     fees, not sanctions.  The 22,584 for Mr. Wulff and

5     the thousand dollars against Mr. Sub -- Subramanian

6     for improper removal are both -- are both sanctions.

7     The 5,000 dollars against counsel is sanctions.

8          And let me tell you where those sanctions

9     were awar -- awarded.  20,783 were sanctions for --

10    that the Court found appropriate under the removal

11    section of the code -- Federal Rules, and the Court

12    found that since the removal was improper, although

13    it wasn't going to find the removal itself was in --

14    the first removal was in bad faith, the Court found

15    that it would be appropriate to award St. Pauls

16    attorneys fees for having to defend against that

17    removal, so that's 20,783 of the attorneys fees.

18          In addition, the Court found that the

19    second removal, which -- which was removal that took

20    place in May of 2004 -- the first removal of that

21    case was in April of 2004.  That one -- the second

22    removal occurred while there was a motion for remand

23    pending filed by St. Paul, and the -- the Court --

24    Judge Walker's reason for awarding 5,000 dollars in

25    sanctions against Vedatech and against -- a thousand

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1  dollars against Vedatech and 5,000 against counsel

2  was because by the time the second removal occurred,

3  there was no action pending in state court to be

4  removed.

5          And any attorney that has practiced in

6  Federal Court should know that the first removal

7  removes the state court of jurisdiction from the

8  case, and that's why the Court found that that

9  removal was in bad faith.

10          So those -- and -- and the appeal here that

11  Mr. Subramanian's filed is -- with regard to St. Paul

12  is primarily an appeal for -- from the award of

13  sanctions against himself and his attorney and the

14  award of attorneys fees against Vedatech and Mr.

15  Subramanian for the improper removal of the -- the

16  declaratory relief case.

17          That's -- we've -- we've prepared a chart

18  that tracks all these things, but they're -- they're

19  a little bit hard to -- to keep track of them.  As we

20  say at the end here, there -- at least on -- on the

21  final case, the fourth case, there are 54 docket

22  entries, so it's a little bit hard to keep track

23  of -- of things here.

24          JUDGE HAWKINS:  Okay.  Is it a fair summary

25  of what occurred with respect to your client?

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1      MR. GREENAN:  Well, Your Honor, I think --

2      JUDGE HAWKINS:  Let me just finish.  Just

3  tell me if this is a fair summary, that an insured

4  brought to the attention that they had been sued.

5  St. Paul undertook the defense under a reservation of

6  rights.  When it discovered facts that suggested that

7  there was no coverage, it filed a declaratory

8  judgment action.

9      When there was an action filed by Vedatech

10  and its president affirmatively against the company,

11  a separate action, St. Paul declined to fund the

12  prosecution of the action because, in its view, their

13  policy did not cover.  Ultimately, these things went

14  to mediation.  In the mediation, the suit was settled

15  with QDA for half a million dollars?

16      MR. GREENAN:  Half a million dollars.

17      JUDGE HAWKINS:  And as part of that

18  obtained a full release of the individual and the

19  company, but they were left free to pursue their own

20  claims if they wanted?

21      MR. GREENAN:  The settlement agreement

22  provided that -- that the settlement did not impair

23  the rights of Subramanian and Vedatech to pursue its

24  own claims.

25      And let me correct a misstatement that Mr.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    Subramanian made.  The entire action by QAD against

2    Vedatech and Subramanian was dismissed, everything

3    that was pending at that time.

4            Now Mr. Subramanian may have filed sub --

5    subsequent actions, but everything up to that time

6    was -- was dismissed.

7            Let me just turn for a moment to the

8    declaratory relief action.  There's another

9    misstatement, I'm afraid, that Mr. Subramanian made,

10   and that is that there -- he doesn't -- I don't think

11   he really understands what's -- continues to be

12   pending.

13           The only thing that is presently pending is

14   the declaratory relief action in state court.  Now

15   that action was removed three times.  The Court in --

16   Judge Walker in his decision decided that -- that

17   under the Colorado River case, the Court would

18   abstain.

19           The Court Order provides that that case

20   will go back to state court.  It will be litigated in

21   the state court.  Whatever actions or claims Mr.

22   Subramanian has against St. Paul can -- can be fully

23   litigated in -- in that action.

24           And when that action is concluded, a

25   report's to be given to Judge Walker, and then the --

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1     the declaratory relief action will be dismissed.

2              So that's present pendency of -- of things.

3              I'd just like to say a couple words about

4     the dismissal of the action -- the fourth action here

5     that Mr. Subramanian filed.

6              That action was dismissed for -- the

7     primary reason that action was dismissed was because

8     Mr. Subramanian could demonstrate no -- no

9     justifiable reliance.

10             He was ordered by the -- Judge Komar in

11    Santa Clara County to attend that mediation, and so

12    Judge Walker concluded since he was ordered to

13    attend, he could not show any justifiable reliance,

14    and, therefore, he couldn't show any fraud.

15             And the last thing I want to say, Your

16    Honor, is that Mr. Subramanian challenges what St.

17    Paul did here.

18             St. Paul under the Hurvitz case, which is

19    cited in our briefs, has an absolute right under its

20    policy to settle the case without any interference

21    with -- from the insured, and that's what it did.  It

22    got him a complete release.

23             And -- and why is he complaining, he is

24    solely complaining because St. -- because the

25    settlement of that case precluded him from using the

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    money that St. Paul was paying him and his counsel

2    to -- to pursue the affirmative cases that --

3    affirmative case and claims that he wanted to pursue

4    against QAD, and that's -- that was the reason he

5    filed that case.

6            And the -- Judge Walker concluded that --

7    that that case was -- was properly dismissed.

8            And that's all I have to say unless the

9    Court has any further questions.

10           JUDGE HAWKINS:  I don't see any.

11           Mr. Connell?

12           MR. CONNELL:  Thank you, Your Honor.

13           May it please the Court, I am William

14   Connell, and I represent respondents QAD, Inc., and

15   QAD Japan KK.

16           I would like to clarify, although Mr.

17   Greenan may have already done so, the settlement of

18   QAD's claims was complete at the time.  There were

19   no -- QAD has no claims pending against Mr.

20   Subramanian or the Vedatech entities.  They were

21   dismissed in this settlement agreement, and it was a

22   full and complete settlement agreement at the time.

23           JUDGE HAWKINS:  St. Paul paid your client?

24           MR. CONNELL:  St. Paul, and that dismissal

25   was in return for a payment from St. Paul of half a

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1  million dollars.

2        Essentially what QAD did here was settle

3  the case against Mr. Subramanian and the Vedatech

4  parties.   They had every right to do so.

5        In this suit which has now been dismissed

6  against the QAD parties, plaintiff -- or the

7  appellants have shown no authority for the

8  proposition that QAD is liable to them in any manner

9  for settling the lawsuit against them, and

10  essentially, that's the simple case with respect to

11  QAD.

12        Whether or not they have any claims against

13  St. Paul, whether St. Paul fulfilled its obligations

14  or not, is a matter of no moment to the QAD parties.

15        Hurvitz makes it clear, as Mr. Greenan

16  said, that St. Paul had the right to settle the case,

17  but even if it's found that they didn't comply with

18  their requirements under Hurvitz, there's nothing in

19  Hurvitz or in any other case that suggests that the

20  settling party -- that is, the plaintiffs in the

21  underlying action -- have any liability to the

22  insured for having settled the case, dismissed their

23  claims.

24        We did everything that was required by the

25  settlement agreement, and that's it.

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1              JUDGE HAWKINS:  I don't see any other

2    questions.

3              Thank you for your argument.  You have a

4    little bit of time for rebuttal, a little over a

5    minute.

6              And you can't split this up.  Whoever

7    stands up gets the minute.  Okay.

8              MR. SUBRAMANIAN:  I probably didn't explain

9    myself clearly.  I -- I wanted to split between the

10   rebuttal and this.

11             If Your Honor please, I would need take

12   more time.  I would really ask only because the

13   amounts of sanctions and the charges are quite

14   serious, and I -- it takes me some time to explain to

15   your lordship.

16             No. 1, the Hurvitz decision, in the Hurvitz

17   decision, St. Paul was the defendant.  St. Paul sent

18   a letter -- St. Paul had control of the defense, so

19   they were paying for the defense, and they were

20   controlling the defense.

21             They sent a letter to the Hurvitzes saying

22   you can take over the defense or we will settle it,

23   and they said no, so St. Paul went ahead and did

24   that.

25             In this case, there is a question --

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    difficult question; now why would someone not want

2    their cases settled?

3              But before we come to that, what I first

4    want to submit is that they did not have a right to

5    settle, not under Hurvitz, not under any existing

6    law, so the reason I did not want St. Paul to settle

7    this, they were taking the money that they had

8    withheld --

9              JUDGE HAWKINS:  Let me stop you for just a

10   second, okay.

11             You were told when you came in here today

12   that you would be held to the same rules as any

13   lawyer who walked in here.  The time constraints

14   apply to all lawyers.

15             And I'm going to give you one minute -- put

16   one minute on the clock, please -- and I promise you

17   when that minute is up, you're going to start -- stop

18   talking, or you may face some other sanctions.  Do

19   you understand?

20             MR. SUBRAMANIAN:  I apologize, Your Honor.

21             JUDGE HAWKINS:  Okay, start.

22             MR. SUBRAMANIAN:  Your Honor, No. 1, I'm

23   thankful, Your Honor, and I apologize.  I don't -- I

24   mean no disrespect.  I'm doing my best.

25             I became a defendant, and I -- if I didn't

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1    defend, I get default judgment.  Now I have the

2    sanctions amount, and QAD has taken the position that

3    the sanctions amount are not covered by the

4    settlement agreement, so there is no new case, but

5    there's these sanctions.

6         And I had to become pro se in 2002 because

7    I couldn't afford the lawyers, and so I had a choice.

8    I could walk away or I could proceed to try to defend

9    myself.

10        I've tried to do my best, and if I've come

11   up short, then I apologize.

12        So under the Hurvitz decision, there is no

13   right for St. Paul to settle.  I did not want them to

14   settle because they took money that was kept for

15   reimbursing, and the settlement gave them the fig

16   leaf to not pay Vedatech.

17        JUDGE HAWKINS:  Thank you.

18        Thank both sides for their argument.  The

19   case is argued and will be submitted for decision.

20        The Court will stand in recess for the day.

21                  --o0o--

22

23

24

25

REPORTER'S TRANSCRIPT OF AUDIOTAPE

1   STATE OF CALIFORNIA            )
                                    )ss.
2   CITY & COUNTY OF SAN FRANCISCO )

3

4

5           I, HELEN CHIN, a Certified Shorthand

6   Reporter of the State of California, do hereby

7   certify that the foregoing transcript was transcribed

8   into typewriting and is a true and correct

9   transcription of an audiotape to the best of my

10  ability.

11          I further certify that I am not of counsel

12  or attorney for either or any of the parties in the

13  foregoing deposition and caption named, nor in any

14  way interested in the outcome of the cause named in

15  said caption.

16          Dated the 2nd day of April 2008.

17

18

19

20  _____

21          HELEN CHIN
            CSR NO. 3856
22

23

24

25

# Litigation Chronology

#1

(241 Docket Entries in state court as of 6/22/05)

QAD/QAD KK
v.
Vedatech/Vedatech KK
(1/26/98:  contract, tort:
state law)

#2

Vedatech/Subr.
v.
QAD/QAD KK, Arthur
Andersen, et al.
(9/99:  fraud, breach of
contract, etc.:  state
law).  Counterclaims
by QAD/QAD KK

Consolidated late 2001
- 1/13/04:  Verbal order to mediate before Wulff
- 2/6/04:  Written order to mediate before Wulff
- 3/4/04:  Written order to mediate before Wulff
- Settled 3/25/04

↓

3/15/04:  Removal (Hamilton) (#1)

4/29/04:  Remanded

Remand Order Appealed

8/16/04 Appeal Dismissed (28 USC § 1447(d)

↓

5/6/04:  Second Removal (Ware; Hamilton) (#3)

Recusal motion denied.

7/16/04:  Remanded with admonition

↓

Remand Order Appealed

8/16/04:  Appeal Dismissed (28 USC § 1447(d)

↓

8/30/04:  Petition for En Banc

2/16/05:  Petition denied

2/23/05:  Motion to Stay Mandate

#3

(151 Docket Entries in state court as of 6/22/05)

St. Paul Decl. Relief (ins. coverage)
v.
Vedatech/Subr.
(2/8/02:  Counterclaims by Vedatech/Subr. asserting St. Paul duty to fund affirmative claims in #2; also bad faith, etc.)

↓

6/22/02:  Removal by Subramanian
10/21/02:  Remand (Fogel) under 28 USC § 1446

↓

4/12/04:  Removal (Conti) (#2)

↓

5/7/04:  Removal (Fogel) (#4)

↓

07/02/04:  Order relating case #3 to #4 (Walker)

#4

(162 Docket Entries as of 6/22/05)

Vedatech/Subr.
v.
St. Paul, QAD/QAD KK Wulff
(3/30/04:  in Fed. Ct., alleging collusion in settlement of cases 1 and 2 to obtain consent to mediate)

6/15/04:  FAC filed in response to motions to dismiss and to comply with Rule 9(b), adding Wulff as defendant

↓

7/7/04:  Wulff sends letter re *Howard*'s applicability

7/16/04:  Wulff files motion to dismiss based in part on *Howard*

↓

7/22/04:  Service of Rule 11 Motion by Appellants

Filing of more than 30 briefs, letters, errata by Appellants

↓

6/22/05:  Dismissal/ Remand of Bad Faith Insurance Claim (Walker)

↓

These appeals
(54 Docket Entries)

19003/1239266_3.ppt

PAGES 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER, JUDGE

VEDATECH, INC., ET AL.,            )
                                   )
          PLAINTIFFS,              )
                                   )
  VS.                              )    NO. C 04-1249 VRW
                                   )
ST. PAUL FIRE & MARINE             )    THURSDAY, SEPTEMBER 16, 2004
INSURANCE CO., ET AL.,             )
                                   )    SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              )
                                   )

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:            LAW OFFICES OF JAMES S. KNOPF
                          1840 GATEWAY DRIVE, SUITE 200
                          SAN MATEO, CALIFORNIA 94404
                 BY:   CHRISTINA M. GONZAGA, ESQUIRE

                          MANI SUBRAMANIAN, PRO PER
                          228 HAMILTON AVENUE, 3RD FLOOR
                          PALO ALTO, CALIFONRIA 94301

FOR DEFENDANT             GREENAN, PEFFER, SALLANDER & LALLY
ST. PAUL FIRE &           6111 BOLLINGER CANYON ROAD, SUITE 500
MARINE INSURANCE:         SAN RAMON, CALIFORNIA 94583
                 BY:   JAMES S. GREENAN, ESQUIRE
                          ENOCH WANG, ESQUIRE

                 (APPEARANCES CONTINUED)

REPORTED BY:              DIANE E. SKILLMAN, CSR 4909
                          OFFICIAL COURT REPORTER

2

```
1    FOR DEFENDANT          GENERAL COUNSEL ASSOCIATES
     QAD, INC. & QAD JAPAN: 1891 LANDINGS DRIVE
2                           MOUNTAIN VIEW, CALIFORNIA 94043
                       BY:  WILLIAM D. CONNELL, ESQUIRE
3
     FOR DEFENDANT          FARELLA, BRAUN + MARTEL
4    RANDALL WULFF:         235 MONTGOMERY STREET, 30TH FLOOR
                            SAN FRANCISCO, CALIFORNIA  94104
5                      BY:  DOUGLAS R. YOUNG, ESQUIRE
                            RODERICK M. THOMPSON, ESQUIRE
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

38

1          I ONLY MENTION THAT TO SAY THAT IT IS NOT SETTLED

2     LAW.  AND EVEN THE CALIFORNIA COURT RULES THAT SPECIFY

3     CONDITIONS UNDER WHICH MEDIATORS THAT ARE IN THE COURT'S PANEL

4     PROVIDE MEDIATION, DO NOT PROVIDE IMMUNITY THAT, FOR EXAMPLE,

5     OTHER STATE STATUTES PROVIDE.  SO THE CALIFORNIA STATUTORY

6     SCHEME ITSELF DOESN'T EXTEND IMMUNITY TO COURT-APPOINTED,

7     COURT-CONNECTED MEDIATORS.

8          THERE IS NO QUESTION THAT SOMEBODY WHO IS CONNECTED

9     TO THE COURT AND AGREES TO THE COURT'S CONDITIONS IS PERFORMING

10    A CASE, SOME KIND OF A PUBLIC FUNCTION WHETHER A PRIVATE

11    MEDIATOR IS UNREGULATED BY THE BAR --

12          **THE COURT:**  DIDN'T JUDGE KOMAR ORDER THIS CASE TO

13    MEDIATION?

14          **MR. SUBRAMANIAN:**  I HAVE TWO ANSWERS TO THAT, YOUR

15    HONOR.

16          **THE COURT:**  WELL, DID HE NOT DO SO?

17          **MR. SUBRAMANIAN:**  HE DID, YOUR HONOR, ONCE.

18          **THE COURT:**  DOESN'T THAT --

19          **MR. SUBRAMANIAN:**  ONCE ORALLY AND A SECOND TIME, BUT

20    HE WAS WITHOUT JURISDICTION, YOUR HONOR, SO THOSE ORDERS CANNOT

21    STAND.

22          **THE COURT:**  WHY WAS HE WITHOUT JURISDICTION?

23          **MR. SUBRAMANIAN:**  THE CODE OF CIVIL PROCEDURE SAID

24    MEDIATION CANNOT BE ORDERED IN THE MATTER OF CONTROVERSY THAT

25    EXCEEDS $50,000.  IT HAS TO BE BY AGREEMENT OF THE PARTIES.

1  HONOR, AND MR. WULFF RESPECTFULLY REQUESTS SANCTIONS BE

2  AWARDED.

3            THE COURT:  IN WHAT AMOUNT?

4            MR. THOMPSON:  WE WOULD MAKE A FEE PETITION, YOUR

5  HONOR, TO COVER THE FEES OF DEFENDING THIS FRIVOLOUS --

6            THE COURT:  DID YOU SUBMIT A DECLARATION IN THAT

7  REGARD?

8            MR. THOMPSON:  WE WILL BE HAPPY TO, YOUR HONOR, IF

9  THE COURT SO REQUESTS.

10            THE COURT:  PLEASE DO.

11            MR. THOMPSON:  THANK YOU, YOUR HONOR.

12            THE COURT:  ALL RIGHT.  MR. SUBRAMANIAN OR

13  MS. GONZAGA, WHO WISHES TO ADDRESS THE RULE 11 MATTER?

14            MR. SUBRAMANIAN:  YES, YOUR HONOR.

15            YOUR HONOR, ON THE RULE 11 MOTION, THE MAIN POINT ON

16  WHICH WE MADE THE MOTION WAS THE FACTUAL MATTER IN THE PLEADING

17  THAT MR. WULFF WAS COURT APPOINTED.  YOUR HONOR HAD ASKED

18  BEFORE, THERE WAS A COURT ORDER.

19            NOW, THE COURT ORDER WAS NOT DIRECTED TO MR. WULFF.

20  THE COURT ORDER WAS DIRECTED TO THE PARTIES.  AND WHAT THEY

21  THEMSELVES NOTE IS THAT THE PARTIES, STARTING FROM US,

22  ACTUALLY, REQUESTED THAT WE BE BEFORE MR. WULFF.  AND SO THERE

23  IS -- AND THEY DON'T STOP THERE.  THEY CONNECT IT WITH C.R.C.

24  1622 WHERE THEY CLAIM THAT VEDATECH PARTIES HAVE NOT EXHAUSTED

25  ADMINISTRATIVE REMEDIES.  AND ALSO HOWARD V. DRAPKIN DOES NOT

1    NECESSITATE THAT THE MEDIATOR BE A COURT-APPOINTED MEDIATOR IN

2    ORDER TO QUALIFY UNDER ITS REASONING FOR ABSOLUTE IMMUNITY.

3         SO, THE OTHER SERIES OF DECISIONS LIKE IN WAGSHAL,

4    THE FEDERAL CASES, WERE MEDIATOR THAT WERE CONNECTED WITH THE

5    COURT PROGRAM HAVE BEEN GRANTED IMMUNITY IS THE LINE OF CASES

6    THAT MR. WULFF WANTED TO RELY UPON, AND TO DO THAT, THEY CLAIM

7    THAT HE WAS A COURT-APPOINTED MEDIATOR.

8         SO, IT DEPENDS ON WHETHER YOUR HONOR DECIDES THAT

9    THAT IS A FACT THAT THE ORDER ITSELF DIRECTED TO THE PARTIES

10   WHERE MR. WULFF'S NAME ENTERED NOT BECAUSE THE JUDGE DECIDED

11   THAT HE WANTED IT BEFORE MR. WULFF, WE HAVE NO INDICATION THAT

12   HE COMMUNICATED WITH, OR SELECTED, OR APPOINTED.

13        AND THE OTHER MATTER IS THAT THEY POINTED OUT 1622,

14   BUT THEY DO NOT POINT OUT THE REMAINING PORTIONS OF THE CODE

15   RULES 1602 AND OTHER PORTIONS WHICH CLEARLY DEFINE TO WHOM

16   THESE REMEDIAL PROCEDURES, COMPLAINT PROCEDURES APPLY.

17        THE CALIFORNIA RULES OF COURT DEFINE WHO'S A

18   MEDIATOR FOR THE PURPOSE OF THEIR SECTION, THEY HAVE TO BE ON

19   THE PANEL LIST, AND THEY HAVE TO BE SELECTED, APPOINTED, OR

20   RECOMMENDED BY THE COURT, AND THEY MUST ACCEPT THAT.  AND THEY

21   HAVE OTHER DUTIES THAT COME WITH IT.

22        SO OUR ONLY POINT WAS THAT IT IS -- WE ARE NOT

23   SAYING THAT MR. WULFF SHOULD NOT HAVE CLAIMED IMMUNITY UNDER

24   HOWARD V. DRAPKIN, WE ARE NOT SAYING THAT HE SHOULD EVEN ARGUE

25   THAT HIS POSITION SHOULD BE THE SAME AS THAT OF NEUTRALS THAT

<u>CERTIFICATE OF REPORTER</u>

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED

STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

THAT THE FOREGOING PROCEEDINGS IN C-04-1249 VRW, VEDATECH, ET

AL V. ST. PAUL FIRE AND MARINE INSURANCE, ET AL., PAGES

NUMBERED 1 THROUGH 59, WERE REPORTED BY ME, A CERTIFIED

SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY

DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL,

COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AT THE TIME OF

FILING.

**THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF**

**SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT**

**FILE.**

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (415) 552-5393