1  WILLIAM D. CONNELL, Cal. State Bar No. 89124
   bconnell@gcalaw.com
2  SALLIE KIM, Cal. State Bar No. 142781
   skim@gcalaw.com
3  GCA LAW PARTNERS LLP
   1891 Landings Drive
4  Mountain View, CA  94043
   (650) 428-3900
5  (650) 428-3901 [fax]

6  Attorneys for Defendants QAD Inc., John Doordan,
   Lai Foon Lee, and William D. Connell

7

8

9            UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11               [San Francisco Division]

12

| | |
|---|---|
| 13  MANI SUBRAMANIAN, as an individual etc., | **Case No.  08-cv-1426-VRW   [ECF]** |
| 14                    Plaintiff, | |
| 15        vs. | |
| 16  ST. PAUL FIRE AND MARINE INSURANCE COMPANY, et al. (including QAD INC., a Delaware Corporation with principal place of business in California; JOHN DOORDAN, an individual and citizen of California; LAI FOON LEE, an individual and citizen of California; ROLAND DESILETS, an individual and citizen of New Jersey; and, WILLIAM D. CONNELL, an individual and citizen of California), Defendants. | Date:        October 9, 2008<br><br>Time:        2:30 p.m.<br><br>Dept:        Courtroom 6<br><br>Judge:      Hon. Vaughn R. Walker |

24

25       **REQUEST FOR JUDICIAL NOTICE
26    IN SUPPORT OF MOTION BY DEFENDANTS
     QAD INC., WILLIAM D. CONNELL, JOHN DOORDAN, AND LAI FOON LEE
        TO DISMISS COMPLAINT PURSUANT TO FRCP RULE 12(b)(6)**

27

28

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

QAD Inc. ("QAD"), William D. Connell ("Mr. Connell"), John Doordan ("Mr. Doordan"), and Lai Foon Lee ("Ms. Lee")(collectively the "QAD-related defendants, in support of their Motion to Dismiss the Complaint ("Complaint") of Plaintiff Mani Sub-ramanian ("Plaintiff" or "Mr. Subramanian") pursuant to Rule 12(b)(6), Fed.R.Civ.Proc., "), request that the Court take judicial notice, pursuant to Rule 201(b)(2), Federal Rule of Evidence, of the following documents and materials, which are: (1) referenced in the Complaint and/or (2) public records (i.e., court records filed in this Court or in the Superior Court of California for the County of Santa Clara):

1.     Exhibit A – The Third Amended Complaint in *Vedatech-Japan K.K., et al. v. QAD, Inc., et al.*, No. CV 784685, Santa Clara County Superior Court, filed on or about December 21, 2001.

2.     Exhibit B – The First Amended Complaint in *Vedatech Inc., et al. v. St. Paul Fire & Marine Insurance Co., et al.*, United States District Court Case No. 04-1249-VRW, filed on or about March 30, 2004.

3.     Exhibit C – Request for Dismissal filed by Mr. Subramanian in *Vedatech-Japan K.K., et al. v. QAD, Inc., et al.*, No. CV 784685, Santa Clara County Superior Court, on or about May 26, 2006, with respect to defendant John Doordan, showing dismissal entered as requested on that date.

4.     Exhibit D – Judgment by Court under C.C.P. 437c, entered on or about May 24, 2006, in favor of defendant Lai Foon Lee as to all claims in *Vedatech-Japan K.K., et al. v. QAD, Inc., et al.*, No. CV 784685, Santa Clara County Superior Court.

5.     Exhibit E – Order of Walker, Chief J., entered on June 22, 2005, in *Vedatech Inc., et al. v. St. Paul Fire & Marine Insurance Co., et al.*, United States District Court Case No. 04-1249-VRW and related matters.

6.     Exhibit F – Notice of  Dismissal of Appeal in *Mani Subramanian, Plaintiff and Appellant v. Lai Foon Lee, Defendant and Respondent*, Case No. H030456, California Court of Appeal for the Sixth District, entered on October 13, 2006, and Notice that petition for review is denied in California Supreme Court Case No. S156063.

///

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

Dated: August 4, 2008

WILLIAM D. CONNELL
SALLIE KIM
GCA LAW PARTNERS LLP

By: _William D. Connell_ .
William D. Connell

By: _Sallie Kim_ .
Sallie Kim

Attorneys for Defendants QAD Inc.,
John Doordan, Lai Foon Lee, and
William D. Connell

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A  -

# QAD Request for Judicial Notice

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

1  Archie S. Robinson, Esq. [SBN 34789]
2  Robert A. Nakamae, Esq. [SBN 148561]
   Christopher K. Karic, Esq. [SBN 184765]
3  ROBINSON & WOOD, INC.
   227 North First Street, San Jose, CA 95113
4  Telephone:  408.298.7120
5  Facsimile:  408.298.0477

6  Attorneys for Plaintiffs
7  VEDATECH-JAPAN K.K. and MANI SUBRAMANIAN

8

9        SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

10  VEDATECH-JAPAN K.K., a Japanese          No. CV 784685
11  Corporation;  MANI
    SUBRAMANIAN, an individual,              (VERIFIED)
12
                          Plaintiffs,        THIRD AMENDED COMPLAINT OF
13                                           PLAINTIFFS FOR
    vs.
14                                           BREACH OF CONTRACT;  BREACH
15  QAD, Inc., a Delaware Corporation;       OF COVENANT OF GOOD FAITH
    QAD JAPAN Inc., a Delaware               AND FAIR DEALING;  FRAUD;
16  corporation; QAD JAPAN K.K. a            CONSTRUCTIVE FRAUD;
    Japanese corporation; ARTHUR             NEGLIGENT MISREPRESENTATION;
17  ANDERSEN LLP, a limited partnership      INTENTIONAL INTERFERENCE
    located in California;  NOMURA           WITH CONTRACTUAL RELATIONS
18  RESEARCH INSTITUTE HONG                  AND BUSINESS ADVANTAGE;
19  KONG LIMITED, a Hong Kong               NEGLIGENT INTERFERENCE WITH
    Corporation;  NOMURA RESEARCH            CONTRACTUAL RELATIONS AND
20  INSTITUTE LIMITED, a Japanese            BUSINESS ADVANTAGE;
    Corporation;  JOHN DOORDAN, an           INTENTIONAL INTERFERENCE
21  individual;  LAI FOON LEE, an            WITH PROSPECTIVE ECONOMIC
    individual; ISAO TAKATORI, an            ADVANTAGE;  NEGLIGENT
22  individual;   and DOES 1 through 50      INTERFERENCE WITH
23  inclusive;                               PROSPECTIVE ECONOMIC
                                             ADVANTAGE;  TRADE LIBEL;
24                         Defendants.       DISPARAGEMENT OF GOODS AND
25  _____/        QUALITY;  CONVERSION;  BREACH
                                             OF FIDUCIARY DUTY;  AND  UNFAIR
26                                           COMPETITION
27  AND RELATED CROSS-ACTION                 (UNLIMITED JURISDICTION)
    _____/
28

Robinson & Wood, Inc.
227 North First Street
Jose, CA 95113
(298-7120

1

THIRD AMENDED COMPLAINT
CASE NO: CV 784685                                          A 2836

Plaintiffs VEDATECH-JAPAN K.K. ("VEDATECH-JAPAN"), a Japanese corporation, and Mani Subramanian ("SUBRAMANIAN"), an individual, bring this Complaint against Defendants QAD Inc. ("QAD-USA"), a Delaware corporation, QAD Japan Inc., a Delaware corporation ("NEW-QAD-JAPAN"), QAD JAPAN K.K. a Japanese corporation ("OLD-QAD-JAPAN"), Arthur Andersen LLP, a limited partnership located in California ("ANDERSEN"),   Nomura Research Institute Hong Kong Limited, a Hong Kong Corporation ("NRI-HKG"), Nomura Research Institute Limited, a Japanese Corporation ("NRI-JAPAN"), LaiFoon LEE, an individual ("LEE"), John Doordan, an individual ("DOORDAN"),   Isao Takatori, an individual, ("Takatori") and DOES 1 through 50 inclusive;

## THE PARTIES AND RELATED INDIVIDUALS AND ENTITIES

### Plaintiffs VEDATECH-JAPAN AND SUBRAMANIAN

1   VEDATECH-JAPAN is a Japanese corporation, established in 1991, with its current principal place of business in Yokohama, Japan.

2   SUBRAMANIAN is a citizen of the United States and, at all times relevant to this Complaint, has resided in Japan.  SUBRAMANIAN is, and was, for all material periods relevant to this action, the Representative Director of VEDATECH-JAPAN.

3   VEDATECH-JAPAN and SUBRAMANIAN may be referred to collectively herein as "Plaintiffs".

### Defendant QAD-USA

4   Upon information and belief, defendant QAD-USA was a California corporation from around 1991 to around 1997, and in or around 1997 became, and to this date is, a Delaware corporation that has been continuously and regularly transacting business in

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

2

A 2837

California. QAD-USA has at all times relevant to this Complaint, maintained its principal place of business in or near Carpinteria (near Santa Barbara), California, and a sales office in San Jose, California.

5   Upon information and belief, the sales office in San Jose, California has been relocated recently. QAD-USA also, for some time now, maintains executive offices in its new buildings in Ortega Hill in Summerland, near Santa Barbara, California

6   Upon information and belief, QAD-USA has a branch office in Hong Kong operating under the name "Qad Asia-Pacific" or such similar name.

## Defendant NEW-QAD-JAPAN (Qad Japan Inc.)

7   Upon information and belief, defendant NEW-QAD-JAPAN is a corporation organized and existing under the laws of the state of Delaware.

8   NEW-QAD-JAPAN maintains, and at all times relevant to this Complaint, has maintained a branch office in the city of Tokyo, Japan, but its effective headquarters is the same as that of QAD-USA, viz., Carpinteria / Summerland, California.

9   Defendant DOORDAN was for all material times a director of and the operational manager of NEW-QAD-JAPAN.

## NEW-QAD-JAPAN is an alter ego of QAD-USA

10 Plaintiffs are informed and believe, and thereupon allege that defendant NEW-QAD-JAPAN is so dominated and controlled by QAD-USA and that the recognition of its separate corporate identity will promote a serious injustice and fraud on this Court, that for the purposes of this action, NEW-QAD-JAPAN and QAD-USA are alter egos of each other.

11 The management of NEW-QAD-JAPAN reported to DOORDAN at all material times.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

3

A 2838

1  12 NEW-QAD-JAPAN was set up expressly by QAD-USA, DOORDAN, and others for

2  the sole purpose of taking over the business of OLD-QAD-JAPAN and in the pursuit of

3  the fraudulent and tortious activities detailed in this Complaint.

### Defendant OLD-QAD-JAPAN (Qad Japan K.K.)

6  13 Upon information and belief, Defendant Qad Japan K.K. ("OLD-QAD-JAPAN") is a

7  corporation organized (and believed to be currently existing) under the laws of Japan.

8  OLD-QAD-JAPAN, until October 1997, maintained its offices in Yokohama, Japan.

### OLD-QAD-JAPAN is an alter ego of QAD-USA since December 1997

11  14 Plaintiffs are informed and believe, and thereupon allege that since December 1997,

12  OLD-QAD-JAPAN has been so dominated and controlled by QAD-USA (and has

13  essentially been reduced to a non-entity, its business having been taken over by NEW-

14  QAD-JAPAN) and allege that the recognition of its separate corporate identity will

15  promote a serious injustice and fraud on this Court, so that, for the purposes of this action,

16  and for the period December 1997 through the current date), OLD-QAD-JAPAN and

17  QAD-USA are alter egos of each other.

### Defendant ARTHUR ANDERSEN

20  15 Upon information and belief, defendant ANDERSEN is a limited partnership located

21  in California, and regularly transacts business in California and all over the world under

22  the concept of "One Firm".

24  16 ANDERSEN maintains offices in numerous locations, including the city of Los

25  Angeles, California, the city of San Jose, California, and the city of Tokyo, Japan.

26  17 The partners, employees and other agents of ANDERSEN relevant to this action

27  worked out of the Los Angeles and Tokyo offices of ANDERSEN.

28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

4

A 2839

18  Defendant NRI-JAPAN is a corporation organized and existing under the laws of Japan, with its corporate headquarters located in the city of Tokyo, Japan.  NRI-JAPAN has affiliates or subsidiaries operating in the State of California.

### Defendant NRI-HKG

19  Upon information and belief, defendant NRI-HKG is a corporation organized and existing under the laws of Hong Kong, Special Administrative Region (SAR), People's Republic of China, with its principal place of business in Hong Kong.

20  Upon information and belief, defendant NRI-HKG engaged in various business activities in California relating to this Complaint and specifically involving, among others, defendants QAD-USA and DOORDAN.

### NRI-HKG and NRI Pacific Inc. are alter egos of NRI-JAPAN

21  Plaintiffs are informed and believe that NRI-HKG, and a California corporation called NRI Pacific, Inc., transacting business in San Mateo, California, are, for the purpose of this Complaint, so dominated and controlled by NRI-JAPAN and have such a unity of interest and ownership to the extent that these two subsidiaries have no separate identities of their own.

22  Furthermore these companies undertook and continue to undertake  actions that caused injuries to the Plaintiffs and continue to undertake actions that are meant to cover up such causation;  all three of NRI-JAPAN, NRI-HKG and NRI Pacific Inc. are all alter egos of each other and maintenance of the separate identities will promote an injustice and fraud relating to the identification of the facts surrounding this Complaint and bringing the actors to justice.

Jhinuas & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

5

THIRD AMENDED COMPLAINT
CASE NO:  CV 784685

A 2840

Defendant JOHN DOORDAN

23 Defendant DOORDAN is an individual. Upon information and belief, during all times relevant to this Complaint, defendant DOORDAN resided in the State of California, and maintained his principal place of work at the offices of QAD-USA in the city of San Jose, California.

24 In the second half of 1993 and through the middle part of 1995, DOORDAN worked out of the Hong Kong branch offices of QAD-USA as the Asia-Pacific Regional Director and supervised a large staff dealing with sales and support in the Asia-Pacific region, including Japan.

25 From information and belief, DOORDAN maintained a home in or near Los Gatos near Santa Clara county during his time working in Hong Kong.

26 In or around 1995 DOORDAN moved back to the bay area (near Los Gatos) and started to work out of the offices of QAD-USA in San Jose, California.

27 Upon information and belief, after the initiation of this lawsuit, DOORDAN has been attempting to reside outside of California.

Defendant LAI FOON LEE

28 Defendant LEE is an individual.

29 From the early part of 1997 LEE worked for QAD-USA at its headquarters near Santa Barbara (in the Ortega Hills office at Summerland or the Carpinteria offices), and continued to work for QAD-USA through all times material to this Complaint.

30 Upon information and belief, LEE currently resides in or around the county of Santa Clara.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2841

Defendant ISAO TAKATORI

31 Defendant TAKATORI is an individual. Upon information and belief, TAKATORI is a citizen of Japan and, at all times relevant to this Complaint, resided in Hong Kong, and traveled to and engaged in various business activities in California directly related to this Complaint and involving, among others, defendants QAD-USA and DOORDAN. Upon information and belief, since about six months ago, TAKATORI has left NRI-HKG and has presumably moved back to Japan.

Karl Lopker and Pamela Lopker

32 Karl Lopker ("KLOPKER"), a resident of the State of California is, and has been at all times relevant to this matter, Chief Executive Officer, Secretary, and / or a Director of QAD-USA.

33 KLOPKER and his wife, Pamela Lopker ("PLOPKER"), together are, and have been at all times relevant to this matter, majority shareholders of QAD-USA, and directors of OLD-QAD-JAPAN. One or both of them were directors and/or shareholders of NEW-QAD-JAPAN at all material times.

34 From information and belief, PLOPKER is either the founder or co-founder of QAD-USA. KLOPKER is also either the founder or co-founder or in any event joined his wife shortly after its establishment in order to help run the business. KLOPKER along with his wife PLOPKER form the driving force and the husband-wife team leading QAD-USA from its inception.

35 QAD-USA maintains a management group comprised of its senior executives called the E-team or some similar name. Notwithstanding this, no major decision is taken at QAD-USA without the concurrence and explicit approval of KLOPKER (and in some instances, additionally PLOPKER).

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

7

A 2842

Defendants DOES 1-50

36 Plaintiffs are ignorant of the capacities of other defendants sued here under fictitious names as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend the Complaint to allege their true names and capacities when properly such are properly ascertained. Plaintiffs are informed and believe, and thereupon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences and/or injuries alleged herein, and that Plaintiffs' injuries were proximately caused by such defendants. QAD-USA, NEW-QAD-JAPAN, ANDERSEN, NRI-JAPAN, NRI-HKG, DOORDAN, LEE, TAKATORI, and the defendants sued as DOES 1 through 50 are referred to individually as "Defendant" or "defendant" and collectively herein as "Defendants" or "defendants".

37 Plaintiffs are informed and believe that each defendant is, and at all relevant times was, an individual (or a business entity such as, without limitation, a corporation or a (limited) partnership), and/ or the agent and/ or employee or otherwise acting for, on behalf of, or in concert with each other co-defendant, and in committing the alleged acts, was acting either in an individual capacity or in the scope of his, her or its agency or employment or with the permission and consent of other co-defendants, and that each defendant is legally responsible for the injuries and damages to plaintiffs alleged herein to the full extent given that they participated in the conspiracies they are alleged herein, or so proven at trial to have so participated in.

## BACKGROUND FACTS RELEVANT TO ALL CLAIMS

### The business of VEDATECH-JAPAN

38 The principal business of VEDATECH-JAPAN, at all times relevant to this Complaint, was the provision of services in the Information Technology area to Japanese

.blosen & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

8

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2843

multinationals, or to US and European multinationals operating in Japan. In order to accomplish this goal, VEDATECH-JAPAN actively entered into partnerships with software vendors such as QAD-USA whose software products are large and complex.

39 VEDATECH-JAPAN helped software vendors establish a foothold in a difficult Japanese market, in return for which such vendors promoted and supported VEDATECH-JAPAN in obtaining a significant portion of the follow-on service business (known in the application software industry as "implementation business").

40 Since this follow-on service business is typically very profitable, there is considerable incentive among service companies to enter into preferred, and typically lucrative relationships with software vendors such as QAD-USA.

## The business of QAD-USA

41 The principal business of QAD-USA, at all times relevant to this Complaint, was the development and marketing of software for the planning operations of manufacturing enterprises. The primary product of QAD-USA in such relevant periods was a software package called MFG/PRO.

42 During the calendar years 1992 and 1993, QAD-USA, through defendant DOORDAN located in the Hong Kong branch office of QAD-USA (such branch office doing business in Hong Kong under the name "QAD Asia-Pacific" or similar name), was involved in various business contacts with VEDATECH-JAPAN, a portion of such contacts, in the early days in 1992 and/or 1993, relating to a common customer of QAD-USA and VEDATECH-JAPAN in Tokyo, Japan.

## Contract formation between QAD-USA and VEDATECH-JAPAN

43 In March 1994, QAD-USA, after a period of or around seven (7) months of intense negotiations that were undertaken between SUBRAMANIAN, DOORDAN and

.blsson & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO:  CV 784685

9

A 2844

KLOPKER, entered into a written agreement with VEDATECH-JAPAN (the "March Agreement"), wherein VEDATECH-JAPAN would assist QAD-USA in setting up a subsidiary in Japan whose purpose would be to be the sole supplier of the QAD-USA software products in Japan, and further maintain control over other service providers. VEDATECH-JAPAN would provide personnel services to QAD-USA to be in turn used by the Japanese subsidiary to be so established.

44  The consideration for the services provided by VEDATECH-JAPAN and for the opportunity cost and other factors relating to the commitment that VEDATECH-JAPAN and SUBRAMANIAN were providing QAD-USA per this March Agreement (and the subsidiary agreement between OLD-QAD-JAPAN and SUBRAMANIAN that was foreseen in the March agreement), was that QAD-USA would

   44.01  pay for any services provided at agreed upon rates,

   44.02  enable VEDATECH-JAPAN to obtain a significant share of the follow-on services business to Japanese multinationals worldwide, or to US or European multinationals in Japan.

45  Since the follow-on services came AFTER the successful sale of software to such customers, it was understood by both QAD-USA and VEDATECH-JAPAN (and reflected in their subsequent behavior) that the first order of business was to establish a strong sales presence for the sale of the MFG/PRO software (especially its version to be modified for Japan).

46  Upon establishing such sales, VEDATECH-JAPAN would benefit by being a preferred implementation partner that was actively promoted by QAD-USA or its affiliates and agents.

A 2845

bhinson & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO:  CV 784685

10

47 The original agreement provided for SUBRAMANIAN to be the full-time President and Representative Director of QAD-USA's Japanese subsidiary that was to be established (which eventually came to be known as QAD Japan K.K., referred to herein as "OLD-QAD-JAPAN").

48 As per this original agreement, VEDATECH-JAPAN would assist QAD-JAPAN in finding an appropriate Japanese president for the management of this subsidiary.

## Establishment of OLD-QAD-JAPAN in July 1994

49 OLD-QAD-JAPAN, a corporation organized under the laws of Japan, was established in July 1994 with QAD-USA contributing capital for 1999 shares and SUBRAMANIAN contributing capital towards 1 share.

50 OLD-QAD-JAPAN is different from NEW-QAD-JAPAN. NEW-QAD-JAPAN was established in or around August 1997 expressly and specifically in order to harm Plaintiffs and destroy OLD-QAD-JAPAN and to fraudulently induce customers to shift their business from OLD-QAD-JAPAN to NEW-QAD-JAPAN.

51 The finances of OLD-QAD-JAPAN was arranged so that QAD-USA would fund its operations directly. In the beginning, it was envisaged that QAD-USA would make payments to VEDATECH-JAPAN directly, or under its control.

## ANDERSEN's role in the establishment and operation of OLD-QAD-JAPAN

52 Even prior to the formal contract with QAD-USA in March 1994, Plaintiffs had an existing relationship with ANDERSEN through various contacts and relationships with senior partners at ANDERSEN. Plaintiffs introduced ANDERSEN and other firms such as KPMG-Japan and various smaller outfits to QAD-USA as potential candidates for helping with the complicated Japanese procedures for the proper establishment of a Kabushiki Kaisha (stockholding company, or the equivalent of a C-corporation).

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

11

A 2846

53 Under authorization from Ms. Barbara Whatley ("WHATLEY") who was then Chief Financial Officer of QAD-USA, Mr Bennet Chan (Regional Controller of QAD-USA's branch office in Hong Kong) personally interviewed the various candidates in Japan and approved of the selection of ANDERSEN (recommended by Plaintiffs) for helping with the establishment of OLD-QAD-JAPAN.

54 Thus, Plaintiffs, with the concurrence of QAD-USA, hired ANDERSEN to help them set up OLD-QAD-JAPAN. ANDERSEN arranged for the observance of the various Japanese formalities, and established OLD-QAD-JAPAN with SUBRAMANIAN as the local promoter with 1 share and QAD-USA as the majority shareholder with 1999 shares.

55 Furthermore, ANDERSEN's partners served as directors on the board of OLD-QAD-JAPAN from its inception.

## Replacement of ANDERSEN with KPMG-JAPAN in 1995

56 In or around early 1995, Ms. Barbara WHATLEY visited Japan to review the setup and operations of OLD-QAD-JAPAN.

57 Plaintiffs arranged for WHATLEY to meet the local banks, KPMG-Japan and other service providers of OLD-QAD-JAPAN relevant to its financial management.

58 WHATLEY had a change of heart about which professional firm to use in supporting the operations of OLD-QAD-JAPAN and was of the opinion that she would prefer to use KPMG-JAPAN as she was dealing with KPMG in California regarding the affairs of QAD-USA and it would be better for her to work with KPMG in Japan also.

59 Thus, in order to accommodate the feelings of WHATLEY, ANDERSEN was replaced with KPMG-Japan and the board of directors was reconstituted to include executives from QAD-USA, in addition to SUBRAMANIAN who continued to serve as the Representative Director of OLD-QAD-JAPAN.

obinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408)298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

12

A 2847

Additions, Variations and Extensions to/of the initial one-year agreement

60 Before the end of this initial one-year period, both parties realized that the goals set out in the March Agreement (the written agreement) were more difficult than was mutually envisaged.

61 QAD-USA specifically requested SUBRAMANIAN and VEDATECH-JAPAN, and SUBRAMANIAN AND VEDATECH-JAPAN agreed that the agreement between QAD-USA and VEDATECH-JAPAN would be orally modified, added to, and extended for a number of terms, without a limit on the number of such automatic extensions, and with the mutual agreement that the right time to transition into a pure partnership relating to implementation services would be when the parties mutually agreed that the initial goals established for the March Agreement were achieved.

62 Furthermore, it was additionally orally agreed between the parties that SUBRAMANIAN would be officially appointed for a two-year term as Representative Director of OLD-QAD-JAPAN. It was agreed that SUBRAMANIAN would serve as the Representative Director until the parties could agree on the timing and selection of a Japanese president of OLD-QAD-JAPAN.

63 It was also agreed that in return for the long-term commitment of VEDATECH-JAPAN and SUBRAMANIAN to the business of QAD-USA through its subsidiary in Japan, QAD-USA in turn would commit itself long-term to ensuring VEDATECH-JAPAN being its preferred implementation partner and to the financial success of the VEDATECH-JAPAN implementation business relating to MFG/PRO.

64 It was specifically recognized by all the parties to such agreements that they were entering into a closer relationship over a longer term than was originally envisaged in the original March Agreement, and that the March Agreement was only a small portion of the scope and extent of the renewed and expanded agreement between the parties.

ableson & Wood, inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

13

A 2848

Formalization the long-term appointment of SUBRAMANIAN

65 KPMG-JAPAN, hired expressly to accommodate the wishes of QAD-USA, was asked to conduct the formalities necessary for the appointment of SUBRAMANIAN to the two-year period as Representative Director of OLD-QAD-JAPAN.

66 Whereas the other aspects of the oral agreement that added to, varied and extended the initial one-year written agreement were never captured on paper, the conduct of the parties since early 1995 through 1997 clearly demonstrate the fact of such agreement and the terms and conditions of such agreement.

Role of DOORDAN in the management of OLD-QAD-JAPAN

67 DOORDAN, as Regional Director of QAD-USA's branch office in Hong Kong in the 1993 - 1995 period, had responsibilities for sales and support in the Asia-Pacific region that included Japan before the establishment of OLD-QAD-JAPAN. It was DOORDAN that initially negotiated with SUBRAMANIAN and VEDATECH-JAPAN, and DOORDAN who was responsible for the first sale of the MFG/PRO software in Japan, which first sale was accomplished in or before 1992 to a customer in Tokyo, Japan.

68 Thus, after the establishment of OLD-QAD-JAPAN, QAD-USA made DOORDAN responsible on the QAD-USA side to manage and coordinate all issues relating to its newly formed majority owned subsidiary, OLD-QAD-JAPAN.

69 In early 1995, as described above, KPMG-Japan formalized the two-year appointment of SUBRAMANIAN as Representative Director of OLD-QAD-JAPAN, and when ANDERSEN and its directors on the board of OLD-QAD-JAPAN were relieved of its duties towards OLD-QAD-JAPAN. At this time, DOORDAN was appointed as one of the directors of OLD-QAD-JAPAN along with KLOPKER. This was done to ensure adequate representation of QAD-USA in the affairs of OLD-QAD-JAPAN.

Johnson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

14

A 2849

Reorganization ("Verticalization") at QAD-USA.

70 In or around late 1995, QAD-USA started a worldwide overhaul of its management structure. From managing its various branch offices worldwide by region, it started experimenting with a structure where the organization was divided into various groups reflecting customer segments (such as the "Electronics" market segment, the "Automotive" market segment, the "Consumer Products" market segment etc.

71 A direct result of this was that the position that DOORDAN enjoyed as Regional Director of Hong Kong was eliminated and DOORDAN was assigned the position of managing the "Electronics" sales segment worldwide, operating out of the San Jose, California offices of QAD-USA.

72 At one point in time, DOORDAN told SUBRAMANIAN that he was the brain behind this verticalization idea as he had wanted to move back to San Jose for personal reasons.

73 By early 1996, the performance of the new organization, including that of DOORDAN in his new job was so poor that QAD-USA got into serious financial trouble. Its profits were plummeting and cash was becoming scarce.

## Cash Flow Problems at QAD-USA and layoffs at OLD-QAD-JAPAN

74 Thus, starting from or around early 1996, QAD-USA started to experience severe cash flow problems. Since OLD-QAD-JAPAN was still not in a profit-making mode and was dependent on QAD-USA for continuing financial support, this led to layoffs and cutbacks at OLD-QAD-JAPAN. Many of the employees left at OLD-QAD-JAPAN, including Nobuo Kanehara ("KANEHARA") and Takeshi Nagae ("NAGAE") became very disturbed by these turn of events and built up resentment towards the management, which inevitably became directed as SUBRAMANIAN, who was the de facto leader in Japan. DOORDAN, later, exploited this unhappiness for his own personal gain.

Jbinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 394-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

15

A 2850

75 QAD-USA sent regular communications to all of its offices and subsidiaries warning of the cash crunch. DOORDAN, who was still trying to stay involved with the affairs of OLD-QAD-JAPAN, suddenly wanted to distance himself from what he said was a losing proposition.

### The meeting in San Jose in or around May 1996

76 Given the cash flow problems at QAD-USA and the effect on QAD-USA's ability to keep up with its commitments in Japan (both to OLD-QAD-JAPAN and VEDATECH-JAPAN), SUBRAMANIAN was faced with severe pressure from vendors of OLD-QAD-JAPAN and VEDATECH-JAPAN and the need to keep salary commitment to the remaining staff at OLD-QAD-JAPAN and those at VEDATECH-JAPAN.

77 Furthermore, VEDATECH-JAPAN was just starting to do some of the implementation work relating to the sales of OLD-QAD-JAPAN and it was critical for VEDATECH-JAPAN to ascertain QAD-USA's commitments to its Japanese operations in light of this cash crunch. Will QAD-USA survive this cash crunch?

78 SUBRAMANIAN and VEDATECH-JAPAN also had other business opportunities, but out of a sense of loyalty to its partner QAD-USA, SUBRAMANIAN wished to give QAD-USA a chance to set things right or be candid about its prospects, before making any decisions on abandoning the QAD-related project and related commitments.

79 It is with this in mind that SUBRAMANIAN traveled to San Jose, California in or around May 1996 to meet with DOORDAN. DOORDAN was not very helpful and said that he himself was in great trouble and did not wish to be more involved. DOORDAN reminded SUBRAMANIAN that per the new organization structure, he was no longer responsible for Japan, as he was now a "vertical" manager and that SUBRAMANIAN had to get a go-ahead from KLOPKER in order to fund OLD-QAD-JAPAN or continue with the contract with VEDATECH-JAPAN any further.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

16

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2851

80 DOORDAN did tell SUBRAMANIAN that he would be recommending to KLOPKER that OLD-QAD-JAPAN be shut down, given the bleak financial outlook for QAD-USA.

### The meetings near Santa Barbara in 1996

81 SUBRAMANIAN was very concerned by the approach of DOORDAN and DOORDAN's attempts to distance himself from QAD-USA's responsibilities towards the Japanese operations. SUBRAMANIAN proceeded to the headquarters of QAD-USA to get this matter resolved by direct discussions with KLOPKER and others.

82 As a first step, SUBRAMANIAN discussed this matter with KLOPKER who assured SUBRAMANIAN that what DOORDAN said was not true and that the cash flow problems at QAD-USA were temporary and that while SUBRAMANIAN should hold the line on costs, it was important for QAD-USA that Japan succeed. KLOPKER encouraged SUBRAMANIAN to invest further in the relationship.

83 Based on this encouragement from KLOPKER, SUBRAMANIAN met with Mr. Dale Akita ("AKITA") who was then the controller at QAD-USA to chart out a plan for handling the cash flow problems at QAD-USA which was affecting the operations of both OLD-QAD-JAPAN and VEDATECH-JAPAN.

### Management Changes at QAD-USA

84 Because of these cash flow problems there were many top-level meetings in QAD-USA at this time and a lot of finger pointing was going on. Several top level executives were relieved of their duties or left the company, depending on one's point of view.

85 DOORDAN informed SUBRAMANIAN that KLOPKER blamed the sales executives including DOORDAN for not delivering on the sales projections / forecasts promised and

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

17

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2852

DOORDAN blamed the new leaders of the administrative and financial "vertical" groups for unnecessarily and prematurely expanding office space and increasing overheads.

86 DOORDAN was very angry especially about the purchase of new office buildings at Ortega Hill in Summerland near Santa Barbara, California in this kind of a period (he said that the Lopkers bought it just because of their personal attraction to the site and as a matter of prestige and not as a matter of good commercial sense), and also the expansion of offices spaces at QAD-USA's offices in Singapore without any sales to back it up.

87 In any event, it was very clear that DOORDAN was very worried about his own position and about being blamed for the financial troubles at QAD-USA.

**Authorization of SUBRAMANIAN to use own discretion in handling payments in Japan (as between VEDATECH, OLD-QAD-JAPAN and other vendors)**

88 In or around July of 1996, based on the new developments, including the inability of QAD-USA to keep its funding commitments to OLD-QAD-JAPAN and its payment obligations to VEDATECH-JAPAN, QAD-USA decided to change its funding activities regarding OLD-QAD-JAPAN and the payment procedures for any invoices of VEDATECH-JAPAN. Until then, QAD-USA typically paid or authorized any payment to VEDATECH-JAPAN with respect to the ongoing agreements for services etc.

89 Now, in light of the cash crunch and the difficulties SUBRAMANIAN was facing in handling vendors and the employee related issues in Japan for both organizations, SUBRAMANIAN was additionally authorized by QAD-USA, with the concurrence and acceptance of DOORDAN and AKITA, to make payments to VEDATECH-JAPAN for invoices submitted to QAD-USA from funds available at OLD-QAD-JAPAN. This new updated practice was put into effect immediately and SUBRAMANIAN was persuaded not to drop the QAD-related projects on that basis.

.Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

18

90 This was done because it was recognized in that period, with the chronic cash shortages at QAD-USA, that the funds necessary to pay both OLD-QAD-JAPAN expenses and the invoices of VEDATECH-JAPAN were simply not available, and that SUBRAMANIAN was in a difficult position in balancing the priorities of both companies by having accepted QAD-USA's offer to serve as Representative Director of OLD-QAD-JAPAN in addition to his duties as Representative Director of VEDATECH-JAPAN.

91 Thus QAD-USA through AKITA and SUBRAMANIAN agreed that the decision to pay the outstanding accounts payable or other expenses at OLD-QAD-JAPAN or use the scarce funds to pay off some of the outstanding invoices due from QAD-USA to VEDATECH-JAPAN in order to enable VEDATECH-JAPAN to continue to provide services to QAD-USA for the benefit of both QAD-USA and OLD-QAD-JAPAN would henceforth be based on the discretion of SUBRAMANIAN.

92 This arrangement then continued from that time forward, with SUBRAMANIAN, through the staff of OLD-QAD-JAPAN and/ or the reports of ANDERSEN working on the accounting functions of OLD-QAD-JAPAN periodically informing QAD-USA of the exact nature of the disbursements as and when necessary.

93 QAD-USA never once objected to the actual exercise of this discretion until its attempts to improperly terminate SUBRAMANIAN starting in or around July 1997.

### Temporary Relief for QAD-USA

94 In this period, some "factoring" company had extended financing in the form of either a loan or a receivables-based line of credit to QAD-USA and QAD-USA was out of crisis mode with respect to cash flow issues. QAD-USA based on this near-death experience decided to prepare immediately for an initial public offering of its stock, (the "IPO") and make management changes to make itself presentable to the financial community.

ablntos & Wood, Inc.
277 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

19

A 2854

95 Until that time, the Lopkers had steadfastly refused to offer stock to the public. QAD-USA had some kind of an internal program of trading employee owned stock, but this was never a major source of additional financing needed to support its growth.

### "Mike" MOHANDAS and the Management Changes

96 QAD-USA hired an outside consultant, one Mr. Mike Mohandas ("MIKE"), to help it prepare for such an IPO and to advise it on revamping its management practices.

97 MIKE was a retired executive who had held very senior positions at Xerox (?) or some such multinational, and was now acting as a personal advisor to young chief executives such as Karl Lopker who were going through rapid growth and struggling to build an experienced management team.

98 MIKE was a straight-shooting action-oriented gentleman who acted quickly to make many changes at QAD-USA. He did use strong language to make his points (some said he was foul-mouthed), and understandably the entrenched management such as DOORDAN did not like him or approve of him one bit.

99 Partly because of the recommendations of this consultant, many management changes were brought about during the late 1996 period, most of which were resented by DOORDAN. DOORDAN expressed such resentment of such changes several times to SUBRAMANIAN and others, although it was clear that QAD-USA needed such changes.

### KLOPKER's trip to Japan in 1996

100  In addition to this, KLOPKER, in order to show his commitment to Japan, also visited Japan in or after the summer of 1996 and attempted to meet with key customers to assure them of QAD-USA's commitment to its subsidiary OLD-QAD-JAPAN and also to assure them of his involvement as a director of OLD-QAD-JAPAN.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

20

A 2855

101    During such a trip, KLOPKER, DOORDAN and SUBRAMANIAN visited Kyoto and during dinner at a riverside outdoor restaurant in Kyoto, KLOPKER commended SUBRAMANIAN for his work and commitment and suggested that he needed individuals such as SUBRAMANIAN to be on the board of directors at QAD-USA.

102    DOORDAN later told SUBRAMANIAN that he did not like that invitation to SUBRAMANIAN as he felt slighted, having worked for KLOPKER for so many years and never having been invited to the board of directors of QAD-USA. In any event, that matter was never pursued further and was overtaken by the confusion caused by DOORDAN in the following months.

103    Another outcome of the Japan trip of KLOPKER was that KLOPKER discussed his attempts to put together a comprehensive budgeting system for QAD-USA including all of its subsidiaries. KLOPKER showed SUBRAMANIAN a simulation program (a kind of computer game) based on Microsoft Excel (the spreadsheet program) that he was using to educate managers in the US about the impact of management decisions on issues such as budgets and cash flow.

104    SUBRAMANIAN was very interested in this and as a result KLOPKER requested SUBRAMANIAN to prepare a detailed long-term business plan and budget for OLD-QAD-JAPAN to grow rapidly under the assumption of significant funding from QAD-USA.

105    SUBRAMANIAN agreed to prepare such a plan started preparing such a plan with a three to five year period going forward.

106    KLOPKER suggested that the plan be ready to be presented to him at the upcoming sales conference in January 1997 and also suggested the SUBRAMANIAN work with DOORDAN to coordinate such a plan with the financial projections already being developed at QAD-USA for the other divisions and subsidiaries.

Johnson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

A 2856

The search for a Japanese executive for OLD-QAD-JAPAN

107    SUBRAMANIAN, partly worried about the financial management of QAD-USA and partly encouraged by their decision to find additional funding through the IPO, etc., decided to start the search for a Japanese executive.

108    Since KLOPKER wanted SUBRAMANIAN to stay for the period of the business plan to be drawn up (three to five years), SUBRAMANIAN compromised and instructed EGON-JAPAN to look for a senior manager who can be groomed to become the President of OLD-QAD-JAPAN at the appropriate time.

109    Thus in 1996, the search for Japanese executives to strengthen the management team of OLD-QAD-JAPAN was started through the Japanese office of the executive placement firm Egon Zehnder ("EGON-JAPAN"). The consultant in charge of the project at EGON-JAPAN was Mr. Obata ("OBATA"). It was thus foreseen that one of the executives so selected would become a candidate to be groomed for the position then held by SUBRAMANIAN.

## Plaintiffs hire ANDERSEN as book-keepers for OLD-QAD-JAPAN

110    In or around August of 1996, in an attempt to keep the expenses of OLD-QAD-JAPAN minimal and flexible, all in line with the new realities of the funding situation with QAD-USA, SUBRAMANIAN hired ANDERSEN to assist with the accounting and book-keeping functions of OLD-QAD-JAPAN.

111    During the process of hiring ANDERSEN to do this job, SUBRAMANIAN explained to Mr. Chiba ("CHIBA") a partner at ANDERSEN in its Tokyo office and the individual responsible for supervising the accounting services to be provided to OLD-QAD-JAPAN, the updated status of the relationships between the various parties, especially the importance of the QAD-USA partnership for Plaintiffs' business.

Blasco & Wood, Inc.
127 North First Street
San Jose, CA 95113
(408) 298-7120

22

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2857

The promises made by CHIBA of ANDERSEN

112    CHIBA specifically assured SUBRAMANIAN that in providing such services ANDERSEN would not undertake any actions that would be harmful to OLD-QAD-JAPAN or its principals and directors, or VEDATECH-JAPAN or SUBRAMANIAN, given the complicated relationship between such parties.

113    This assurance by CHIBA was repeated in July 1997 when a proposed investigation by ANDERSEN of the finances of OLD-QAD-JAPAN created a conflict of interest situation between ANDERSEN providing accounting services and auditing-related services to the same organization. At this time, SUBRAMANIAN decided to continue the services of ANDERSEN in the accounting function in reliance upon such continued assurances by CHIBA.

## The management changes wrought at QAD-USA by MIKE and the IPO preparations

114    Major changes were made starting in late 1996 to the top executive ranks at QAD-USA. The Vice President of the consumer products vertical segment resigned or was pushed out, and there was even talk of WHATLEY being sidelined to make way for a new finance team to be hired through Egon Zehnder of San Francisco ("EGON-SFO"). Even PLOPKER, the President was deemed unfit to lead the R&D Division and an outside, Vince Niedzielski was brought in to manage Research and Development efforts.

115    At the same time (late 1996), at QAD-USA, DOORDAN was moved to a position with lesser responsibilities, much to his chagrin. Specifically, DOORDAN was relieved of his duties as the worldwide head of the "vertical" segment for the electronics market, and given a backwater position as VP of emerging markets or some such position. This included regions such as Brazil where the sales volume was not considered large enough for the main "vertical" managers to spend a lot of time on.

Johnson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

23

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2858

116    DOORDAN, in or around the end of 1996 complained several times to SUBRAMANIAN that KLOPKER was not treating old loyal employees such as DOORDAN fairly and that he, DOORDAN was not being appreciated for the difficult tasks he had accomplished for QAD-USA. DOORDAN was especially upset with the downgrading of his own responsibilities and expressed his concern that he was being sidelined in favor of untested newcomers and that it was DOORDAN's opinion that MIKE did not know what he was doing.

### The meetings in San Jose / near Santa Barbara in late 1996

117    In or around November 1996, SUBRAMANIAN had an initial draft of his business plan and traveled to San Jose to meet with MIKE regarding the plans for Japan.

118    MIKE, DOORDAN and SUBRAMANIAN met in the conference room at the offices of QAD-USA in San Jose, California. MIKE complimented SUBRAMANIAN on his plan but made various suggestions for improving the presentation. He especially pointed out to SUBRAMANIAN that in addition to the analysis of the numbers, SUBRAMANIAN needed to arrange his market research in the form of a "story" that senior executives can clearly understand. He said that while it was possible for him to clearly understand such a "story" from talking with SUBRAMANIAN, he wanted that captured on paper, in the plan and in the accompanying presentations and slide shows.

119    In addition, MIKE openly insulted DOORDAN in the meeting, telling him that DOORDAN was no longer necessary for the management of Japan and it was time for the "younger generation" to take over. DOORDAN was livid about this comment and told SUBRAMANIAN later on that MIKE was not liked by anybody and DOORDAN did not understand why KLOPKER put up with him and that DOORDAN was sure that MIKE would eventually upset KLOPKER

A 2859

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

24

Robinson & Wood, Inc.
227 North First Street
San Jose, CA. 95113
(408) 298-7120

120    SUBRAMANIAN proceeded to travel to the QAD-USA headquarters near Santa Barbara and received further commitments from KLOPKER that the business plan being developed by SUBRAMANIAN would be supported and that SUBRAMANIAN should plan on personally being in this arrangement with QAD-USA and OLD-QAD-JAPAN for at least the period of the plan and see it through to success.

121    During these meetings near Santa Barbara (in the Ortega Hills office in Summerland), MIKE brought up this new idea of his that SUBRAMANIAN should merge VEDATECH-JAPAN with QAD-USA and SUBRAMANIAN should join QAD-USA. MIKE said that SUBRAMANIAN would get stock options going into the IPO and would be well rewarded. He said that he would recommend that to KLOPKER and that he wanted to see someone such as SUBRAMANIAN leading the effort as an insider for the long-term in Japan and not as a partner that might walk away from QAD-USA.

122    SUBRAMANIAN told MIKE that he would consider it but that it was not consistent with the agreement between the parties and that it would be major departure from the understanding between the parties for the (then) past three years or more.

123    In any event, MIKE and SUBRAMANIAN decided to discuss this matter further at the upcoming sales conference in January 1997. SUBRAMANIAN met with other executives such as AKITA and then left to go back to Japan.

## TAKATORI and NRI's interest in MFG/PRO

124    Upon information and belief, in or around the second half of 1996 or early 1997, NRI-HKG, and its executive TAKATORI became interested in the service business relating to the MFG/PRO product of QAD-USA. TAKATORI was negotiating on behalf of both NRI-HKG and NRI-JAPAN. In addition to developing a relationship between NRI-HKG and QAD-USA, TAKATORI started to promote NRI-JAPAN as a potential partner of QAD-USA.

25

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(4[  ]120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2860

DOORDAN's renewed interest in OLD-QAD-JAPAN

125   Given the turn of fortunes at QAD-USA for the better, and given KLOPKER's strong commitment to Japan and MIKE's enthusiasm for the Japanese market and MIKE's personal support for an expanded budget for Japan, DOORDAN suddenly became very interested in renewing his control over the operations in Japan.

126   In or around December 1996, DOORDAN expressed an interest to SUBRAMANIAN in becoming President or Representative Director of OLD-QAD-JAPAN. DOORDAN's stated reasons for seeking this position was his unhappiness with what he stated as being sidelined at QAD-USA and what he termed as the excessive influence of consultants such as MIKE on KLOPKER.

127   DOORDAN also told SUBRAMANIAN that he was planning on being an executive consultant after he left QAD-USA and he had good asia-pacific experience for most regions except Japan. It was critical, he said that he could put something good about Japan on his resume.

128   SUBRAMANIAN was generally supportive of this plan of DOORDAN, not knowing that DOORDAN was planning on accomplishing this at the expense of SUBRAMANIAN and VEDATECH-JAPAN and that DOORDAN, unfortunately, considered SUBRAMANIAN as a road block to the achievement of DOORDAN's personal ambitions and goals.

129   Until this point in time, SUBRAMANIAN generally had a good working relationship with DOORDAN. In fact, SUBRAMANIAN, upon request from DOORDAN, even wrote a recommendation / evaluation for DOORDAN speaking highly of him in support of his evaluation by the E-team. BUT, going forward from this point in time, because of DOORDAN's underhanded and harmful tactics,, SUBRAMANIAN found himself always on the defensive about one form of subterfuge or another.

.obinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

26

A 2861

1

The tragic, untimely and early death of MIKE

2

130    MIKE used to fly his own plane between his home south of Los Angeles and to

3

various places such as Santa Barbara and San Jose to meet with QAD-USA's executives.

4

One foggy day in December 1996, when MIKE was piloting his plane to Santa Barbara, it

5

crashed for reasons unknown to Plaintiffs and he met with his tragic death.

6

7    131    SUBRAMANIAN called DOORDAN to find out more details of this. While

8    DOORDAN expressed sympathy, he also said that unfortunate as it was, it meant that his

9    (DOORDAN's ) problems with what DOORDAN said were arbitrary management

10    changes would be over now.  DOORDAN actually seemed relieved.

11

12    132    Without a powerful outsider such as MIKE moderating the influence of

13    DOORDAN, DOORDAN went back to his plan of trying to topple SUBRAMANIAN

14    from the position at OLD-QAD-JAPAN so that he can find a way to redeem himself in

15    the QAD-USA organization and get back to a position of some importance.

16    133    KLOPKER was loyal to his team of executives from the start-up days of QAD-

17    USA and only a strong personality such as MIKE had overcome that.  After the untimely

18    death of MIKE, KLOPKER was dependent more than ever on the familiar and the

19    comfortable and the stars of executives such as DOORDAN began to rise again.

20

DOORDAN resorts to underhanded activities to undermine SUBRAMANIAN

21

22    134    Starting from or around December 1996, DOORDAN, without informing

23    SUBRAMANIAN, also started contacting employees of OLD-QAD-JAPAN and other

24    individuals and entities in Japan with the intention of having them help DOORDAN

25    convince KLOPKER and QAD-USA in replacing SUBRAMANIAN with DOORDAN or

26    with someone that DOORDAN chooses and thus could control.

27

28

Robinson & Wood, Inc.
(408) 396-7120

CASE NO: CV 784685

A 2862

135    DOORDAN's activities included encouraging some such individuals contacted (such as Takahashi or Nagae of OLD-QAD-JAPAN) to either start an independent search for a new President of OLD-QAD-JAPAN to replace SUBRAMANIAN or be candidates themselves for such a position in the near future.

136    In spite of DOORDAN's attempted secrecy with such attempts on his own part, news of his efforts were related to SUBRAMANIAN by several sources in Japan, one of them being OBATA of EGON-JAPAN, who, at that time was upset at having a parallel "search" going on while he assumed that he had the exclusive contract to do the same.

### The Ojai sales conference of QAD-USA in January 1997

137    In January 1997, QAD-USA organized a sales conference in Ojai, California (the "Ojai Conference"), which SUBRAMANIAN attended.

138    During this Ojai conference, SUBRAMANIAN had a meeting with KLOPKER to express SUBRAMANIAN's concerns with DOORDAN's activities in Japan and the potential embarrassment for all the parties in a protocol-conscious society such as Japan (with the concerns of OBATA being explained to KLOPKER).

139    KLOPKER assured SUBRAMANIAN that DOORDAN would not undertake such activities and suggested that this was a possible misunderstanding on the part of SUBRAMANIAN and that SUBRAMANIAN should not worry about these matters and proceed on with the tasks requested by KLOPKER regarding the business plan and related activities (such as increasing sales to Japanese companies outside of Japan etc.)

140    KLOPKER further committed to SUBRAMANIAN that he agreed that SUBRAMANIAN would serve as Representative Director of OLD-QAD-JAPAN until SUBRAMANIAN and KLOPKER (QAD-USA) could agree on a proper management

Robinson & Wood, Inc.
rth First Street
, CA 95113
498-7120

A 2863

team for OLD-QAD-JAPAN and after OLD-QAD-JAPAN was made strong enough to be independent on its own (as opposed to being dependent on QAD-USA for funds).

141    Said meeting between KLOPKER and SUBRAMANIAN took place in the early afternoon in a small green clearing to the side of the main lecture halls where the principal meetings were taking place.

142    Several hours later, SUBRAMANIAN presented the latest version of the business plan for OLD-QAD-JAPAN, as requested several months earlier by KLOPKER, to KLOPKER, DOORDAN and others (such as Vince Niedzielski, the new R&D manager and David Burns, the marketing manager). The plan was well received.

## Follow-up to the Ojai Conference

143    In the weeks following the Ojai conference, SUBRAMANIAN and KLOPKER talked over the telephone several times. KLOPKER instructed SUBRAMANIAN to start integrating the budgetary requirements of the new plan with the overall plan then being developed at the headquarters in California.

144    Consistent with his earlier request that the business plan be coordinated with DOORDAN (from his Japan trip in the summer of 1996), KLOPKER assigned DOORDAN to be the person to coordinate such information from SUBRAMANIAN, with the work being undertaken at the headquarters. DOORDAN was supposed to keep in close touch with the new budgets being prepared in California and help integrate the plan prepared by SUBRAMANIAN into the overall budgetary scheme.

## DOORDAN intensifies activities, notwithstanding KLOPKER's observations

145    Instead, after the Ojai conference, DOORDAN intensified his activities trying to exert indirect control over the operations of OLD-QAD-JAPAN. In order to assist himself in these efforts, DOORDAN intensified contacts with TAKATORI, NRI-HKG,

...on & Wood, Inc.
...orth First Street
San Jose, CA 95113
(408) 298-7120

1    NRI-JAPAN, and other companies or agents of companies that were potential

2    competitors of VEDATECH-JAPAN (such as Toyo Joho Systems), or were individuals

3    interested in obtaining some senior position at OLD-QAD-JAPAN (including some that

4    had been rejected both by EGON-JAPAN and by SUBRAMANIAN for such positions).

### Replacement of DOORDAN with SPRUIT as coordinator for Japan

7    146    SUBRAMANIAN informed KLOPKER of these actions and activities by

8    DOORDAN, and reiterated his serious concerns regarding the same.

10    147    KLOPKER agreed that this was becoming a problem issue and agreed to appoint

11    Hans Spruit ("SPRUIT") to work with Plaintiffs on matters relating to QAD-USA's

12    interests in the affairs of OLD-QAD-JAPAN and the agreements between QAD-USA and

13    VEDATECH-JAPAN.

14    148    KLOPKER also agreed that effective from the date that he formalized such new

15    arrangements (which he said he would do soon), DOORDAN would no longer be

16    responsible on the QAD-USA side for Japan.

### Discussions regarding reducing oral agreements to writing

19    149    In this same period (early 1997), QAD-USA as part of its preparations for the IPO,

20    informed VEDATECH-JAPAN that, as part of the feedback received from the due

21    diligence efforts of consultants hired to help it prepare for the IPO, there was identified

22    by such consultants, a need to memorialize the various oral agreements between QAD-

23    USA and VEDATECH-JAPAN in a formal written agreement.

### Doordan's threats

26    150    In or around March 1997, DOORDAN traveled to Japan and met with

27    SUBRAMANIAN over a period of several days.

28

30

.bison & Wood, Inc.
.27 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2865

151    Near the end of this trip, DOORDAN informed SUBRAMANIAN that he has become aware of KLOPKER's unhappiness with himself and that he knew about the proposed transfer of responsibilities to SPRUIT.

152    He warned SUBRAMANIAN that unless SUBRAMANIAN recommended to KLOPKER that DOORDAN be the new President and Representative Director, or an equivalent position at OLD-QAD-JAPAN, DOORDAN would cause serious damage to the relationship between VEDATECH-JAPAN and (SUBRAMANIAN) and QAD-USA.

153    DOORDAN further warned SUBRAMANIAN that failure to cooperate with DOORDAN would mean loss of both the direct and indirect service business that was ongoing and forthcoming to VEDATECH-JAPAN under the agreement(s) between QAD-USA and VEDATECH-JAPAN and SUBRAMANIAN.

154    When asked why he was asking SUBRAMANIAN to undertake such activities and not proposing such matters to KLOPKER himself, DOORDAN mentioned to SUBRAMANIAN that he (DOORDAN) considered it unfortunate that KLOPKER would place more faith in SUBRAMANIAN and SPRUIT but not (in DOORDAN's opinion) in an old loyal employee such as himself.

### The 1997 (second) Asia Pacific Sales conference in Bali

155    In or around March of 1997, in a meeting at Bali, Indonesia, KLOPKER formally appointed SPRUIT to become the person in charge of representing QAD-USA in all negotiations with both Plaintiffs and other parties such as EGON-JAPAN. DOORDAN was removed from such responsibilities.

156    At this conference, KLOPKER reaffirmed his and QAD-USA's commitments to the oral agreements with VEDATECH-JAPAN and SUBRAMANIAN and the commitments made by KLOPKER during the Japan trip in 1996, and their commitment to the business plan presented to KLOPKER at the Ojai conference.

31

227 North First Street
San Jose, CA. 95112
(408) 298-7120

A 2966

157    SPRUIT and SUBRAMANIAN met at the Bali conference after this endorsement by KLOPKER and agreed to start working on the written versions of the various agreements regarding VEDATECH-JAPAN, SUBRAMANIAN and the Japan business in general.

158    SPRUIT indicated that he will be traveling to Japan shortly and also invited SUBRAMANIAN to come to Amsterdam (where SPRUIT was based,) to follow-up on the various complex issues.  In addition, upon his return to Europe, SPRUIT sent SUBRAMANIAN a sample distributor agreement that he had used with Origin (a subsidiary of Philips) and a large partner of QAD-USA, as an initial reference to the kind of language that needed to be drawn up.

## Re-Emergence of DOORDAN as negotiator-in-chief

159    Soon after this endorsement by KLOPKER and the agreement between SPRUIT and SUBRAMANIAN to follow-up, DOORDAN returned to San Jose and after a week or so, telephoned SUBRAMANIAN to inform him that SUBRAMANIAN had to deal with DOORDAN after all, as he had convinced SPRUIT to "delegate" to himself (DOORDAN) the duties assigned to SPRUIT by KLOPKER.

160    SUBRAMANIAN was quite shocked by this but did not know how to react to this, and decided to bring this up with SPRUIT at their next face-to-face meeting.

## Formalization of the extension of the term of SUBRAMANIAN

161    In or around March 1997 SUBRAMANIAN and KLOPKER decided formally that SUBRAMANIAN should be elected to another two-year term at OLD-QAD-JAPAN in the position of Representative Director and President.

162    It should be remembered that QAD-USA (acting through KLOPKER) and SUBRAMANIAN were the two shareholders of OLD-QAD-JAPAN and could and

1    would decide amongst themselves at the annual shareholder's meeting as to the
2    composition of the board of directors.

3    163    KLOPKER and SUBRAMANIAN also agreed that given the problems that
4    DOORDAN had in working smoothly with SUBRAMANIAN it is best that DOORDAN
5    be demoted from a full director.
6

7    164    But in consideration of DOORDAN's feelings, KLOPKER and SUBRAMANIAN
8    decided to give him the largely ceremonial post in a Japanese K.K. company of an
9    internal "auditor".

10   165    Upon such agreement between the majority shareholder QAD-USA (through
11   KLOPKER) and the minority shareholder SUBRAMANIAN, KPMG Peat-Marwick in
12   Japan, which was selected by QAD-USA in or around early 1995 to handle such formal
13   matters such as the holding and registration of shareholders' meetings and other corporate
14   matters of OLD-QAD-JAPAN, undertook the necessary steps to have this formally
15   registered with the Japanese governmental authorities (such as the Legal Affairs Bureau
16   of Yokohama), as they had done in 1995 and as they did with various other corporate
17   formalities required to be performed on behalf of OLD-QAD-JAPAN in accordance with
18   the laws and regulations of Japan.
19

20       QAD-USA approved of, was fully aware of and was, and is, in possession of
21       all documents relating to the renewal of SUBRAMANIAN's term

22
23   166    Shortly thereafter, SUBRAMANIAN received a request from QAD-USA (from
     one Sheila Blaise (?)), for copies of documents that related to the official status of OLD-
24   QAD-JAPAN, its board of directors and other related information, with the reason for the
25   request being the need to have such documents in preparation for the IPO.
26

27   167    SUBRAMANIAN had such documents sent over from KPMG Peat Marwick
28   Japan, and then sent the same over to QAD-USA.

168    SUBRAMANIAN did not hear any objections whatsoever from QAD-USA to such documents after receipt by QAD-USA.

169    It was only later on (in or after October 1997), during the course of one of several legal proceedings that started between the parties that QAD-USA started criticizing such renewal of the term of SUBRAMANIAN and slowly built it up to the current allegations of fraud.

170    QAD-USA approved of and was aware of the changes formalized by KPMG-Japan with respect to the appointment of SUBRAMANIAN to the two-year term in 1997.

## EGON-JAPAN's concerns about the improper activities of DOORDAN

171    In 1997, EGON-JAPAN continued their search for executive team members for OLD-QAD-JAPAN from whom a potential president or Representative Director for OLD-QAD-JAPAN could be groomed.

172    In this period, OBATA of EGON-JAPAN expressed increasing concern about the continuing activities of DOORDAN in Japan (which, he told SUBRAMANIAN was continuing to cause him considerable embarrassment), and urged SUBRAMANIAN to take some action to straighten this out with KLOPKER so that EGON-JAPAN could present a unified front to the potential candidates.

## Meeting with EGON-SFO to seek help regarding activities of DOORDAN

173    Upon advice from EGON-JAPAN, SUBRAMANIAN met with a representative of Egon Zehnder in San Francisco (referred to herein as "EGON-SFO" and with said meeting taking place in San Francisco) regarding the threats and actions by DOORDAN.

174    EGON-SFO, in the course of the meeting expressed surprise at the scale of the underground and clandestine efforts by DOORDAN in Japan, and told SUBRAMANIAN that what they had heard from OBATA of EGON-JAPAN worried them.

THIRD AMENDED COMPLAINT

34

175    EGON-SFO initially assured SUBRAMANIAN that they would help SUBRAMANIAN meet with Barry Anderson ("BARRY") or Dennis Raney ("RANEY") of QAD-USA (both of whom were placed in QAD-USA during that period by EGON-SFO as part of the IPO preparations and/or the related management changes) in order to gain their support in possibly bringing an end to DOORDAN's activities.

176    Furthermore, EGON-SFO informed SUBRAMANIAN that they had heard from Dennis Raney and/or Barry Anderson that DOORDAN was not considered to be in a strong position in the executive line-up at QAD-USA and that it was their opinion that this matter would be looked upon sympathetically by RANEY or BARRY.

177    EGON-SFO also told SUBRAMANIAN that even though KLOPKER did not consider DOORDAN to be fit for a senior position, he (KLOPKER) nevertheless seemed reluctant to fire DOORDAN out of a sense of loyalty.

### No help from Dennis Raney or Barry Anderson

178    SUBRAMANIAN was unable to meet with Dennis Raney and it was only in September 1997 that SUBRAMANIAN met with BARRY when he came over to Japan to meet with EGON-JAPAN.

179    During a follow-up telephone call with EGON-SFO, the EGON-SFO consultant told SUBRAMANIAN that after a conversation with Mr. Raney and/or Mr. Anderson he was concerned that this was a larger problem than he could get into and wanted to be excused from trying to help SUBRAMANIAN as committed earlier.

180    He mentioned that Mr. Raney and Mr. Anderson thought that it would be difficult for them to convince KLOPKER about the seriousness of DOORDAN's activities and that it may be too sensitive a matter for them to deal with, given what they said were non-committal responses from KLOPKER to their initial test balloons on this matter.

Robinson & Wood, Inc.
27'     ¼ First Street
S       |CA 95113
|4.     ʌ·7120

A 2870

**DOORDAN's attempts to compromise employees at VEDATECH-JAPAN**

181    Beginning in or about March 1997, DOORDAN, directly or through others, contacted employees of VEDATECH-JAPAN for the purpose of denigrating SUBRAMANIAN and VEDATECH-JAPAN and / or trying to hire them away from VEDATECH-JAPAN.

182    DOORDAN instructed several individuals in QAD-USA, including Kanehara (employed by DOORDAN's protege Bezy in Hong Kong) and John Gould to contact various employees of VEDATECH-JAPAN and try to induce them to join QAD.

**March / April 1997 Meeting with SPRUIT and DOORDAN in California**

183    In or around early April of 1997, SUBRAMANIAN traveled to California to meet with SPRUIT regarding (as it was explained to SUBRAMANIAN by DOORDAN) memorializing the various oral agreements into a comprehensive written agreement.

184    Having brought SUBRAMANIAN to California under this pretext, DOORDAN, in the presence of SPRUIT unsuccessfully tried to coerce SUBRAMANIAN to quit his position as Representative Director of OLD-QAD-JAPAN.

**The theory of "conflict of interest"**

185    Since DOORDAN was officially not responsible for interfacing with SUBRAMANIAN (by the prior decision of KLOPKER), SPRUIT led the discussion.

186    SPRUIT tried to convince SUBRAMANIAN that what they really wanted was not to terminate the relationship with VEDATECH-JAPAN and SUBRAMANIAN but that because of the impending IPO, QAD-USA had to act "professionally" in all its transactions. According to SPRUIT he could not negotiate the written version of the current agreement with VEDATECH-JAPAN and additions reflecting the agreement between the parties as to the long-term relationship between VEDATECH-JAPAN and

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

A 2871

1  QAD-USA as long as SUBRAMANIAN was Representative Director of OLD-QAD-
2  JAPAN since SUBRAMANIAN was also the Representative Director of VEDATECH-
3  JAPAN and this according to SPRUIT would create s situation where SUBRAMANIAN
4  would be negotiating with himself. Thus, reasoned SPRUIT, the people doing due
5  diligence for the IPO would never accept such a transaction and hence SUBRAMANIAN
6  should first resign, and then negotiate the details of memorializing the prior agreements
7  along with additional agreements for a long-term relationship with QAD-USA.

9  187   SUBRAMANIAN told SPRUIT that while the argument seemed clever, it did not
10 hold water under close scrutiny, as the agreement being formalized was between
11 VEDATECH-JAPAN and QAD-USA and SUBRAMANIAN had no official position at
12 QAD-USA. SUBRAMANIAN explained that OLD-QAD-JAPAN itself had to negotiate
13 at arms length with QAD-USA for tax and regulatory purposes and there was  no reason
14 to use this excuse to try to replace SUBRAMANIAN with DOORDAN at this stage.

## The dummy "resignation letter" prepared by DOORDAN

17 188   In this meeting (at the headquarters of QAD-USA in its Summerland offices at
18 Ortega Hill), DOORDAN had prepared a sample "voluntary" resignation letter to be
19 signed by SUBRAMANIAN and also a proposed email that he would be sending,
20 informing everyone at QAD-USA and affiliates about the proposed change in the
21 management structure.

22 189   In this meeting, DOORDAN also informed SUBRAMANIAN that it would not be
23 possible to make progress in memorializing the oral agreements as agreed before, unless
24 SUBRAMANIAN resigned his position at OLD-QAD-JAPAN and permitted
25 DOORDAN to replace SUBRAMANIAN in that position.

26 190   During this meeting, SUBRAMANIAN asked DOORDAN and SPRUIT whether
27 KLOPKER approved of these actions by them. Unsatisfied with their evasive answers

(although in the affirmative), SUBRAMANIAN approached KLOPKER in his office which was several rooms away and expressed his shock and disbelief at what DOORDAN and SPRUIT were proposing to SUBRAMANIAN.

## KLOPKER denies he sanctioned or requested such efforts by DOORDAN

191    KLOPKER assured SUBRAMANIAN that DOORDAN and SPRUIT should not have done what they did and that his only intention was to have them work out and formalize all the relationships based on oral agreements, so that QAD-USA was not subject to criticism for not having proper procedures for the same, in light of the upcoming IPO.

192    KLOPKER suggested that SUBRAMANIAN should proceed back to Japan without further discussions with DOORDAN and SPRUIT and he will make sure that these two would not continue in that vein and approach the problem differently.

193    Specifically KLOPKER assured SUBRAMANIAN that he was committed to keeping QAD-USA's promises regarding the oral agreements and the partnership, including the commitments regarding the management of OLD-QAD-JAPAN and his commitment to the appointment of SUBRAMANIAN for the two-year term.

## DOORDAN's facsimile disposing of the original March 1994 agreement

194    In or around April 16, 1997, DOORDAN sent a facsimile to the attention of SUBRAMANIAN in Japan, purporting to state his position that the written agreement was terminated. In this letter DOORDAN purported to terminate the March 1994 Agreement although that agreement in its original form had already expired.

195    SUBRAMANIAN, rather surprised by this in the light of the prior conversation with KLOPKER, contacted KLOPKER by telephone.

196    KLOPKER explained that this was just a mere formality because of the preparations for the IPO, and that he had instructed SPRUIT to work with SUBRAMANIAN in formalizing a proper and comprehensive set of agreements with SUBRAMANIAN and VEDATECH-JAPAN.

197    KLOPKER further assured SUBRAMANIAN that it was essential in preparing for the IPO that the "expired" status of the old written agreement be recognized / formalized and the existing and additional new oral agreements be accurately captured on paper.

198    SUBRAMANIAN was assured that before the stated July 31, 1997 deadline for the purported termination of the March 1997 written agreement, a new written agreement memorializing the current understanding of the parties would be in place.

## Defendant LAI FOON LEE enters the picture

199    LEE was hired by QAD-USA in or around the early part of 1997 as part of QAD-USA's efforts to strengthen its management team in preparation for its IPO.

200    From information and belief, the following background facts are averred:

200.01    that LEE worked in Singapore for Hewlett-Packard ("HP") at some point in time before joining QAD-USA;  AND

200.02    at some point in time (either at HP or otherwise) worked directly for or with Mr. Dennis Raney, who was her supervisor at QAD-USA; AND

200.03    at some point in time (either at HP or otherwise) had a personal and professional working relationship with Arthur Andersen and certain individuals at Arthur Andersen.

200.04    EGON-SFO hired RANEY first and then RANEY hired LEE and/or brought her along with him in joining QAD-USA.

THIRD AMENDED COMPLAINT
CASE NO: CV 78-1606

39

A 2874

## Lai Foon Lee's Position in QAD-USA

201    Before the team of Mr. Dennis Raney (as CFO) and Lai Foon Lee (working for him as controller), were brought in to assist with the IPO as described above, the finance department at QAD-USA was managed by one Ms. Barbara Whatley ("WHATLEY").

202    Ms. Whatley was a personal friend, and from information and belief, a college roommate or fellow student of PLOPKER (Pamela Lopker), the President and   (co-) founder of QAD-USA at the University of California at Santa Barbara.

203    WHATLEY exerted considerable influence on PLOPKER and was widely resented inside the management team of QAD-USA, most of which reported to KLOPKER, who was the actual operational manager (CEO) of QAD-USA.

204    For example, DOORDAN consistently expressed his ill-will and disapproval of WHATLEY to SUBRAMANIAN and many others inside QAD-USA.

205    It was widely felt and commented in and among the management circles at QAD-USA (especially DOORDAN) that WHATLEY was not experienced enough to lead QAD-USA into the IPO and that she would be a liability when presenting QAD-USA to the investment bankers and other members of the financial community when doing the pre-IPO "road show" and that she was "too close for comfort" with PLOPKER.

206    Although SUBRAMANIAN had met WHATLEY only a few times, at which times the interactions were pleasant, he was well aware of the politics of the management shuffle going on at QAD-USA at this time.

207    AKITA (Mr. Dale Akita) worked directly for WHATLEY before the pre-IPO management changes.

208    It is in this context that the arrival of Mr. Raney and LEE into QAD-USA was welcomed by individuals such as DOORDAN who had an axe to grind with WHATLEY.

209   DOORDAN related to SUBRAMANIAN with some satisfaction the fact that WHATLEY had been given a ceremonial tax-related position and that RANEY and LEE were now the center of finance related powers in QAD-USA.

210   DOORDAN had always complained that many or most of his budget requests and proposals had been compromised because of his inability to get past WHATLEY or what he considered as the undue and unfair influence of WHATLEY on PLOPKER which he said prevented him from being more forceful with the Lopkers (PLOPKER and KLOPKER). DOORDAN was happy to see WHATLEY being sidelined.

211   It should be noted that QAD-USA was run as a family firm and most of the managers were keen on pleasing or being in the good books of the Lopkers for their own survival or advancement within the organization. DOORDAN especially was very aware of and conscious of this. DOORDAN was always very careful not to upset the Lopkers and was always trying to please them.

## The convergence of the personal agendas of DOORDAN and LEE

212   Thus, when LEE was hired into QAD-USA, DOORDAN and LEE had a common goal of trying to neutralize whatever residual influence they thought WHATLEY had with the Lopkers.

213   LEE had to overcome the shadow of WHATLEY in order to establish herself in QAD-USA and DOORDAN saw LEE as a tool to get back at WHATLEY and also gain budgetary and other powers through cooperation with LEE.

214   Since OLD-QAD-JAPAN was still not making money and needed large amounts of further investments before it would turn the corner, it was critical for DOORDAN to be able to get the support of the new finance team, if his dreams of displacing SUBRAMANIAN and having a successful reign at OLD-QAD-JAPAN were to be realized.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408)  '720

THIRD AMENDED COMPLAINT
CASE NO: CV 784685                    41

A 2876

LEE's efforts to find fault with the financial systems in place in 1997

215    One way that LEE saw in neutralizing WHATLEY was to show to the Lopkers how badly QAD-USA's financial affairs had been managed until then and how she, LEE was responsible for cleaning it up and contributing to a successful IPO.

216    This would help promote her at the expense of WHATLEY and independent of the issue with WHATLEY show herself (LEE) as a go-getter and provide for her (LEE's) career advancement inside QAD-USA.

217    It is in this context that LEE, in the advancement of her own position inside QAD-USA, in her attempts to quickly demonstrate her superiority over the previous team of WHATLEY and in her overzealousness in accomplishing the same went overboard on trying to find fault in various departments inside QAD-USA and its subsidiaries such as QAD-AUSTRALIA and QAD-JAPAN.

218    DOORDAN was quick to catch on to these efforts of LEE and commented once to SUBRAMANIAN that LEE was on a tear to make all the regions look bad and that he was lucky he was no longer responsible for the finances of QAD-USA's Hong Kong offices. DOORDAN was aware of LEE's need and stated goals of trying to impute and then "fix" problems with various subsidiaries, especially OLD-QAD-JAPAN.

219    When DOORDAN and LEE discussed QAD-JAPAN both of them saw an easy way to advance their own personal goals in making Plaintiffs look bad and promote themselves as major contributors to the IPO process. It also would give them status in the eyes of the Lopkers, and gain power and position in the post-IPO executive line up.

220    DOORDAN wished to be reinstated in an important position (specifically the head of OLD-QAD-JAPAN) after being sidelined in the management shuffle (starting with the changes brought it by MIKE), and LEE, for her part, wished to neutralize WHATLEY and also promote her own interests and advancement inside QAD-USA.

42

**DOORDAN and LEE decide to sacrifice Plaintiffs for their personal goals**

221    Plaintiffs were an easy and expendable target as DOORDAN was already laying the groundwork by working with various elements in Japan to undermine Plaintiffs. DOORDAN already had a conspiracy going with TAKATORI and the NRI group of companies. With LEE, now DOORDAN had another powerful tool to attack Plaintiffs.

222    In addition DOORDAN needed someone to help him weaken support for Plaintiffs with KLOPKER, as he had until then failed to do the same on his own.

223    Both DOORDAN and LEE had a problem with this plan because of KLOPKER's continued support for SUBRAMANIAN and Plaintiffs. It was very important that they somehow found a very convincing way of attacking the credibility of Plaintiffs. With ANDERSEN all the pieces of the puzzle started to fit in for these two conspirators.

**ANDERSEN was the tool that LEE wished to use to dislodge KPMG and hence marginalize the influence of WHATLEY with the Lopkers**

224    WHATLEY was the one that chose KPMG to be the auditor for QAD-USA and was loyal to KPMG both in the US and in Japan.

225    In Japan, whereas Plaintiffs had used ANDERSEN to help set up QAD-JAPAN and had ANDERSEN's partners on the board of directors for a while, WHATLEY (in or around early 1995) discharged the appointment of ANDERSEN and replaced them with KPMG Japan.

226    Thus, when LEE came into the picture, it was natural for her to try to find a way to get rid of KPMG who were friendly to WHATLEY and have auditors that she would control. If LEE could show that KPMG had not done a good job and that a new team from ANDERSEN was necessary to fix the problems that LEE could say were caused by

Ison & Wood, Inc.
121 North First Street
San Jose, CA 95113
(408) 293-7130

1    KPMG, then the story would fit LEE's goal of showing how WHATLEY had not
2    managed the financial affairs of QAD-USA and subsidiaries properly.

3    227    It is not known, without further discovery, if ANDERSEN provided any other
4    personal benefits to LEE or DOORDAN in trying to develop their business with QAD-
5    USA.

6

7    228    Thus, in the early part of 1997, LEE (along with her supervisor Mr Dennis Raney)
8    had convinced QAD-USA to hire ANDERSEN to undertake some "internal functions"
9    relating to accounting and financial controls and related areas.

10

11   229    It is thus that LEE intended for ANDERSEN to act as a counterweight to KPMG
12   which she saw as loyal to the outgoing CFO, Ms. Barbara WHATLEY (who was still
13   close to the Lopkers and stayed on in a senior position), and a way to increase her own
14   influence and position within the management ranks of QAD-USA.

15        **The Conspiracy between DOORDAN, LEE and ANDERSEN is born**

16
17   230    It is for these reasons that the conspiracy between DOORDAN, LEE and
18   ANDERSEN, and some DOES 1-50 was hatched.  Each one of the above had a personal
19   gain in sacrificing the relationship Plaintiffs had with QAD-USA.

20   231    Thus, in or around June 1997, DOORDAN and LEE made plans to try to force
21   SUBRAMANIAN into resigning his position at OLD-QAD-JAPAN.

22
23   232    This would benefit DOORDAN by making it easy for him to install himself as the
24   head of OLD-QAD-JAPAN, and would benefit LEE in promoting herself as the savior of
25   problems created by WHATLEY and quickly gain power and financial gains inside a
26   company expected to grow quickly through an IPO.

27

28

Robinson & Wood, Inc.
227 North First Street

THIRD AMENDED COMPLAINT

CASE NO: CV 784685

44                                A 2879

233    ANDERSEN, in turn would be able to displace KPMG in providing various accounting and related services on a worldwide basis to a company about to go public, and presumably on a high growth path.

234    It is to be noted that most of the big six (or five or four or whatever the number is) accounting firms, in the 1997 period were aggressively expanding their "consulting" business as a way to make up for flagging revenues from the traditional audit engagements.

235    It was also very profitable to sell such "consulting" services when there was already a captive customer acquired in the normal audit business.  The managers of such consulting business were under tremendous pressure to expand their business at all costs.

236    Given that LEE was plugging for ANDERSEN inside QAD-USA, ANDERSEN was eager to please LEE and her co-conspirator DOORDAN.  ANDERSEN saw Plaintiffs as a small business run by an individual, and saw them as expendable in their quest for capturing the business of a software company going public in the US.

### Meeting in Yokohama in June 1997

237    In June 1997, DOORDAN, LEE and others traveled to Japan to meet with SUBRAMANIAN, ostensibly to finalize a written agreement.

238    At this meeting in June 1997, LEE informed SUBRAMANIAN that she wished to arrange for an audit of QAD-JAPAN by ANDERSEN.

239    Initially LEE was combative and tried to imply that when such an audit would be done, SUBRAMANIAN would be found to have not managed OLD-QAD-JAPAN properly, and that she "already" could see how there were many "control" problems at OLD-QAD-JAPAN, including what she termed as the "conflict of interest" of SUBRAMANIAN in his positions at VEDATECH-JAPAN, and that there needs to be an

1   investigation of the finances OLD-QAD-JAPAN to confirm her "suspicions".

2   SUBRAMANIAN mentioned several problems that he had been asking QAD-USA to fix

3   for several years, such as, for example, a lack of a formal agreement between parent and

4   subsidiary but LEE ignored all such feedback.

### With respect to the "conflict of interest" situation

240   SUBRAMANIAN told LEE that with respect to the so-called "conflict of interest"

situation, (i.e. the fact that SUBRAMANIAN was Representative Director for both

VEDATECH-JAPAN and OLD-QAD-JAPAN), the situation itself was created by the

request of and concurrence of QAD-USA and that this was not something that

SUBRAMANIAN could be criticized for.

### The instant "severance agreement"

241   Instead, SUBRAMANIAN was presented by LEE with a hastily prepared draft

severance agreement.  SUBRAMANIAN was unsuccessfully pressed by DOORDAN and

LEE into signing this right then and there.  This draft severance agreement was sent to

LEE by Mr. Roland Desilets of QAD-USA during this visit of LEE to Japan and shortly

before she presented it to SUBRAMANIAN.  LEE tried to induce SUBRAMANIAN to

sign this agreement by saying that he can get a large severance payment if he signed it.

242   DOORDAN told SUBRAMANIAN shortly after LEE presented this document

that SUBRAMANIAN should not pay any attention to the section where there was a

blank space for filling in an amount of money as "severance", as he would make sure that

such amount was "zilch", and that SUBRAMANIAN did not deserve any such severance,

even if SUBRAMANIAN were to accept the unilateral proposal.

243   With so much confusion between the various amateurish attempts by DOORDAN

and LEE to trick SUBRAMANIAN into simply resigning, not much progress was made.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

THIRD AMENDED COMPLAINT

CASE NO: CV 784065

46

A 2881

Alternatives offered by SUBRAMANIAN to the "audit" by ANDERSEN

244    SUBRAMANIAN rejected this extemporaneous attempts by DOORDAN and LEE in bringing up the issue of a "severance agreement" and referred them to KLOPKER and the directions given by KLOPKER at the previous meeting in California. The topic then shifted to the issue of the audit.

245    In the beginning, LEE told SUBRAMANIAN that the investigation by ANDERSEN will go on because she was going to order it, and because she felt that any opinion by ANDERSEN, even though they would be technically reporting to her and not be strictly independent, would still be considered authoritative, and expressed her conclusion that SUBRAMANIAN will have no choice but to resign shortly afterward such an investigation.

246    Being fully aware of the various efforts by Doordan and LEE to cast doubt upon the reputation of Plaintiffs, SUBRAMANIAN at this point in time offered to clear up his name and participate in a full and thorough check of the accounts of QAD-JAPAN and, (to the extent feasible and possible) that of VEDATECH-JAPAN, all to be conducted by the finance department of QAD-USA.

247    SUBRAMANIAN explained clearly to LEE that such an exhaustive audit of OLD-QAD-JAPAN was quite feasible as the operations of OLD-QAD-JAPAN were small and the amount of transactions relatively few and thus OLD-QAD-JAPAN was amenable to such a thorough and exhaustive check.

248    SUBRAMANIAN specifically suggested that Mr Dale Akita of QAD-USA, a senior finance department executive in QAD-USA and well respected inside QAD-USA might lead such an effort.

249    LEE was not willing to listen to any of these alternatives.

Exhaustive Check better than "audit"

250    SUBRAMANIAN reminded LEE again that if the reasons for LEE wanting an audit were as stated then SUBRAMANIAN would offer LEE the proposal described above which was even better than an audit: since the number of transactions at OLD-QAD-JAPAN was not very high, it would be more efficient for LEE or someone in the Finance department at QAD-USA to simply look through the books of OLD-QAD-JAPAN exhaustively, and thus exonerate SUBRAMANIAN completely.

251    SUBRAMANIAN further told LEE that he considered it improbable that the IPO preparations would be better served with an audit that checked (or sampled) only a few things than by such a thorough review which had the benefit of putting all issues to rest once and for all.

252    SUBRAMANIAN explained to LEE that an outside audit was not satisfactory as, based only on "sample" data, such an audit made various conclusions, all based on assumptions relating to the auditing company's experience and other historical "averages" and "trends" based on prior audits.

253    LEE rejected such a proposal. LEE was adamant that only a big name, and that too ANDERSEN staff from their Los Angeles branch would be acceptable for the IPO.

KPMG-Japan as an alternate disinterested party to conduct the audit

254    Furthermore, SUBRAMANIAN tried to persuade LEE that the best outside agency to undertake such an effort, if such an effort had to be taken would be KPMG Japan as they had handled a prior audit of QAD-JAPAN, were local Japanese auditors familiar with Japanese accounting and business practices and would be able to do a better job for QAD-JAPAN than ANDERSEN staff from the Los Angeles office.

Rabianes & Wood, In.c
137 North First Street

255    Lee rejected this too as it did not fit her plan of showing up WHATLEY or of showing how she had brilliantly detected problems in all these subsidiaries. It was also not consistent with the conspiracy hatched with DOORDAN.

## LEE's attempt to persuade Plaintiffs on different grounds

256    Nevertheless, upon hearing these many alternatives that SUBRAMANIAN was willing to accept, LEE changed her tactic (as she had to) and tried then to persuade SUBRAMANIAN that it was in Plaintiffs' best interest to cooperate with the audit, and that it was necessary and that it would be professionally done etc.

257    As detailed below, upon further questioning by SUBRAMANIAN, LEE took the position that an evaluation by ANDERSEN of Los Angeles was an essential condition for QAD-USA to clear due diligence for the IPO and that it is important that SUBRAMANIAN should cooperate.

258    SUBRAMANIAN, of course wanted to help make the IPO a success.

## Fraud Committed by LEE, ANDERSEN, DOORDAN and others

259    LEE made several fraudulent statements in this vein and, along with ANDERSEN and her supervisor RANEY, and thus QAD-USA, convinced SUBRAMANIAN to participate in this charade dressed up as an "audit".

260    As a result of this, Plaintiffs forewent other options of clearing their name and the confusion and ill-will engendered by the process of going through these preordained exercises and the resulting false information, innuendoes and other fallout damaged the relationship that Plaintiffs had with QAD-USA irretrievably, leading to a breakdown in the relationships, causing, in addition, consequential and incidental damages to Plaintiffs. The time lines relating to these activities are set out below.

## The arrangements for the audit by ANDERSEN

A 2994

261    In or about July 1997, DOORDAN and LEE requested ANDERSEN to conduct this internal investigation of OLD-QAD-JAPAN ostensibly using techniques similar to what they use in their normal auditing duties.

262    Unknown to Plaintiffs, the results were preordained and LEE and DOORDAN would make sure that it was severely critical of Plaintiffs. Thus, DOORDAN, LEE and ANDERSEN planned from the beginning that the results of this investigation would be used to persuade KLOPKER to breach QAD-USA's relations with Plaintiffs.

### Assurances by Mr. Dennis Raney, the new CFO of QAD-USA

263    Worried by LEE's inconsistent statements during her trip to Japan in June 1997, SUBRAMANIAN sought and obtained assurances from Mr. Raney that such an investigation would be conducted fairly and SUBRAMANIAN could rest assured that it will be a professional job done by ANDERSEN. Mr. Raney did assure SUBRAMANIAN that the investigation would be conducted fairly and there would be no attempt to unfairly target SUBRAMANIAN or VEDATECH-JAPAN.

264    As a result of this Mr. Dennis Raney, who was the immediate supervisor of LEE at that time, asked SUBRAMANIAN to give permission to ANDERSEN and to QAD-USA for conducting an investigation of OLD-QAD-JAPAN by ANDERSEN.

265    Mr. Raney informed SUBRAMANIAN that ANDERSEN had a dual role in this matter and was acting both in their capacity as an independent professional firm used to such audit-like investigations and also acting in their capacity of having been hired as an internal consulting group to help QAD-USA conduct its own internal investigations and make recommendations to QAD-USA in light of its upcoming IPO.

266    RANEY further assured SUBRAMANIAN that he was speaking both on behalf of QAD-USA and, as he had personally confirmed the matter with ANDERSEN, could also speak for ANDERSEN on this matter. Furthermore, the staff from ANDERSEN were

... & Wand, Inc.
227 North First Street
San Jose, CA 95113

1    technically under this control as he (through LEE) directed their job assignments in at
2    least an overall sense.

3    267    Although SUBRAMANIAN had some doubts, he was persuaded by these
4    multiple endorsements and assurances (including direct assurances and promises by
5    ANDERSEN itself), and on that basis, permitted such an investigation to proceed with the
6    full expectation that a firm such as ANDERSEN would never dare falsify the results of
7    such an investigation.
8

9        The dual role of ANDERSEN

10   268    ANDERSEN, in at least one written communication in or around September 1997
11   also took the position that it was acting as QAD-USA in its conduct of the investigation
12   of OLD-QAD-JAPAN (suggesting that perhaps it was not acting as a professional
13   independent audit firm under the Arthur Andersen name), although the initial report
14   presented to SUBRAMANIAN and QAD-USA was clearly on the letterhead of
15   ANDERSEN and was presented as a report from ANDERSEN.
16

17   269    This was obviously a naked attempt by ANDERSEN (after the event) to distance
18   itself from the mess it created after it became apparent that SUBRAMANIAN was going
19   to pursue the matter beyond simple protestations.
20

      Representations by ANDERSEN made directly to Plaintiffs
21

22   270    The manager at ANDERSEN working out of the Los Angeles office ("AA-
23   MANAGER") responsible for this investigation, directly himself, and through Mr. Chiba
24   ("CHIBA"), who is a partner at ANDERSEN but working in the Tokyo office, also
25   assured SUBRAMANIAN that his staff will travel to Japan and conduct a professional
26   investigation whose results would not be biased in any way and that SUBRAMANIAN
27   had nothing to fear from such an investigation.
28

Robinson & Wood, Inc.
227 North First Street
(408) 298-7120

51

271    The AA-MANAGER specifically assured SUBRAMANIAN, directly by himself, and through CHIBA that personnel at QAD-USA such as LEE or RANEY would not be able to affect their professional judgment, and that they were an independent auditing firm that would be undertaking to do this audit for OLD-QAD-JAPAN.

272    Furthermore, SUBRAMANIAN was assured by CHIBA that ANDERSEN would conduct such an investigation professionally, and that his own department, that was providing accounting services to OLD-QAD-JAPAN would also behave very professionally and observe the "Chinese wall" between the accounting and audit-related functions.

273    Furthermore, Ms. Akiko Sasaki ("AKIKO"), the actual individual assigned to perform this investigation, met with SUBRAMANIAN before the start of such investigation in the offices of OLD-QAD-JAPAN in July 1997. At this meeting, AKIKO initially expressed her own surprise at the unusual nature of some of the tasks assigned to her regarding the investigation she was going to perform (including, in her words, the request by QAD-USA to try to conduct an investigation of VEDATECH-JAPAN also), but nevertheless promised SUBRAMANIAN that ANDERSEN will conduct a fair and even investigation, that the techniques she will be using are standard auditing procedures used by ANDERSEN worldwide, and that this report would be a true and accurate report of her findings.

## The position of the parties with respect to this "audit"

274    OLD-QAD-JAPAN is a Japanese corporation incorporated in Yokohama, Japan under the Commercial Code of Japan. QAD-USA is a majority shareholder of OLD-QAD-JAPAN and as such does not have the ability to direct the day-to-day operations of OLD-QAD-JAPAN, nor can QAD-USA initiate or permit any investigation into the affairs of OLD-QAD-JAPAN without the permission and concurrence of its Representative Director, which at that time was SUBRAMANIAN.

Wilson & Wood, Inc.
North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685                    52

275    VEDATECH-JAPAN had a contract with QAD-USA to manage OLD-QAD-JAPAN and SUBRAMANIAN's role was authorised both under the Commercial Code of Japan and under the contractual arrangement of VEDATECH-JAPAN with QAD-USA.

276    Fully realizing this, both QAD-USA and ANDERSEN formally sought permission from Plaintiffs and received such permission on the basis of their false assurances and fraudulent representations.

277    It is by making fraudulent representations directly to Plaintiffs that ANDERSEN was able to enter the premises of OLD-QAD-JAPAN and conduct its so-called "investigation", in which Plaintiffs participated voluntarily although as a result of the deceit practiced by ANDERSEN, LEE, QAD-USA, DOORDAN and others on Plaintiffs.

Plaintiffs are clearly third-party beneficiaries of ANDERSEN's "audit"

278    Thus, not only did ANDERSEN form a direct auditor-client relationship with OLD-QAD-JAPAN, Plaintiffs were also the clear and direct third-party beneficiaries of such engagement.  This is clear from the fact that ANDERSEN clearly knew the purpose of the audit, conspired with LEE and DOORDAN to falsify the audit in order to hurt Plaintiffs and needed permission from Plaintiffs to conduct the audit in the first place.

Actions undertaken by SUBRAMANIAN in reliance on such representations and the various options that Plaintiffs forewent in agreeing to this "audit"

279    Thus, based on specific assurances of QAD-USA (through its then Chief Financial Officer, Mr. Dennis Raney), and LEE and ANDERSEN (in conspiracy with the ever active DOORDAN), SUBRAMANIAN voluntarily permitted such an exercise to be conducted at the offices of OLD-QAD-JAPAN in spite of his misgivings about the potential for injuries to himself and VEDATECH-JAPAN from a falsified or inaccurate report generated from such exercise, even though he was under no obligation under the circumstances to agree to the same.

Robinson & Wood, Inc.
North First Street
Jose, CA  95113
441 298-1220

280    Furthermore, based on the specific assurances of CHIBA of ANDERSEN, Plaintiffs decided to permit ANDERSEN to continue in its conflicting roles of accounting services provider and investigator (in an audit-like role), and continued the engagement of ANDERSEN to provide internal accounting services to OLD-QAD-JAPAN.

281    In addition, SUBRAMANIAN forewent his other options of asking someone such as Mr. Dale AKITA from QAD-USA to conduct an exhaustive check of OLD-QAD-JAPAN's accounting records, or insist on someone neutral such as KPMG-JAPAN who had undertaken work for OLD-QAD-JAPAN under specific agreement and appointment by QAD-USA before.

282    Furthermore, SUBRAMANIAN delayed his decision to travel to California to meet with KLOPKER to resolve the potential problem created by DOORDAN and QAD-USA not fulfilling QAD-USA's promise to have a comprehensive written agreement (by the end of July 1997) reflecting the various oral agreements between the parties.

283    In addition, the ill-will and friction created by this entire exercise and the false reports that followed in and of itself damaged the relationship between Plaintiffs and QAD-USA to the point of a complete breakdown in the relations between the parties.

## The breach of the Chinese Wall by CHIBA of ANDERSEN

284    CHIBA and his staff at ANDERSEN, contrary to their promise to maintain the "Chinese wall" between the function they were providing and the function of AKIKO, without the permission of SUBRAMANIAN or OLD-QAD-JAPAN discussed various accounting related issues during the week of the investigation.

285    CHIBA and his staff also helped create false descriptions of the status of the accounts at OLD-QAD-JAPAN to aid ANDERSEN's Los Angeles office to falsify its report regarding the books of OLD-QAD-JAPAN.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

ANDERSEN's attempts to expand their "investigation" to VEDATECH

286   Although during the first several days at OLD-QAD-JAPAN, AKIKO, the auditor from ANDERSEN complained about not having access to VEDATECH-JAPAN's internal accounting data (which she clubbed under the term "non-cooperation"), on the Friday of the week of the investigation (at the end of the investigation,) AKIKO informed SUBRAMANIAN that she had found no problems on the basis of her investigation and she wanted SUBRAMANIAN not to worry about the results of her work.

287   IN addition, AKIKO specifically told SUBRAMANIAN that there were no problems at all that she found in her week long investigation, barring minor ones relating to documents she was still expecting to get, and further said that she was relieved especially that the cash reconciliation turned out to be without problems -- she told SUBRAMANIAN not to worry about the ANDERSEN report before she left (early on Friday afternoon).

The easy and leisurely schedule of AKIKO of ANDERSEN

288   It is significant to note that SUBRAMANIAN at that time offered to have AKIKO stay for another week or more if necessary for her to complete any questions she might have, but it was turned down by AKIKO.  While during the week, in general she did not stay past 5 pm and turned up late in the morning several times (past 10 a.m, and once at or around 11:00 a.m, explaining that her work was going very well, and that there was no need for a lot of overtime), on Friday, the last day of the investigation, AKIKO left early (soon after lunch) to be with her relatives in Japan, (she had indicated that she was visiting her mother) as she said that she had completed her job adequately.

Reliance on the assurances of AKIKO of ANDERSEN

289   In reliance on these further assurances by ANDERSEN, SUBRAMANIAN further delayed his trip to California to meet with KLOPKER and decided to stay and solve the

THIRD AMENDED COMPLAINT
CASE NO: CV 784065

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

1   problems caused by the situation going into August 1997 with the unclear status of the
2   relationship created by the April 1997 letter of DOORDAN and the broken promise of
3   QAD-USA to have a comprehensive replacement agreement by the end of July 1997.

4

5   ## ANDERSEN forges signatures to help DOORDAN and LEE

6   290    In or around August 1997, ANDERSEN, acting in concert with DOORDAN
7   opened a bank account in Japan under the name of OLD-QAD-JAPAN, improperly using
8   the name of SUBRAMANIAN.  Such an account was set up with the express purpose of
9   improperly funneling funds from QAD-USA to Japan to be used under the direction of
10  ANDERSEN and DOORDAN.

11
12  291    This helped DOORDAN achieve his goal of starving OLD-QAD-JAPAN of funds,
13  justified, of course by spreading rumors inside QAD-USA about ostensible worries about
14  permitting Plaintiffs to manage funds for OLD-QAD-JAPAN, with such insinuations to
15  be bolstered by the false report of ANDERSEN.

16  292    In fact, by cooperating with DOORDAN in falsifying signatures and starving
17  Plaintiffs of funds to operate with ANDERSEN was also causing damage to Plaintiffs.

18
19  ## DOORDAN's conspiracy with TAKATORI and the NRI group of companies

20  293    Upon information and belief, in or around July 1997, NRI-HKG, NRI-JAPAN,
21  TAKATORI and other parties facilitated the involvement of an affiliate, Nomura
22  Securities, to invest a substantial sum in the securities of QAD-USA offered as part of the
23  IPO process.

24
25  294    In or around July 1997, KLOPKER traveled to Japan to make presentations
26  regarding the IPO ("the road show").  During one such presentation KLOPKER met with
27  OBATA of EGON-JAPAN where he reiterated his (KLOPKER's) commitment to having
28  SUBRAMANIAN stay on until a smooth transition could be agreed between KLOPKER

Robinson & Wood, Inc.
127 North First Street

1    and SUBRAMANIAN. OBATA later on told SUBRAMANIAN about this meeting and
2    related the above conversation.

### The motivation for DOORDAN

295    Several executives from QAD-USA told SUBRAMANIAN that KLOPKER was concerned that VEDATECH-JAPAN had a lot of experience built up with QAD's business, especially in the matter of the MFG/PRO software and that KLOPKER was further concerned that DOORDAN's efforts might destroy this built up goodwill and experience in the marketplace.

296    Thus, DOORDAN needed a story for how QAD-USA can have a good partners in Japan before he could ever hope to gain KLOPKER's approval for breaching QAD-USA's commitments to Plaintiffs, if he would even agree to such a thing for other reasons.

297    In TAKATORI and the NRI group, DOORDAN saw just such a solution. NRI was a large group of service providers that could, under the right conditions be a good partners for OLD-QAD-JAPAN and QAD-USA in Japan. SUBRAMANIAN himself had wanted to build a good partnership with the NRI group. But DOORDAN did not want both Plaintiffs and the NRI group to survive -- he simply wanted to use the NRI group as a reason to reassure KLOPKER that the loss of a relationship with Plaintiffs would not hurt KLOPKER's plans for succeeding in the Japanese market..

### The motivation for TAKATORI

298    TAKATORI was a low-level manager at NRI-JAPAN sent to Hong Kong to start up and lead the IT business for NRI through its controlled subsidiary and alter ego NRI-HKG. TAKATORI realized the enormous potential of MFG/PRO for getting adjunct service business and saw a chance to improve his personal standing within the company by creating a quick success story out of the MFG/PRO business in Hong Kong and Japan.

299    TAKATORI was able to establish a relationship with the managers left in place in Hong Kong by DOORDAN and was successful in starting up an MFG/PRO based business for NRI-HKG.

300    Although TAKATORI was officially only responsible for the activities of NRI-HKG, he was still an employee of NRI-JAPAN (as most Japanese managers on deputation to foreign subsidiaries are), and wished to increase his chances of getting a better position within the group. In attempting to do this TAKATORI took it upon himself to gain the MFG/PRO business for NRI-JAPAN also.

301    Like DOORDAN, TAKATORI saw SUBRAMANIAN and VEDATECH-JAPAN (and the relationship that Plaintiffs had with QAD-USA) as a road block to achieving his personal goals , which in the case of TAKATORI being able to grab easily a major share of the Japanese market for the MFG/PRO service (implementation) business. In this way, he could raise his stature not only within the NRI group, but also bolster his resume for joining any other multinational in Japan.

302    It is thus that the conspiracy between DOORDAN and TAKATORI (and NRI-HKG and NRI-JAPAN) was born and sustained.

### The libelous letters from TAKATORI to QAD-USA

303    In or around July 1997, defendant TAKATORI, acting in concert with DOORDAN and/or their agents, sent one or more letters and/or emails to QAD-USA denigrating the business reputation and capability of Plaintiffs and attempting to induce QAD-USA to terminate its relationship with Plaintiffs.

304    This was done on behalf of, and for the benefit of NRI-HKG, NRI-JAPAN, and TAKATORI personally, all of whom would gain existing and potential customers of VEDATECH-JAPAN and other benefits including the consequential entry into the lucrative after-sales service business (implementation) of the products of QAD-USA.

Robin.    Weed, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

## Conspiracy between DOORDAN, NRI-HKG, NRI-JAPAN and TAKATORI

305  Upon information and belief, in the ways as described above, and in additional ways, DOORDAN, TAKATORI, NRI-HKG and NRI-JAPAN, acted in concert and induced KLOPKER to terminate the relationship between VEDATECH-JAPAN and QAD-USA. Further, these actions were undertaken to benefit NRI-JAPAN, NRI-HKG, and TAKATORI in obtaining business that was being developed by VEDATECH-JAPAN for their own benefit.

306  In addition, the same group of DOORDAN, TAKATORI, NRI-HKG, and NRI-JAPAN continued to induce other customers of VEDATECH-JAPAN to terminate their relationships with VEDATECH-JAPAN and influenced many others not to even start a relationship with VEDATECH-JAPAN.

307  These and other actions were also undertaken by TAKATORI and DOORDAN for the promotion of their own personal interests, over and above their duties as an executive of the NRI group or QAD-USA respectively. NRI-JAPAN both through TAKATORI and through its own employees and agents further took actions damaging to Plaintiffs.

## Conspiracy to starve funds from OLD-QAD-JAPAN

308  In or around July 1997, DOORDAN, LEE and others conspired to force the resignation of SUBRAMANIAN from OLD-QAD-JAPAN by starving OLD-QAD-JAPAN and VEDATECH-JAPAN of funds from QAD-USA.

309  Whereas DOORDAN and QAD-USA (by later ratification of the actions of DOORDAN) continued to promise SUBRAMANIAN that more funds would be transmitted for the operation of QAD-JAPAN and for the payments to VEDATECH-JAPAN, all the while knowing fully well that no such funds would be sent, QAD-USA continued to benefit from the services of VEDATECH-JAPAN and made continuing

Jinlon & Wood, Inc.
..7 North First Street
San Jose, CA 95113
(408) 298-7120

1  requests for work from SUBRAMANIAN and VEDATECH-JAPAN, and Plaintiffs, in

2  reliance on such promises by DOORDAN continued to provide such services.

3

4  310    With the exception of a small payment to VEDATECH-JAPAN in or around

5  August of 1997, QAD-USA made no further payments to VEDATECH-JAPAN.

6  311    From August 1997 QAD-USA also made no further remittances to OLD-QAD-

7  JAPAN, in spite of having falsely assured SUBRAMANIAN that such payments would

8  be made.

9

10           The falsified "report" of ANDERSEN following its "investigation"

11  312    In or around August 1997, ANDERSEN prepared a draft report of the results of

12  their "audit" of OLD-QAD-JAPAN. This report engineered by ANDERSEN improperly

13  accused Plaintiffs of diverting and improperly benefitting from funds of OLD-QAD-

14  JAPAN, and further accused Plaintiffs of refusing to cooperate with or withholding

15  information from the investigator (AKIKO) assigned by ANDERSEN.

16

17  313    Without regard to objections by SUBRAMANIAN and documented proof offered

18  by SUBRAMANIAN refuting the allegations of ANDERSEN in its draft report submitted

19  to SUBRAMANIAN for feedback, ANDERSEN, in concert with LEE and DOORDAN,

20  finalized and published a revised version of this draft report in September 1997 along

21  with publication of its responses to SUBRAMANIAN's feedback, which responses

22  contained further falsities regarding the subject matter of such report. Upon information

23  and belief, such publications were at the express direction and exhortation of LEE and

24  DOORDAN, and were also independently the result of the conspiracy between

25  DOORDAN, LEE and ANDERSEN.

26  314    By the time SUBRAMANIAN realized the seriousness of the false report having

27  already been presented to KLOPKER and others in QAD-USA, DOORDAN and LEE

28

M       & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7128

A 2895

had used such false report to turn several influential executives at QAD-USA against SUBRAMANIAN.

315    Several QAD-USA employees in various conversations with SUBRAMANIAN expressed surprise at the nature of the allegations and expressed doubt about the viability of SUBRAMANIAN or VEDATECH-JAPAN being able to continue in their positions.

### DOORDAN's attempts to hire away VEDATECH-JAPAN's employees

316    DOORDAN, directly or through his agents, continued in his attempts to hire away employees of VEDATECH-JAPAN.

### DOORDAN's further attempts to disrupt the business of OLD-QAD-JAPAN

317    In or around February 1997 DOORDAN was continuing to try to disrupt the support for SUBRAMANIAN both in QAD-USA and in Japan. One of the techniques adopted by DOORDAN was to try to build friendships with the staff of OLD-QAD-JAPAN, and inform them falsely that QAD-USA was trying to replace SUBRAMANIAN and that he needed help from them in doing so. This he did, even while KLOPKER was replacing him with SPRUIT as the person to coordinate with OLD-QAD-JAPAN on behalf of QAD-USA.

318    The employees that DOORDAN was so trying to improperly influence included Takahashi, Sato, Kanehara and Nagae. Kanehara was being courted by Mr. William Bezy, a young manager installed in a high position in Hong Kong soon after or just before DOORDAN went back to California from Hong Kong in late 1995 or early 1996.

319    Bezy was Doordan's hatchet man and took care of DOORDAN's interests even though DOORDAN was no longer managing the Hong Kong office.

320    In early 1996, Kanehara resigned from OLD-QAD-JAPAN and was mysteriously hired by QAD's Asia-Pacific office under Bezy. From this position, Kanehara started

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT

61

A 2896

contacting customers of OLD-QAD-JAPAN and the employees of VEDATECH-JAPAN and in various ways started creating disruptions in the relationship between Plaintiffs and VEDATECH-JAPAN's customers and OLD-QAD-JAPAN's customers on one hand and between Plaintiffs and its employees on the other hand.

321    Takahashi and Nagae for their part started scouting for a new president of OLD-QAD-JAPAN, falsely believing that DOORDAN had the sanction of the QAD-USA top management at this point in time.

322    DOORDAN encouraged other employees such as Sato to voice their complaints about SUBRAMANIAN or the management of OLD-QAD-JAPAN to senior executives in QAD-USA so that SUBRAMANIAN could be made to look bad.

### The hatchet team from Carpinteria

323    DOORDAN also, through Kanehara et. al. started writing to customers telling them to send their customer support questions directly to Hong Kong and offering support from the Hong Kong offices of QAD-USA.

324    From processing normal customer support calls, DOORDAN, through his agents Bezy and Kanehara started to falsely accuse OLD-QAD-JAPAN of not being able to support their customers properly and with that excuse sought permission from SUBRAMANIAN to send his team of "specialists" to Japan to work out of the OLD-QAD-JAPAN offices, ostensibly to help customers in Japan.

325    Since additional support of any kind would ultimately benefit customers, even if it was part of an improper design by DOORDAN, SUBRAMANIAN eventually agreed to having such a team come to Japan, not realizing the depths to which DOORDAN would go to try to topple SUBRAMANIAN.

326    It is in this context, that John Gould came to Japan in the last week of July 1997.

THIRD AMENDED COMPLAINT
CASE NO: CV-784685

62

A 2897

### The Gould factor - Doordan's hatchet team gets a leader

327    John Gould, whose claim to fame inside QAD-USA was his hatchet job for DOORDAN in Brazil where DOORDAN had successfully destroyed the business of QAD-USA's ex-Brazilian distributor by hiring away their employees and taking over the business they had developed for QAD-USA, came to Japan in or around the last week of July 1997, and checked into the Landmark Tower hotel.

328    Given a desk at the OLD-QAD-JAPAN offices he quickly set out to try to get customers to deal with him directly and not with VEDATECH-JAPAN or SUBRAMANIAN. But lacking in Japanese language skills, he was not wholly successful.

329    In or around August 1997, Justin Decker, an employee of QAD-USA, responsible for computer systems maintenance came to Japan and recorded all the computer equipment in the office, after having falsely represented to SUBRAMANIAN that he was there to fix some problems with the networking between Japan and USA.

330    Justin's wife, Yoko Wada Decker, who was Japanese, and who was neither employed by QAD-USA nor employed by OLD-QAD-JAPAN was permitted to work for John Gould in the office. Upon objections by SUBRAMANIAN, Barry Anderson while on his trip to Japan in September 1997 wrote up a backdated employment offer letter in front of SUBRAMANIAN and said that would take care of the "employment" problem, not realizing that he had no legal right to make a Japanese employee work in the offices of OLD-QAD-JAPAN by executing a back-dated (or otherwise dated) document purportedly signed between that individual and QAD-USA.

331    In any event, Gould and his team started building a team for NEW-QAD-JAPAN (see below), by using the offices of OLD-QAD-JAPAN and all the while working to undermine OLD-QAD-JAPAN and Plaintiffs.

# & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

THIRD AMENDED COMPLAINT    63
CASE NO. CV-396696

A 2898

NEW-QAD-JAPAN

332    In or around August 1997, DOORDAN, with the help of others, and with the concurrence of QAD-USA, established NEW-QAD-JAPAN as a Delaware corporation.

333    NEW-QAD-JAPAN was intentionally named as QAD Japan Inc. to sound similar to OLD-QAD-JAPAN, which in English was called Qad Japan K.K. Letterheads were made that looked similar to the ones used by OLD-QAD-JAPAN.

## Change in the Bank Account Number?

334    Beginning in or around October 1997, DOORDAN and QAD-USA (especially through Bezy and Kanehara, and then through Takeshi Nagae, a salesman based out of the Osaka region), contacted existing and prospective customers of VEDATECH-JAPAN, fraudulently presented NEW-QAD-JAPAN as OLD-QAD-JAPAN for the purpose of, among other things, diverting funds and business of such customers away from OLD-QAD-JAPAN and VEDATECH-JAPAN.

335    DOORDAN and others started sending letters to customers of OLD-QAD-JAPAN under the letter head called Qad Japan (which could technically stand for both OLD-QAD-JAPAN or NEW-QAD-JAPAN), "informing" them, among other things that the bank account had changed (i.e sending them the bank account information for NEW-QAD-JAPAN under the pretext that the bank account for OLD-QAD-JAPAN had changed).

336    DOORDAN et. al. were committing fraud on the customers in order to achieve their goal of forcing SUBRAMANIAN to resign for lack of funds to operate the business of OLD-QAD-JAPAN or VEDATECH-JAPAN.

337    DOORDAN and others such as Roger Boyle also called customers such as Daikyo-Webasto to stop payments that were due to OLD-QAD-JAPAN.

.binson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784695

64

A 2899

## Office Space at the Landmark Tower

338    Because of DOORDAN's tactics leading to a lack of funds to operate OLD-QAD-JAPAN, the rent on the premises being used by OLD-QAD-JAPAN at the Landmark Tower (a prestigious building in Yokohama, and the tallest building in Japan) was severely overdue. SUBRAMANIAN was under severe pressure from the landlord to guarantee future payments and provide an explanation for what was going on.

339    Unable to be able to provide any such guarantees and unable to convince KLOPKER to take action against DOORDAN, SUBRAMANIAN cancelled the lease on the premises in or around early October 1997. DOORDAN by this time tried to arrange for a partial payment directly to the landlord but it was too late and the lease was duly cancelled.

340    QAD-USA, through DOORDAN started legal action in the Yokohama District Court in October 1997 asking the Court to provide a restraining Order against SUBRAMANIAN, and an order against the Landlord (Mitsubishi Real Estate of Yokohama) among other requests for relief, but dropped the case after sharp questioning by the Court at the first hearing. Specifically the Court questioned QAD-USA about the activities surrounding NEW-QAD-JAPAN which understandably QAD-USA did not want to get into or answer in any great detail.

## Temporary Office Space in Tokyo

341    In order to continue to operate OLD-QAD-JAPAN, SUBRAMANIAN rented space in a business center in the Shinjuku district of Tokyo. Soon, DOORDAN approached the manager of that office, Ms. Amy Ohnuma ("AMY"), and made libelous statements about SUBRAMANIAN, in addition to indicating to AMY that he had an unlimited budget and wanted to operate out of the same offices.

Cobi. .. Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

A 2900

342   Thus, NEW-QAD-JAPAN was established in offices literally in the same space as OLD-QAD-JAPAN and started using information from the incoming phone calls for OLD-QAD-JAPAN and faxes for OLD-QAD-JAPAN to respond to customers and send them letters asking them not to deal with OLD-QAD-JAPAN but to deal with NEW-QAD-JAPAN.

343   NEW-QAD-JAPAN even used the same fax letterheads prepared for OLD-QAD-JAPAN by the business center to communicate with customers, all the while leading them to believe that they were dealing with OLD-QAD-JAPAN.

344   AMY, whose personal or professional motivation for cooperating with DOORDAN is not known to Plaintiffs, quit her job at the business center and started working for NEW-QAD-JAPAN under DOORDAN.

345   In this way, DOORDAN used NEW-QAD-JAPAN to destroy the business of OLD-QAD-JAPAN and SUBRAMANIAN and VEDATECH-JAPAN.

## Interference with the business of VEDATECH-JAPAN

346   Beginning in or around October 1997, DOORDAN, NEW-QAD-JAPAN, NRI-JAPAN and others continued to induce existing and potential customers of VEDATECH-JAPAN to shift their business to NRI-JAPAN and others friendly to DOORDAN.

347   DOORDAN accomplished this by using the resources of OLD-QAD-JAPAN that he had hired into NEW-QAD-JAPAN and those of Hong Kong.

## Conversion of SUBRAMANIAN's share in OLD-QAD-JAPAN

348   In December 1997, QAD-USA conducted an improperly held shareholders' meeting, after which they filed papers with the legal affairs bureau in Yokohama, falsely naming themselves as owners of all 2000 shares of OLD-QAD-JAPAN and improperly terminating SUBRAMANIAN from OLD-QAD-JAPAN.

THIRD AMENDED COMPLAINT

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

A-2001

Partial Summary of Actions damaging to Plaintiffs

349   Further to this improper termination, DOORDAN, NEW-QAD-JAPAN, QAD-USA and one or more of DOES 1-50 contacted existing and potential customers, employees, and other business contacts of Plaintiffs with the purpose of denigrating the business reputation and abilities of Plaintiffs.

350   Upon information and belief, DOORDAN, NEW-QAD-JAPAN, NRI-JAPAN, TAKATORI and NRI-HKG, and one or more DOES 1-50 directly and indirectly, interfered with the existing and potential relationships between customers of VEDATECH-JAPAN, with the intention of diverting them away from VEDATECH-JAPAN.

351   Upon information and belief, the actions undertaken by QAD-USA, NEW-QAD-JAPAN, ANDERSEN, DOORDAN, NRI-JAPAN, NRI-HKG, DOORDAN, LEE, TAKATORI and DOES 1 through 50, wrongfully damaged SUBRAMANIAN and VEDATECH-JAPAN's business reputation, their relationships with existing and potential customers, and fraudulently converted share ownership of Plaintiff SUBRAMANIAN in OLD-QAD-JAPAN.

352   From January 1997 through at least October 1997, QAD-USA (liable for the actions of and in ratifying the actions undertaken through SPRUIT, Mr. Roland Desilets, KLOPKER and others) and DOORDAN (both or separately in his official and personal capacities), falsely and fraudulently and with intent to deceive and defraud Plaintiffs, represented to Plaintiffs that a written version of a long-term agreement memorializing the terms and conditions of the oral agreement between QAD-USA and VEDATECH-JAPAN would be finalized, in reliance upon which Plaintiffs continued to provide services to QAD-USA and forewent other opportunities and preparations to their own detriment.

_____ & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

A 2902

353    From about June 1997 through at least part of October 1997, defendant DOORDAN falsely and fraudulently and with intent to deceive and defraud Plaintiffs, represented to Plaintiffs that DOORDAN would provide a written proposal regarding the option of QAD-USA paying a lump-sum amount to VEDATECH-JAPAN in lieu of the promised written agreement. Plaintiffs, in reliance upon this forewent other opportunities and forewent other options of taking corrective action and preparations to their own detriment.

354    In or around July 1997, QAD-USA and ANDERSEN, falsely and fraudulently, and either with intent to deceive and defraud, or negligently represented to SUBRAMANIAN and VEDATECH-JAPAN that the proposed investigation by ANDERSEN would be conducted professionally and that the results of such an exercise would be truthful and accurate, in reliance on which SUBRAMANIAN

   354.01    permitted such investigation to proceed;  AND

   354.02    forewent alternate options to clear his name such as asking for an exhaustive check by an impartial but respected executive of QAD-USA such as AKITA;  AND

   354.03    forewent an audit by an impartial firm such as KPMG-Japan;  AND

   354.04    forewent taking actions with KLOPKER and QAD-USA in a timely manner, all to the detriment of SUBRAMANIAN and VEDATECH-JAPAN.

355    In or around August of 1997 (in a draft form) and again in or around September 1997 (as a final conclusion) defendant ANDERSEN, falsely and fraudulently, and either with intent to deceive and defraud, or negligently represented to QAD-USA and others that Plaintiff SUBRAMANIAN diverted funds for the benefit of Plaintiffs.

Robinson & Wood, Inc.
217 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT

68

A 2903

356    In addition, in September 1997, ANDERSEN represented to Plaintiff SUBRAMANIAN that their purported professional conclusions were based on factual knowledge of DOORDAN's instructions to SUBRAMANIAN and that their false representations were true, when, in fact, ANDERSEN had no reasonable grounds to believe that such representations were true.

357    In or around August 1997, ANDERSEN, falsely and fraudulently, and with intent to deceive and defraud, represented to the Tokyo Mitsubishi bank in Iidabashi, Tokyo that they were authorized to set up a bank account on behalf of OLD-QAD-JAPAN and Plaintiff SUBRAMANIAN. ANDERSEN owed a duty towards Plaintiffs to inform them of such a transaction but failed to do so.

358    From around August 1997 and continuing through November 1997 and beyond, NEW-QAD-JAPAN, DOORDAN, and QAD-USA, falsely and fraudulently, and with intent to deceive and/or defraud, have misrepresented to existing and potential customers of VEDATECH-JAPAN the nature and purpose of NEW-QAD-JAPAN and OLD-QAD-JAPAN.

359    This was done with the intention of diverting funds intended for OLD-QAD-JAPAN, and thus force the resignation of Plaintiff SUBRAMANIAN form his position at OLD-QAD-JAPAN.

360    This was also done with the intention of diverting existing and potential customers away from VEDATECH-JAPAN and for the benefit of DOORDAN and entities and individuals that were helpful to DOORDAN in these fraudulent and tortious activities. QAD-USA and others had a special (and fiduciary) duty towards Plaintiffs to inform them of such activities and they failed to do so.

A 2904

THIRD AMENDED COMPLAINT

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

361    From about November 1997 onwards QAD-USA, falsely and fraudulently, and with intent to deceive and defraud Plaintiffs, have represented both to Plaintiffs and to others that QAD-USA is the owner of all 2000 shares of OLD-QAD-JAPAN.

362    Further, QAD-USA, through its agents KLOPKER and PLOPKER, and defendant DOORDAN falsely and fraudulently represented these facts to the Yokohama Legal Affairs Bureau and fraudulently caused the termination of Plaintiff SUBRAMANIAN's appointment as Representative Director of OLD-QAD-JAPAN.

363    Because of this fraudulent representation, Plaintiff SUBRAMANIAN has been deprived of the economic and other benefits of the ownership of the share in OLD-QAD-JAPAN.

364    Said representations were false and were then and there known by defendants to be false and/or said defendants negligently represented said facts to be true when, in fact, defendants had no reasonable ground to believe that the representations were true.

365    Plaintiffs believe and relied on the said representations made by defendants DOORDAN and QAD-USA (through its agents/ officers / managers) and/or by ratification of the acts of such agents / officers/ managers), and were thereby induced to continue to invest time and resources in the performance of their obligations under the written and oral agreements, all in reliance on such representations by defendants, and without the benefit of the promised return performance.

366    Existing and potential customers of VEDATECH-JAPAN, believed and relied on said representations made by defendants DOORDAN, QAD-USA and NEW-QAD-JAPAN, and were thereby induced to terminate agreements and abandon proposed agreements (including any progress towards the conclusion of such proposed agreements) with the consequent loss of business for VEDATECH-JAPAN.

367    Existing and potential customers of OLD-QAD-JAPAN and VEDATECH-JAPAN relied on the false representations by NEW-QAD-JAPAN, DOORDAN and QAD-USA and were induced to take actions harmful to Plaintiffs including the diversion of business and funds intended for the use and control of the Plaintiffs.

368    At the time that said representations were made by defendants QAD-USA and DOORDAN, a fiduciary relationship existed between these defendants and Plaintiff SUBRAMANIAN, including the duty to a minority shareholder and the duty as directors of OLD-QAD-JAPAN. Defendants had a duty to disclose the true facts relating the above representations to Plaintiff SUBRAMANIAN.

369    In addition, at the time ANDERSEN made fraudulent and deceitful statements to QAD-USA, a fiduciary relationship existed between ANDERSEN and Plaintiff SUBRAMANIAN, (partly because of the dual role of ANDERSEN where they were also agents of QAD-USA, and partly because of their professional status and their clear knowledge of the relationships between the parties and the clear foreseeability of harm to Plaintiffs), including the duty to disclose the true facts relating to the investigation, and the duty to disclose any attempts to open bank accounts using, without permission, the name and authority of Plaintiff SUBRAMANIAN.

370    Plaintiffs did not discover the fraud and deceit practiced on them until the first week of October 1997 when, for the first time, KLOPKER indicated to SUBRAMANIAN the nature and activities undertaken by QAD-USA and DOORDAN regarding these matters.

371    Because of the prior fraudulent misrepresentations by QAD-USA and DOORDAN, Plaintiffs relied on such misrepresentations at least until this time. Further details of these fraudulent activities became known to Plaintiffs over a period of several months following this initial disclosure.

...al. e Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7110

372   Upon information and belief, in late 1996 or early 1997, DOORDAN, acting personally and TAKATORI, acting for his personal benefit, and acting on behalf of NRI-HKG and NRI-JAPAN, had discussions regarding the termination of the relationship between Plaintiffs and QAD-USA. In March 1997, DOORDAN and TAKATORI made further attempts to interfere in the relationship between QAD-USA and Plaintiffs, especially at the Bali conference of 1997.

373   In or around the first half of 1997, DOORDAN, TAKATORI, NRI-HKG, and NRI-JAPAN, directly and through their agents, started interfering in the existing and potential economic relations between Plaintiff VEDATECH-JAPAN and various existing and potential customers. In or around July 1997, TAKATORI sent a letter to KLOPKER at QAD-USA denigrating the business reputation and competence of Plaintiffs.

374   In or around July of 1997, DOORDAN and NRI-JAPAN, directly and through their agents, started contacting customers and potential customers of VEDATECH-JAPAN with the purpose of diverting their business away from VEDATECH-JAPAN, and with the full knowledge that QAD-USA was contractually committed to promoting such business for the benefit of VEDATECH-JAPAN.

375   Defendants DOORDAN, TAKATORI, NRI-HKG, NRI-JAPAN and one or more DOES 1-50 involved in this conspiracy were fully aware of the nature and details of the existing and potential contractual relations between QAD-USA and Plaintiffs, and other relationships between customers and Plaintiffs. Said defendants knowingly, willingly and/or negligently acted to harm Plaintiffs with the full knowledge of such relationships.

376   In June 1997, DOORDAN and LEE traveled to Japan to meet with Plaintiff SUBRAMANIAN and with the common purpose of attempting to force the resignation of SUBRAMANIAN from OLD-QAD-JAPAN. When such attempts failed, DOORDAN and LEE arranged for an "investigation" by ANDERSEN, ostensibly in preparation for the IPO. Furthermore, ANDERSEN prepared a final report in September 1997 and

...athleson & Wand, Inc.
227 North First Street
San Jose, CA 95113
(408) 286-7120

THIRD AMENDED COMPLAINT

72

A 2907

published it with the full knowledge of its false statements and misrepresentations that were part of this final report.

377   Further, ANDERSEN, in concert with DOORDAN, LEE and one or more DOES 1-50, participated in the setting up of bank accounts in possible violations of criminal laws of Japan, all for the purpose of aiding DOORDAN and LEE in their attempts to force the resignation of SUBRAMANIAN from OLD-QAD-JAPAN.  Such causation of resignation was the first step in DOORDAN's attempts to deprive Plaintiffs of the benefits of the existing and potential relationships with QAD-USA and other existing and potential customers of VEDATECH-JAPAN.

378   Defendants DOORDAN, LEE, ANDERSEN, and one or more DOES 1-50 involved in this conspiracy were fully aware of the nature and details of the existing and potential contractual relations between QAD-USA and Plaintiffs, and other relationships between customers and Plaintiffs.  Said defendants knowingly, willingly, and/or negligently acted to harm Plaintiffs with the full knowledge of such relationships.

379   As a proximate result of these activities of DOORDAN, TAKATORI, NRI-HKG, NRI-JAPAN, and one or more of DOES 1-50, Plaintiffs have sustained and continue to sustain actual damages in an amount of the jurisdictional limits of this Court, and to be determined at trial.

380   From August 1999 onwards, DOORDAN, NEW-QAD-JAPAN, QAD-USA, and one or more DOES 1-50 worked in concert to divert existing and potential business from existing and potential customers of VEDATECH-JAPAN.

381   From August 1999 onwards, DOORDAN, NEW-QAD-JAPAN, QAD-USA and one or more DOES 1-50 worked in concert to divert existing and potential business from existing potential customers of OLD-QAD-JAPAN, thereby making the value of Plaintiff SUBRAMANIAN's share in OLD-QAD-JAPAN become worthless.

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2908

.assa & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

382    Defendants DOORDAN, NEW-QAD-JAPAN, QAD-USA and one or more DOES 1-50 involved in this conspiracy were fully aware of the nature and details of the existing and potential contractual relations between QAD-USA and Plaintiffs, other relationships between customers and Plaintiffs, and the share ownership of Plaintiff SUBRAMANIAN in OLD-QAD-JAPAN.  Said defendants knowingly, willingly, and/or negligently acted to harm Plaintiffs with the full knowledge of such relationships.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

383    Plaintiffs repeat the allegations of the previous paragraphs, and incorporate them as if fully set forth herein.

384    The conduct undertaken by QAD-USA constitutes a breach of written and oral agreements between QAD-USA and Plaintiffs.

385    Such conduct also constitutes a breach of the agreements between OLD-QAD-JAPAN and SUBRAMANIAN.

386    Except to the extent excused by acts of Defendants, Plaintiffs have performed all conditions, covenants, and promises required on their behalf to be performed in accordance with the terms and conditions of the agreements.

Damages

387    As a proximate result of QAD-USA's (and OLD-QAD-JAPAN's) breach of contract, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

388    In addition, Plaintiffs are entitled to incidental damages flowing from the breach plus interests and costs.

# SECOND CAUSE OF ACTION

## (Breach of covenant of Good Faith and Fair Dealing)

389    Plaintiffs repeat the allegations of the previous paragraphs, and incorporate them as if fully set forth herein.

390    Implied in the above-described agreements was a covenant that QAD-USA would act in good faith and deal fairly with Plaintiffs and do nothing to deprive Plaintiffs of the benefits of the agreements and that QAD-USA shall do nothing to destroy Plaintiffs' business.

391    Implied in the above-described agreements was a covenant that OLD-QAD-JAPAN would act in good faith and deal fairly with Plaintiffs and do nothing to deprive Plaintiffs of the benefits of the agreements and that OLD-QAD-JAPAN shall do nothing to destroy Plaintiffs' business.

392    QAD-USA, by its actions and the actions of its agents or others ostensibly on its behalf, breached this covenant.

393    OLD-QAD-JAPAN by its actions and the actions of its agents or others ostensibly on its behalf, breached this covenant.

Damages

394    As a proximate result of QAD-USA's bad faith breach of its implied obligations, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

395    As a proximate result of OLD-QAD-JAPAN's bad faith breach of its implied obligations, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

THIRD AMENDED COMPLAINT

A 2910

# THIRD CAUSE OF ACTION

## (Fraud)

396     Plaintiffs repeat the allegations of all of the previous paragraphs, and incorporate them as if fully set forth herein.

### Fraud committed by DOORDAN and QAD-USA with respect to promises of contract formalization

397     DOORDAN, and QAD-USA (because it ratified the actions of DOORDAN sometime in or around 1998, and after the breakdown in the relations between the parties),  and some or all of DOES 1-50, as alleged above, fraudulently represented to SUBRAMANIAN and VEDATECH-JAPAN that the various oral agreements would be formalized and the relationship would continue for at least several more years on the terms and conditions understood by the parties in their various dealings over the years from 1994 and from the initial basis of the March Agreement.

398     DOORDAN, and QAD-USA (because it ratified the actions of DOORDAN sometime in or around 1998, and after the breakdown in the relations between the parties),  and some or all of DOES 1-50, as alleged above, fraudulently represented to SUBRAMANIAN and VEDATECH-JAPAN that a proper lump-sum severance in lieu of QAD-USA honoring its contractual and promissory commitments would be provided and thus induced Plaintiffs to continue to provide services to QAD-USA even after the troubles created by DOORDAN started becoming critical in or around August 1997.

399     Such defendants knew at the time of making such statements (except possibly QAD-USA which became liable at the time it ratified the actions of DOORDAN et. al. later) that they were false and that they had no intention of facilitating such an arrangement.  To the contrary, DOORDAN and some such DOES 1-50 clearly planned to

THIRD AMENDED COMPLAINT

.obinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

1    destroy the relationship between Plaintiffs and QAD-USA at the time of making such

2    statements.

3    400    Plaintiffs, in reliance upon such false assurances, continued to provide services

4    under such implied terms and with expectations of the proper consideration for such

5    efforts, failed to take corrective actions or make alternate plans, and suffered damages as

6    a direct consequence of such reliance.

7

8    401    Furthermore, although QAD-USA, and KLOPKER may not have intended to make

9    such false assurances or deceive Plaintiffs before the breakdown of the relationship,

10   QAD-USA is nevertheless liable for the actions of its officers and senior executives such

11   as DOORDAN, other executives such as SPRUIT and other DOES 1-50 in similar

12   positions.

13        Proximate Harm and Damage

14

15   402    As a proximate result of Defendant DOORDAN's and Defendant QAD-USA's

16   conduct, Plaintiffs have sustained and continue to sustain actual damages in an amount in

17   excess of the jurisdictional limits of this Court, and to be determined at trial.

18        Fraud relating to the activities of LAI FOON LEE

19

20   403    Information regarding LEE, the reasons why she acted for her personal benefit,

21   and the various false representations she made and upon which Plaintiffs relied to their

22   detriment are all set out above and partially summarized below.

23        The fraudulent Statements

24

25   404    LEE told SUBRAMANIAN that an audit by a professional outside auditor such as

26   ANDERSEN was an essential and formal requirement for the IPO process, (a false

27   statement  but not known to SUBRAMANIAN as false at that time), and that an internal

28

Robinson & Wood, Inc.
227 North First Street
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

77

A 2912

1  check, even if it was thorough would not be enough for the due diligence steps required

2  in preparing for the IPO.

3  405   LEE further told SUBRAMANIAN that ANDERSEN would conduct the audit in

4  an impartial and professional way, and that was the real value of the audit and which is

5  why it was essential as a preparatory step for the IPO. LEE further told

6  SUBRAMANIAN that unlike an internal audit, she would have no influence on the

7  outcome of the Andersen audit and that SUBRAMANIAN would thus have no reason to

8  complain whichever way the audit results came out.

9

10  406   Furthermore, LEE specifically told SUBRAMANIAN that ANDERSEN was

11  indispensable as they were working with QAD-USA in California in a centralized and

12  coordinated fashion, and for the purposes of the IPO, QAD-USA cannot complete its due

13  diligence processes without the official clearance of ANDERSEN.

14  407   At all times, LEE knew that the representations she was making to with respect to

15  the audit, the function of ANDERSEN, and the representation that it was necessary to

16  have ANDERSEN do the audit for the purposes of preparation for the IPO, and her own

17  expressed and purported commitment not to interfere with the integrity of the audit (either

18  before, during or after the audit) were all false.

19

20  408   The primary reason for LEE to have this audit was to find a way to denigrate the

21  character of SUBRAMANIAN and VEDATECH-JAPAN and in that way cause QAD-

22  USA to terminate its relationship with Plaintiffs. This would help her status inside QAD-

23  USA as someone who came in from outside and found out all these serious problems

24  caused under WHATLEY and help her quickly advance her personal career inside QAD-

25  USA. LEE upon the instigation of DOORDAN, and in conspiracy with him and

26  ANDERSEN, saw this as an easy way of achieving such goals.

27

28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT

78

A 2913

409    In order to achieve this, LEE (and ANDERSEN) fraudulently induced Plaintiffs to agree to the audit by ANDERSEN without Plaintiffs realizing that the result were pre-ordained and without realizing that LEE had made these assurances falsely and had no intention of keeping her promises as made and as described herein.

410    Finally, LEE was behind the other assurances provided by RANEY and ANDERSEN directly to Plaintiffs, and by working in concert with and in conspiracy with ANDERSEN is liable for such false assurances.

## Plaintiffs's Reliance on LEE's Statements

411    Plaintiffs specifically relied upon these false assurances and statements (i.e., the necessity of the audit for the IPO process, the necessity of ANDERSEN of the Los Angeles office, the impartiality of LEE and ANDERSEN and the assurance that LEE would in no way interfere with the integrity of the functioning of the audit process, and, upon further assurances by Mr. Dennis Raney of QAD-USA and ANDERSEN (also in conspiracy with LEE), agreed to the process.

412    But for such fraudulent representations by LEE and ANDERSEN, Plaintiffs would not have given their permission to have QAD-JAPAN be audited by ANDERSEN in this fashion and would have found alternate ways of establishing their credibility (such as getting concurrence of a full and thorough check by a respected QAD-USA manager such as Mr. Dale Akita), or through the services of KPMG-Japan or other impartial third-party auditor).

413    Instead, Plaintiffs proceeded with the audit with ANDERSEN because of the fact that LEE and ANDERSEN had so induced Plaintiffs with their false and fraudulent statements described herein.

414    Plaintiffs's reliance was justified given the relationship between the parties.

.binson & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7120

Proximate Harm and Damage

415   As a proximate result of Defendant LEE's conduct (and the conduct of ANDERSEN and DOORDAN both independently of and in conspiracy with LEE), Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

416   Such damages relate to the termination of the relationship between Plaintiffs and QAD-USA on one hand, and Plaintiffs and QAD-JAPAN on the other, all as described more fully herein.

Conspiracy in relation to LEE's fraudulent activities

417   LEE, DOORDAN and some of the DOES 1-50 conspired in at least some or all of the fraudulent activities described herein.

418   LEE, ANDERSEN and some of the DOES 1-50 conspired in at least some or all of the fraudulent activities described herein.

419   LEE, DOORDAN, ANDERSEN, and some of the DOES 1-50 conspired in at least some or all of the fraudulent activities described herein.

420   LEE, DOORDAN, ANDERSEN, NEW-QAD-JAPAN and some of the DOES 1-50 conspired in at least some or all of the fraudulent activities described herein.

421   LEE, DOORDAN, ANDERSEN and the DOES 1-50 that participated in such conspiracies are individually liable in full for the fraudulent activities described herein.

Duty of ANDERSEN towards the Plaintiffs

422   ANDERSEN was hired by OLD-QAD-JAPAN and/or Plaintiffs NOT in order to conduct an "audit" of OLD-QAD-JAPAN, in its usual sense of the word and in the sense used in the auditor liability cases that ANDERSEN has been trying to rely on, i.e. either

R... ..on & Wood, Inc.
227 North First Street
San Jose, CA 95113

as a part of a public auditing function or as an attempt to obtain an audit report to be used with outside parties. Rather, ANDERSEN had the following relationships with Plaintiffs:

422.01   As a professional body and as certified public accountants, they have a duty when providing accounting or auditing-related services, toward their clients, the Client's principals and others that are directly and foreseeably affected by the professional services of such public accountants. Knowing the exact nature of the relationship between the Plaintiffs and QAD-USA among others, ANDERSEN could easily foresee the results of actions such as breaching their own "Chinese wall", their own false promises, the effect of such false promises and the effect of falsifying or participating in falsifying reports, and the effect such acts may have on Plaintiffs.

422.02   Plaintiffs were clearly intended third-party beneficiaries of the "audit" engagement that ANDERSEN undertook with OLD-QAD-JAPAN, which ANDERSEN undertook with the explicit permission from and concurrence of Plaintiffs, which permission and concurrence were obtained by the fraudulent representations detailed herein.

422.03   In its dual role as public accountants licensed by the state and as an agent of QAD-USA in its efforts to investigate OLD-QAD-JAPAN (as admitted at least in one written communications by ANDERSEN,) ANDERSEN assumed all the duty of care and fiduciary obligations that QAD-USA had towards Plaintiffs.

422.04   General duties of care as per California Civil Code and California law, and other duties as set above in the allegations and as it is required of ANDERSEN by California Law arising from the special and prior/ongoing relationship between ANDERSEN and Plaintiffs, and the clear foreseeablity of harm to Plaintiffs by the actions undertaken by ANDERSEN, such as making false promises and creating false reports, all for the promotion of its own self-interest.

THIRD AMENDED COMPLAINT
CASE NO: CV 784695

A 2916

422.05    Furthermore, since ANDERSEN did all of this in order to curry favor with LEE, DOORDAN and others at QAD-USA in order to get more business from company that was in the process of doing an IPO, the duty of care becomes a matter of much more seriousness and cannot be made light of.

## Fraud relating to the accounting services provided by ANDERSEN

423    ANDERSEN knew clearly the relationship between QAD-USA, SUBRAMANIAN and VEDATECH-JAPAN.

424    CHIBA of ANDERSEN as alleged above falsely provides assurances to SUBRAMANIAN that if hired by OLD-QAD-JAPAN to provide accounting services for the same, it would do nothing to harm the interests of OLD-QAD-JAPAN or its principals, shareholders or directors, or to Plaintiffs, and knew at the time of providing those assurances that such assurances would be honored in the breach.

425    In reliance upon such false assurances, SUBRAMANIAN extended the services of ANDERSEN in the accounting function in spite of the conflict of interest presented by ANDERSEN providing both accounting and audit-like functions.

426    As a result of such reliance, Plaintiffs were compromised in not being able to prevent or avoid the issuance of and dissemination of incorrect statements made by CHIBA and his subordinates, all so made under the color of authority and authenticity lent by the continuing appointment and position as accountants for OLD-QAD-JAPAN.

427    ANDERSEN's Los Angeles office used such statements to prepare and justify various false statements made in the final report that was unfairly and falsely derogatory of Plaintiffs and their services and business reputation and integrity.

428    As a direct and proximate result of such reliance of Plaintiffs resulting in the ability of ANDERSEN to proceed to prepare such false reports, Plaintiffs have suffered

Robinson & Wood, Inc.
227 North First Street
San Jose, CA. 95113

THIRD AMENDED COMPLAINT
CASE NO. CV 73003

A 2917

1    injuries relating to the breakdown of the relations with QAD-USA, accompanied by a

2    breakdown in the existing and prospective business and economic relations between

3    Plaintiffs and other customers

### Conspiracy to commit fraud

6    429    DOORDAN, LEE, QAD-USA, ANDERSEN and one or more of DOES 1-50

7    conspired to provide the false assurances (in or around July 1997) detailed above and are

8    thus each individually liable in full for the damages caused thereof.

### Fraud relating to the investigation conducted by ANDERSEN

11   430    ANDERSEN knew clearly the relationship between QAD-USA,

12   SUBRAMANIAN and VEDATECH-JAPAN.

13   431    In July 1997, as pleaded more fully above, ANDERSEN, while planning in concert

14   with DOORDAN and LEE to create a report damaging to Plaintiffs, falsely provided

15   assurances that their investigation will be conducted to professional standards.

17   432    In addition, at the completion of the audit, AKIKO provided additional assurance

18   that the results of the audit were good and that SUBRAMANIAN did not have to worry

19   about any negative reports being written up on that account.

20   433    SUBRAMANIAN in reliance upon such false assurances also forewent the option

21   of having someone such as AKITA do a full thorough and exhaustive check of QAD-

22   JAPAN's accounts and thus exonerate Plaintiffs and forewent the option of having

23   someone such as KPMG-Japan do the audit and thus avoid the fallout from the negative

24   results.  SUBRAMANIAN, in reliance on such false assurances also did not take actions

25   to finalize the written agreements with KLOPKER or others at QAD-USA.

27   434    As a result of such reliance, the false reports created widespread mistrust in

28   SUBRAMANIAN and VEDATECH-JAPAN inside QAD-USA and contributed to QAD-

83

THIRD AMENDED COMPLAINT

Robinson & Wood, Inc.
227 North First Street
San Jose, CA  95113

1  USA's eventual termination of SUBRAMANIAN from his position and the breach of
2  QAD-USA's oral agreements with Plaintiffs and it decision not to proceed with
3  formalizing the same.

4
5  435  Independent of the false reports themselves, the ill-will created by the
6  controversies and the disputes relating to the report and the conduct of the "investigation"
7  by themselves also contributed to the deterioration and eventual termination of the
8  relationship between Plaintiffs and QAD-USA.

9  Conspiracy to commit fraud

10
11  436  DOORDAN, LEE, ANDERSEN, and one or more of DOES 1-50 conspired to
12  commit the fraud alleged above and worked in concert as more fully alleged in the
13  various paragraphs above and hence are each individually liable in full for the damages
14  caused thereof.

15  437  DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN and one or more of DOES
16  1-50 conspired to commit the fraud alleged above and worked in concert as more fully
17  alleged in the various paragraphs above and hence are each individually liable in full for
18  the damages caused thereof. The conspiracy between these parties to commit fraud on the
19  Plaintiffs caused severe damages to Plaintiffs.

20  Damages
21
22  438  As a direct and proximate result of such reliance of Plaintiffs of the false promises
23  of ANDERSEN, LEE, (DOORDAN), and others, Plaintiffs have suffered injuries relating
24  to the breakdown of the relations with QAD-USA, accompanied by a breakdown in the
25  existing and prospective business and economic relations between Plaintiffs and other
26  customers and further consequential and/or incidental damages.

27
28

439    As a proximate result of such fraudulent conduct by these Defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

440    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendants knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Constructive Fraud)

441    Plaintiffs repeat the allegations of the previous paragraphs, and incorporate them as if fully set forth herein.

442    The duties of QAD-USA towards Plaintiffs arise from the contractual relationships they maintained over a period of years.

443    The acts of QAD-USA alleged above relating to Fraud amount to acts of Constructive Fraud. QAD-USA's duties of care towards Plaintiffs are set out above.

444    Furthermore, QAD-USA, as detailed above is also responsible for the fraudulent activities of DOORDAN, LEE and some DOES 1-50 as it ratified the actions of these senior managers after the breakdown of the relationship between the parties, and even though DOORDAN, LEE and such DOES 1-50 acted for their personal benefit.

445    The duty of ANDERSEN toward Plaintiffs and the special circumstances of the relationship between Plaintiffs and ANDERSEN are set out above.

A 2920

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

THIRD AMENDED COMPLAINT

446    The actions of ANDERSEN alleged above, in light of these duties of care, amount to acts of Constructive Fraud.

447    DOORDAN and LEE, while acting for their personal benefit nevertheless owed a duty towards Plaintiffs not to harm them arising from the California tests outlined in the *Biakanja* case.

448    The actions of DOORDAN and LEE alleged above, in light of these duties of care, amount to acts of Constructive Fraud.

449    The actions of QAD-USA alleged above, in light of these duties of care, amount to acts of Constructive Fraud.

Conspiracy regarding Constructive Fraud

450    DOORDAN, LEE, ANDERSEN and one or more of DOES 1-50 conspired to commit the fraud alleged above and worked in concert as more fully alleged in the various paragraphs above and hence are each individually liable in full for the damages caused thereof.

451    DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN and one or more of DOES 1-50 conspired to commit the fraud alleged above and worked in concert as more fully alleged in the various paragraphs above and hence are each individually liable in full for the damages caused thereof.

Damages

452    As a proximate result of such conduct by these Defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

A 2921

THIRD AMENDED COMPLAINT

Jinaon & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 293-7120

1  453  The acts and conduct of Defendants were oppressive, fraudulent, and malicious.

2  Defendants knew or should have known that their conduct would harm Plaintiffs. Their

3  actions were undertaken for the specific purpose of enriching themselves at Plaintiffs'

4  expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary

5  damages in the amount to be determined at trial.

6

7  FIFTH CAUSE OF ACTION

8

9  (Negligent misrepresentation)

10  454  Plaintiffs repeat the allegations of all of the earlier paragraphs and incorporate

11  them as if fully set forth herein.

12  455  The duties of each of the defendants towards the Plaintiffs are as set out above.

13  Specifically, the duties of QAD-USA and those of ANDERSEN are alleged above.

14

15  456  The facts relating to DOORDAN and LEE acting for their personal benefit are set

16  out above.

17  457  DOORDAN and LEE, while acting for their personal benefit nevertheless owed a

18  duty towards Plaintiffs not to harm them arising from the California tests outlined in the

19  *Biakanja* case.

20

21  458  The actions of DOORDAN regarding the promises of a contract and subsequently

22  enjoying the benefits of the efforts of Plaintiffs in reliance upon such promises, in light of

23  the damages caused by the same to Plaintiffs, arise at least to the level of Negligent

24  Misrepresentation.

25  459  The actions of QAD-USA (through ratification of the actions of DOORDAN, et.

26  al.) regarding the promises of a contract and subsequently enjoying the benefits of the

27

28

Johnson & Wood, Inc.
217 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO.: CV 784696

A 2922

1  efforts of Plaintiffs in reliance upon such promises, in light of the damages caused by the

2  same to Plaintiffs, arise at least to the level of Negligent Misrepresentation.

3
4  460    The actions of ANDERSEN regarding the promises of professional conduct, and a
   professional and truthful report, in light of the duties owed by ANDERSEN to Plaintiffs
5  as detailed above and the damages caused to Plaintiffs in reliance upon such promises,
6  arise at least to the level of Negligent Misrepresentation.
7

8  461    The actions of LEE regarding the promises of ANDERSEN's professional conduct,

9  and a professional and truthful report, her own promises of non-interference in the

10  impartiality of the report, her promises of the necessity of having such an audit in the first

11  place, and the necessity of using ANDERSEN of Los Angeles for such an audit, all in

12  light of the duties owed by LEE to Plaintiffs as detailed above and the damages caused to

13  Plaintiffs in reliance upon such promises, arise at least to the level of Negligent

14  Misrepresentation.

15

16      Damages

17

18  462    As a proximate result of Defendants' conduct, Plaintiffs have sustained and

19  continue to sustain actual damages in an amount in excess of the jurisdictional limits of

20  this Court, and to be determined at trial.

21

22              SIXTH CAUSE OF ACTION

23
    (Intentional Interference in Contractual Relations and Business Advantage)
24
25  463    Plaintiffs repeat the allegations of the previous paragraphs and incorporate them as

26  if fully set forth herein.

27

28

...ston & Wood, Inc.
. North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO. CV 784685

88

464    Defendants DOORDAN, TAKATORI, NRI-HKG, NRI-JAPAN, LEE, ANDERSEN, NEW-QAD-JAPAN and DOES 1-50 undertook actions as alleged above, and were so undertaken with the knowledge of Plaintiff VEDATECH-JAPAN's contractual and /or business relationship with QAD-USA and OLD-QAD-JAPAN.

465    Defendants DOORDAN, TAKATORI, NRI-HKG, NRI-JAPAN, LEE, ANDERSEN, QAD-USA, NEW-QAD-JAPAN and DOES 1-50 undertook actions as alleged above, and were so undertaken with the knowledge of Plaintiff VEDATECH-JAPAN's contractual and /or business relationship with OLD-QAD-JAPAN, and with the knowledge of the relationship of Plaintiffs with their customers, and of Plaintiff VEDATECH's existing employment and / or business relationships with its employees and other consultants.

466    The actions of Defendants ANDERSEN, DOORDAN, LEE, TAKATORI, NRI-HKG, NRI-JAPAN, NEW-QAD-JAPAN and some DOES 1-50 were intended to cause QAD-USA to breach its contract and/or agreement and/or business relationship with VEDATECH-JAPAN and to cause OLD-QAD-JAPAN to breach its contract and/ or agreement and/ or business relationship with SUBRAMANIAN and did so cause such terminations.

467    The actions of Defendants QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, NRI-JAPAN, DOORDAN, and some DOES 1-50 were intended to cause customers of VEDATECH-JAPAN to terminate their contracts and/or agreement and/or business relationship with VEDATECH-JAPAN and did so cause such terminations.

468    DOORDAN's actions relating to these were taken for his own personal benefit and thus make him liable for actions purportedly taken in his official capacity and purportedly for the benefit of QAD-USA.

A 2924

469    These included, without limitation, his goals of reversing his being sidelined in the QAD-USA management line-up in the executive shuffle taking place before the IPO, and to promote his personal goal of adding a senior position in Japan on his resume to round out his Asia-Pacific experience (in the achievement of which he saw Plaintiffs as a roadblock).

470    LEE's actions, as described more fully above were also taken to further her personal goals, these including casting the prior management efforts of WHATLEY in a bad light in order to reduce WHATLEY's influence and promote LEE's influence, sacrifice Plaintiffs in order to show the Lopkers how valuable she was in the IPO process and assure a better position post-IPO (when QAD-USA was expected to be flush with cash and opportunities), etc.

471    TAKATORI's actions, as describe more fully above were taken to further his own personal goals, including promoting himself in the eyes of the parent NRI-JAPAN and ensuring a better career either in the NRI group or in looking for another job upon leaving NRI-HKG.

472    While NRI-HKG is liable for his actions as it ratified TAKATORI's actions, TAKATORI's actions are nevertheless outside the scope of his duties as President of NRI-HKG and were meant to promote his personal interests.

473    NRI-JAPAN is also liable for the actions of TAKATORI as TAKATORI still was officially employed by NRI-JAPAN and, in addition, NRI-JAPAN ratified the actions of TAKATORI and voluntarily benefitted from such actions.

Conspiracy to interfere intentionally in contractual relations and business advantage

474    DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in

90

THIRD AMENDED COMPLAINT

the damages thereof. Each and every one of them is thus responsible individually for the entire liability of all the others.

475    DOORDAN, QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in damages thereof. Each and every one of them is thus responsible individually for the entire liability of all the others.

Damages

476    As a proximate result of these actions by defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

477    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

SEVENTH CAUSE OF ACTION

(Negligent Interference in Contractual Relations and Business Advantage)

478    Plaintiffs repeat the allegations of all the paragraphs above and incorporate them as if fully set forth herein.

479    The duties of each of the defendants towards the Plaintiffs are as set out herein.

480    The facts relating to DOORDAN and LEE acting for their personal benefit are set out above. DOORDAN and LEE, while acting for their personal benefit nevertheless

Robinson & Wood, Inc.
7 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A 2926

1    owed a duty towards Plaintiffs not to harm them arising from the California tests outlined

2    in the *Biakanja* case.

3

4    481    TAKATORI, NRI-HKG and NRI-JAPAN were in the process of discussing a

5    partnership with OLD-QAD-JAPAN and a separate partnership with Plaintiffs relating to

6    the MFG/PRO business in Japan.  They were clearly aware of the relationship between

7    Plaintiffs and QAD-USA and OLD-QAD-JAPAN.  The relationship between Plaintiffs

8    and these NRI defendants (including TAKATORI) gave rise to a duty of care under the

9    California rules outlined in the *Biakanja* case.

10    482    TAKATORI, while acting for his personal benefit nevertheless owed a duty

11    towards Plaintiffs not to harm them arising from his being a senior executive of both

12    NRI-HKG and NRI-JAPAN and the California tests outlined in the *Biakanja* case.

13    483    The actions of defendants DOORDAN, LEE, TAKATORI, NRI-HKG, and NRI-

14    JAPAN, in light of these duties and the damages caused to Plaintiffs by their actions, rise

15    at least to the level of Negligent Interference in Contractual Relations and Business

16    Advantage as it relates to the relations between QAD-USA and Plaintiffs and the relations

17    between OLD-QAD-JAPAN and SUBRAMANIAN.

18

19    484    The actions of defendant ANDERSEN, in light of their duties to Plaintiffs and the

20    damages caused to Plaintiffs by their actions, rise at least to the level of Negligent

21    Interference in Contractual Relations and Business Advantage as it relates to the relations

22    between QAD-USA and Plaintiffs and the relations between OLD-QAD-JAPAN and

23    SUBRAMANIAN, and consequentially the relations between Plaintiffs and their other

24    customers relating to the MFG/PRO business.

25

26    485    The actions of defendants QAD-USA, DOORDAN, LEE, TAKATORI, NRI-

27    HKG, and NRI-JAPAN, in light of these duties and the damages caused to Plaintiffs by

28    their actions, rise at least to the level of Negligent Interference in Contractual Relations

R.
22}    Wood, Inc.
- First Street
San Jose, CA 95113
(408) 286-7126

and Business Advantage as it relates to the relationship between Plaintiffs and their then existing customers relating to the MFG/PRO business.

### Damages

486    As a proximate result of these actions by defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

487    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

488    Plaintiffs repeat the allegations of all of the above paragraphs and incorporate them as if fully set forth herein.

489    The facts relating to DOORDAN and LEE acting for their personal benefit are set out above.

490    Defendants DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN, NRI-JAPAN, NRI-HKG,, TAKATORI, and DOES 1-50's actions alleged above were done with the knowledge of Plaintiffs' economic relationships between Plaintiff VEDATECH-JAPAN and QAD-USA and OLD-QAD-JAPAN (especially additional business with such existing customers).

A 2928

THIRD AMENDED COMPLAINT
CASE NO. C11-784685

491    Defendants DOORDAN, LEE, ANDERSEN, QAD-USA, NEW-QAD-JAPAN, NRI-JAPAN, NRI-HKG, TAKATORI, and DOES 1-50's actions alleged above were done with the knowledge of Plaintiffs' economic relationships between Plaintiff VEDATECH-JAPAN and its existing customers (especially additional business with such existing customers) and potential customers and prospects.

492    Defendant's actions disrupted those relationships and potential relationships.

### Conspiracy to interfere intentionally in prospective economic advantage

493    DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN and one or more DOES 1-50 conspired in the actions alleged above and acted in concert resulting in the damages thereof relating to intentional interference in prospective economic advantage. Each and every one of them is thus responsible individually for the entire liability of all the others.

494    DOORDAN, LEE, QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, NRI-JAPAN, and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in the damages thereof relating to intentional interference in prospective economic advantage. Each and every one of them is thus responsible individually for the entire liability of all the others.

### Damages

495    As a proximate result of these actions by DOORDAN, LEE, QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

496    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs'

THIRD AMENDED COMPLAINT

obinson & Wood, Inc.
227 North First Street
San Jose, CA 95113

1    expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary

2    damages in the amount to be determined at trial.

3

4                              NINTH CAUSE OF ACTION

5

6          (Negligent Interference with Prospective Economic Advantage)

7    497    Plaintiffs repeat the allegations of all the paragraphs above and incorporate them

8    as if fully set forth herein.

9

10   498    The duties of each of the defendants, including DOORDAN, LEE, QAD-USA,

11   ANDERSEN, TAKATORI, NRI-HKG, and NRI-JAPAN towards the Plaintiffs are as set

12   out above /herein.

13   499    The facts relating to DOORDAN, LEE and TAKATORI acting for their personal

14   benefit are set out above.

15

16   500    The actions of defendants ANDERSEN, DOORDAN, LEE, TAKATORI, NRI-

17   HKG, and NRI-JAPAN, in light of their duties towards Plaintiffs and the damages caused

18   to Plaintiffs by their actions, rise at least to the level of Negligent Interference in

19   Prospective Economic Advantage as it relates to the relations between QAD-USA and

20   Plaintiffs and the relations between OLD-QAD-JAPAN and SUBRAMANIAN, and

21   consequentially the relations between Plaintiffs and their prospective customers (and

22   prospective new business from existing customers) relating to the MFG/PRO business.

23   501    The actions of defendants QAD-USA, DOORDAN, LEE, TAKATORI, NRI-

24   HKG, and NRI-JAPAN, in light of these duties and the damages caused to Plaintiffs by

25   their actions, rise at least to the level of Negligent Interference in Prospective Economic

26   Advantage as it relates to the relationship between Plaintiffs and their prospective

27   customers (and prospective new business from existing customers) relating to the

28   MFG/PRO business.

Jason & Wood, Inc.
North First Street
San Jose, CA 95113
(408) 298-7128

                                                    95

502   Defendants' negligent actions disrupted those and other potential relationships.

Damages

503   As a proximate result of these actions by defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

504   The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Trade Libel)

505   Plaintiffs repeat their allegations of all the paragraphs above, and incorporate them as if fully set forth herein.

506   The facts relating to DOORDAN, LEE and TAKATORI acting for their personal benefit are set out above.

507   Defendant ANDERSEN was aware of the nature and extent of the relationships between VEDATECH-JAPAN and QAD-USA and the nature of services provided by VEDATECH-JAPAN to QAD-USA, including the management of OLD-QAD-JAPAN.

508   ANDERSEN actively conspired with and cooperated with DOORDAN, LEE and others to improperly force the resignation of SUBRAMANIAN from the position and to terminate the agreement between VEDATECH-JAPAN and QAD-USA.

THIRD AMENDED COMPLAINT

96

Libelous statements of ANDERSEN, LEE and DOORDAN

509   In their preliminary report prepared on 28th July 1997, ANDERSEN, in conspiracy with DOORDAN and LEE and upon exhortation by DOORDAN and LEE made several libelous statements including, without limitation, the following:

1.   *Further follow-up indicated that the QAD-Japan president diverted the funds received on this request to pay invoices owed to VEDATECH-JAPAN Corporation.*

2.   *The president of QAD-Japan refused to provide sufficient documentation to support expenditures paid to his VEDATECH-JAPAN company. As a result, we were unable to validate the propriety of approximately 15 VEDATECH-JAPAN invoices (which were previously paid by QAD) selected in our test work.*

3.   *We attempted the following financial test work, but we were unable to complete it because the client (the QAD-Japan president) was unwilling or unable to provide information (resulting in limitation in scope):*

4.   *There was no evidence that reconciliations of the bank cash accounts were performed during the period of examination (1996 and 1997 year-to-date). Given the weakness identified above associated with access to cash, unauthorized withdrawals or disbursements would have gone undetected because of the lack of bank reconciliation.*

5.   *When approached to obtain the documentation from the vendor, the president of QAD-Japan refused to provide the information from his VEDATECH-JAPAN company to properly support the expenditures. ... the president was unwilling to cooperate with our legitimate request to properly validate invoices paid to his VEDATECH-JAPAN company.*

THIRD AMENDED COMPLAINT

97

6. *Furthermore, given the unusual conflicting relationship between the president's roles with QAD-Japan and Vedatech, sufficient supporting documentation is imperative to avoid adverse appearances.*

7. *However, management was either unwilling or unable to provide this information by the completion of our review.*

510    In September 1997 ANDERSEN, in response to feedback from Plaintiffs regarding the false nature of these statements, reaffirmed their libelous statements by repeating them, including, without limitation as follows:

1. *I can assure you that the report reflects our professional opinion and was in no way swayed or influenced adversely by management of QAD Inc.*

2. *In summary, approximately 80% of the 7/28/97 disbursements was made to Vedatech, contrary to what had been approved at that time by John Doordan and QAD-Corporate.*

3. *You did not provide us with all the invoices or sufficient documentation to support these payments.*

4. *Overall, given your relationship with QAD-Japan and Vedatech, it would seem that you could have authorized VEDATECH-JAPAN to provide copies of these invoices and other proper documentation. ... As a possible resolution to this situation, if you would like to provide proper supporting documentation to the 15 VEDATECH-JAPAN sample payments, we would be glad to amend the report.*

5. *... the report comment that "QAD-Japan does not provide adequate detail of expenses and supporting documentation with its cash funding requests to QAD-Corporate accounting" is accurate.*

THIRD AMENDED COMPLAINT

98

A 2933

511   Defendant ANDERSEN's conduct as alleged herein constitutes trade libel and were caused with malice and ill-will towards Plaintiffs.

512   Defendant LEE specifically influenced, and worked with and conspired with ANDERSEN in the preparation of the said report and contributed to the creation of the report and the libelous statements detailed above. LEE acted for her personal benefit in doing so as alleged above. LEE is personally responsible for these libelous statements and this cause of action. LEE's actions were undertaken both with the purpose of peronal gain and (after the June 1997 trip to Japan) with malice and ill-will towards Plaintiffs.

513   Defendant DOORDAN specifically influenced, and worked with, and conspired with ANDERSEN in the preparation of the said report and contributed to the creation of the report and the libelous statements detailed above.

514   DOORDAN acted for his personal benefit in doing so as alleged above. DOORDAN is personally responsible for these libelous statements and this cause of action. DOORDAN's actions were undertaken with malice and ill will towards Plaintiffs.

## Libelous statements of QAD-USA, NEW-QAD-JAPAN and DOORDAN

515   In addition, DOORDAN, NEW-QAD-JAPAN and QAD-USA sent communications to various customers including Matsushita (Panasonic), Daikyo-Webasto, etc., asking them not to send monies to QAD-JAPAN and not to deal with SUBRAMANIAN and VEDATECH, indicating that they were not to be trusted with funds meant for QAD-JAPAN. Some of the statements, without limitation, include statements such as in the case of Daikyo-Webasto, "Do not send the payment due at the end of this month to Qad Japan K.K. Mr Subramanian is not the president of Qad Japan K.K. and cannot be trusted with the monies. You must send it to the account for Qad Japan Inc., which is the true Qad Japan."

516   Such statements constitute trade libel.

A 2934

THIRD AMENDED COMPLAINT

99

& Wood, Inc.
th First Street
San Jose, CA 95113

Libelous statements of TAKATORI, NRI-HKG and NRI-JAPAN

517    Upon information and belief, defendant TAKATORI, DOORDAN, NEW-QAD-JAPAN, NRI-HKG, and NRI-JAPAN, and other Defendants have made statements disparaging Plaintiffs' business reputation and their business products and/ or services, all constituting trade libel. The statements of TAKATORI on behalf of himself, NRI-HKG and NRI-JAPAN include, without limitation, statements made to QAD-USA such as "Mr. Subramanian is not fit to be President of Qad Japan K.K." etc. All these other defendants were also aware of the nature and extent of the existing and potential relationships between VEDATECH-JAPAN and its customers, including QAD-USA.

Other libelous statements constituting Trade Libel

518    Upon information and belief, defendants QAD-USA, NEW-QAD-JAPAN, DOORDAN, TAKATORI, NRI-HKG, NRI-JAPAN and other defendants have made statements disparaging Plaintiffs' business reputation and their business products and services, all constituting trade libel. Such statements include statements such as "Vedatech can no longer support you adequately", or "SUBRAMANIAN was fired from Qad Japan K.K.". All these other defendants were also aware of the nature and extent of the existing and potential relationships between VEDATECH-JAPAN and its customers including and other than QAD-USA.

Conspiracy regarding Trade Libel

519    DOORDAN, LEE, QAD-USA, NEW-QAD-JAPAN, ANDERSEN and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in the damages thereof resulting in Trade Libel. Each and every one of them is thus responsible individually for the entire liability of all the others.

520    DOORDAN, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted

100

Robinson & Wood, Inc.
7 North First Street
San Jose, CA 95113
(408) 298-7120

in concert resulting in the damages thereof resulting in Trade Libel. Each and every one of them is thus responsible individually for the entire liability of all the others.

Damages

521    As a proximate result of Defendants' conduct, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of the jurisdictional limits of this Court, and to be determined at trial.

522    The acts and conduct of Defendants were oppressive, fraudulent and malicious. Defendants knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

# ELEVENTH CAUSE OF ACTION

## (Disparagement of Goods and Quality)

523    Plaintiffs repeat the allegations of all of the previous paragraphs and incorporate them as if fully set forth herein.

524    Defendants ANDERSEN, DOORDAN, and LEE were aware of the nature and extent of the relationships between VEDATECH-JAPAN and QAD-USA and the nature of the services provided by VEDATECH-JAPAN to QAD-USA, including the management of OLD-QAD-JAPAN. ANDERSEN participated in the efforts by DOORDAN, LEE and others to improperly force the resignation of SUBRAMANIAN from the position of Representative Director of OLD-QAD-JAPAN and to terminate the agreement between VEDATECH-JAPAN and QAD-USA.

A 2936

525    The conduct of Defendants ANDERSEN, DOORDAN and LEE constitute Disparagement of Goods and Quality.

526    Upon information and belief, defendant DOORDAN, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN, and other defendants have made statements disparaging of Goods and Quality as described above. All these other defendants were also aware of the nature and extent of the existing and potential relationships between VEDATECH-JAPAN and its customers, including QAD-USA.

527    Upon information and belief, defendants DOORDAN, QAD-USA, TAKATORI, NEW-QAD-JAPAN, NRI-HKG, NRI-JAPAN and other Defendants have made statements disparaging Plaintiffs' business reputation and their business products and / or services, all of which constitute disparagement of goods and quality. All these Defendants were also aware of the nature and extent of the existing, and potential relationships between VEDATECH-JAPAN and its customers other than QAD-USA.

## Conspiracy resulting in Disparagement of Goods and Quality

528    DOORDAN, LEE, ANDERSEN, NEW-QAD-JAPAN, and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in the damages thereof relating to disparagement of goods and quality. Each and every one of them is thus responsible individually for the entire liability of all the others.

529    Defendants DOORDAN, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in the damages thereof relating to disparagement of goods and quality. Each and every one of them is thus responsible individually for the entire liability of all the others.

530    DOORDAN, QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN and one or more DOES 1-50 conspired in some or all of the actions alleged above

and acted in concert resulting in the damages thereof relating to disparagement of goods and quality. Each and every one of them is thus responsible individually for the entire liability of all the others.

## Damages

531    As a proximate result of these actions by DOORDAN, LEE, ANDERSEN, QAD-USA, NEW-QAD-JAPAN, TAKATORI, NRI-HKG, and NRI-JAPAN, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

532    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### (Conversion)

533    Plaintiffs repeat the allegations of all of the previous paragraphs, and incorporate them as if fully set forth herein.

534    Defendant QAD-USA, DOORDAN, NEW-QAD-JAPAN, OLD-QAD-JAPAN and one or more DOES 1-50 fraudulently converted the share in OLD-QAD-JAPAN owned by Plaintiff SUBRAMANIAN.

## Conspiracy to cause conversion

535    DOORDAN, LEE, QAD-USA, NEW-QAD-JAPAN, OLD-QAD-JAPAN, and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in

R.      & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO. CV-784685

103

concert resulting in the damages thereof relating to conversion of the one share that SUBRAMANIAN held in OLD-QAD-JAPAN. Each and every one of them is thus responsible individually for the entire liability of all the others.

### Damages

536    As a proximate result of these actions by DOORDAN, LEE, QAD-USA, NEW-QAD-JAPAN, OLD-QAD-JAPAN, and one or more DOES 1-50, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

537    The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

538    Plaintiffs repeat the allegations of all the paragraphs above, and incorporate them as if fully set forth herein.

539    Defendants QAD-USA, DOORDAN and one or more of DOES 1-50 owed a fiduciary duty to Plaintiff SUBRAMANIAN not to undertake some or all of the actions described herein.

540    The fiduciary duty of QAD-USA towards SUBRAMANIAN is that of a majority shareholder to a minority shareholder and is set out above.

A 2939

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

Howe & Wood, Inc.
North First Street
San Jose, CA  95113
(408) 298-7210

541   The fiduciary duty of DOORDAN towards SUBRAMANIAN is both that arising in his position as an agent of QAD-USA and that arising independently towards SUBRAMANIAN from his role as a co-director/board member of OLD-QAD-JAPAN.

542   Both DOORDAN and QAD-USA, in undertaking the actions described herein, breached their duties towards SUBRAMANIAN.

### Conspiracy resulting in breach of fiduciary duty

543   DOORDAN, QAD-USA and one or more DOES 1-50 conspired in some or all of the actions alleged above and acted in concert resulting in the damages thereof relating to their breach of fiduciary duties towards SUBRAMANIAN. Each and every one of them is thus responsible individually for the entire liability of all the others.

### Damages

544   As a proximate result of these actions by DOORDAN, QAD-USA and one or more DOES 1-50, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

545   The acts and conduct of Defendants were oppressive, fraudulent, and malicious. Defendant knew or should have known that their conduct would harm Plaintiffs. Their actions were undertaken for the specific purpose of enriching themselves at Plaintiffs' expense. Plaintiffs therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

### FOURTEENTH CAUSE OF ACTION

### (Unfair Competition)

546   Plaintiffs repeat the allegations of all the previous paragraphs and incorporate them as if fully set forth herein.

.obinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT

547   The facts relating to DOORDAN, LEE and TAKATORI acting for their personal benefit are set out above.

548   The duties of various parties towards Plaintiffs are also set out above.

Regarding defendant ANDERSEN

549   QAD-USA had engaged KPMG to do most of its auditing and related functions for many years until 1997, including using KPMG to help its subsidiary OLD-QAD-JAPAN. With the arrival of a new management team, Mr. Raney and LEE brought in ANDERSEN to perform some functions that would normally have gone to KPMG.

550   ANDERSEN, as is well known from public reports from that period was aggressively courting such "consulting" business in addition to the normal business lines, and ANDERSEN's division that was helping QAD-USA starting from or around the first half of 1997 was engaged in one such "growth" business.

551   In their enthusiasm in getting additional business from QAD-USA and OLD-QAD-JAPAN and NEW-QAD-JAPAN (and perhaps from other parts of QAD worldwide), both the AA-MANAGER in Los Angeles and CHIBA in its Tokyo office undertook a pattern of activity described by the actions alleged above, including fraud, opening bank accounts in violation of criminal laws of Japan, and other improper or illegal activities, all of which resulted in the loss of a very valuable business relationship that Plaintiffs had with QAD-USA and consequentially business relating to the MFG/PRO product and the customers and business, then current and prospective of VEDATECH-JAPAN.

552   Plaintiffs seek in addition to damages, disgorgement of the profits that ANDERSEN gained from providing services to QAD-USA, OLD-QAD-JAPAN, and NEW-QAD-JAPAN or other parts of QAD worldwide under the restitutionary principles of unjust enrichment.

Haas & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

106

THIRD AMENDED COMPLAINT

Regarding defendants DOORDAN, LEE and TAKATORI

553    These defendants, for their own personal benefit and enhancement of their position inside their respective organizations and the advancement of their personal financial gains, caused various damages to Plaintiffs as detailed above.

554    LEE acted to enhance her status within QAD-USA in the pre-IPO period by trying to show that the management under WHATLEY had many problems and sacrificed the reputation of Plaintiffs to show how she had contributed to the cleaning up of such purported and cooked up problems in preparation for the IPO. From information and belief, it is averred that as a direct result of this LEE was promoted within QAD-USA and gained salary increases and increases in stock options and other benefits.

555    The specific actions of LEE that constitute unfair competition are those relating to her efforts to damage Plaintiffs in their trade in order to further her own personal goals as specified herein (including fraudulent activities, trade libel, intentional and negligent interference in contractual relations and prospective economic advantage.)

556    LEE undertook these to gain position and power and consequent financial gains for herself and did realize such profits. These profits are to be disgorged to Plaintiffs as a remedy for LEE's activities giving rise to this cause of action for unfair competition.

557    The activities of DOORDAN, the motivation of DOORDAN and the damages caused by DOORDAN are all set out in great detail above. DOORDAN gained status, better stock options, financial gains and a new lease on his management life inside QAD-USA and its affiliates because of his illegal and improper activities in harming Plaintiffs.

558    Plaintiffs request that any such monetary benefits or other benefits that can be reasonably valued in monetary terms (including gains from stock options etc.) that flowed from the efforts of such individuals (especially DOORDAN and LEE) in harming

Imaan & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-1120

THIRD AMENDED COMPLAINT

1    Plaintiffs be stripped from them under the restitutionary principles of unjust enrichment

2    and be made that of Plaintiffs as a remedy.

3

4    559    The activities of TAKATORI, the motivation of TAKATORI and the damages

5    caused by TAKATORI are all set out in great detail above. TAKATORI gained status,

6    financial gains and a better resume because of his illegal and improper activities in

7    harming Plaintiffs.

8    560    Plaintiffs request that any such monetary benefits or other benefits that can be

9    reasonably valued in monetary terms (including gains from stock options etc.) that flowed

10   from the efforts of such individuals (DOORDAN, LEE, and TAKATORI) in harming

11   Plaintiffs be stripped from them under the restitutionary principles of unjust enrichment

12   and be made that of Plaintiffs as a remedy.

13

14   ## Regarding defendants QAD-USA, and NEW-QAD-JAPAN

15   561    The actions of these defendants stretching from around October 1997 through the

16   current period (becoming minimal after 1998) have caused complete loss of the

17   MFG/PRO related business for VEDATECH-JAPAN and was a direct result of the

18   actions regarding unlawful interference as alleged elsewhere in this Complaint.

19

20   ## Regarding defendant QAD-USA

21   562    QAD-USA, by ratifying the activities of DOORDAN, LEE and others, and by

22   constituting illegal stockholders' and directors meetings in order to remove

23   SUBRAMANIAN, withholding payments to Plaintiffs and preventing customers from

24   properly paying OLD-QAD-JAPAN so that Plaintiffs will be starved of funds, directly

25   and in conspiracy with NEW-QAD-JAPAN acting to commit fraud on their own

26   customers in order to prevent business from going to VEDATECH-JAPAN, and actively

27   encouraging customers not to deal with VEDATECH-JAPAN (through libelous and false

28

THIRD AMENDED COMPLAINT
CASE NO: CV 784685

A-2943

1   statements), engaged in a pattern of activity proscribed by the Unfair Competition laws of

2   California.

3   563   QAD-USA through its improper activities detailed herein, avoided having to honor

4   its commitments to Plaintiffs, including having to pay for the past and committed future

5   services of SUBRAMANIAN and VEDATECH-JAPAN (such as the contracts for the

6   localization etc.) and instead routed that to its own subsidiaries (such as QAD Australia

7   for the localization work). QAD-USA also gained in other ways including investments

8   from the NRI group (in the pre-IPO road shows) in return for a commitment to illegally

9   terminate relations with Plaintiffs.

10

11  564   Plaintiffs seek to identify all such profits of QAD-USA (including the pre-IPO

12  investments by the NRI group) gained improperly through its engagement in activities

13  proscribed by the Unfair Competition statutes and disgorge such profits to Plaintiffs.

14

15              **Regarding defendant NEW-QAD-JAPAN**

16  565   Furthermore, NEW-QAD-JAPAN (mostly through DOORDAN and under his

17  command) acted in violation of the Unfair Competition statutes in robbing OLD-QAD-

18  JAPAN of its business and in gaining business by harming Plaintiffs.

19

20  566   Plaintiffs seek to disgorge all the profits of NEW-QAD-JAPAN as it was

21  specifically set up to harm Plaintiffs through these unfairly competitive activities.

22  567   To the extent that QAD-USA manipulated the accounts of NEW-QAD-JAPAN or

23  artificially reduced its profits, Plaintiffs seek to identify the true profits of NEW-QAD-

24  JAPAN and disgorge those (from QAD-USA or otherwise) for the benefit of and as a

25  remedy for the injuries suffered by Plaintiffs.

26

27                                                    A 2944

28

.obinson & Wood, Inc.
223 North First Street
San Jose, CA 95113
(408) 291-7110

THIRD AMENDED COMPLAINT
CASE NO. CV 784685

568    Plaintiffs seek to disgorge any and all profits attributable to such defendants, including the service business that they directly started doing with such customers in different instances, under the principles of unjust enrichment for the benefit of Plaintiffs..

## Regarding defendants TAKATORI, NRI-HKG and NRI-JAPAN

569    Defendants TAKATORI, NRI-HKG and NRI-JAPAN initiated a pattern of activity starting in or around late 1996 (through mainly the activities of their executive and agent, TAKATORI) that went over and beyond the normal privileges of a competitor in trying to take the business that VEDATECH-JAPAN had developed through its partnership with QAD-USA.

570    These activities culminated in TAKATORI, NRI-HKG and NRI-JAPAN participating in a conspiracy with DOORDAN, by generating letters calling into doubt the integrity or professionalism of VEDATECH-JAPAN or its principal SUBRAMANIAN with the focus no longer being on competition but the destruction of the relationship between Plaintiffs and QAD-USA through unlawful and improper means.

571    These Defendants, furthermore, acted to take away the MFG/PRO implementation business painfully built up by Plaintiffs in Japan, all to the benefit of NRI-JAPAN and NRI-HKG (and to the benefit of TAKATORI).

572    As a direct result of these activities taken in whole, VEDATECH-JAPAN, as alleged above, lost current and prospective business with its customers regarding the MFG/PRO product and lost its business with QAD-USA.

573    Plaintiffs pray both for damages and for specific injunctions preventing TAKATORI, NRI-HKG and NRI-JAPAN continuing to benefit from such improperly obtained benefits and/ or in the alternative for restitution under the principles of unjust enrichment and order such parties to disgorge any and all profits so gained.

Johnson & Wood, Inc.
227 North First Street
San Jose, CA  95113
(408) 298-7110

THIRD AMENDED COMPLAINT
CASE NO.: CV 784685

A 2945

574   Specifically it is prayed for that TAKATORI disgorge all profits he gained from or through a higher position or a better job by virtue of his "success" in quickly establishing the Japanese business of MFG/PRO for NRI-JAPAN.

575   Plaintiffs seek to have NRI-HKG disgorge all profits that it gained from promoting MFG/PRO to Japanese customers that it handles in its region (for example companies such as Panasonic in China) and which flowed as a result of taking away VEDATECH-JAPAN's business with MFG/PRO.

576   Plaintiffs also seek to have NRI-JAPAN disgorge all the profits it made from improperly acquiring both the existing and potential customers of VEDATECH-JAPAN in the implementation and software support and related businesses surrounding the support of MFG/PRO in Japan.

Damages

577   As a proximate result of these actions by defendants, Plaintiffs have sustained and continue to sustain actual damages in an amount in excess of jurisdictional limits of this Court, and to be determined at trial.

PRAYER

WHEREFORE, Plaintiffs pray judgment against Defendants as follows:

(1) for consequential and economic losses in an amount to be proven at trial;

(2) for interest on such amounts;

(3) for general damages to compensate Plaintiffs for their lost business reputation, goodwill, and other losses in an amount to be proven at trial;

(4) for punitive damages;

oe & Wood, Inc.
22? North First Street
San Jose, CA 95113
(408) 298-7120

THIRD AMENDED COMPLAINT
CASE NO: CV 784695
111

A 2946

1    (5) for attorney's fees;

2    (6) for costs of suit;

3    (7) for equitable relief stripping defendants of their unjust enrichment and quantum

4        meruit, as is appropriate; and

5    (8) for such and any other relief as the Court deems proper.

6

7

8

9

10    DATED: December 26, 2001         ROBINSON & WOOD, INC.

11

12

13    By: _____

14                        CHRISTOPHER K. KARIC

15                        Attorneys for Plaintiffs

16    VEDATECH-JAPAN K.K. and MANI SUBRAMANIAN

17

18

19

20

21

22

23

24

25

26

27

28                                            A 2947

...oo & Wood, Inc.
.lorth First Street
San Jose, CA  95113
(408) 298-1120

<u>VERIFICATION</u>

STATE OF CALIFORNIA      )
COUNTY OF *Santa Clara* )

I, the undersigned, certify and declare that I have read the foregoing PLAINTIFFS' VERIFIED THIRD AMENDED COMPLAINT and know its contents. The statement following the box checked is applicable.

[✓]   I am a party to this action. The matters stated in the document(s) described above are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters I believe them to be true.

[ ]   I am [ ] an officer [ ] a partner [ ] a _____ of _____ a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I am informed and believe and on that ground allege that the matters stated in the document(s) described above are true.

[ ]   I am the attorney, or one of the attorneys for _____, a party to this action. Such party is absent from the county where I or such attorneys have their offices and is unable to verify the document described above. For that reason, I am making this verification for and on behalf of that party. I am informed and believe that on that ground allege that the matters stated in said document(s) are true.

Executed on *26ᵗʰ December*, 2001, at *London, United Kingdom*. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Name: *Mani S. Subramanian*

~~Title:~~ *( Individual Plaintiff )*

A 2948

<u>VERIFICATION</u>

STATE OF CALIFORNIA          )
                            )
COUNTY OF <u>Santa Clara</u>  )

     I, the undersigned, certify and declare that I have read the foregoing PLAINTIFFS' VERIFIED THIRD AMENDED COMPLAINT and know its contents. The statement following the box checked is applicable.

[ ]  I am a party to this action. The matters stated in the document(s) described above are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters I believe them to be true.

[✓]  I am [✓] an officer [ ] a partner [ ] a _____ of <u>VEDATECH K.K.</u> a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I am informed and believe and on that ground allege that the matters stated in the document(s) described above are true.

[ ]  I am the attorney, or one of the attorneys for _____, a party to this action. Such party is absent from the county where I or such attorneys have their offices and is unable to verify the document described above. For that reason, I am making this verification for and on behalf of that party. I am informed and believe that on that ground allege that the matters stated in said document(s) are true.

Executed on <u>26th December</u>, 2001, at <u>London, United Kingdom</u>. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

             _____
             for <u>VEDATECH K.K</u> as its officer
             Name: <u>Mani S. Subramanian</u>
             Title: <u>Representative Director</u>

A 2949

1

## PROOF OF SERVICE

Short Title: VEDATECH v. QAD (CV 784685)
Short Title: QAD, INC. v. SUBRAMANIAN (CV 771638)

I, MARYKNOL R. LOPEZ, declare:

I am a citizen of the United States and a resident of the County of Santa Clara. I am over the age of eighteen (18) years and not a party to the within entitled action. I am employed by Robinson & Wood, Inc., 227 North First Street, San Jose, California, 95113, in the office of a member of the bar of this court at whose direction the service was made. I am readily familiar with Robinson & Wood, Inc.'s practice for collection and processing of documents for delivery by way of the service indicated below:

(X)    [BY MAIL] By consigning such copy in a sealed envelope, First Class postage fully prepaid, in the United States Postal Service for collection and mailing

( )    [BY OVERNIGHT DELIVERY]By consigning such copy in a sealed envelope to an overnight courier for next business day delivery

( )    [BY HAND-DELIVERY]By consigning such copy in a sealed envelope to a messenger for guaranteed hand-delivery

( )    [BY FACSIMILE TRANSMISSION] By consigning such copy to a facsimile operator for transmittal

On December 26, 2001, in accordance with ordinary business practices at Robinson & Wood, Inc., I caused to be served *VERIFIED THIRD AMENDED COMPLAINT OF PLAINTIFFS* in the manner identified above on the person(s) listed below:

William D. Connell, Esq.
General Counsel Associates LLP
1891 Landings Drive
Mountain View, DA 94043

Attorneys for Defendant
QAD, Inc., QAD Japan and Lai Foon Lee
650/428-3900; 650/428-3901-fax

Frederick S. Fields, Esq.
Coblentz, Patch, Duffy & Bass LLP
222 Kearny Street, 7th Floor
San Francisco, CA  94108-4510

Attorneys for Defendant
Arthur Andersen LLP
415/391-4800; 415/989-1663-fax

J. David Black, Esq.
John Arai Mitchell, Esq.
White & Case LLP
3000 El Camino Real
Five Palo Alto Square, 10th Floor
Palo Alto, CA  94306

A 2950

Robinson & Wood, Inc.
227 North First Street
(08) 298-7120

1   Maureen McFadden, Esq.
    GREENAN, PEFFER, et al.
2   Two Annabel Lane, Suite 200
    San Ramon, CA 94583
3

4       I declare under penalty of perjury that the foregoing is true and correct.

5   Executed on December 26, 2001, at San Jose, California.

6

7
                                                    _____
8                                                   MARYKNOL R. LOPEZ

9   F:\DOC\ASR\11843\PLEADING\3DAM-COM.POS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                                  A 2951

27

28

Robinson & Wood, Inc.
San Jose, CA 95113
(408) 298-7120
                                                    2
    Proof of Service

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B  -

# QAD Request for Judicial Notice

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

CHRISTINA GONZAGA (CSBN # 221187)
LAW OFFICES OF JAMES S. KNOPF
1840 Gateway Drive, Suite 200
San Mateo, CA 94404
Telephone: (650) 627-9595
Facsimile: (888) 715-9583

Attorney for Plaintiffs
VEDATECH K.K, and VEDATECH INC.

MANI SUBRAMANIAN (PRO PER)
c/o LAW OFFICES OF JAMES S. KNOPF
1840 Gateway Drive, Suite 200, San Mateo, CA 94404
Telephone: (650) 627-9595
Facsimile:  (888) 715-9583

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### (San Francisco Division)

| | |
|---|---|
| **VEDATECH INC.,** a Washington State Corporation, *and* **VEDATECH K.K.,** a Japanese Corporation, *and* **MANI SUBRAMANIAN**, an Individual;<br><br>Plaintiffs,<br>vs.<br><br>**ST.PAUL FIRE & MARINE INSURANCE COMPANY**, a Minnesota Corporation, *and* **UNITED STATES FIDELITY AND GUARANTY COMPANY**, a Maryland Corporation;  *and* **QAD INC.,** a Delaware Corporation; *and* **QAD Japan K.K.,** a Japanese Corporation; *and* **RANDALL WULFF**, an individual; *and* **DOES 1-50**;<br><br>Defendants. | **Case No.: C-04-01249 VRW**<br><br>**FIRST AMENDED COMPLAINT** of Plaintiffs **VEDATECH INC., VEDATECH K.K. and MANI SUBRAMANIAN** for<br>1. **DECLARATORY JUDGMENT;**<br>2. **PERMANENT INJUNCTION;**<br>3. **FRAUD / MISREPRESENTATION; CONSPIRACY TO COMMIT FRAUD;**<br>4. **CONSTRUCTIVE FRAUD; CONSPIRACY TO COMMIT FRAUD;**<br>5. **NEGLIGENT MISREPRESENTATION;**<br>6. **INSURANCE BAD FAITH (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)**<br>7. **UNFAIR COMPETITION;** and<br><br>**DEMAND FOR JURY TRIAL** |

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

Plaintiffs VEDATECH INC., VEDATECH, K.K., and MANI SUBRAMANIAN allege as follows:

**JURISDICTION**

1.      This court has jurisdiction under  28 USC §1332 (a)(3) ("<u>citizens of different States and in which citizens or subjects of a foreign state are additional parties</u>" – please see the section titled "THE PARTIES" in the next page.)

2.      The amount in controversy exceeds US$ 75,000.

**VENUE AND INTRADISTRICT ASSIGNMENT (SAN FRANCISCO)**

3.      Venue is proper in the Northern District of California as required under the provisions of <u>28 USC § 1391</u> and according to the Northern District's <u>Civil L-R 3-2</u>.

4.      Defendant St.Paul Fire and Marine Insurance Co. is a resident of, and maintains offices (its Regional Claims office) in, San Francisco County at 100 California Street, Suite 300, San Francisco, California 94111.

5.      Defendant United States Fidelity and Guaranty Co., a wholly owned and controlled subsidiary of defendant St.Paul Fire and Marine Insurance Co., is a resident of, and maintains offices in San Francisco County at One Market Plaza, Ste., 2075 San Francisco, CA 94105.

6.      Defendants QAD Inc. and QAD Japan K.K. are subject to personal jurisdiction in the County of San Francisco.

7.      Randall Wulff, a key player in the events relevant herein is a resident of Piedmont, California in Alameda County.

8.      A substantial part of the events that give rise to the Claims occurred in Alameda County, California.  In addition, most or all of the negotiations regarding the "agreement"  attached as Exhibit-A and the subject matter of this complaint, were undertaken by Mr. Tancredy of St.Paul from its Oakland offices in Alameda County.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

## THE PARTIES

**[Plaintiff] SUBRAMANIAN**

9.     Individual Plaintiff Mani Subramanian ("SUBRAMANIAN") is a United States Citizen and is a resident of and domiciled in Seattle, Washington.

**[Plaintiff] VEDATECH INC.**

10.     Plaintiff Vedatech Inc., ("VEDATECH-USA") is a Washington State corporation with principal place of business in Seattle, Washington.

**[Plaintiff] VEDATECH K.K.**

11.     Plaintiff Vedatech K.K., ("VEDATECH-JAPAN"), is a corporation organized under the laws of Japan with its principal place of business in Yokohama, Japan.

**[Defendant] ST.PAUL FIRE & MARINE INSURANCE CO.**

12.     Defendant St.Paul Fire & Marine Insurance Co., ("ST.PAUL") is a Minnesota corporation with principal place of business in Minneapolis (Saint Paul), Minnesota.

**[Defendant] UNITED STATES FIDELITY & GUARANTY CO.**

13.     Defendant Unites States Fidelity and Guaranty Co. (USF&G) is a Maryland Corporation with its principal place of business in Baltimore, Maryland.

**[Defendant] QAD INC.**

14.     Defendant QAD Inc. ("QAD"), is a Delaware corporation, with its principal place of business in Carpinteria, California.   QAD is an alter ego of each and every one of its subsidiaries including QAD Japan K.K., a defendant in this action, and QAD Japan Inc., a Delaware corporation founded solely to strip QAD Japan K.K. of its assets and value.

**[Defendant] QAD JAPAN K.K.**

15.     Defendant QAD Japan K.K..("QAD-JAPAN") is a Japanese corporation which used to have its principal place of business in Yokohama, Japan.  In or around August

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

1997, QAD Inc. set up a parallel Delaware corporation called QAD Japan Inc., solely for the

purpose of usurping all of the business, customers, and capital value of QAD Japan K.K.,

reducing the value of Plaintiff Subramanian's share of the issued stock of QAD Japan K.K.

to a minimum or nothing, and rendering QAD Japan K.K. a defunct company.  This much,

QAD Inc. has achieved with great success.  In addition, QAD Inc. improperly concealed the

existence of QAD Japan Inc., the new company from the public in its SEC offerings.  QAD

Inc. went public in August of 1997.  The 10-K registrations of QAD Inc., (NASDAQ:

QADI), filed on April 29, 1998, lists only QAD Japan K.K. as a subsidiary of QAD Inc.  The

April 28, 2000 filing of QAD Inc. with the SEC lists both QAD Japan K.K. and the new

company QAD Japan Inc. as subsidiaries.  Since then, the April 27, 2001, April 30, 2002,

April 30, 2003, and April 15, 2004 10-K registrations with the SEC only show QAD Japan

Inc., the new company as a subsidiary of QAD Japan K.K.   QAD Japan K.K. as such does

not have a separate existence apart from QAD Inc., and to the extent it does, it is an "alter

ego" of QAD Inc.  To hold otherwise would cause great injustice to Plaintiffs.

16.     Valerie Miller ("MILLER") is an individual residing in or near Santa Barbara,

California.   MILLER serves as Vice President and Corporate Controller of QAD Inc.

MILLER works at the offices of QAD Inc. in or near Carpinteria, California.  MILLER also

signs official documents as an officer of QAD Japan K.K.  For example, MILLER signed the

"Settlement Agreement" that is at issue in this case and attached herewith as <u>Exhibit A</u>.  The

exact liability of MILLER, if any, with respect to these events is not known at this time.  If

such liability becomes known, Plaintiffs will join MILLER to the action at the right time.

**RANDALL WULFF**

17.     Randall Wulff ("WULFF") is an individual residing in Piedmont (Oakland),

in Alameda County, California.   WULFF conducts business as a "mediator" and works out

of offices in Oakland, Alameda County, California.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**DOE DEFENDANTS**

18.     The identity of the DOE defendants 1-50 are unknown or not determinable with certainty at this point in time.  Plaintiffs wish to amend the Complaint later as necessary as such defendants are identified.  From information and belief, such DOE defendants are responsible for some or all of the causes of action set out herein.   The term Defendants or DEFENDANTS shall refer to the named defendants and the DOE defendants collectively.

**NOMENCLATURE**

19.     Defendants ST.PAUL and USFG shall be referred to individually and jointly as "ST.PAUL" with distinctions made between the two if and when necessary.

20.     Defendants QAD and QAD-JAPAN shall be referred to individually and jointly as "QAD" with distinctions made between the two if and when necessary.

21.     Defendants VEDATECH-USA and VEDATECH-JAPAN shall be referred to individually and jointly as "VEDATECH" with distinctions made between the two if and when necessary.

22.     VEDATECH and defendants SUBRAMANIAN shall be collectively referred to as the "VEDATECH PARTIES" or "Vedatech Parties".

**PRELIMINARY NOTE**

23.     Since the filing of the original Complaint, Plaintiffs have come across a web article attached as Exhibit B to this Complaint, which provides support for Plaintiffs' claims herein.  This article appeared in the website of an insurance research organization in Dallas in March 2004.  The issues that are in dispute in this instant case raise difficult issues of developing areas of law.  It is Plaintiffs' contention that carriers such as St.Paul are abusing the process of mediation to engage in pre-meditated acts of bad faith under the cloak of confidentiality provided by such mediation.  These practices need to be stopped.

Page 5 of  49

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

# FACTUAL BACKGROUND [1]

### The QAD-Case

24.     Litigation in California was initiated by QAD against VEDATECH-USA and SUBRAMANIAN in January 1998.  This followed several months of efforts by various parties affiliated with QAD, and eventually QAD itself, to improperly terminate QAD's contractual obligations to Vedatech Parties.  This case, originally filed in State Court in San Jose as CV 771638 is now pending in this district as C-04-01806.  This case, C-04-01806, shall be referred to herein as the "QAD-Case". [2]

25.     The Complaint in the QAD Case, apart for some non-controversial background information, is a long list of fabrications.  This was a naked attempt by QAD to put financial pressure on Vedatech Parties and thus force them to abandon their claims which might have been brought more economically in Japan.  An accurate description of the background events is set out in great detail in the Third Amended Complaint of VEDATECH-JAPAN in the companion case, currently available as <u>Tab-90 of Exhibit B to the Notice of Removal (Docket #1) in C-04-01806</u>.

---

[1]     ST.PAUL has objected to the original Complaint on the basis that the Complaint did not have enough details (mostly referring to the State procedural rules for pleadings).  Conversely, QAD has objected to the same Complaint on the basis that the Complaint had too many details.  QAD has suggested that the Complaint be dismissed under FRCP 41(b) for not being concise enough.  This First Amended Complaint attempts to comply with the heightened requirements for pleading Fraud under FRCP 9(b).  The amount of detail is provided in the hope of discouraging QAD and St.Paul from filing further meritless 12(b)(6) motions claiming a failure to state a claim.

[2]     VEDATECH-JAPAN intervened in the QAD-Case by means of a second action, CV 784685 that has been consolidated into CV 771638 for all purposes.  Thus, there is only one consolidated case extant.  This was last removed to Federal Court as C-04-01806.  QAD has filed a motion to remand and a hearing is currently set for July 7, 2004.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Involvement of insurers, ST.PAUL**

26.     In January 1999, Vedatech Parties tendered defense of the QAD-Case to ST.PAUL.  Rather than provide a proper defense to the in the QAD-Case, insurers ST.PAUL engaged in a whole series of insurance bad faith acts against Vedatech Parties, weakening their position vis-à-vis QAD considerably.

**Crisis time in the QAD Litigation**

27.     In February 2002, independent attorneys hired directly by Vedatech Parties to defend the QAD-Case gave notice that they will quit for non-reimbursement (and non-likelihood of future reimbursements) of various attorney's fees from ST.PAUL.

**The ST.PAUL-Case**

28.     If February 2002, ST.PAUL, in an attempt to escape their contractual obligations and to take advantage of the developing situation where it seemed that Vedatech Parties would be left without legal help, purported to rescind their insurance obligations by initiating a Declaratory Action in State Court in San Jose as CV 805197.

29.     A full account of the bad faith actions of St.Paul in leading up to their Declaratory Action is described in the Fourth Amended Cross-Complaint of Vedatech Parties (who are defendants therein) as <u>Tab-37, Docket #5, Exhibits (Parts 9-10) to the Notice of Removal, in C-04-01818</u>.  C-04-01818 shall be referred to herein as the ST.PAUL-Case. [3]

**ST.PAUL's acts of insurance bad faith continued even after the filing of the counterclaims (cross-complaint) by Vedatech Parties in June 2002**

30.     In spite of the fact that Vedatech Parties filed their counterclaims in June 2002 in the ST.PAUL-Case, and detailed their grievances therein, ST.PAUL continued to deny proper defense benefits, did not appoint any defense counsel for the QAD Case, and

---

[3]     The ST.PAUL-Case, CV 805197 was also removed recently to this district as C-04-01403, and on additional evidence as C-04-01818.  ST.PAUL has filed motions to remand.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

provided sporadic, late, and partial reimbursements for some of the fees incurred by Vedatech Parties' independent counsel. In addition, ST.PAUL intentionally and falsely portrays its bad faith efforts in public documents (such as in filings in this case) as if it is or was providing a full defense in the QAD Case.

**SUBRAMANIAN forced to appear *pro se***

31.     Since June 2002, Vedatech Parties have been struggling to maintain their defense of both the QAD-Case and the ST.PAUL-Case. As a result of the poor reimbursement policies of ST.PAUL, SUBRAMANIAN has been forced to appear *pro se*. This has played into QAD's strategy of stonewalling and denying proper discovery. [4]

**ST.PAUL's request for a status report**

32.     In November 2003, in response to a request from ST.PAUL for a recommendation with respect to ADR / Mediation, Vedatech Parties suggested mediation with a view to a Global settlement, and floated two names Randall Wulff (WULFF) and Jack Williams as mediators that they had heard about. Vedatech Parties at that point in time were not aware of the prior relationship between ST.PAUL and WULFF. ST.PAUL did not respond substantively to this report. In fact, ST.PAUL, in spite of their duties to disclose the conflict they had with WULFF, failed to disclose their prior contacts with WULFF.

**The January 13, 2004 hearing**

33.     On January 13, 2004, ST.PAUL lost its last attempt to dismiss Vedatech Parties' counterclaims in the ST.PAUL-Case. Before the hearing, ST.PAUL, without informing Vedatech Parties and outside their presence, discussed the matter of mediation

_____

[4]     QAD refuses to provide even a copy of their CGL policies that might cover Vedatech's (counter-)claims against them in the QAD-Case. In addition, email archives have been withheld entirely by QAD, who are plaintiffs in a case they themselves chose to bring in California, on the basis that it is "oppressive", etc., etc. ST.PAUL's lack of proper defense support has assisted QAD in getting away with this for this long.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

with QAD. ST.PAUL then requested the Judge to "order" mediation *specifically* before WULFF. ST.PAUL did not disclose to the Vedatech Parties or to the Court, the detailed nature of its prior relationship with WULFF either before or after this hearing.

**Pre-meditated plan of ST.PAUL regarding the mediation**

34. In addition, ST.PAUL had before the time of this January 13, 2004 hearing, already formulated a strategy for using the secrecy of mediation as a cover for engaging in collusive and bad faith negotiations with QAD, and specifically with the help of WULFF, in order to weaken the legal representation of Vedatech Parties and enhance their own position in the insurance coverage litigation.

35. Prior to the January 13, 2004 hearing, QAD had not made any open settlement offers to ST.PAUL. Neither had ST.PAUL requested QAD (or the Vedatech Parties) to make an offer. ST.PAUL itself had not made any offers to QAD. ST.PAUL knew that any efforts by them to have open settlement discussions with QAD and conduct discussions would be subject to approval of the Vedatech Parties. ST.PAUL knew fully well that they had to give Vedatech Parties an opportunity to choose to undertake their own defense. But this would defeat ST.PAUL's goal of freely being able to pursue their coverage litigation. Thus, ST.PAUL concocted this plan to arrange a mediation with the specific intent of engaging in bad faith tactics which they otherwise would not be able to engage in.

**Prior business dealings between WULFF and ST.PAUL**

36. ST.PAUL and its attorneys had conducted prior business with WULFF wherein both ST.PAUL and WULFF knew of the advantages of using the cloak of secrecy provided by the mediation in order to strike deals with the plaintiffs in the underlying cases (such as the QAD-Case) to the detriment of the insureds. ST.PAUL and Mr. Greenan did not disclose the details of ST.PAUL's and/or his firm's prior dealings with WULFF. Instead, before the January 13, 2004 order was made, ST.PAUL made brief general statements of confidence in the ability of WULFF that failed to describe the close relationship and understanding they had with WULFF regarding the conduct of insurance mediations.

Page 9 of 49

---

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Vedatech Parties tricked into "consenting" to mediation before WULFF**

37.     Vedatech Parties were unaware of the nature and extent of ST.PAUL's prior relationship with WULFF, and unaware of ST.PAUL's plans on using the mediation as a mechanism to safely (for ST.PAUL) engage in bad faith activities.  Accordingly, Vedatech Parties did not object to a mediation at the January 13, 2004 hearing.  Vedatech Parties made a reasonable assumption that it would be useful to mediate with QAD, and that ST.PAUL would not, for the purpose of the mediation, mix-up the coverage issues with the underlying liability issues in the QAD litigation. <u>Had Vedatech Parties been aware either of</u>

     (a)  the conflict that WULFF had because of a close working relationship with ST.PAUL and/or Mr Greenan on similar insurance related mediation;  *or*

     (b)  the detailed nature of the prior relationship between ST.PAUL and WULLF; *or*

     (c)  the detailed nature of the prior relationship between Mr Greenan and his firm with WULFF and the types of mediation they had conducted before; *or*

     (d)  ST.PAUL's premeditated plans regarding the improper use of the mediation, *or*

     (e)  ST.PAUL's premeditated plans of using the attorneys litigating the coverage issues (Mr Greenan, Mr Wang, et. al.) to "negotiate" with QAD and participate in the settlement of the QAD-Case,

they would not even have provisionally consented to this "Order", or the mediation.

38.     In any event, as decided on January 13, 2004, the mediation was contingent and conditional upon the consent and stipulation of all the parties.  For example, Arthur Andersen LLP (not a party to this case) did not consent to the proposed mediation, but the order that was prepared by ST.PAUL did not incorporate this condition.

**ST.PAUL handles mediation issues through the coverage attorneys**

39.     ST.PAUL moved quickly to arrange mediation.  This was done through its attorneys, Mr Greenan and Mr Wang, the same attorneys who were handling the coverage issues (i.e., prosecuting the Declaratory Relief action and defending Vedatech's bad faith action /counterclaims).  The mediation was thus tainted from the beginning.

Page 10 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**ST.PAUL's desperate attempts to force the mediation to happen**

40.     ST.PAUL and WULFF tentatively set the mediation for March 3, 2004.   In early February 2004, SUBRAMANIAN had to attend to a family emergency.  This prevented him from attending on March 3, 2004, a date selected by ST.PAUL.  In response, ST.PAUL filed an *ex parte* motion in the State Court.  ST.PAUL obtained an order forcing SUBRAMANIAN to personally appear for the mediation on the March 3, 2004 date or face "contempt of Court". [5]   One of the grounds for such a request was the convenience of WULFF and his non-availability until May 2003.  ST.PAUL would not consider anyone except WULFF as a mediator.  This was not the first time that ST.PAUL would get an erroneous order signed at the hearing itself.  Due to ST.PAUL's practices of this nature, the State Court changed its policy with respect to this case, and began writing out its own orders.

**Attempts by WULFF to "make it happen"**

41.     Initially WULLF did not respond to calls from SUBRAMANIAN and his requests to change the mediation date.  The assistant to WULFF informed SUBRAMANIAN that he and WULLF only dealt with attorneys and not with *pro se* parties. SUBRAMANIAN intensified his efforts to alert all parties concerned about the difficulties he had in attending the March 3, 2004 date.  Subsequently, WULFF called SUBRAMANIAN and offered to reschedule the mediation date for March 12, 2004.  WULFF did this as a favor to ST.PAUL (in order to ensure that ST.PAUL had the forum to engage in their pre-planned collusive activities with QAD and bad faith tactics to threat SUBRAMANIAN).

---

[5]     ST.PAUL repeated this kind of extreme behaviour when it gave notice of an ex parte hearing for March 15, 2004 ostensibly for resolution of is discovery dispute asking VEDATECH to produce all the discovery documents disclosed by QAD in the underlying litigation.  When SUBRAMANIAN appeared for the hearing, Mr. Wang, an attorney for ST.PAUL, seconds before entering the chambers gave SUBRAMANIAN papers in support of a "contempt citation".  Of course, the Court did not issue any such contempt citation.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**WULFF and the "Confidentiality Agreement"**

42.     In the way of preparation for mediation, on or around February 3, 2004, Michael Richards, assistant to WULFF sent copies of a fee schedules and a "CONFIDENTIALITY AGREEMENT".  This document purported to be a proposed agreement between the various parties to the mediation and WULFF, the mediator.

**Vedatech Parties decline offer regarding multilateral agreements**

43.     SUBRAMANIAN refused to sign any further agreements with the parties just for the sake of engaging in the mediation process, especially given the multiplicity of disputes already ongoing between the parties.  SUBRAMANIAN was willing to consider a separate limited bilateral agreement with the mediator as necessary and appropriate.

**Conference Call conducted by WULFF**

44.     The issue of the lack of consent of Arthur Andersen to the January 13, 2004 "consent" order came before the State Court again in February 2004.  This resulted in the State Court deciding that the mediator should set the terms of the mediation.  In a telephone conference call organized by WULFF in response to this, SUBRAMANIAN made clear the objection of Vedatech Parties to signing the Confidentiality Agreement or any sort of agreement with the parties.  Mr Greenan, attorney for ST.PAUL (in the coverage action) was also participating in the conference call.  He immediately said that this would be a "problem".  ST.PAUL and Mr Greenan did not disclose to Vedatech Parties the real reason why this was a "problem".  ST.PAUL and Mr Greenan then proceeded to put pressure on SUBRAMANIAN to sign the CONFIDENTIALITY AGREEMENT.  ST.PAUL and Mr Greenan insisted on extended agreements on confidentiality with respect to the mediation.

**WULFF requests a Court Order**

45.     WULFF, at this conference call decided that the arrangements discussed at the conference call should be turned into an Order of the State Court.  Arthur Andersen prepared a draft that was found unacceptable by Vedatech Parties.  ST.PAUL put pressure on Arthur Andersen to submit that draft urgently to the State Court.

Page 12 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Further desperate and extreme measures adopted by ST.PAUL**

**46.**     SUBRAMANIAN and VEDATECH had rejected this proposed Order prepared by Andersen. ST.PAUL and QAD, yet again without notice and at a hearing on a different matter, persuaded the State Court Judge to sign the order setting various details of the mediation, including portions of a contract originally offered by the mediator and which SUBRAMANIAN had rejected.  The State Court Judge signed this coercive order on the basis that the January 13, 2004 order was by "consent".  The "consent" of Vedatech Parties to the January 13, 2004 was obtained through fraudulent non-disclosure by ST.PAUL.

**SUBRAMANIAN forced to attend the March 12, 2004 mediation**

47.     The net effect of all of this was that SUBRAMANIAN, although not desirous of participating in any mediation under these coercive conditions, was under a Court order (obtained fraudulently by ST.PAUL) to participate in the mediation on March 12, 2004.  This mediation had been carefully stage-managed by ST.PAUL, and WULFF.

**The proposed agreement with WULFF**

48.     A few days before the mediation, SUBRAMANIAN reviewed the draft proposed agreement sent by the mediator, the original "CONFIDENTIALITY AGREEMENT".  Upon inquiry with Michael Richards, the assistant to the mediator, Mr Richards informed SUBRAMANIAN's attorneys that the reference to "Confidentiality" in this agreement was to the agreement itself, and that the reference to "Conflicts Check" simply meant that a conflicts check had been completed and that there was no conflict.  No reference to the "Mediation Procedures" was made and no such document was received. WULFF's assistant, Mr. Richards did not mention any conflict with ST.PAUL, nor did he provide any information at all about the past relationship WULFF had with ST.PAUL or Mr. Greenan or his law firm.  On this basis that WULFF had performed a conflicts check and there was no known conflict with the participants, SUBRAMANIAN proposed a draft revised bilateral agreement and sent that proposal by email to WULFF and Mr Richards.  No response was received until the day of the mediation.

Page 13 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**EVENTS BEFORE THE MEDIATION STARTED**

49.     In light of the uncertainty over the admissibility of evidence of events at the actual mediation itself, Plaintiffs will only detail events before the official start of the mediation (around 11:00 AM) and after the end of the mediation (around 4:00 PM).  Further details will be provided if necessary and as the Court permits. [6]

**Coercion and Duress before the commencement of the Mediation**

50.     On the morning of March 12, 2004 the parties assembled BEFORE the start of the mediation for a discussion of contractual formalities etc.   SUBRAMANIAN objected to the participation by the coverage attorneys for ST.PAUL (Mr. James Greenan and Mr. Enoch Wang).   This was due to the conflict of interest arising from the coverage issues and the declaratory relief action, wherein ST.PAUL was trying to defeat coverage by taking positions that essentially put them in the same camp as QAD.   As a means to avoiding this conflict, SUBRAMANIAN further suggested that the insurance adjuster (Mr Joseph Tancredy) was the appropriate person to participate in the negotiations with QAD. [7]   ST.PAUL flatly rejected these offers.  Mr Tancredy insisted that Mr Greenan be in charge.

**SUBRAMANIAN attempted to leave before the mediation started**

51.     SUBRAMANIAN then informed WULFF, that he did not want to start the mediation under these conditions.  SUBRAMANIAN expressed his decision to leave before the mediation started.  After strong pressure and further promises from WULFF detailed

---

[6]     This clarification is provided to avoid unnecessary objections by QAD or ST.PAUL regarding the pleading of confidential matters.

[7]     VEDATECH's motion in State Court in late 2003 to have the insurance coverage litigation stayed pending the resolution of the QAD case was denied.  Because of the financial troubles caused by the lack of proper funding from ST.PAUL, no writ application has been filed yet although Vedatech Parties wish to make such an appeal.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

herein, SUBRAMANIAN agreed to stay back for limited purposes only.  One of the conditions for SUBRAMANIAN's continued participation was that SUBRAMANIAN should first be able to attempt mediation with QAD alone and then have the option of terminating the mediation.  SUBRAMANIAN also told WULFF that Vedatech Parties would consider the entire mediation to be over if SUBRAMANIAN so chose to leave.  WULFF agreed to these conditions.

### The bilateral proposed agreement with WULFF

52.    At this point, WULFF presented the old CONFIDENTIALITY AGREEMENT to SUBRAMANIAN for signature and SUBRAMANIAN reminded WULFF of the email he had sent with the proposed bilateral agreement.  WULFF rejected the proposal made by SUBRAMANIAN and started making several changes to the draft sent by SUBRAMANIAN.  In addition, SUBRAMANIAN explained Mr Richards' prior assurances about the "conflicts check".  Then, for the first time SUBRAMANIAN and VEDATECH were given a document called "Mediation Procedures", which had buried among other language the following text, and which SUBRAMANIAN did not notice at that time:

> "Any past professional acquaintance with counsel o[n] prior matters I have mediated for any counsel or parties will not be included in any disclosure being made;  I rely on the parties and counsel to advise one another of this, if appropriate"

53.    This is made even more egregious because SUBRAMANIAN insisted unsuccessfully that all terms of the confidentiality agreement should be within that one document and should not refer to any another document.  WULFF insisted on referring to this separate document titled "CONFLICTS CHECK".  In addition, WULFF assured SUBRAMANIAN that the purpose of this separate page titled "CONFLICTS CHECK" was to take into consideration the fact that he had worked for a large firm before.  WULFF further stated that this prior firm had many clients that WULFF did not even know anything about, and it would be impossible for him to do a conflicts check with all such entities that he had had no contact with or had not represented.  At no point during this conversation did WULFF

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

mention that he had worked with ST.PAUL or Mr. Greenan before, nor did he alert SUBRAMANIAN to the passage in the text (excerpted above) that was outside the scope of the verbal assurances he was providing SUBRAMANIAN.

54.    Even at this stage, and especially at this stage, if SUBRAMANIAN had known that Mr. Greenan or his firm or ST.PAUL had personally conducted prior mediations of any sort with WULFF, or if ST.PAUL or WULFF had disclosed such matters to him, as they should have, SUBRAMANIAN would have withdrawn before the start of the mediation.

### Duress in signing the bilateral agreement

55.    Thus, although SUBRAMANIAN had sent WULFF a draft ahead of the mediation, WULFF had not reviewed the draft, and at the last minute was making various changes to it and insisting that the document be signed before he would start the mediation. On the other hand, WULFF discouraged SUBRAMANIAN from leaving or canceling the whole mediation, which is what SUBRAMANIAN wanted to do in light of the severe conflicts of interest posed by ST.PAUL mixing up coverage and settlement issues.

### Document not signed by WULFF

56.    In light of the various assurances provided by WULFF and on the assumption that ST.PAUL and/or WULFF would have informed SUBRAMANIAN of any prior contacts, SUBRAMANIAN signed this revised document titled "CONFIDENTIALITY AGREEMENT".  WULFF did not sign the document.

### Failure of discussions with QAD

57.    The discussions with QAD eventually failed. At this point, around 4:00 PM, SUBRAMANIAN informed the mediator that the mediation was formally over and promptly left.  SUBRAMANIAN also explicitly informed the mediator that the mediation was terminated.  Vedatech Parties believe that many of the acts of WULFF, ST.PAUL and QAD under the rubric of "mediation" are unlawful, unfair and fraudulent.  Vedatech Parties will further detail such activities if the Court permits such evidence to be introduced.

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

**Continuation of discussions between ST.PAUL and QAD and WULFF**

58.     Despite the departure by Vedatech Parties, WULFF continued the discussions with ST.PAUL and QAD and conducted various negotiations, even though the mediation was called off, and even though WULFF was well informed of the conflicts of interest between the two roles of ST.PAUL as insurer and the instigator of coverage disputes.

**WULFF as advocate of ST.PAUL and QAD and against SUBRAMANIAN**

59.     In continuing such mediations, WULFF breached his promises to the parties and his duties to be an impartial mediator, and worked with QAD and ST.PAUL in a collusive and conspiratorial manner to the detriment of Vedatech Parties.

**No agreement between ST.PAUL and QAD on Monday, March 15, 2004**

60.     On March 15, 2004, SUBRAMANIAN met Mr Enoch Wang, the associate working under Mr Greenan on the coverage issues, at an *ex parte* hearing at the Court. Later, Mr Wang came to the offices of attorneys for VEDATECH to go over documents produced by QAD in the underlying litigation. Mr Wang did not provide any information at all regarding any negotiations or agreement between QAD and ST.PAUL.

**Removal of QAD-Case to Federal Court on March 15, 2004**

61.     On March 15, 2004, Vedatech Parties removed the QAD-Case to federal court. Vedatech Parties had assumed that the mediation was called off after they left around 4:00 PM on March 12, 2004. No information to the contrary was received.

**Announcement of secretly concluded "settlement" between QAD and ST.PAUL**

62.     On March 16, 2004, ST.PAUL and QAD unsuccessfully attempted to have the QAD claims dismissed so that the removal of the QAD-Case can be defeated.

**Details of this clandestine agreement not provided in spite of repeated requests**

63.     On March 16, 2004, Mr Greenan, coverage attorney for ST.PAUL, after repeated requests from SUBRAMANIAN, would only state that no settlement papers had been prepared. On March 18, 2004, Mr Greenan for ST.PAUL, finally relented and stated

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

only that "an agreement in principle was reached with QAD … the details of the agreement have not yet been reduced to writing, as the agreement was reached through the mediator."

### Confirmation of WULFF's role in the mediation

64.    Thus, it was Mr Greenan's email (ST.PAUL) dated March 18, 2004, that first alerted Plaintiffs to the fact that WULFF was continuing to assist ST.PAUL and QAD even though SUBRAMANIAN had specifically called off the mediation after discussions with QAD had failed to produce a negotiated settlement.

### NO OPTION TO VEDATECH PARTIES TO TAKE OVER DEFENSE

65.    This "settlement" and "agreement and release" was entered into without allowing Vedatech Parties the option of releasing ST.PAUL from any bad faith claims for not paying for future defense costs, partial or otherwise, going forward from the time of any such agreement.  Additionally, Vedatech Parties were not given the option of releasing ST.PAUL from any liability for Judgments in excess of policy limits.  Indeed, since even QAD's unrealistic estimates of damages were themselves much less than the policy limits, this scenario was improbable if not an impossibility.  ST.PAUL always knew that there was no realistic chance of any Judgment being in excess of the applicable policy limits.

### The "agreement" between QAD and ST.PAUL reached on March 25, 2004

66.    On March 25, 2004, Mr Wang for ST.PAUL sent a copy of a signed document attached as Exhibit A of this Complaint (titled "AGREEMENT AND RELEASE") that purports to be the settlement agreement that St.Paul reached with QAD.  It is signed by Karl Lopker, CEO of QAD Inc., and Valerie Miller, an officer of QAD Inc., for QAD Japan K.K., and (on a separate piece of paper) by Mr Joe Tancredy, claims adjuster for ST.PAUL.

### Real purpose of this secret "agreement and release"

67.    ST.PAUL wishes to escape its obligations regarding its duty to defend involving the QAD litigation.  ST.PAUL also wishes to find excuses for not paying outstanding legal bills to various attorneys.  ST.PAUL also wishes to weaken Vedatech

Page 18 of  49

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

Parties's legal representation in the coverage litigation.  In this coverage litigation, Vedatech

Parties have counterclaims for bad faith actions by ST.PAUL at least until the date of

Vedatech's answer to the declaratory relief action by ST.PAUL.  ST.PAUL also wishes to

defeat Federal Jurisdiction which would involve further defense costs regarding copyright

and other issues.

### QAD's multi-year effort to weaken Vedatech Parties' legal representation

68.     QAD wishes to weaken Vedatech Parties's legal representation for the

affirmative claims.  QAD knows that its own claims are meritless and is happy to accept

ST.PAUL's monies if it would weaken the position of Vedatech Parties in the overall

litigation.  QAD has, since 1997 repeatedly tried to interfere with or weaken legal

representation for Plaintiffs.  These acts involved QAD's internal counsel, Mr Roland

Desilets writing a letter to Morrison and Foerster and trying to conflict them out for

representing a bank that was *adverse* to QAD!  In addition, Mr Desilets made overtures to

attorneys at Bogle and Gates after that firm fell apart in 1999, trying to get them not to

represent SUBRAMANIAN or VEDATECH anymore.  The current "agreement and release"

has been intentionally designed by ST.PAUL and QAD, with the unlawful use of the process

of mediation and the mediator to harm Plaintiffs for the benefit of ST.PAUL and QAD.

### ST.PAUL now refuses to pay even for past limited defense costs

69.     Predictably, after its secretly obtained "agreement and release" with QAD,

ST.PAUL has refused to reimburse for large portions of even the limited defense costs that it

had promised to Vedatech Parties in their standstill agreement of July 2002.  These non-

reimbursed amounts exceed US$ 200,000.  ST.PAUL induced Vedatech Parties to hire

attorneys in July 2002 with promises of limited reimbursement.  Vedatech Parties would not

have attended the mediation if they knew of ST.PAUL's plans to withhold their partial

reimbursements for past defense costs.  Now that ST.PAUL claims it has "settled" the QAD

claims, it feels free to put pressure on Vedatech's attorneys.

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

**FIRST CAUSE OF ACTION**
**(DECLARATORY JUDGMENT)**

70.    Vedatech Parties reallege all of the allegations of paragraphs 1-69 above.

**Existence of Controversy**

71.    There has arisen between the parties, actual substantial and justiciable controversies over the validity, interpretation, authority to enter into, and other aspects of the purported contractual document in Exhibit A.  Specifically, Plaintiffs wish judicial determination of the validity, scope, and interpretation of this "agreement and release" between ST.PAUL and QAD (and which directly affects Plaintiffs' rights).  Plaintiffs contend that this "agreement and release" is void, was entered into by ST.PAUL without authority, and was the effort of collusive and unlawful secret negotiations by ST.PAUL. [8]

---

[8]    Both ST.PAUL and QAD attempt to rely on a California Court of Appeals decision in *Hurvitz v St.Paul Fire & Marine Insurance Co.*, (2003) 109 Cal.App.4th 918.  That decision cannot in any way support the propositions that ST.PAUL and QAD are advancing.  For example, in *Hurvitz, supra, p.934*, it is clearly explained that:

The Hurvitzes attempted to prevent St. Paul from settling with Dr. Hoefflin, but, notwithstanding their professed expectations of an easy victory, at no time indicated a willingness to give up their right to indemnity from St. Paul if Dr. Hoefflin won a judgment in excess of the proposed settlement. Nor did they agree to give up their right to seek a bad faith recovery against St. Paul if a judgment was obtained against them in excess of policy limits.

In this case, first of all there was no open settlement offer from QAD. The whole process was a secret, collusive bad faith conspiracy by St.Paul and QAD to find a way to benefit themselves at Vedatech Parties' expense. Vedatech was not even informed of a tentative offer or settlement from QAD.  The result of an "oral agreement in principle" was "announced" in open Court to the surprise of Vedatech Parties on the morning of March 16, 2004.   St.Paul never gave Vedatech Parties a chance to consider such an offer.  Vedatech's attempts to raise such possibilities were summarily rejected by ST.PAUL through their coverage attorney Mr. Greenan.

---

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

72.     Furthermore, ST.PAUL still wishes to continue with the declaratory relief action to try to recover already disbursed costs of defense in the QAD case.

**Rescission of the CONFIDENTIALITY AGREEMENT with the mediator**

73.     Plaintiffs have rescinded the CONFIDENTIALITY AGREEMENT with WULFF for fraud, misrepresentation, duress, want of execution, lack of acceptance of offer, and for other lawful reasons.  Plaintiffs have issued a proper notice of rescission to WULFF. In response, WULFF contests the rescission of this secondary agreement.   Plaintiffs seek a Judicial confirmation of the validity the rescission of this secondary agreement.

**Statutory basis for Prayer**

74.     Plaintiffs base their request for declaratory judgment on Title 28, United States Code § 2201, for the purpose of determining questions of such actual controversies between the parties and as detailed more fully in this Complaint.

**The mischief in ST.PAUL's "settlement"**

75.     ST.PAUL (and QAD and WULFF) know clearly that QAD's claims, even in the case of a default Judgment cannot result in damages in excess of the policy limits.  The policy limits are anywhere between $2 Million and more than $12 Million depending on the period of coverage and the inclusion of "umbrella" provisions.

76.     <u>WITHOUT THIS "SETTLEMENT"</u>:

- ST.PAUL would still be prevented from proceeding full steam with its "coverage action" because of the conflicts with the QAD-Case.

- The insurance policies in question are not "self-burning" and hence the defense costs are not limited by the policy limits.

Page 21 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

- Withholding past defense costs (even on the limited basis that ST.PAUL has been reimbursing them for), would seriously expose ST.PAUL for further bad faith actions in light of interference with an ongoing defense.

77.   <u>BUT WITH THIS "SETTLEMENT"</u>:

- ST.PAUL now claims to be free to litigate all of the QAD-related issues in order to try to recover their past defense costs

- ST.PAUL are withholding past defense costs (even on their own limited "standstill agreement," more than $200,000,);

- A side-benefit for ST.PAUL is weakening of Vedatech Parties legal representation (by causing financial distress to their attorneys) and thereby improving their position in the coverage litigation;

**There is real damage to Plaintiffs if declaratory relief is not granted**

78.   The threatened action by ST.PAUL and QAD, viz., the compromise of QAD's claims (ostensibly good for Plaintiffs) but on the condition that ST.PAUL will unilaterally exhaust $500,000 of Plaintiffs' available insurance limit and still "reserve" their rights to recover that from Plaintiffs is tantamount to a coercive and unlawful foisting of liability on Plaintiffs for which the apparent justification is that the insurance policies provide such a contractual right.

79.   Plaintiffs have been denied their rights to choose to pursue their own defense and clear their names [see footnote 9 above regarding the distinction with the <u>*Hurvitz*</u> case.]

80.   In addition, ST.PAUL is continuing with its coverage on the basis of "reservation of rights" with respect to various causes of action in the QAD-Case.  Plaintiffs will have to re-litigate the exact same issues that are purportedly "released".

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**St.Paul's Purported Authority to Settle QAD's Claims**

81.     The Commercial General Liability (CGL) policies of ST.PAUL issued to

Vedatech Parties have the following language under the section titled

> COVERAGE B.  PERSONAL AND ADVERTISING INJURY LIABILITY
> [...]
> [...]   We may, at our discretion, investigate any
> "occurrence" or offense and settle any claim of "suit" that
> may result."

82.     On the other hand, in the coverage litigation (C-04-01818), ST.PAUL pleads

rescission of these very same policies.  To wit, the Fifth Cause of Action of ST.PAUL is

pleaded as follows ("Plaintiffs" in the excerpt below refers to ST.PAUL and "defendants" in

the excerpt below to Vedatech Parties):

> FIFTH CAUSE OF ACTION
> (Declaratory Relief – Recission [sic])
> [...]
> 52.     Plaintiffs contend that defendants made false
> representations which were material to the issuance of the
> insurance policies, that Plaintiffs were unaware these
> representations were false, and that the policies should
> accordingly be rescinded and rendered null and void

83.     California Civil Code §1691 provides for a party to give a notice of rescission

and thus effect the same (i.e. rescission).  It also provides that the service of a pleading in an

action or proceeding that seeks relief based on rescission shall be deemed to be such notice.

84.     Since California abolished the equitable action for "rescission" in 1961, it has

to be assumed that St.Paul in its Declaratory Action in State Court is asking for various

declarations based on its own unilateral election to rescind and the effectiveness of the same,

i.e. based on the premise that it has already rescinded the insurance policies.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

85. Any orders by the Court restoring parties to the position before such rescission (if it is valid) does not affect the date or effectiveness of rescission, which is the date of commencement of the coverage litigation, viz., Feb 2002.

86. If these insurance polices are "null and void", and already rescinded, as ST.PAUL claims, and especially if they are so null and void because of Vedatech's alleged pre-contractual misrepresentations, then it would be unlawful for ST.PAUL to depend on null and void agreements to gain the right to unilaterally, in their "discretion," to enter into this "agreement and release" with QAD that affects Vedatech's substantive rights, with respect to settlement of claims or otherwise. Furthermore, under California Civil Code §1691, ST.PAUL's declaratory suit itself serves as a notice of rescission and thus effects rescission unless found otherwise by the Court. Thus, until a final Judgment is reached in the insurance coverage litigation, and the issue and question of, and effectiveness of ST.PAUL's rescission is judicially determined, ST.PAUL cannot act inconsistently with its position that the policies have been rescinded. Thus, ST.PAUL on its own position has acted without authority, or ST.PAUL is estopped from asserting such authority while at the same time seeking to have the contracts be declared null and void in its coverage action.

87. In addition, the purpose for which ST.PAUL has unlawfully manufactured this "agreement and release" has to do with gaining advantages in the coverage litigation, weakening Plaintiffs and helping QAD to indirectly weaken Plaintiffs (provide them funds for resisting Plaintiffs' counterclaims / affirmative claims). It would be inequitable for ST.PAUL to be permitted to proceed in this fashion.

88. Plaintiffs would also not be able to clear their names and prove their innocence in the QAD case. Plaintiffs' rights to prosecute QAD for malicious prosecution would be compromised by this "settlement". Nevertheless, Plaintiffs would be facing litigation of the very same issues in the coverage case with ST.PAUL.

Page 24 of 49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

89.     In addition, the "agreement and release" has not prevented QAD from publicly accusing Vedatech of all of the matters (and more) that is the subject of its misguided Complaint in the QAD-Case.  In its support of remand in C-04-01035, Mr Connell, attorney for QAD has elaborated on the fabrications of the original Complaint, further maligning Vedatech Parties in spite of an "agreement and release" where QAD apparently gives up its claims on all these matters.  In proceeding with their affirmative claims against QAD, Vedatech Parties will have to "defend" against such claims in spite of this so-called "agreement".   To the extent that it affects juries to diminish the award to Vedatech Parties, these allegations would act as a "set-off" for QAD, thus undermining any finality of this "release".  It is for this reason also, the Settlement Agreement must be set aside and a declaration of its voidness made.

### DECLARATIONS REQUESTED

90.     Accordingly, Vedatech Parties respectfully request the Court for one or more of the following declarations or any other declaration in a form determined by the Court, all as the Court deems appropriate:

**With respect to Defendant ST.PAUL**

a.    THAT the purported settlement agreement, "agreement and release" dated March 25, 2004, between QAD and ST.PAUL is null and void, and/or unenforceable.

b.    THAT ST.PAUL had no authority to enter into this "agreement and release" on behalf of VEDATECH and/or SUBRAMANIAN;

c.    That any payment made by ST.PAUL cannot be used to deduct available benefits to Vedatech Parties from any of their policy agreements with ST.PAUL;

Page 25 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

d.    THAT any payments ST.PAUL may make is not on behalf of the "Insured or Putative Insureds" as set out in paragraph 2 of this agreement but is a voluntary payment undertaken by ST.PAUL for its own benefit;

e.    That ST.PAUL has no right of reimbursement from VEDATECH or SUBRAMANIAN for the amounts it may pay under this agreement;

f.    That ST.PAUL is not permitted to "reserve" any rights with respect to any payment under this agreement;

g.    THAT ST.PAUL has acted in bad faith and breached its duties as an insurer to Vedatech Parties as insureds by collusively and secretly conducting such negotiations with QAD and by using the cloak of settlement privilege for unlawful and improper purposes;

h.    THAT ST.PAUL may not use any monies it may pay under the "agreement and release" as a set-off in any action between Vedatech Parties and ST.PAUL;

i.    THAT ST.PAUL cannot recover such payments even if the policies are null and void as ST.PAUL claims they are;

j.    THAT all discussions between ST.PAUL and QAD are not subject to any evidentiary privilege or protection and are discoverable;

k.    THAT all discussions between ST.PAUL and QAD made through or ostensibly through the mediator are also not subject to any evidentiary privilege of protection and are discoverable;

l.    THAT ST.PAUL is liable to pay past legal bills due on the same terms and conditions it has been paying them before this "agreement and release" was secretly concluded and that ST.PAUL take no efforts to unfairly withhold such payments under the excuse of having concluded such an agreement;

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

m.  THAT ST.PAUL has no rights to "audit" any such bills beyond legal proceedings for any fault it may think there is or, alternatively, raise such issues in this litigation or in the underlying coverage litigation;

n.  THAT ST.PAUL cannot re-litigate the QAD claims that are purportedly released in the "agreement and release" in the underlying coverage litigation or otherwise;

**With respect to Defendant QAD**

o.  THAT any release "with prejudice" by QAD parties not be referable to this "agreement and release";

p.  THAT any dismissal "with prejudice" of QAD's complaint(s) against any or all of the Vedatech Parties be final and shall not be affected by any adjudication of the status or validity or enforceability of the "agreement and release" signed between ST.PAUL and QAD.

q.  THAT to the extent that QAD has released or will release any claims against VEDATECH or SUBRAMANIAN its only remedies remain against ST.PAUL;

r.  THAT, if QAD releases any rights or claims under this agreement, then it may not raise any issues relating to such rights or claims in any judicial proceedings, as a defense or for any other purpose and that no setoff of any kind is permissible;

s.  THAT QAD, at a minimum, cannot rely upon the settlement evidentiary privilege for negotiations regarding this "agreement and release", especially after SUBRAMANIAN terminated the mediation around 4 PM on March 12, 2004;

t.  THAT QAD transfer to Vedatech Parties all of the monies it received from ST.PAUL under this "agreement and release", [either under a theory of Unjust Enrichment or as a remedy to the Cause of Action for Unfair Competition / disgorgement of profits as detailed below].

Page 27 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**With respect to Defendants ST.PAUL and QAD**

u.    THAT, in any event, this "agreement and release" not be given effect until the underlying coverage litigation between ST.PAUL and Plaintiffs is finally resolved and all issues regarding the validity of the various policies and rights of the parties under such polices are finally determined by the Courts.

**With respect to Defendant WULFF**

v.    THAT, the "confidentiality agreement" has been properly rescinded.

w.    THAT no evidentiary privilege attaches to any aspect of the "mediation" described herein, especially after its termination by Vedatech Parties around 4:00 PM on March 12, 2004;

**SECOND CAUSE OF ACTION
(INJUNCTIVE RELIEF)**

91.    Vedatech Parties reallege paragraphs 1-90 above.

**Inadequacy of Remedy in Law**

92.    Plaintiffs have no adequate or speedy remedy at law for Defendants' conduct (and threatened conduct) detailed herein, and this action for injunctive relief is Plaintiffs' only certain means for securing relief.

93.    ST.PAUL has already rescinded its own policies (contracts) and if they prevail in their cause of action for "Declaratory Relief – Recission [sic]" in the underlying coverage case, then Plaintiffs are left with no meaningful remedy in law if, for example, QAD wishes to argue a basis for remand to State Court of C-04-01818 based on dismissal of claims in reliance of this ineffective "agreement and release."

Page 28 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

94.     ST.PAUL and QAD are clearly colluding to try to defeat Federal Jurisdiction with respect to the underlying consolidated actions removed from State Court.

95.     If the claims against Plaintiffs are dismissed but later found to be improperly dismissed (i.e. without affording Vedatech Parties a chance to clear their names, and the right to pursue QAD for malicious prosecution, etc.), then the results of any further proceedings both in the QAD matter and in the insurance matter cannot be reversed.

96.     Vedatech Parties are being forced to defend these "dismissed" claims in the context of the Coverage action.  There is no real benefit to the insureds at all, which is the real problem with this "release".

### No Harm to ST.PAUL or QAD

97.     ST.PAUL has provided a notice of rescission by filing their suit.  There is no reason for ST.PAUL to have any expectation of being able to exercise any such rescinded contractual rights.  Alternatively, ST.PAUL should be denied any rights to further rescind the insurance policies, having relied upon them to cause prejudice to Vedatech Parties.

98.     ST.PAUL has repeatedly referred to their partial reimbursement of defense costs in the underlying QAD litigation.  But that was, and has always been voluntary and amounts to ST.PAUL's strategy of implementing a program of self-insurance and mitigation of damages, *in case* their baseless theories regarding rescission are judicially adjudged to be wrong.  The fact that ST.PAUL was hedging their bets should not be a cause for any prejudice to Plaintiffs.   Indeed, Plaintiffs have not even been given an option of proceeding with their own defense as an alternative to ST.PAUL entering into such collusive and secret agreements behind the back of Plaintiffs.  QAD still has to defend against Vedatech Parties' claims.  The issues are identical and there is not savings in judicial time or efficiency in "settling" QAD's claims.  If QAD sincerely considers its claims to be worth $500,000 or more, then not involving in this "compromise" exchange cannot harm QAD.

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

**Injunctive Relief Requested**

99.    WHEREFORE, Plaintiffs respectfully request the Court to issue an injunction with respect to one or more of the following imminent acts of Defendants (and their officers, agents, employees, successors, and attorneys, and all those in active concert or participation with Defendants), enjoining and restraining Defendants either, permanently and perpetually or until a final Judgment (including appeals) is entered in the underlying insurance Declaratory Relief action commenced by ST.PAUL (C-04-01818).  The Court is also requested to order additional injunctions as appropriate:

a.    ST.PAUL to be ordered not to pay any monies directly or indirectly to QAD or related parties under paragraph 2 of the "agreement and release," a copy of which is attached as Exhibit A to this Complaint;

b.    ST.PAUL to be ordered not to pay directly or indirectly any monies to QAD or any other related party at all, wherein such a payment is or can be construed as being on behalf of Plaintiffs (referred to as "Insured and Putative Insureds" in Paragraph 2 of the "agreement and release");

c.    ST.PAUL to be ordered not to pay directly or indirectly any monies to QAD or any other related party at all, wherein such payments create any liability for payments or set-offs of any sort, present or future on the part of Plaintiffs;

d.    ST.PAUL to be ordered to pay past due legal bills without any further delays;

e.    ST.PAUL and QAD be enjoined from trying to enforce this "agreement and release" in this Court or otherwise until the underlying coverage litigation and this action itself is resolved;

f.    ST.PAUL be enjoined from re-litigating the QAD claims in part or whole in the underlying coverage litigation;

Page 30 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

g.    ST.PAUL and QAD and WULFF to be ordered to provide full details of all their negotiations relating to the "mediation" and the "agreement and release";

h.    QAD be ordered not to bring any proceedings or motions in reliance of this "agreement and release";

i.    QAD be ordered not to act in reliance of this agreement in any way whatsoever;

j.    QAD be ordered to produce all insurance policies in the period 1994 through the current period, including D&O policies and CGL policies;

**Damages**

100.    As a proximate result of such threatened activities of Defendants, Vedatech Parties have sustained damages including various attorney fees and costs and pray that such amounts be ordered to be paid to Plaintiffs by Defendants.

101.    The actual damages to Plaintiffs if Defendants are permitted to pursue their threatened actions are in an amount in excess of $75,000.

**THIRD CAUSE OF ACTION**
**(FRAUD – INTENTIONAL MISREPRESENTATION)**

102.    Vedatech Parties reallege all of the allegations of paragraphs 1-101 above.

**Representations by ST.PAUL regarding purpose of "mediation" and the aggressive promotion of WULFF as a mediator**

103.    ST.PAUL concealed from Plaintiffs the true reasons for their desire to conduct a mediation.  ST.PAUL's non-disclosure of their pre-meditated plans of using the cloak of secrecy surrounding the mediation to engage in insurance bad faith actions is a deliberate misrepresentation.  Such misrepresentation and non-disclosure was intended by ST.PAUL to induce Plaintiffs to consent to such a *faux*-mediation.  ST.PAUL obtained Court orders based on such fraudulently procured "consent" and then freely conducted their bad faith activities with the cooperation of WULFF and then QAD.

Page 31 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Representations by ST.PAUL regarding contacts with WULFF**

104.    Although ST.PAUL had fiduciary-like duties towards its insureds, it failed to disclose the nature and details of ST.PAUL's and its attorneys' prior contacts and relationship with WULFF.  ST.PAUL should have made such disclosure before it obtained Plaintiffs' consent which consent was the stated basis for the Court order(s) regarding mediation.  Such non-disclosure is deliberate misrepresentation.  In addition, ST.PAUL actively promoted WULFF as a proper neutral.  ST.PAUL aggressively prevented the choice of alternative neutrals even when there was a scheduling problem with WULFF vis-à-vis the convenience of SUBRAMANIAN.  Thus, the Court order of January 13, 2003 and all further orders regarding mediation were fraudulently obtained and the consent of Plaintiffs to such orders was obtained by such fraudulent representations and intentional non-disclosures.

**Representations by WULFF regarding neutrality**

105.    WULFF represented to Vedatech Parties that he would not act as an advocate for any party.  In addition, Mr Richards, the assistant to WULFF assured Vedatech Parties that a conflicts check had been made and there are no conflicts with respect to the actual parties to the mediation.  This was and is a deliberate misrepresentation.  Mr Richards at that time did not inform Plaintiffs about the more limited written "conflicts check" provision, which had loopholes for hiding the relationship that WULFF had with ST.PAUL.  Mr. Richards is an agent of WULFF.  WULFF is responsible for the fraudulent representations of Mr. Richards.  WULFF further confirmed and added to Mr. Richards' misrepresentations on the day of the mediation and before the mediation started.  Furthermore, WULFF did not provide Vedatech Parties with a reasonable opportunity to read or check the newly presented "conflicts check" documents, which was included in another document under duress.

106.    Before the start of the Mediation, WULFF further assured SUBRAMANIAN that SUBRAMANIAN could terminate the mediation any time SUBRAMANIAN wanted to,

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

and especially if and after SUBRAMANIAN initially made an effort to settle with QAD. WULFF had no intention of terminating the mediation if SUBRAMANIAN terminated it. Such assurances were false. ST.PAUL and WULFF needed the fig leaf of the participation by SUBRAMANIAN, just to lend an air of legitimacy for their premeditated plans for helping ST.PAUL benefit themselves (and QAD) at the expense of Vedatech Parties.

**Intention to Induce Plaintiffs**

107.    WULFF and ST.PAUL intended Plaintiffs to rely upon these misrepresentations and fraudulent statements and deliberate non-disclosures and thus intended to and did induce them to attend the mediation under terms that were favorable to them and harmful to Plaintiffs. WULFF and ST.PAUL knew at all times that Plaintiffs would rely upon such statements. WULFF and ST.PAUL needed SUBRAMANIAN to join the mediation at least in the beginning as they could not otherwise engage in such negotiations with QAD under the cloak of secrecy provided by a "mediation".

**Falsity and Knowledge of Falsity of these various representations**

108.    All of the representations above were false and WULFF and ST.PAUL always knew that they were so false. From information and belief, WULFF has conducted various other mediations for ST.PAUL and/or Mr Greenan, the attorney for ST.PAUL and/or the firm that Mr Greenan works in. Notwithstanding potential conflicts because of such prior representation, such information was not disclosed to Plaintiffs by ST.PAUL or its attorneys or by WULFF. Had Plaintiffs been aware of such prior contacts, they would not have agreed to participating in this mediation at all or consented to the January 13, 2004 "order"

109.    In addition, if Plaintiffs were aware of the falsity of such statements, even after the January 13, 2004 order or the further orders, they would have applied to the Court to set aside such Orders and would have sought relief from attending the mediation or withdrawn from it immediately.

Page 33 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Reliance on these Misrepresentations**

110.    Vedatech Parties were unaware of the falsity of these representations, were unaware of the information that was deliberately withheld from them, and relied upon these misrepresentations and, in the absence of proper disclosure, their reasonable beliefs as to the state of affairs, in "consenting" to the January 13, 2004 order, and not fully opposing further orders, participating even in the limited fashion in the mediation and in staying back briefly after initially telling WULFF before the mediation started that they wished to withdraw.

**Proximate Harm and Damages**

111.    As a proximate result of such reliance upon the false promises of these Defendants, Vedatech Parties have sustained heavy damages, and continue to sustain damages, including, but not limited to, further delay in pursuing legal remedies with respect to their claims, costs related to various satellite litigation necessitated by such fraud, potential compromise of their underlying claims, consequential damages caused by SUBRAMANIAN's inability to conduct other business and other incidental damages.

112.    The actual damages are in an amount in excess of $75,000, and to be determined at trial.

**Exemplary and Punitive Damages**

113.    The acts and conduct of these Defendants were, and continue to be oppressive, fraudulent, and malicious.  Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.

114.    Defendants' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.   Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

Page 34 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**(CONSPIRACY TO COMMIT FRAUD / MISREPRESENTATION)**

115.    Plaintiffs reallege the allegations of paragraphs 1-114 above.

116.    The various defendants, ST.PAUL, and WULFF acted in collusion with each other and other parties, and intended to commit and had the common purpose of committing the fraud alleged herein and profiting from the same at the expense of Vedatech Parties.

**Participation by QAD**

117.    Defendant QAD became aware of the fraudulent schemes during the mediation, and initially through WULFF and/or ST.PAUL.  Subsequently, willingly, and with an intent to harm Vedatech Parties, and with full knowledge of the details, purpose and intent of the parties thereof, QAD participated in the ongoing fraudulent scheme of ST.PAUL and WULFF.  QAD especially relied upon the idea that the cloak of secrecy in mediation can be used to engage in fraudulent and collusive schemes to benefit themselves and ST.PAUL at the expense of Vedatech Parties.

118.    Defendants are jointly and severally liable for the fraud and misrepresentation that either of them engaged in.

**Exemplary and Punitive Damages**

119.    The acts and conduct of Defendants were, and continue to be oppressive, fraudulent, and malicious.  Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.

120.    Defendants' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.   Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

Page 35 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

# FOURTH CAUSE OF ACTION
## (CONSTRUCTIVE FRAUD)

121.    Vedatech Parties reallege paragraphs 1-120 above.

**Duty of Care / Confidential Relationship / Fiduciary-like duties**

122.    ST.PAUL in the position of an insurer had fiduciary-like duties towards its insureds.  ST.PAUL further had a confidential relationship arising from the participation in a mediation.  ST.PAUL breached their duties towards Vedatech Parties by their conduct described herein.  ST.PAUL failed to disclose various material facts, and intended to conceal such material facts from Vedatech Parties, in an effort to harm Vedatech Parties and benefit themselves economically.  Vedatech Parties relied to their own detriment upon the trust they placed in ST.PAUL (as the insurer).

123.    Accordingly the facts alleged above constitute liability on the part of ST.PAUL and WULFF for constructive fraud.

124.    WULFF in the position of a self-declared neutral and a mediator was in a confidential relationship with Vedatech Parties.  WULFF further had a confidential relationship arising from the conduct of this particular mediation where he was supposed to help Vedatech Parties on the same footing as all of the other participants.  WULFF breached his duties towards Vedatech Parties by his conduct described herein.  WULFF failed to disclose various material facts, and intended to and did conceal such material facts from Vedatech Parties, in an effort to harm Vedatech Parties and benefit himself economically.  Vedatech Parties relied to their own detriment upon the trust they placed in WULFF (as the mediator).

125.    Accordingly the facts alleged above constitute liability individually and jointly on the part of WULFF for constructive fraud.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Damages**

126.    As a proximate result of such reliance upon the false promises and non-disclosures of Defendants, Vedatech Parties have sustained heavy damages, and continue to sustain damages, including, but not limited to, further delay in pursuing legal remedies with respect to their claims, costs related to various satellite litigation necessitated by such fraud, potential compromise of their underlying claims, consequential damages caused by SUBRAMANIAN's inability to conduct other business and other incidental damages.

127.    The actual damages are in an amount in excess of $75,000, and to be determined at trial.

**Exemplary and Punitive Damages**

128.    The acts and conduct of Defendants were, and continue to be oppressive, fraudulent, and malicious.  Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.

129.    Defendants' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.   Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

**(CONSPIRACY REGARDING CONSTRUCTIVE FRAUD)**

130.    Plaintiffs reallege the allegations of paragraphs 1-129 above.

131.    Defendants WULFF was aware of the purpose and intent of ST.PAUL in their plans to harm Vedatech Parties.  WULFF acted in collusion with ST.PAUL in furtherance of the unlawful activities of ST.PAUL alleged herein.  WULFF joined in the conspiracy in furtherance of his own individual economic interests (e.g. continuing business with ST.PAUL and their attorneys, Mr Greenan and his law firm).

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

132.    WULFF is jointly and severally liable for the constructive fraud committed on Vedatech Parties by ST.PAUL.

133.    Defendants ST.PAUL was aware of the purpose and intent of WULFF in his plans to harm Vedatech Parties.  ST.PAUL acted in collusion with WULFF in furtherance of the unlawful activities of WULFF alleged herein.  ST.PAUL joined in the conspiracy in furtherance of its own individual economic interests (e.g. unfairly gaining advantage in the coverage litigation, weakening Vedatech Parties' legal representation etc.).

134.    ST.PAUL is jointly and severally liable for the constructive fraud committed on Vedatech Parties by WULFF.

135.    Defendant QAD joined these conspiracies in furtherance of its own individual economic interests, and at the expense of Vedatech Parties.  QAD intended to gain various benefits (e.g. a Settlement amount from ST.PAUL in return for dropping its worthless claims, avoidance of malicious prosecution claims from Vedatech Parties, weakening Vedatech Parties' legal representation – the last a multi-year ongoing effort by QAD, their in-house counsel Mr Roland Desilets, and their attorney Mr. Connell that is ongoing to this day.)

136.    QAD intended to harm Vedatech parties and is liable as a co-conspirator for the acts and liabilities of ST.PAUL and/or WULFF. [9]

137.    In addition, *to the extent* that ST.PAUL, and/or WULFF and/or QAD rely upon any agreement, formal or informal to participate in the mediation (as a forum for negotiating a settlement,) that agreement or those agreements (or the Court order itself) include(s) an implied covenant of good faith and fair dealing towards Vedatech Parties.

---

[9]    See e.g., *City of Atascadero v St.Paul Fire & Merrill Lynch.*, (1998) 68 Cal.App.4th 445, 464 and n.14 thereof (discussing civil conspiracy):

*As long as the third parties were acting to further their own individual economic interests, they may be liable for actively participating in a fiduciary's breach of his or her trust.*

Page 38 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Exemplary and Punitive Damages**

138.　The acts and conduct of Defendants were, and continue to be oppressive, fraudulent, and malicious.  Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.  Plantiffs' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.  Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION)**

139.　Vedatech Parties reallege all of the allegations made in paragraphs 1-138 above.

140.　In the alternative to the cause of action for intentional fraud, it is alleged in the alternative that Defendants ST.PAUL, WULFF, and DOES 1-50 made the various representations without any reasonable grounds for believing them to be true.

**Damages**

141.　As a proximate result of such reliance upon the false promises of these Defendants, Vedatech Parties have sustained heavy damages, and continue to sustain damages, including, but not limited to, further delay in pursuing legal remedies with respect to their claims, costs related to various satellite litigation necessitated by such fraud, potential compromise of their underlying claims, consequential damages caused by SUBRAMANIAN's inability to conduct other business and other incidental damages.

142.　The actual damages are in an amount in excess of $75,000, and to be determined at trial.

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

## SIXTH CAUSE OF ACTION
## (INSURANCE "BAD FAITH")
## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

143.    Vedatech Parties reallege all of the allegations of paragraphs 1-142 above.

**The insurance agreements**

144.    The contractual agreements between ST.PAUL and Vedatech Parties are detailed in the counterclaims (Fourth Amended Cross-Complaint) of the ST.PAUL-Case currently pending as C-04-01818.

**Bad Faith Acts by ST.PAUL**

145.    Some of the bad faith actions of ST.PAUL are detailed in para.153 below under the section for "Unfair Competition". A sample is reproduced below:

a.    Contrary to their fiduciary-like duties, planning to breach such duties under the cloak of the mediation in order to "cut a deal" with QAD outside the sunshine of normal open settlement offers for insurance claims and responses;

b.    Mixing coverage concerns, nay, permitting coverage concerns to dominate and be the sole concern in dealing with settlement and mediation issues;

c.    Withholding reimbursement for defense costs already incurred based on past promises of ST.PAUL regarding their commitment at least regarding partial payments in limited areas, suddenly after the purported "settlement" with QAD;

d.    Permitting Mr. Greenan, Mr. Wang and their law firm to viciously attack Vedatech Parties (the insureds) in the coverage litigation and bringing meritless *ex parte* motion after *ex parte* motion in State Court with respect to the coverage litigation, mostly in violation of State Court procedural rules and thus compromising the preparation and work that insureds could put into defending

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

the QAD-Case; Harassing Plaintiffs with meritless "contempt of court" motions or inserting unwarranted "contempt of court" provisions in proposed orders etc.

e.    Failure to present any settlement "offer" from QAD to Vedatech Parties (even if made under the excuse of "mediation") to see if Vedatech Parties were willing to continue defense without any help from ST.PAUL and see whether Vedatech Parties were willing to waive any excess liability for judgments that may exceed policy limits, especially when such a contingency (for excess Judgment) is non-existent;

**Continuing Bad Faith Acts**

146.    Plaintiffs especially wish to emphasize the bad faith acts of ST.PAUL that have occurred since the answer in the original coverage action, viz. June 2002.

**Proximate Harm and Damages**

147.    As a proximate result of such reliance upon the false promises of these Defendants, Vedatech Parties have sustained heavy damages, and continue to sustain damages, including, but not limited to, further delay in pursuing legal remedies with respect to their claims, costs related to various satellite litigation necessitated by such fraud, potential compromise of their underlying claims, consequential damages caused by SUBRAMANIAN's inability to conduct other business and other incidental damages.

148.    The actual damages are in an amount in excess of $75,000, and to be determined at trial.

**Exemplary and Punitive Damages**

149.    The acts and conduct of these Defendants were, and continue to be oppressive, fraudulent, and malicious. Defendants knew or should have known, (and, in addition, know or should know) that their conduct would harm Vedatech Parties.

Page 41 of 49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

150.    Defendants' actions were, and continue to be undertaken for the specific purpose of enriching themselves at the expense of Vedatech Parties.   Vedatech Parties therefore seek, and are entitled to recover, punitive and exemplary damages in the amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## (UNFAIR COMPETITION)

### (CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 et. seq.)

151.    Vedatech Parties reallege all of the allegations or paragraphs 1-150 above.

**Pattern of behavior**

152.    From information and belief, Defendants have engaged in a pattern of behavior that is unlawful, unfair or fraudulent, including (in addition to all of the allegations in the Complaint set out above):

**ST.PAUL**

**Fraudulent Behavior**

a.  Fraudulently inducing Plaintiffs to "consent" to an order by the Court on January 13, 2004 (and inducing Plaintiffs not to oppose in full, subsequent orders) with respect to a mediation with premeditated plans for using the cloak of secrecy provided by mediation, so that they could, with the help of WULFF, and QAD, make collusive arrangements with QAD that would be harmful to their insureds;

b.  Fraudulently and coercively forcing Plaintiffs into such a mediation;

c.  Failure to disclose the detailed nature of ST.PAUL's (and their attorneys') prior relationship and dealings with WULFF to insureds, both before the January 13, 2004 hearing / order, and through the end of the mediation and afterwards;

d.  Other fraudulent behavior as detailed above;

Page 42 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**Abuse of Process**

e.  Inserting items such as "contempt of court" etc in Court orders even though the Court did not make such orders;

f.  Inserting various other provisions into proposed orders where the Court did not make such orders or made contrary orders;

g.  Harassing insureds by bringing improper "contempt of court" applications for trivial and disproportionate normal discovery issues and that too without notice and at ex parte hearings, with such documents being served literally seconds before the parties enter the chambers;

**Insurance Bad Faith and Conspiracy to Harm Plaintiffs**

h.  Compromising the defense of the QAD-Case by their vicious attacks on their own insureds;

i.  Failure to terminate the mediation when Vedatech Parties terminated it at or around 4:00 PM on March 12, 2004;

j.  Failure to separate coverage issues from settlement issues before and after the mediation;

k.  Failure to have a separation of duties and responsibilities between the coverage attorneys and the insurance adjuster so that the settlement discussions are not tainted with coverage concerns;

l.  Failure to inform or update insureds of secret negotiations undertaken with QAD and WULFF even after the mediation was terminated by SUBRAMANIAN;

m.  Failure to present any settlement "offer" from QAD to Vedatech Parties to see if they were willing to continue defense without any help from ST.PAUL and see whether Vedatech Parties were willing to waive any excess liability for judgments that may exceed policy limits;

Page 43 of 49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

n.  Continuing with the mediation between QAD and ST.PAUL even after mediation was
    terminated by SUBRAMANIAN;

o.  Conspiring with QAD and others to weaken Plaintiffs' legal representation with
    respect to the coverage litigation and concurrently getting released from their risk of
    bad faith behavior with respect to inadequate responses to their duties to defend;

p.  Asking WULFF to act as an advocate for ST.PAUL and QAD while sacrificing the
    interests of SUBRAMANIAN and VEDATECH;

q.  Withholding even the partial skimpy payments for past defense costs and fees already
    incurred (even for dates before March 15, 2004);

r.  Refusal to provide even this skimpy limited and partial reimbursement of defense
    costs for defense activities after the purported "settlement" of March 15, 2004;

s.  Making false statements in Court pleadings and letters to the Court in the insurance
    coverage litigation;

t.  Refusing to make any arrangements for advance payments in the QAD-Case and
    compromising the defense and discovery activities;

u.  Other fraudulent, unfair, and unlawful activities as detailed above;


**WULFF**

v.  Non-disclosure of relationship with ST.PAUL and their attorneys (including Mr
    Greenan and his law firm) to Vedatech Parties;

w.  Non-disclosure regarding past insurance related three-party mediation (such as
    between insurer, insured and plaintiffs in underlying litigation triggering insurance);

x.  Using Unfair and Unlawful activities during the mediation to favor one set of parties
    over the weaker, smaller party (the insured in this case);

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

y.  Falsely presenting himself as a neutral while at the same time favoring large clients such as ST.PAUL and QAD to the detriment of small businesses and one-time clients;

z.  Permitting the fact that ST.PAUL and QAD agreed to reimburse mediation fees affect neutrality;

aa.  Adopting coercive tactics such as using ST.PAUL and QAD to obtain Court orders compelling Vedatech Parties to undertake various activities, all in relation to his own mediation while confessing that he himself had no such coercive authority;

bb.  Misrepresenting the results of conflicts check and using small print for escape clauses buried in an addendum to the main form contracts.  Using such hidden disclaimers to shift the burden of disclosure on voluntary acts of counsel;

cc.  Misrepresenting the effect of the separate document of "conflicts check" as solely dealing with former clients of former law firm, while suppressing the vital information about non-disclosure of prior business relationship with other parties to the mediation and their attorneys;

dd.  Using duress and coercive tactics to force Vedatech Parties to sign an agreement they did not want to sign;

ee.  Continuing with the mediation after SUBRAMANIAN terminated it around 4:00 PM on March 12, 2004 in spite of knowing about the various conflicts and specifically in light of SUBRAMANIAN's pre-mediation query about the legality.  Undertaking such activities in spite of opining to SUBRAMANIAN before the mediation started that this was an unsettled area of law.  A mediator presenting himself as a neutral should not continue conflicting duties if there was even a hint of potential illegality;

ff.  Unlawfully conspiring with ST.PAUL and QAD in the above activities;

gg.  Other fraudulent and unlawful activities as detailed above;

Page 45 of  49

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

**QAD**

hh. Unlawfully conspiring with ST.PAUL and WULFF in the above activities;

ii. Conspiring to unlawfully, fraudulently and unfairly benefiting to the tune of $500,000 with such monies coming out of the insurance benefits of Vedatech Parties;

jj. Hiding the true nature of QAD Japan K.K. and QAD Japan Inc. in its SEC filings;

kk. Refusing to provide CGL policies covering relevant periods in spite of repeated requests for the same, while at the same time engaging in secret collusive deals with the insurer of Vedatech Parties;

ll. Refusing to provide timely information on insurance coverage for SUBRAMANIAN under QAD Inc.'s policies;

mm.   After the mediation, cooperating with ST.PAUL in furtherance of ST.PAUL's insurance bad faith activities.


**ST.PAUL, WULFF and QAD**

nn. Other fraudulent, unfair and unlawful activities as detailed in the Complaint and to be proven at trial;

153.   Defendants' behavior, and pattern of behavior, including the unlawful, unfair and fraudulent acts alleged above constitute a violation of the Unfair Competition Laws of California, as set out in the California Business and Professions Code §§ 17200 et seq.

**(CONSPIRACY REGARDING UNFAIR COMPETITION)**

154.   Plaintiffs reallege the allegations of paragraphs 1-155 above.

155.   The various defendants acted in collusion with each other (as detailed above), and with the common purpose of engaging in and with prior knowledge of the unfair, unlawful and fraudulent business practices alleged herein and profiting from the same at the

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

expense of Vedatech Parties. Defendants are jointly and severally liable for their conduct and for the conduct of each other.

### RESTITUTION /DISGORGEMENT OF PROFITS

156. ST.PAUL is enriched by withholding defense costs and benefits to Vedatech Parties. It is further enriched by its other bad faith activities described herein at the expense of Vedatech. ST.PAUL is liable to disgorge all such benefits that are due to the Vedatech Parties under the California Unfair Competition laws.

157. QAD is enriched by gaining the right to receive (or by actually receiving) $500,000 from ST.PAUL from funds that are held in trust for the Vedatech Parties. QAD is also liable to Vedatech Parties for all of the amounts that ST.PAUL or WULFF are liable, on the basis of their participation in the conspiracies as alleged herein.

158. WULFF is liable to Vedatech Parties for all of the amounts that ST.PAUL or QAD are liable, on the basis of his participation in the conspiracies as alleged herein.

159. Defendants are also liable for any and all other remedies available to Vedatech Parties under the California Business and Professions Code §§ 17200 et seq.

160. The actual amounts in restitution /disgorgement of profits and other damages prayed for herein are in an amount in excess of $75,000, and to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

(1)     Declaratory and injunctive relief as sought herein or as deemed appropriate by the Court;

(2)     damages be awarded as sought herein;

(3)     for consequential and economic losses in an amount to be proven at trial;

(4)     restitution be provided for the unlawful profits made by Plaintiffs;

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

(5)     for interest on such amounts;

(6)     for general damages to compensate Plaintiffs for their lost business opportunities, goodwill, and other losses in an amount to be proven at trial;

(7)     for punitive damages;

(8)     for attorney's fees and for costs of suit;

(9)     for equitable relief stripping defendants of their unjust enrichment;

(10)    for appropriate injunctions preventing defendants from continuing their unlawful, and/or unfair and/or fraudulent activities;  *and*

(11)    for such and any other relief as the Court deems proper.


**Respectfully submitted** on behalf of Plaintiffs VEDATECH INC., VEDATECH K.K. and MANI SUBRAMANIAN.

Dated: June 15, 2004                    **LAW OFFICES OF JAMES S. KNOPF**


By _____//s//_____
**CHRISTINA GONZAGA**
ATTORNEY FOR PLAINTIFFS
VEDATECH INC., *and*
VEDATECH K.K.


Dated: June 15, 2004                    **MANI SUBRAMANIAN (pro per)**


By _____//s//_____
**MANI SUBRAMANIAN (pro per)**


**Next Page:        Demand for Jury Trial**

Page 48 of  49

**First Amended Complaint** *of*
Plaintiffs Vedatech Inc., Vedatech K.K. and Mani Subramanian *against* defendants
St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff

# DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiffs VEDATECH K.K. and MANI SUBRAMANIAN request a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated: June 15, 2004          **LAW OFFICES OF JAMES S. KNOPF**


By _____//s//_____
           **CHRISTINA GONZAGA**
           ATTORNEY FOR PLAINTIFFS
           VEDATECH INC., *and*
           VEDATECH K.K.


Dated: June 15, 2004          **MANI SUBRAMANIAN (pro per)**


By _____//s//_____
           **MANI SUBRAMANIAN (pro per)**

---

**First Amended Complaint** *of*
Plaintiffs <u>Vedatech Inc., Vedatech K.K. and Mani Subramanian</u> *against* defendants
<u>St.Paul Fire and Marine Insurance, USF&G, QAD Inc., QAD Japan K.K. and Randall Wulff</u>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C  -

# QAD Request for Judicial Notice

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: | TELEPHONE NO: 1-650-798-5288 | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*:
MANI SUBRAMANIAN
228 Hamilton Avenue, 3F
Palo Alto, CA 94301

ATTORNEY FOR *(Name)*: pro se party

Insert name of court and name of judicial district and branch court, if any:
SUPERIOR COURT for the COUNTY OF SANTA CLARA
191 North First Street, San Jose, California

PLAINTIFF/PETITIONER:
Mani Subramanian

DEFENDANT/RESPONDENT:
QAD Inc., et al.

TELEPHONE NO: 1-650-798-5288

FOR COURT USE ONLY

ENDORSED

2006 MAY 26  A 11: 02

[stamp] SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY _____
DEPUTY CLERK

**REQUEST FOR DISMISSAL**

- [ ] Personal Injury, Property Damage, or Wrongful Death
  - [ ] Motor Vehicle   [ ] Other
- [ ] Family Law
- [ ] Eminent Domain
- [✔] Other *(specify)*: Fraud, Unfair Competition, etc.

CASE NUMBER:
1-98-cv-771638 (and 1-99cv784685)

Clark Sakai

— A conformed copy will not be returned by the clerk unless a method of return is provided with the document. —

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) [ ] With prejudice   (2) [✔] Without prejudice

**BY FAX**

   b. (1) [✔] Complaint   (2) [ ] Petition
      (3) [ ] Cross-complaint filed by *(name)*:                   on *(date)*:
      (4) [ ] Cross-complaint filed by *(name)*:                   on *(date)*:
      (5) [ ] Entire action of all parties and all causes of action
      (6) [✔] Other *(specify)*:* All causes of action against QAD Japan Inc., John Doordan, and Arthur Andersen LLP and
              all remaining causes of action and parties other than those *already* dismissed or relieved by the Court

Date: May 26, 2006

MANI SUBRAMANIAN (party without attorney)                        ▶ /s/ M. Subramanian
(TYPE OR PRINT NAME OF [ ] ATTORNEY [✔] PARTY WITHOUT ATTORNEY)                           (SIGNATURE)
* If dismissal requested is of specified parties only, of specified causes of    Attorney or party without attorney for:
action only, or of specified cross-complaints only, so state and identify         [✔] Plaintiff/Petitioner   [ ] Defendant/Respondent
the parties, causes of action, or cross-complaints to be dismissed.               [ ] Cross-complaint

2. TO THE CLERK: Consent to the above dismissal is hereby given.**
Date: May 26, 2006

MANI SUBRAMANIAN (party without attorney)                        ▶ /s/ M. Subramanian
(TYPE OR PRINT NAME OF [ ] ATTORNEY [✔] PARTY WITHOUT ATTORNEY)                           (SIGNATURE)
** If a cross-complaint—or Response (Family Law) seeking affirmative   Attorney or party without attorney for:
relief—is on file, the attorney for cross-complaint (respondent) must    [✔] Plaintiff/Petitioner   [ ] Defendant/Respondent
sign this consent if required by Code of Civil Procedure section 581(i)   [ ] Cross-complaint
or (j).

MAY 2 6 2006

*(To be completed by clerk)*
3. [☒] Dismissal entered as requested on *(date)*:
4. [ ] Dismissal entered on *(date)*:                   as to only *(name)*:
5. [ ] Dismissal not entered as requested for the following reasons *(specify)*:

MAY 2 6 2006

6. [☒] a. Attorney or party without attorney notified on *(date)*:
       b. Attorney or party without attorney not notified. Filing party failed to provide
          [ ] a copy to conform   [ ] means to return conformed copy

Clark Sakai

MAY 2 6 2006                                    KIRI TORRE
Date:                              Clerk, by    CHIEF EXECUTIVE OFFICER/CLERK, Deputy

Form Adopted by the              **REQUEST FOR DISMISSAL**        Code of Civil Procedure, § 581 et seq.
Judicial Council of California                                    Cal. Rules of Court, rules 383, 1233
982(i)(5) (Rev. January 1, 1997)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D  -

# QAD Request for Judicial Notice

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

1  WILLIAM D. CONNELL, State Bar No. 089124
   SALLIE KIM, State Bar No. 142781
2  GCA LAW PARTNERS LLP
   1891 Landings Drive
3  Mountain View, CA 94043
   (650) 428-3900
4  (650) 428-3901 [fax]

5  Attorneys for QAD Inc., QAD Japan K.K., QAD Japan Inc.,
   John Doordan, and Lai Foon Lee

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF SANTA CLARA

10

11  QAD INC., a Delaware corporation, et al.    No. 1-98-CV-771638 [Lead Case]

12       Plaintiffs,

13       vs.

14  MANI SUBRAMANIAN, an individual, et
    al.
15
         Defendants.
16

17  VEDATECH K.K., et al.,                       No. 1-99-CV-784685 [Consolidated Case]

18       Plaintiffs,

19       vs.

20  QAD INC., et al.,                            Trial Date:   June 12, 2006

21       Defendants.

22

23  AND RELATED CROSS-ACTION.

24

25

26       [Proposed] JUDGMENT BY COURT UNDER C.C.P. 437c

27

28

---

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA 94043
(650)428-3900

[Proposed] JUDGMENT BY COURT UNDER
CCP 437c

1    This Court, having on May 12, 2006, granted the Motion for Summary Judgment by

2  Defendant [in Case No. **1-99-CV-784685**] LAI FOON LEE, as set forth in Exhibit A

3  hereto, and having ordered entry of judgment as requested in said motion,

4        IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

5        Plaintiffs shall take nothing as against Defendant LAI FOON LEE, and

6        that judgment is entered in favor of said Defendant.

7

8  DATED:  May 23 2006

9                                                    GREGORY H. WARD

10                                             Judge of the Superior Court

11

12

13

14  APPROVED AS TO FORM:

15

16  _____

17  Plaintiff [in Case No. 1-99-cv-784685]

18  MANI SUBRAMANIAN, pro se

19

20

21

22

23

24

25

26

27

28

[Proposed] JUDGMENT BY COURT UNDER
CCP 437c

**EXHIBIT  A**



(ENDORSED)
**FILED**
MAY 1 2 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

1
2
3
4
5
6
7

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

10
11  QAD, INC., et al.,

12          Plaintiffs,                         Case No.: 1-98-CV-771638

13      v.                                      ORDER

14  MANI SUBRAMANIAN, et al.,

15          Defendants

16

17          Defendant Lai Foon Lee's motion for summary judgment or, in the alternative, for

18  summary adjudication came on for hearing on May 11, 2006, at 9:00 a.m. in Department 9. The

19  matter having been submitted, the court makes the following order:

20          Plaintiff's request for judicial notice is GRANTED. Defendant's request that the court

21  take judicial notice of the First Amended Complaint filed September 29, 1999, is GRANTED.

22  Defendant's request that the court take judicial notice of all pleadings filed in this case is

23  DENIED.

24          The Court declines to render formal evidentiary rulings, but has disregarded all

25  incompetent and inadmissible evidence in ruling upon this motion.  See <u>Biljac Associates v. First</u>

26  <u>Interstate Bank</u> (1990) 218 Cal.App.3d 1410, 1419-1420. The documents attached as Exhibit A

27  to the Opposition have been considered in evaluating plaintiff's request for a continuance.

28          Plaintiff's request for a continuance is DENIED.

EXHIBIT A

-1-

1    Defendant Lai Foon Lee's motion for summary judgment is GRANTED. Defendant met

2  her burden of showing that plaintiff cannot establish all of the elements of each cause of action,

3  that her actions were privileged and that the Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh

4  causes of action are barred by the applicable statutes of limitations. Plaintiff has not raised a

5  triable issue of fact in this regard.

6

7  Dated: May 12, 2006

8                                                                Gregory H. Ward
                                                                 Judge of the Superior Court
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E  -

# QAD Request for Judicial Notice

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]



Not Reported in F.Supp.2d                                                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

Only the Westlaw citation is currently available.

N.D. California.
VEDATECH, INC, Vedatech KK, Mani
Subramanian (an individual), Plaintiffs,
v.
ST PAUL FIRE & MARINE INSURANCE CO, Qad
Inc, Qad Japan KK, Randall Wulff (an
individual), Defendants.
**No. C 04-1249 VRW, 04-1818 VRW, 04-1403
VRW.**
**United States District Court.**

June 22, 2005.

Christina M. Gonzaga, Law Offices of James S.
Knopf, San Mateo, CA, for Plaintiffs.

Mani Subramanian, Palo Alto, CA, pro se.

Enoch Wang, John Phillip Makin, Nelson Hsieh,
James Steven Greenan, Greenan, Peffer, Sallander &
Lally, San Ramon, CA, William D. Connell, General
Counsel Associates, LLP, Mountain View, CA,
Douglas R. Young, Roderick M. Thompson, Farella,
Braun & Martel, LLP, San Francisco, CA, for
Defendants.

ORDER

WALKER, Chief J.

*1 Mani Subramanian (Subramanian) owns
Vedatech, Inc and Vedatech KK (collectively
"Vedatech") and appears in the cases at bar in
*propria persona*. Subramanian and Vedatech have
brought suit against defendant QAD Inc (QAD)
which moves in No 04-1249 to dismiss
Subramanian's and Vedatech's first amended
complaint (FAC) pursuant to FRCP 12(b)(6) and
41(e). Doc # 44. Next, defendant QAD Japan K K
(QADKK) also moves in 04-1249 to dismiss the FAC
pursuant to FRCP 12(b)(5) and (b)(6). Id. Defendant
Randall Wulff (Wulff) moves in 04-1249 the court to
dismiss the FAC pursuant to FRCP 12(b)(6) and
41(e). Doc # 52. Next, defendant St Paul Fire &
Marine Insurance Company (St Paul) moves in 04-
1249 to dismiss the FAC pursuant to FRCP 12(b)(6).
Doc # 45. Additionally, all defendants seek sanctions
pursuant to FRCP 11 or 28 USC § 1927. (04-1249
Docs 86, 97, 106). Subramanian and Vedatech seek

sanctions pursuant to FRCP 11 against Wulff. (04-
1249 Doc # 61). Finally, St Paul seeks to remand Nos
04-1403 and 04-1818 to Santa Clara superior court.
(C-04- 1818 Docs 7, 19) (C-04-1403 Docs 11, 40).

I
A
*The First Action*
On January 26, 1998, QAD and QADKK filed suit
against plaintiffs Vedatech Inc and Vedatech KK
(collectively "Vedatech") and Mani Subramanian
("Subramanian"), owner of all Vedatech entities, in
the Santa Clara superior court (hereinafter, the "first
action"). The first action arose out of contractual and
tort disputes between QAD, QADKK, Vedatech and
Subramanian regarding QAD's hiring (and firing) of
Vedatech and Subramanian to develop computer
software in Japan. The substance of the allegations in
the first action need not be recited in depth. Suffice it
to say, QAD's and QADKK's allegations were
premised entirely on state law.

B
*The Second Action*
In September 1999, Vedatech and Subramanian filed
their own action in the Santa Clara superior court
against QAD, QADKK, Arthur Anderson LLP, Foon
Lee and John Doordan alleging fourteen causes of
action including, but not limited to, breach of
contract, fraud, constructive fraud, negligent
misrepresentation, trade libel and state unfair
competition (hereinafter, the "second action"). Like
the first action, all claims in the second action were
premised entirely on state law. In the second action,
Vedatech and Subramanian alleged that these
defendants conspired to sabotage (and did sabotage)
Vedatech and Subramanian's contractual performance
of developing software for QAD and QADKK in
Japan. QAD and QADKK filed a counterclaim in the
second action essentially duplicating their affirmative
allegations in the first action. The first and second
actions were consolidated in late 2001 and assigned
to Judge Jack Komar (hereinafter, the "consolidated
action").

C
*The Third Action*
Between 1997 and 2000, St Paul issued Vedatech
various policies of comprehensive general liability
insurance. Accordingly, on January 14, 1999,
Vedatech and Subramanian tendered to St Paul the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

defense of Vedatech and Subramanian in the first action. St Paul agreed, under a reservation of rights, to provide a defense for Vedatech and Subramanian in the first action (where they were defendants) on May 5, 1999. Moreover, the language of the insurance policy stated, in pertinent part, that "St Paul may, at [its] discretion, investigate any 'occurrence' and settle any claim or suit that may result." St Paul explicitly declined to defend Vedatech and Subramanian regarding the cross-claims filed by QAD and QADKK in the second action.

**\*2** After almost five years of defending Vedatech and Subramanian in the first action, it became clear to St Paul that the events giving rise to the first action occurred entirely in Japan. St Paul's insurance policy with Vedatech and Subramanian, however, provided only domestic coverage. Unsurprisingly, a dispute arose between Vedatech and Subramanian and St Paul regarding liability coverage and indemnity issues under the insurance agreement. Based upon these disputes, on February 8, 2002, St Paul filed an action for declaratory relief (hereinafter, the "third action") in the Santa Clara superior court against Vedatech and Subramanian seeking a judicial determination regarding the scope of St Paul's duty to defend and indemnify Vedatech and Subramanian in the *entire* consolidated action. Vedatech and Subramanian then began asserting that St Paul's duty to defend extended to the second action as well.

Not to be outdone, Vedatech and Subramanian filed a counterclaim against St Paul alleging a pattern of unfair competition in denying benefits, breach of contract and bad faith. Also in the counterclaim, Vedatech and Subramanian asserted, for the first time, that St Paul had a duty to fund the *prosecution* of Vedatech and Subramanian's affirmative claims in the second action. On June 26, 2002, Subramanian individually removed the third action to this court on the basis of diversity jurisdiction. On October 21, 2002, however, Judge Fogel remanded the third action pursuant to 28 USC § 1446 because Vedatech had not joined Subramanian in the petition for removal. See C-02-3061, Doc # 31 (Remand Order). This brief stint in Judge Fogel's court was only the first time, but far from the last, that these parties would darken this court's doors.

### D
*Court-Ordered Mediation of Consolidated Action*
In the meantime, Judge Komar set the consolidated action for trial on May 3, 2004, in state court. While Subramanian appeared *pro se*, Vedatech was represented at all times by counsel, namely Christina

Gonzaga (Gonzaga) of the Law Office of James S Knopf. On January 13, 2004, Judge Komar *verbally ordered* all parties to the consolidated action (including St Paul as Vedatech's insurer) to attend mediation before Wulff, a private mediator. C 04-1249 VRW, Doc # 87, Ex F at 17:13-14 (transcript) (Judge Komar stated: "Right now, I'm *ordering* you [Vedatech and Subramanian] to go to mediation") (emphasis added). Judge Komar chose Wulff based upon St Paul's representation that Wulff was a very skilled mediator whom St Paul had previously worked with on other mediation proceedings. On March 4, 2004, Judge Komar, *in writing,* ordered all parties to attend the Wulff mediation on March 12, 2004. Id, Ex H (Med Order).

On March 12, 2004, the mediation was held before Wulff with all parties attending. At the mediation, all parties were required to sign a confidentiality agreement that provided, in pertinent part, that "all parties agree that the mediator \* \* \* ha[s] no liability for any act or omission in connection with the mediation." Doc # 54, Ex A (Conf Agreement). Subramanian signed the confidentiality agreement on his own behalf and Gonzaga (as well as James Knopp) signed the agreement on behalf of Vedatech. Id. Although Subramanian altered the wording of portions of the document, those changes did not alter the relevant language quoted above.

**\*3** The mediation commenced at 9:30 am and continued until 4:00 pm when Subramanian and Vedatech's attorneys abruptly left the mediation. But St Paul (as Vedatech's insurer), QAD and QADKK elected to continue the mediation and eventually reached a settlement of the consolidated action (the "settlement agreement"). Under this agreement, QAD and QADKK agreed to release and dismiss, with prejudice, the entire first action (as well as all counterclaims asserted by QAD and QADKK in the second action). Doc # 46, Ex A (Sett Agreement). In consideration of this dismissal, St Paul agreed to pay QAD and QADKK the sum of $500,000. Id at 3. This agreement was signed and executed by QAD, QADKK and St Paul on March 25, 2004. Id at 6-7. Moreover, the settlement agreement specifically provided that Vedatech and Subramanian could continue to litigate their affirmative claims against QAD and QADKK in the second action. Id. Whether St Paul was contractually obligated to fund such prosecution was, of course, a hotly contested issue in the third action.

### E
*The Fourth Action*

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

To say that Vedatech and Subramanian were unhappy with the settlement agreement would be an understatement. Specifically, they were unhappy with the settlement agreement to the extent it apparently relieved St Paul from its duty (a duty St Paul vigorously disputes in the third action) of having to prosecute Vedatech's and Subramanian's affirmative claims in the second action. Vedatech and Subramanian turned their anger into action and on March 30, 2004, they filed a lawsuit, in federal court, alleging seven causes of action against St Paul, QAD, QADKK, Wulff and 50 "Doe" defendants (hereinafter, the "fourth action"). This action, based on diversity jurisdiction, was assigned to the undersigned. C 04-1249 VRW Doc # 1. Vedatech and Subramanian filed their first amended complaint on June 15, 2004. Doc # 36 (FAC). The FAC is currently the operative complaint in the fourth action.

The seven "causes of action" pled in the FAC include: (1) declaratory judgment, (2) injunctive relief, (3) fraud, (4) constructive fraud, (5) negligent misrepresentation, (6) insurance bad faith and (7) unfair competition. The sum and substance of Vedatech and Subramanian's 49-page (sometimes unintelligible) FAC appears to be that St Paul, QAD, QADKK, Wulff and 50 unknown defendants covertly conspired and colluded to get Vedatech and Subramanian to "consent" to mediate the consolidated action. Doc # 36 at 19 (stating that Vedatech and Subramanian were "tricked into 'consenting' to mediation before Wulff"). Once this fraudulent plan came to fruition and the mediation took place, the defendants further conspired in an effort to settle the consolidated action on terms that were not in Vedatech and Subramanian's best interests. Id at 9 (stating that St Paul "formulated a strategy for using the secrecy of mediation as a cover for engaging in collusive and bad faith negotiations with QAD * * * and Wulff"). As discussed above, the settlement agreement was not "favorable," according to Vedatech and Subramanian, because it "weaken[ed] Vedatech's [and Subramanian's] legal representation for the affirmative claims" involved in the second action. Id at 19. The FAC was signed by Subramanian, on his own behalf, and Gonzaga, as counsel for Vedatech. All defendants, save the unknown "Doe" defendants, have separately moved for dismissal of the FAC on various grounds. These dispositive motions are currently before the court.

F

*The Removal Rampage*

**\*4** Vedatech and Subramanian's anger did not end with the filing of the fourth action in federal court:

The settlement agreement sent Vedatech and Subramanian on what can only be described as a removal rampage. As described in depth below, from March 15, 2004, to May 6, 2004, Vedatech and Subramanian filed *four* petitions for removal in this court; two petitions involved the consolidated action (the action subject to the settlement agreement) and two petitions involved the third action.

1

*Removal # 1*

On March 15, 2004, before St Paul and QAD had finalized the settlement agreement, Vedatech and Subramanian removed the consolidated action to this court. The removal petition was assigned to Judge Hamilton. C-04-1035 PJH. Vedatech and Subramanian purportedly removed the consolidated action pursuant to 28 USC § 1446(b), asserting that federal question jurisdiction had arisen on March 10, 2004. In support of the removal, they offered an interrogatory response from QAD and QADKK in which QAD claimed that it reserved all of its rights, including copyrights, in the software that Vedatech and Subramanian had created in Japan. According to Vedatech and Subramanian, this interrogatory response revealed that the basis for QAD's state law claims in the consolidated action was, in actuality, the Copyright Act, 17 USC § § 101 et seq. Since the consolidated action, according to Vedatech and Subramanian, would now require an interpretation of the federal Copyright Act, the consolidated action was removable pursuant to 28 USC § 1446(b).

2

*Removal # 2*

Additionally, on April 12, 2004, Vedatech and Subramanian removed the third action to this court pursuant to 28 USC § 1446(b). This removal petition, which contained nine exhibits and totaled hundreds of pages, was assigned to Judge Conti. C 04-1403 SC. Vedatech and Subramanian's "removal logic" goes as follows: For St Paul to prevail in the third action (the insurance declaratory relief action), St Paul would be required to "litigate the issues in the underlying cases [i e, consolidated action]," which, as asserted by Vedatech and Subramanian, were now removable pursuant to 28 USC § 1446(b). Thus, according to Vedatech and Subramanian, because the consolidated action now raised a federal question (i e, application of the Copyright Act) and because St Paul would necessarily have to litigate this federal question to prevail in the third action, the third action itself was now removable.

3

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

*Remand # 1*

On April 29, 2004, Judge Hamilton remanded the consolidated action finding: (1) the consolidated action raised no federal question and thus the court lacked subject matter jurisdiction and (2) even if subject matter jurisdiction existed, the removal was untimely. C 04-1035, Doc # 43 (Remand Order). Vedatech and Subramanian appealed Judge Hamilton's April 29, 2004, remand order to the United States Court of Appeals for the Ninth Circuit. C-04-1305, Doc # 48 (Not App). On August 16, 2004, the Ninth Circuit dismissed Vedatech and Subramanian's appeal pursuant to 28 USC § 1447(d).

4

*Removal # 3 and Remand # 2*

**\*5** Not content to wait for the Ninth Circuit, Vedatech and Subramanian on May 6, 2004, filed a new petition for removal of the consolidated action pursuant to 28 USC § 1446(b). This new petition was *63* pages long and contained 146 paragraphs purporting to demonstrate that Judge Hamilton had clearly erred in remanding the consolidated action and again argued that federal jurisdiction existed in the consolidated case pursuant to 28 USC § 1446(b). The new removal petition was assigned to Judge Ware. Judge Hamilton, however, intervened on May 26, 2004, and related the second removal petition to the first petition. C-04-1806 PJH, Doc # 15 (Related Case Order). QAD and QADKK filed yet another motion to remand, Doc # 16, and Vedatech and Subramanian immediately sought to have Judge Hamilton *recused* from adjudicating the motion to remand. Judge Hamilton denied the recusal motion and again heard oral arguments on the motion to remand the consolidated case. On July 16, 2004, Judge Hamilton remanded the consolidated action for the second time. In her order, Judge Hamilton stated: "As was true when this same action was [first] removed * * *, the present notice of removal does not establish the existence of a federal question." Doc # 45 (Remand Order). Moreover, Judge Hamilton stated that "should the removing parties remove this action yet another time, the court will invite the QAD parties * * * to file a motion for sanctions under [FRCP] 11." Id.

Vedatech and Subramanian appealed Judge Hamilton's second remand of the consolidated case to the Ninth Circuit. Doc # 47. The Ninth Circuit, however, dismissed this appeal on August 16, 2004, citing 28 USC § 1447(d). Astonishingly, on August 30, 2004, Vedatech and Subramanian filed a petition for rehearing en banc of the Ninth Circuit's August 16, 2004, order dismissing their appeal of both of

Judge Hamilton's remand orders. On February 16, 2005, the petition for rehearing en banc was denied and on February 23, 2005, Vedatech and Subramanian filed a motion to stay the Ninth Circuit's mandate. As of the date of this order, the motion to stay is still pending before the Ninth Circuit. The court will not speculate whether Vedatech and Subramanian intend to petition the Ninth Circuit's order to the United States Supreme Court for certiorari.

5

*Removal # 4*

Falling further down the rabbit hole, on May 7, 2004, Vedatech and Subramanian filed a second petition for removal in the third action, which, as described above, had *already been removed* and assigned to Judge Conti for remand determination. C-04-1403 SC. What is more, Judge Conti had not yet remanded the third action to state court; St Paul's motion to remand was still pending before Judge Conti. The second petition for removal of the third action was assigned to Judge Fogel. C-04-1818 JF. The second petition for removal of the third action was signed by Subramanian and Gonzaga.

E

*Present Status of Litigation*

**\*6** In an attempt to corral this removal beast, on July 2, 2004, the undersigned related the fourth action (04-1249 VRW) and *both* of Vedatech and Subramanian's petitions for removal of the third action (04-1403 VRW and 04- 1818 VRW). The court has received St Paul's motion to remand, Vedatech and Subramanian's opposition and St Paul's reply. C-04-1403, Docs 11, 25, 30. Accordingly, the issue whether to remand the third action has been fully briefed, is currently before the court and is ripe for adjudication.

In the meantime, Vedatech and Subramanian filed a motion to impose sanctions pursuant to Rule 11 against Wulff in the fourth action. Doc # 61. Wulff opposes this motion. Doc # 63. This motion is also before the court.

On September 16, 2004, the court heard oral arguments regarding (1) the three motions to dismiss the FAC, (2) St Paul's motion to remand the third action and (3) Vedatech and Subramanian's motion for Rule 11 sanctions against Wulff. Doc # 83. At oral argument, the court invited St Paul, QAD, QADKK and Wulff to file motions for sanctions pursuant to 28 USC § 1927 and Rule 11 against Vedatech and Subramanian. Id. All three have since

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

filed such motions. It is also worth noting that less than one month after the hearing, on October 9, 2004, Gonzaga filed a motion to withdraw as Vedatech's attorney. (04-1249 Doc # 90) (04-1403 Doc # 47) (04-1818 Doc # 27). The court denied this request on October 15, 2004. (02-1249 Doc # 95) (04-1403 Doc # 47) (04-1818 Doc # 27). On March 16, 2005, Gonzaga (having apparently left the Law Offices of James Knopf) and Knopf himself filed a second motion to withdraw as Vedatech's attorney. (02-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). This second motion is currently pending.

Accordingly, for the sake of clarity, the court will summarize the motions that are currently pending before this court. First, St Paul moves this court to remand the third action to state court. (04-1403 Docs 11, 40) (04-1818 Docs 7, 19). Second, QAD, QADKK, St Paul and Wulff separately move to dismiss the FAC in the fourth action. (04-1249 Docs 44, 45, 52). Third, Vedatech and Subramanian request sanctions against Wulff pursuant to FRCP 11. (04-1249 Doc # 61). Fourth, St Paul, QAD, QADKK and Wulff request sanctions pursuant to FRCP 11 and costs and fees pursuant to 28 USC § 1927 against Vedatech and Subramanian. (04-1249 Docs 86, 97, 106) (St Paul 04-1403 Doc # 52) (St Paul 04- 1818 Doc # 32).

Gonzaga and Knopf move to withdraw as counsel of record for Vedatech. (04-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). Additionally, Gonzaga and Knopf have filed a motion to strike portions of Subramanian and Vedatech's opposition to their second motion to withdrawal. (04-1249 Doc # 154) (04-1403 Doc # 74) (04-1818 Doc # 55). Subramanian and Vedatech have filed a motion requesting additional oral argument. (04-1249 Doc # 112) (04-1403 Doc # 63) (04-1818 Doc # 43).

Taking a deep breath, the court proceeds to attempt to resolve these disputes.

## II

### Motion to Remand

**\*7** As discussed above, Vedatech and Subramanian's first petition for removal of the third action (a state declaratory relief action regarding insurance contracts) is based on one single piece of logic: "the removability of the underlying [consolidated action] attaches *mutatis mutandis* to the removability of the insurance case [third action]." C 04-1403, Doc # 6 (Rem Pet) at 5. Moreover, the second petition for removal states that "the [consolidated action] [is] completely preempted by [the Copyright Act]. This,

in turn, justifies removal of this derivative action [third action]." C 04- 1818, Doc # 1 (Rem Pet) at 5.

The court expresses no opinion regarding whether Vedatech and Subramanian's logic is correct. Assuming arguendo that this logic is correct, it is clear that the absence of a federal question in the consolidated action would render the third action unremovable. As mentioned above, this court (per Judge Hamilton) has not once, but *twice,* held that the consolidated action contains no federal question sufficient to confer removal jurisdiction pursuant to 28 USC § 1446(b) and has *twice* remanded the consolidated action to state court. In fact, Subramanian and Vedatech have been threatened with sanctions by Judge Hamilton should they try again to remove the consolidated action to this court.

Accordingly, the question whether a federal question exists in the consolidated action has been answered in the negative by Judge Hamilton--*twice.* Under plaintiffs' own logic, because there is no federal question in the consolidated action, this court must remand the third action for lack of subject matter jurisdiction pursuant to § 1447(c).

Moreover, even if Judge Hamilton's remands were in error (which clearly they were not) and even if the consolidated action between QAD, QADKK, Vedatech and Subramanian hinged entirely on the adjudication of the Copyright Act, this court would *still* lack subject matter jurisdiction over the third action.

As discussed above, the third action is an action for declaratory relief brought by St Paul. St Paul seeks a judicial determination whether it has a duty to defend Vedatech in the consolidated action if the events underlying the consolidated action occurred in Japan. This is a matter governed completely by California law. Under California law, "it has long been a fundamental rule of law that an insurer has a duty to defend an insured if [the insurer] becomes aware of, or if the third-party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Insurance Exchange, Inc.,* 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (citing *Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 276, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)). Accordingly, whether St Paul is under a duty to defend Vedatech in the consolidated action is determined by comparing the facts alleged in the consolidated action complaint and the language of the insuring agreement between St Paul and Vedatech. Even if the underlying claims were federal copyright

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

claims (which they are not), resolution of the third action would hinge on whether the insuring agreement's scope was broad enough to encompass federal copyright claims arising from events that occurred in Japan. This analysis in no way involves interpretation of the Copyright Act; it is simply a matter of state contract interpretation.

**\*8** Further, although Vedatech and Subramanian are diverse from St Paul, they cannot base their two petitions for removal on this fact; 28 USC 1446(b) requires a defendant to file a petition for removal within thirty days of the point when diversity jurisdiction is established. Vedatech's and Subramanian's petitions were filed more than two years after St Paul initiated the third action in state court.

No federal question exists in the third action and thus Vedatech and Subramanian's removal pursuant to 28 USC § 1446(b) was improper. Accordingly, St Paul's motion to remand 04-1403 and 04-1818 is GRANTED and the court REMANDS these cases to the Santa Clara superior court pursuant to 28 USC § 1447(c).

St Paul requests that the court order Vedatech and Subramanian to pay St Paul's reasonable attorney fees and costs incurred in these motions to remand. 28 USC § 1447(c) provides in relevant part: "An order remanding the case may require payment of just costs and any actual expenses, including attorney [ ] fees, incurred as a result of the removal." As this court stated in Moore v. Kaiser Foundation Hospitals, Inc., 765 F.Supp. 1464, 1466 (N.D.Cal.1991), aff'd 981 F.2d 443 (9th Cir.1992):

> As a matter of public policy, the party forced to bring a motion to remand an improperly removed case generally should be fully reimbursed for its costs in remanding the case whether the removal was in bad faith or otherwise. The court's award of fees in this case is not a punitive award against defendants; it is simply reimbursement to plaintiffs of wholly unnecessary litigation costs the defendants inflicted. Attorney fees spent to remand an improperly removed case without bad faith cost just as much as fees spent to remand a case removed in bad faith.

The court orders the remand of this case and, accordingly, finds that an award of reasonable attorney fees is appropriate. To determine a reasonable attorney fee award, the court employs the lodestar method, under which the court multiplies the number of hours the prevailing party reasonably

expended on the litigation by a reasonable hourly rate. Yahoo!, Inc. v. Net Games, Inc., 329 F Supp 2d 1179, 1182 (N.D.Cal.2004). "[T]o convert the data provided by fee applicants to a 'reasonable attorney fee,' the court first compares the requested number of hours to the number of hours that 'reasonably competent counsel' would have billed." Id at 1188.

St Paul requests 108.5 hours for services performed by attorneys in connection with (1) the preparation and filing of both motions to remand, (2) its reply to Vedatech's and Subramanian's opposition to its motions to remand and (3) preparation for the September 16, 2004, hearing. Doc # 98, Ex A. Having considered the nature of the complex legal questions created by Vedatech's and Subramanian's voluminous and repetitive removal petitions and memoranda, as well as the quality of the attorneys' work, the court finds the claim for 108.5 hours of attorney time to be reasonable in preparing and defending its motions to remand in these cases.

**\*9** The court now turns to determining a reasonable hourly rate. More than one methodology exists to make this determination. In Laffey v. Northwest Airlines, Inc., 572 F.Supp. 354 (D.D.C.1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C.Cir.1984) the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience. The Laffey methodology is useful when an unusually large fraction of either senior or junior attorney time is necessary, and spent, by counsel on behalf of a client. The Laffey methodology allows the court to reflect in the fee award the disproportion of the time spent by senior or junior attorneys at a rate commensurate with such attorneys' market hourly rate. Cf In re HPL Technologies Inc, Securities Litigation, 2005 U.S. Dist LEXIS 7244 (ND Cal 2005) (Walker, J). In this case, 13.3 hours were spent by James Greenan who claimed a billing rate of $250/hour and 96 hours by Enoch Wang who claimed a $185/hour billing rate. St Paul requests total fees of $20,738.75. Doc # 162 at 2; Doc # 98, Ex A.

A "blended hourly rate" rather than the Laffey methodology would appear sufficient in this case to reflect the market rate for counsel's services. This is because "[t]he purpose of using prevailing market rates is to estimate the hourly rate reasonably competent counsel would charge[,] * * * [and] not to determine whether or not a specific attorney could command a specific hourly rate in the market." The court concludes, therefore, that "the average market rate in the local legal community as a whole is a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

better approximation of the hourly rate that would be charged by reasonably competent counsel than the actual billing rate charged by a single attorney." *Yahoo!,* 329 F Supp 2d at 1185.

 In several of the court's previous orders, the court has calculated an average market rate in the local legal community as a whole using public data from the United States Census Bureau and Bureau of Labor Statistics ("BLS"). See, e g, *Yahoo!,* 329 F Supp 2d 1179; *Allen v. BART,* 2003 WL 23333580 (N.D.Cal.2003); *Gilliam v. Sonoma City,* 2003 WL 23341211 (N.D.Cal.2003). In *Yahoo!,* the court explained that:

> The BLS provides data on the hourly wages earned by attorneys * * *. To estimate the hourly rates billed to clients, the court first calculated the ratio of net receipts to gross receipts from data compiled by the Census Bureau. This ratio was used to approximate the overhead costs that would be incorporated in the hourly rates billed to clients. The court then divided the BLS wage data ($w$) by the ratio of net receipts ($nr$) to gross receipts ($gr$) to determine an estimated average market rate ($r$) * * *.

Id at 1189.

 This methodology is represented by the following equation: r = w / (nr/gr). Stated another way, the average market rate r = w * (gr/nr). The most recent census data describing gross and net receipts by law partnerships are located in "Statistical Abstract of the United States: 2004-2005" ("2004 Statistical Abstract"). See United States Census Bureau, *Statistical Abstract of the United States:* 2004-2005, tbl 718, available at http://www.census.gov/statab/www/. The 2004 Statistical Abstract provides gross and net receipts for the year 2001. For law partnerships, gross receipts totaled $91 billion and net receipts totaled $32 billion. This yields a ratio of net receipts to gross receipts of 0.351. Even though these data are four years old, it is adequate for present purposes because law firm economics should not vary significantly over such a short period.

 **\*10** The most recent data available from the BLS describing hourly wages in the San Francisco area are located in "November 2003 Metropolitan Area Occupational Employment and Wage Estimates San Francisco, CA PMSA," available at http://www.bls.gov/oes/current/oes_7360.htm# b23-0000 ("2003 BLS Wage Estimates"). The BLS provides wage estimates for "Legal Occupations" in the year 2003. The BLS's estimates for lawyers are a median hourly wage of $65.01/hr and a mean hourly wage of $70.23/hr. Id. As in *Yahoo!,* the court selects the higher of the median or mean hourly wage because it is more favorable to the party seeking the grant of attorney fees. Id at 1191.

 Dividing the most recent mean hourly wage for lawyers, $70.23/hr, by the most recent ratio of net to gross receipts, 0.351, yields an estimate of $200/hr (rounded down from $200.08/hr) as the average market rate for lawyers in the San Francisco area. This, of course, is fairly close to the claimed hourly rate of St Paul's counsel. It should not be surprising that a large insurance company would not allow itself to be overcharged for attorney services and indeed it appears that St Paul has done just that. In any event, the court finds that a reasonable or market value attorney fee for the work of St Paul's counsel is: 108.5 hours at $200/hr, yielding a total of $21,700. Accordingly, $20,738.75, the amount requested by St Paul, is a reasonable attorney fees award; indeed, it is actually almost $1,000 *less* than the court's calculation of a market value fee. Given the unitary nature of both petitions for removal, Vedatech and Subramanian are jointly and severally liable for the full amount of St Paul's attorney fees. *Kona Enterprises, Inc. v. Estate of Bishop,* 229 F.3d 877, 888-89 (9th Cir.2000); see also *Pekarsky v. Ariyoshi,* 575 F.Supp. 673, 676-77 (D.Hawai'i 1983) (Schwarzer, J).

 Finally, the court turns to St Paul's motion for sanctions pursuant to FRCP 11(c)(1)(A). This is an appropriate instance in which to impose FRCP 11 sanctions, as filing a frivolous removal petition can be grounds for imposition of Rule 11 sanctions if there is no "good faith argument" for removal. *Hewitt v. City of Stanton,* 798 F.2d 1230, 1233 (9th Cir.1986); accord *Midlock v. Apple Vacations West, Inc,* 2005 U.S. App LEXIS 6718 (7th Cir2005).

 The court will liberally construe the phrase "good faith argument" and thus will not sanction Vedatech and Subramanian for the filing of the *first* petition of removal (although Vedatech and Subramanian will, as discussed above, pay St Paul's costs on attorney fees associated with the first petition). No amount of leniency, however, can excuse the frivolousness of the *second* petition for removal of the third action. As discussed above, when Vedatech and Subramanian removed the third action for the second time, Judge Conti had not adjudicated the *first* removal. Accordingly, there was no action to remove from the state court, as this court had jurisdiction over the third action as soon as it was removed the first time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

28 USC § 1446(d). To make matters worse, the second petition (which is hundreds of pages in length) essentially duplicates the meritless arguments enumerated in the first petition. Accordingly, to call the second petition frivolous would be an understatement. The question is not whether the court should impose sanctions, the question is how much.

 **\*11** Rule 11 applies to *pro se* plaintiffs like Subramanian. *Warren v. Guelker,* 29 F.3d 1386, 1390 (9th Cir.1994). In determining whether to sanction a *pro se* plaintiff, however, the Ninth Circuit urges district courts to use caution. Id. But even exercising extreme caution, the court determines sanctions are appropriate against Subramanian. "Rule 11 is intended to * * * *deter* [ ] [parties] who submit motions or pleadings which cannot reasonably be supported in law or fact." *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir.1986) (emphasis added). Subramanian has repeatedly abused the federal removal statutes and shows no signs of stopping this practice. He has filed not one, but *four* frivolous petitions for removal, causing continuous and unnecessary congestion of this court's docket. Moreover, this court (per Judges Hamilton, Fogel, Conti and the undersigned) has expended a large amount of judicial resources in adjudicating these petitions. Clearly, the only way to deter Subramanian from engaging in this behavior again is to invoke the monetary penalties of Rule 11.

 The reprehensible conduct engaged in by Subramanian is magnified when it is applied to Gonzaga, an attorney. It is clear that Gonzaga (throughout this litigation) has simply signed off on a myriad of frivolous motions and pleadings drafted by Subramanian--including all four petitions for removal. As an officer of this court, Gonzaga owes a duty not to file papers that are procedurally defective and substantively indefensible. The second petition for removal of the third action alone demonstrates that Gonzaga has *egregiously* breached her duty to this court. The only method to deter Gonzaga from engaging in this type of reckless legal representation where she simply signs off on motions drafted by a *pro se* litigant is to invoke Rule 11.

 In determining the appropriate amount of sanctions, the court is guided by the touchstone of Rule 11: Deterrence. As between Subramanian and Gonzaga, the court concludes it is Subramanian who needs to be deterred more from filing in the future frivolous motions, petitions and complaints. It is clear from Gonzaga's motion to withdraw as counsel for Vedatech that she is suffering the consequences of

simply allowing Subramanian to run the show in this litigation; the court doubts Gonzaga will make this error in judgment again. Accordingly, the court SANCTIONS Gonzaga $5,000 pursuant to Rule 11.

 Turning to Subramanian, the court concludes that although a sanction pursuant to Rule 11 is required to deter future frivolous filings, the large amount of attorney fees and costs already imposed on Subramanian to compensate St Paul and the amount that will be imposed on him to compensate Wulff, see *infra* Part III(B), will certainly serve the function of deterring similar filings in the future. Accordingly, the court SANCTIONS Subramanian $1,000 pursuant to Rule 11. Subramanian is admonished, however, that the court will not hesitate to impose much harsher Rule 11 sanctions should he continue to engage in the conduct described in this order. If Subramanian files in this court (1) another frivolous petition for removal, (2) any frivolous motions in these cases, (3) a new frivolous cause of action or (4) any other filing worthy of Rule 11 sanctions, the court will impose sanctions at $1,000 per page of each filing.

 **\*12** Pursuant to FRCP 11(c)(1)(2), Gonzaga and Subramanian's sanctions are to be paid to the court on or before July 25, 2005.

 Finally, to the extent St Paul seeks sanctions relating to Vedatech and Subramanian's filing of the FAC (as opposed to the two removal petitions), St Paul's motion is DENIED.

III
*Motions to Dismiss*
 As mentioned above, in apparent anger over the settlement reached between St Paul, QAD and QADKK regarding the consolidated action, on March 30, 2004, Vedatech and Subramanian filed the fourth action in this court. Doc # 1. On June 15, 2004, Vedatech and Subramanian filed the FAC. Doc # 35. Named as defendants in the FAC are: (1) St Paul, (2) QAD, (3) QADKK, (4) Wulff and (5) 50 "Doe "defendants. Id. The 49-page, 160-paragraph FAC is truly a frightful piece of legal work. The FAC (1) makes dozens of unintelligible factual assertions; (2) is fraught with arguments, unsupported conclusions and case law citations; (3) contains two portions written as if the FAC were an opposition to a motion to dismiss and (4) even contains an internet article concerning mediation.

 The complaint lists seven "causes of action": (1) declaratory judgment; (2) injunctive relief; (3) fraud

Not Reported in F.Supp.2d                                                                                Page 9
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

and conspiracy to commit fraud; (4) constructive fraud and conspiracy to commit constructive fraud; (5) negligent misrepresentation; (6) breach of covenant of good faith and fair dealing; and (7) state unfair competition. As a preliminary matter, the court must dismiss one of these seven claims out of hand. Vedatech and Subramanian's "second cause of action" is titled "INJUNCTIVE RELIEF." Id at 28. Under California law, however, "[i]njunctive relief is a remedy and not, in itself, a cause of action, and a cause of action must exist before injunctive relief may be granted." *Shell Oil Co., Inc v. Richter, 52 Cal.App.2d 164, 168, 125 P.2d 930 (1942)* (citing *Williams v. Southern Pacific R R Co., 150 Cal. 624, 89 P. 599 (1907)*). Accordingly, Vedatech and Subramanian's claim for injunctive relief is dismissed pursuant to FRCP 12(b)(6).

 All defendants (save the Doe defendants) move to dismiss the FAC in its entirety under various state and federal rules.

### A
### *Wulff's Motion to Dismiss*

 Vedatech and Subramanian allege five causes of action against Wulff: (1) declaratory judgment; (2) fraud; (3) constructive fraud; (4) negligent misrepresentation and (5) state unfair competition. In sum, Vedatech and Subramanian appear to allege that Wulff was not a neutral mediator but instead was biased in favor of St Paul which had used his services previously. Because Wulff was apparently biased towards St Paul, he (1) "tricked" Vedatech and Subramanian into signing the mediation confidentiality agreement, (2) did not terminate the mediation when Vedatech and Subramanian exited and (3) conspired with St Paul and QAD to create a settlement that harmed Vedatech and Subramanian. The court concludes that Wulff is immune from the claims asserted against him in the FAC.

 **\*13** California law, which this court is required to apply in diversity actions pursuant to *Erie Railroad Co v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)*, grants "quasi-judicial immunity" to persons who "fulfill quasi-judicial functions intimately related to the judicial process." *Howard v. Drapkin, 222 Cal.App.3d 843, 847, 271 Cal.Rptr. 893 (1990)*. In *Howard*, the parties to an underlying custody dispute stipulated that a psychologist could act as an independent fact-finder and make non-binding recommendations regarding allegations of physical and sexual abuse to the judge presiding over the dispute. *Id at 848, 271 Cal.Rptr. 893*. This stipulation was ultimately signed by the court and

converted into an order. Id. The child's mother subsequently disagreed with the psychologist's findings and recommendations, asserting that the psychologist (1) was abusive during the six-hour mediation-like setting, (2) negligently prepared her findings so as to include false statements and omit critical information and (3) failed to disclose certain conflicts of interest and lack of expertise in child abuse matters. Id.

 Based upon such allegedly inappropriate behavior, the mother filed a civil lawsuit against the psychologist, pleading causes of action for (1) fraud, (2) negligent misrepresentation, (3) professional negligence, (4) intentional infliction of emotional distress and (5) negligent infliction of emotional distress. The psychologist filed a general demurrer, contending that she enjoyed quasi-judicial immunity from the mother's suit. *Id at 850, 271 Cal.Rptr. 893*. The trial court agreed and sustained the demurrer and the California court of appeal affirmed.

 The *Howard* court began by stating that "under the concept of quasi-judicial immunity, California courts have extended absolute immunity to persons other than judges if those persons act in a judicial or quasi-judicial capacity." *Id at 852-53, 271 Cal.Rptr. 893*. Such persons include court commissioners, grand jurors, administrative law hearing officers, arbitrators and prosecutors. *Id at 853, 271 Cal.Rptr. 893*. Moreover, the court explicitly rejected the idea that only "public" officials enjoyed quasi-judicial immunity, for "if this were so, then arbitrators would not be protected by * * * [such] immunity." *Id at 854, 271 Cal.Rptr. 893*. The court further noted "the relevant policy considerations of attracting to an overburdened judicial system the independent and impartial services and expertise upon which that system necessarily depends." *Id at 857, 271 Cal.Rptr. 893*. Accordingly, the court held that all "nonjudicial persons who fulfill quasi-judicial functions intimately related to the judicial process should be given absolute quasi-judicial immunity for damage claims arising from their performance of duties in connection with the judicial process." Id.

 "Without [this] immunity, such persons will be reluctant to accept court appointments or provide work product for the courts." Id. Moreover, "in order to best protect the ability of neutral third parties to aggressively *mediate* and resolve disputes, a dismissal at the very earliest stage of the proceedings is critical to the proper functioning and continued availability of these services." Id at 905 (emphasis added).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 10
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

**\*14** Quite appropriately, Wulff cites *Howard* in support of his motion to dismiss all claims against him in this case. It is very telling that Vedatech and Subramanian's 25-page opposition to Wulff's motion to dismiss devotes only two pages squarely to addressing the *Howard* decision (while various and unintelligible other references to *Howard* are sprinkled throughout). Doc # 65 at 15-17. Inexplicably, Vedatech and Subramanian devote twelve pages of their opposition to reciting (unnecessarily) the status of quasi-judicial immunity under *federal* law (i e, statutes and Supreme Court decisions). Id at 3-14, 271 Cal.Rptr. 893 (concluding that "[i]t is clear that federal law is conclusively against the grant of any such immunity to private commercial mediators such as defendant Wulff."). But it is *state* law, not federal law, that controls this court's analysis in diversity cases. See *Erie,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

Vedatech and Subramanian's opposition makes, in essence, two arguments why *Howard'* s logic does not mandate the dismissal of all claims against Wulff. First, they argue that *Howard,* insofar as it extended quasi-judicial immunity to "neutral third-party participants in the judicial process" was "unnecessary dictum," and thus is not binding on this court under *Erie.* Doc # 65 at 16. At one point, Vedatech and Subramanian even make the assertion that *Howard'* s extension of quasi-judicial immunity "is double-dicta." Id at 15. Next, Vedatech and Subramanian argue that "it is clear * * * that the California Supreme Court itself is highly unlikely to uphold the [*Howard* ] decision, and most certainly not for the extension of immunity to private commercial mediators." Id at 2, 271 Cal.Rptr. 893. The court finds both arguments to be wholly without merit.

Far from being "unnecessary dictum" or "double dicta," *Howard'* s holding that "nonjudicial persons who fulfill quasi-judicial function * * * should be given absolute quasi-judicial immunity" was the court's *ratio decidendi.* In fact, the court devoted thirteen of the opinion's seventeen pages to the discussion of quasi-judicial immunity. Moreover, *Howard* was not appealed to the California Supreme Court and thus the assertion that *Howard* will not be "upheld" by the California Supreme Court is not only unpersuasive, but plainly wrong. Nor do Vedatech and Subramanian offer any convincing explanation why the California Supreme Court would disapprove of the reasoning in *Howard.* Indeed, *Howard* has been binding California precedent for over 14 years and a search of subsequent treatment of *Howard* by

California courts does not reveal a *single* instance of negative treatment among the 22 cases which have cited it.

Under *Howard,* Wulff is immune from all claims asserted against him in the FAC. Accordingly, the court GRANTS Wulff's motion to dismiss with prejudice pursuant to 12(b)(6). Because the court finds Wulff immune from the claims asserted in the FAC, it is unnecessary to decide whether communications made by Wulff during mediation are protected by Cal Civ Code § 47(b) or whether Vedatech and Subramanian have failed to exhaust state ADR-grievance remedies pursuant to Cal R Court 1622.

### B

#### *Rule 11 Sanctions Against Wulff*

**\*15** On August 12, 2004, Vedatech and Subramanian filed a motion for sanctions pursuant to FRCP 11 against Wulff, his attorneys Douglas Young and Jessica Nall and the entire law firm of Farella, Braun & Martel LLP (Farella). Doc # 61.

Throughout Wulff's motion to dismiss the FAC, Wulff refers to himself as a "court-appointed" mediator, thus deserving of *Howard'* s immunity. Vedatech and Subramanian claim each time this label precedes Wulff's name, a "bad faith misrepresentation" to this court has occurred because the Santa Clara superior court never "appointed" Wulff as a mediator.

Vedatech and Subramanian never specify which part of Rule 11 Wulff has allegedly violated, but since the sanctions are directed at Wulff's defenses, the court presumes Rule 11(b)(2) is the relevant provision. Rule 11(b)(2) prohibits claims and defenses that are not "warranted by existing law or by a nonfrivolous argument for the extension or modification" of such law.

Far from being unwarranted by existing law, Wulff's claim that he was a court-appointed mediator is objectively true. Judge Komar's March 4, 2004, order states that all parties are to attend mediation before Wulff. Vedatech and Subramanian, however, argue that this order does not make Wulff court-appointed: "This order does not in any way 'appoint' Mr Wulff as a mediator, is not directed to Mr Wulff in any way or manner whatsoever, and does not create any official relationship between the Court and Mr Wulff." Doc # 61 at 6. Thus, because Judge Komar's order was directed to the parties, rather than Wulff himself, Wulff is not "court-appointed" even though all parties

Not Reported in F.Supp.2d                                                                                          Page 11
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

were ordered to mediate before him. Rule 11 sanctions cannot be based upon such meaningless word play.

 Further demonstrating the baseless nature of this Rule 11 motion, Subramanian himself recognizes that *Howard'* s grant of immunity applies to mediators *regardless* whether the mediator has been court-appointed. See Doc # 87 (Nall Decl), Ex C (9/16/04 Transcript) at 54:25-55:2 (acknowledging that *"Howard v. Drapkin* does not necessitate that the mediator be a court-appointed mediator in order to qualify under its reasoning for absolute immunity.")

 Vedatech and Subramanian's motion to impose Rule 11 upon Wulff and his attorneys is DENIED.

 The court may award to the person who prevails on a motion under Rule 11 reasonable expenses, including attorney fees, incurred in presenting or opposing the motion. See Advisory Committee Notes to 1993 Amendments to FRCP 11. Because courts may award fees to a party that prevails on a Rule 11 motion, "a cross motion under Rule 11 should rarely be needed." Id. As the target of, and prevailing party on Vedatech's and Subramanian's Rule 11 motion, Wulff is entitled to an award of attorney fees. The court will employ the same calculation method explained above in awarding St Paul its attorney fees under § 1447(c). See *supra* Part III.

 Wulff requests 197.8 hours for services performed by attorneys at Farella in (1) researching and drafting an opposition to Vedatech's and Subramanian's motion for Rule 11 sanctions, (2) preparing for and attending oral argument on the Rule 11 motion and (3) researching and drafting Wulff's counter-motion for sanctions. Doc # 87 (Nall Decl) at 3-4. The court finds this to be an unreasonable expenditure of attorney resources.

 **\*16** Among the factors to be taken into account in the reasonable hours component of the lodestar calculation is (1) the novelty and complexity of the issues and (2) the quality of the attorneys' work. *Morales v. City of San Rafael,* 96 F.3d 359, 364 (9th Cir.1996). Vedatech's and Subramanian's Rule 11 motion is essentially five pages in length and the alleged grounds for sanctions are hardly novel or complex. And while the quality of the attorneys' work is high, Wulff is not entitled recover for extraordinary hours incurred by a legal dream team; he is entitled to recover for the number of hours a reasonably competent counsel would have billed. Additionally, the court does not doubt that the Farella attorneys

spent a large amount of time preparing and strengthening Wulff's defense; Wulff is a former Farella partner. The fact that Wulff's attorneys worked almost 200 hours, however, does not make this number of hours reasonable.

 Indeed 197.8 hours represents about one-tenth of a lawyer's annual billable hours. Put in this context, the unreasonableness of this extraordinary number of hours is evident. After reviewing (1) Vedatech's and Subramanian's Rule 11 motion, (2) Wulff's opposition, (3) the time needed to prepare oral argument and (4) Wulff's counter-motion for sanctions, the court concludes that it would take a reasonable lawyer about two weeks of billable time-- or 75 hours-- effectively to oppose Vedatech's and Subramanian's Rule 11 motion. Multiplying this reasonable number of hours by the average market rate for lawyers in the San Francisco area calculated above, the court concludes that Wulff is entitled to $15,000 (75 hours x $200/hour). Accordingly, Vedatech and Subramanian are jointly and severally liable to Wulff for $15,000 incurred in opposing the unnecessary Rule 11 motion.

 Additionally, Wulff moves for sanctions against Vedatech and Subramanian pursuant to 28 USC § 1927. Doc # 86. Wulff bases his § 1927 cross-motion on Vedatech and Subramanian's "obstinate refusal to acknowledge the effect of" *Howard.* Id at 6, 271 Cal.Rptr. 893.

 "Any * * * person * * * who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct." 28 USC § 1927. As this court has stated: The purpose of § 1927 is "to deter attorneys from multiplying legal proceedings unnecessarily, and to compensate attorneys forced to endure such proceedings." *Winfield v. Beverly Enterprises,* 1994 U.S. Dist LEXIS 2855, *10 (ND Cal 1994) (Walker, J). Sanctioning a party under § 1927 requires a "finding of recklessness or bad faith." *Barber v. Miller,* 146 F.3d 707, 711 (9th Cir.1998). "Bad faith is present when a [party] knowingly or recklessly raises a frivolous argument." *Estate of Blas v. Winkler,* 792 F.2d 858, 860 (9th Cir.1986). Finally, "section 1927 sanctions may be imposed on a *pro se* plaintiff." *Wages v. IRS,* 915 F.2d 1230, 1235-36 (9th Cir.1990).

 **\*17** The court agrees that Vedatech and Subramanian, recklessly *and* in bad faith, multiplied

Not Reported in F.Supp.2d                                                                     Page 12
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

the legal proceedings against Wulff by recklessly raising frivolous arguments regarding the inapplicability of *Howard.* Wulff *repeatedly* and *clearly* informed Vedatech and Subramanian of *Howard'* s holding regarding quasi-judicial immunity and urged Vedatech and Subramanian to dismiss Wulff from the current suit. Vedatech and Subramanian refused and instead chose to make substantively indefensible attempts to distinguish *Howard.* First, they argued that Wulff was not "court appointed," as was the psychologist in *Howard.* This argument, however, has since been repudiated by Vedatech and Subramanian. Doc # 128 at 7 (admitting that "the psychologist in *Howard v. Drapkin* was not 'court-appointed'). Next, Vedatech and Subramanian argued that this court should not follow *Howard* because (1) the holding regarding quasi-judicial immunity is mere "dictum," and (2) the California Supreme Court is imminently preparing to overrule *Howard.* These legal contentions are unwarranted by existing law. As discussed above, there is *no indication* that this fourteen-year-old decision, relied upon by numerous lower courts, is about to be overruled by the California Supreme Court; Vedatech and Subramanian's conclusory assertion to the contrary is baseless and not offered in good faith. Finally, calling *Howard'* s quasi-judicial immunity holding "dictum" evidences a fundamental ignorance (either intentional or reckless) of the ability to read case law. This ignorance, however, is no defense to Wulff's cross-motion for fees and costs. See *Temple v. WISAP USA,* 1993 U.S. Dist LEXIS 18453, *19 (D Neb 1993) ("Mistaken judgment, ignorance of law or personal belief with regard to what the law should be," does not negate the filing of a legally baseless document).

No doubt Vedatech and Subramanian wish *Howard* did not exist or that its holding could be characterized as dictum. These personal beliefs, however, do not constitute good faith legal arguments. The court concludes that Wulff should never have been forced into defending himself against Vedatech and Subramanian's vexatious, frivolous and legally deficient claims in the FAC; he should have been dismissed from the outset. Vedatech and Subramanian, however, "unreasonably and vexatiously" multiplied the proceedings in this case against Wulff as prohibited by § 1927.

Accordingly, the court GRANTS Wulff's motion for § 1927 sanctions. Wulff states that his attorneys billed 290.9 hours for services performed and $2,300 in costs incurred in researching and drafting his motion to dismiss the FAC. Doc # 87 at 4. All

attorneys at Farella who worked on Wulff's case, however, charged a uniform "reduced rate" of $225/hour. Id. Accordingly, Wulff claims he incurred $67,752.50 in attorney fees, costs and expenses associated with defending against the FAC (290.0 hours x $225/hour = $65,452.50 + $2,300 in costs = $67,752.50). This amount seems too high. This is confirmed by Wulff's request for only one-third of this amount, $22,584.16 or, alternatively, $70/hour ($22,584.16--$2,300 = $20,284.16 / 290.9 = $69.73/hour). Id at 5, 271 Cal.Rptr. 893.

**\*18** Farella does not fully explain the steep discount from their claimed normal billing rates. This seems to confirm that counsel's so-called normal billing rates are the starting point for negotiations concerning fees. In any event, in this case, the court need not explore all the details as the amount claimed by Wulff appears reasonable. Applying the $200/hr average market rate (not the $225/hour rate of the Farella attorneys) to the requested $20,284.16 for attorney fees, it appears Wulff's request for fees is tantamount to seeking compensation for 101.42 hours reasonably expended in defending against the FAC ($20,284.16/$200 = 101.42).

Having considered the tangled and complicated nature of the legal and factual issues raised by Vedatech's and Subramanian's 49-page FAC, as well as the quality of the attorneys' work product, the court finds the claim for 101.42 hours of attorney services and $2,300 in legal research and duplicating costs to be reasonable in preparing and defending Wulff's motion to dismiss the hefty FAC. Accordingly, the court finds the following award of attorney fees and costs justified: 101.42 hours at $200/hour, yielding $20,284. The court then adds the $2,300 incurred in duplication and legal research, yielding the requested total of $22,584.

Accordingly, pursuant to § 1927, the court finds Subramanian and Vedatech jointly and severally liable to Wulff for $22,584 in attorney fees, costs and expenses incurred in defending against the FAC.

### C
### *St Paul's and QAD's Motions to Dismiss*

St Paul, QAD and QADKK all move to dismiss the FAC in its entirety pursuant to FRCP 12(b)(6). Docs # 44 (St Paul Mot), # 45 (QAD/QADKK Mot). Because the legal arguments offered by St Paul and QAD in support of their individual motions substantially overlap and because Vedatech and Subramanian address both motions in a single opposition memorandum, Doc # 66, the court will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

address these two dispositive motions in tandem.

                    1

 FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Although a plaintiff is not held to a "heightened pleading standard," the plaintiff must provide more than mere "conclusory allegations." *Swierkiewicz v. Sorema NA,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (rejecting heightened pleading standards); *Schmier v. United States Court of Appeals for the Ninth Circuit,* 279 F.3d 817, 820 (9th Cir.2002) (rejecting conclusory allegations).

 Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle [her] to relief." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); see also *Conley,* 355 U.S. at 45-46. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See *In re Silicon Graphics Inc. Sec Lit.,* 183 F.3d 970, 980 n10 (9th Cir1999). But "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001) (citing *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994)).

 **\*19** Review of a FRCP 12(b)(6) motion to dismiss is generally limited to the contents of the complaint, and the court may not consider other documents outside the pleadings. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir.2001). The court may, however, consider documents attached to the complaint in connection with a motion to dismiss. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Additionally, the court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." See *Lapidus v. Hecht,* 232 F.3d 679, 682 (9th Cir.2000) (internal quotation omitted).

                    2

              *Declaratory Relief*
 In their first cause of action, Vedatech and Subramanian ask this court for a declaratory

judgment pursuant to 28 USC § 2201. Regarding St Paul, Vedatech and Subramanian seek fourteen judicial declarations. Doc # 35 (FAC) at 25-27. This lengthy list of requested declarations, in essence, requests this court to declare that: (1) the settlement agreement with QAD is null and void; (2) St Paul had no authority to enter into this agreement and (3) St Paul has acted in bad faith and breached its fiduciary duties to Vedatech and Subramanian in entering into the settlement agreement. Regarding QAD and QADKK, Vedatech and Subramanian ask this court to declare that: (1) QAD and QADKK cannot rely upon the settlement agreement as a defense to Vedatech and Subramanian's affirmative claims in the second action and (2) any release of claims (affirmative or counterclaims) by QAD and QADKK under the settlement agreement are final.

 The court begins by noting the contradictory nature of these requested declarations; Vedatech and Subramanian ask the court to declare the settlement agreement non-binding on Vedatech and Subramanian, but then request the court declare it binding and final on QAD and QADKK. More importantly, however, the court notes the duplicative nature of these declarations--the issues underlying these declarations (e g, the validity of the agreement, St Paul's authority to enter into the agreement and the presence of bad faith) are *all* squarely before the Santa Clara superior court in the twice-remanded consolidated action and in the now-remanded third action. Whether the settlement agreement is binding, void, unconscionable or the product of bad faith are all arguments that can be made to Judge Komar, the judge who will actually be the one to enforce the settlement agreement in the consolidated action. Moreover, Vedatech and Subramanian recognize this fact in their opposition by stating: "Any effect of any order preventing QAD and St Paul from proceeding with their "settlement," will be *exactly the same as an order that may be obtained within either of the underlying cases."* Doc # 66 at 6-7. The court agrees with Vedatech and Subramanian's assertion.

 Accordingly, Vedatech and Subramanian are asking the court to issue a declaratory judgment regarding certain contractual rights they, St Paul, QAD and QADKK *may* or *may not* have in two pending state court cases. It is clear that Vedatech and Subramanian are wary regarding whether Judge Komar will decide to enforce the settlement agreement. This apprehension, however, is insufficient to justify this court exercising its discretion to issue declaratory relief. The Ninth Circuit has made clear that the purpose of declaratory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 14
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

relief in federal courts is not to "provide insurance against [a] state court deciding the * * * issues less favorably than a district court." *Exxon Shipping Co. v. Airport Depot Diner, Inc.,* 120 F.3d 166, 169 (9th Cir.1997). "Declaratory relief is not authorized so that lower federal courts can sit in judgment over state courts, *and it is not a substitute for removal." Id at 170* (emphasis added). See also 26 CJS Declaratory Judgments § 120 ("The declaratory judgment procedure should not be employed by federal courts to control state action, or to bring into the federal courts actions which are pending in the state courts.").

**\*20** Under *Exxon,* Vedatech and Subramanian cannot avoid Judge Komar's adjudication of issues squarely before him in state court by seeking declaratory relief in federal court. Accordingly, the court refuses to exercise its discretion in issuing declaratory relief and GRANTS St Paul's, QAD and QADKK's motions to dismiss with prejudice Vedatech and Subramanian's first cause of action for declaratory relief.

### 3
### *Fraud*

Next, Vedatech and Subramanian assert causes of action for fraud against St Paul, QAD and QADKK. Doc # 35 (FAC) at 31-35. Vedatech and Subramanian contend that St Paul intentionally "failed to disclose the nature and details of [its] prior contacts and relationship with Wulff." Id at 32. St Paul intentionally withheld this information, according to Vedatech and Subramanian, to "induce them to attend the mediation under terms that were favorable to [St Paul, QAD and QADKK] and harmful to [Vedatech and Subramanian]." Id at 33. Moreover, QAD and QADKK "became aware of [St Paul's] fraudulent schemes during the mediation," but "with an intent to harm Vedatech [and Subramanian] * * * QAD participated in the ongoing fraudulent scheme * * * rel[ying] upon the idea that the cloak of secrecy in mediation can be used to engage in fraudulent and collusive schemes * * *." Id at 35. Finally, Vedatech and Subramanian assert that they indeed relied upon these fraudulent omissions when they "consented" to attend the mediation and thus the fraud has caused them "heavy damages." Id at 34.

To prevail on a claim for fraud in California, Vedatech and Subramanian must prove by a preponderance of the evidence that: (1) St Paul, QAD and QADKK made a knowingly false representation; (2) the false representation was made with the intent to deceive or induce reliance by Vedatech and Subramanian; (3) Vedatech and Subramanian justifiably relied on these false representations; and (4) they incurred damages resulting from the fraud. *Smith v. Allstate Insurance Co.,* 160 F Supp 2d 1150, 1152 (S.D.Cal.2001) (citing *Wilkins v. Nat'l Broadcasting Co.,* 71 Cal.App.4th 1066, 84 Cal.Rptr.2d 329 (1999)). Additionally, alleged material omissions (as alleged in this case) may constitute a "false representation" under the first element of fraud "when the defendant[s] had exclusive knowledge of material facts not known to the plaintiff[s]." *Wilkins,* 71 Cal.App.4th at 1082, 84 Cal.Rptr.2d 329.

The court cannot grant St Paul's, QAD's and QADKK's 12(b)(6) motion to dismiss unless it appears beyond doubt that Vedatech and Subramanian can prove no set of facts in support of their fraud claim which would entitle them to relief. *Hughes,* 449 U.S. at 9.

Vedatech and Subramanian claim that St Paul, QAD and QADKK concealed a material fact (known only to them) when they failed to disclose that Wulff had conducted prior meditations for St Paul. Assuming that St Paul withheld such information, under *Wilkins,* such an omission could meet the first element of a fraud claim. Next, they claim that these omissions and representations were made to induce Vedatech and Subramanian to consent to mediation before Wulff and thus the second element of a fraud claim could be proven. Vedatech and Subramanian's own submissions to the court, however, show that they can prove no set of facts that would meet the third and fourth elements of a fraud claim. Vedatech and Subramanian assert that they "were unaware of the information that was deliberately withheld from them, and relied upon these misrepresentations * * * in consenting" to attend mediation before Wulff. Doc # 35 at 34. No facts can support this assertion for, quite simply, it is not true. Vedatech and Subramanian did not "consent" to mediate before Wulff; they were ordered--*twice*--by Judge Komar to attend the Wulff mediation. Judge Komar first ordered Vedatech and Subramanian to attend this mediation on February 6, 2004. Doc # 84, Ex 6 (Med Order) ("It is ORDERED that Mani Subramanian is required by the Court to appear in person at mediation with St Paul and QAD parties in front of Randall Wulff * * *. Failure to appear at the mediation will bring Mr Subramanian in contempt of the Court * * *."). What is more, it was Vedatech and Subramanian, not any of the defendants, that supplied the court with a copy of Judge Komar's February 6, 2004, order. On March 4, 2004, Judge Komar again

Not Reported in F.Supp.2d                                                                    Page 15
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

ordered the parties to attend mediation before Wulff. Doc # 46, Ex B (2d Med Order). Accordingly, Vedatech and Subramanian cannot prove facts showing their attendance at the mediation was *based upon* justifiable reliance on defendants' alleged omissions; their attendance was based upon court order. Because they can offer no facts to prove this third element of fraud, Vedatech and Subramanian have failed to state a cause of action for fraud.

**\*21** Because St Paul, QAD and QADKK cannot be held liable in tort for fraud, it follows that none can be liable for conspiracy to commit fraud. "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort. A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Allied Equipment Corp. v. Litton Saudi Arabia Limited, 7 Cal.4th 503, 511, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)* (internal quotations and citation omitted).

For these reasons, St Paul's, QAD's and QADKK's motions to dismiss with prejudice the FAC's claims of fraud and conspiracy to commit fraud are GRANTED.

### 4
### *Constructive Fraud*

Next, Vedatech and St Paul assert a cause of action for constructive fraud against St Paul. Doc # 35 at 36. For the reasons discussed above in connection with dismissal of the fraud claims, Vedatech and Subramanian have failed to state a claim for constructive fraud.

"Unlike actual fraud, constructive fraud depends on the existence of a fiduciary relationship of some kind * * *. The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." *Younan v. Equifax, Inc., 111 Cal.App.3d 498, 516-17n14 (1980).* Vedatech and Subramanian assert that St Paul owed them a fiduciary duty as an insurer and thus element one is met (QAD and QADKK have no fiduciary relationship with Vedatech and Subramanian). Next, they claim that St Paul failed to disclose its prior connections with Wulff with the intent to deceive Vedatech and Subramanian into consenting to attend the mediation (element two and three). The fact that Judge Komar *ordered* Vedatech and Subramanian to attend the Wulff mediation, however, prevents them from

proving facts to support the last element of constructive fraud. Again, Vedatech and Subramanian's attendance at the mediation was not the product of reliance on any alleged omission by St Paul; *the attendance was court-ordered.*

For the same reasons discussed above in relation to conspiracy to commit fraud, Vedatech and Subramanian cannot state a cause of action for conspiracy to commit constructive fraud. See *supra* Part IV(C)(3). St Paul's motion to dismiss with prejudice the FAC's claim of constructive fraud and conspiracy to commit constructive fraud is GRANTED.

### 5
### *Negligent Misrepresentation*

Next, Vedatech and Subramanian assert a cause of action against St Paul for negligent misrepresentation. Doc # 35 at 39. The allegations underlying this claim are the same omissions used to form the basis for the fraud and constructive fraud claims (i e, failure to disclose St Paul's prior connection with Wulff). In California, however, negligent misrepresentation requires a "positive" assertion or representation which is false; representation by omission is not sufficient. *Byrum v. Brand, 219 Cal.App.3d 926, 942, 268 Cal.Rptr. 609 (1990).* See also *Sharp v. Hawkins,* 2004 U.S. Dist LEXIS 22928, * 11 (ND Cal 2004) (stating that under California law, "omissions or non-disclosure * * * standing alone are insufficient to sustain a claim for negligent misrepresentation." (citing *Byrum, 219 Cal.App.3d at 942, 268 Cal.Rptr. 609)).*

**\*22** Because Vedatech and Subramanian's claim for negligent misrepresentation is based upon non-disclosures, the court GRANTS St Paul's motion to dismiss with prejudice the FAC's claims for negligent misrepresentation.

### 6
### *Insurance Bad Faith*

Next, Vedatech and Subramanian assert a cause of action against St Paul for "insurance bad faith (breach of covenant of good faith and fair dealing)." Doc # 35 at 40-42. In support of this claim, Vedatech and Subramanian offer the court a laundry list of alleged bad faith acts committed over a period of years by St Paul. Id. The court, however, need not determine whether Vedatech and Subramanian have stated a cause of action for "insurance bad faith," for even if such a claim has been stated, the court must abstain from adjudicating this claim pursuant to *Colorado River Water Conservation District v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:08-cv-01426-VRW    Document 31    Filed 08/04/2008    Page 195 of 200

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

*United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

 As ordered above, the third action is remanded back to state court (State Docket No 1-02-CV-805197). See *supra* Part III. In the third action, St Paul seeks a judicial declaration regarding the scope of its duty to defend Vedatech and Subramanian in relation to the consolidated action as well as other issues surrounding the insurance policy. Vedatech and Subramanian filed a counterclaim in the this action alleging "insurance bad faith." In fact, just prior to removing the third action to this court, Vedatech and Subramanian filed their 112-page fourth amended cross-complaint against St Paul in state court. See 1-02-CV-805197, Doc # 121. Moreover, in asserting the claim for insurance bad faith, the FAC *directs* the court's attention to the *state court* fourth amended cross-complaint in the third action to detail fully the bad faith allegations against St Paul. Doc # 35 (FAC) at 40. Because the court has now remanded the third action back to state court, there are now two "insurance bad faith" claims asserted by Vedatech and Subramanian against St Paul; one is in state court and the other is in federal court.

 As this court has recently stated, "the *Colorado River* doctrine permits [dismissal of a case] in the interests of wise judicial administration when substantially similar claims are pending in state court." *Le v. County of Contra Costa,* 1999 U.S. Dist LEXIS 19611, *2 (ND Cal 1999) (Walker, J) (citations omitted). "The threshold question is whether the state and federal suits are substantially similar." Id at 3 (citing *Nakash v. Marciano,* 882 F.2d 1411, 1416 (9th Cir.1989)). "If so, the factors to consider are: (1) the desirability of avoiding piecemeal litigation; (2) the inconvenience of the federal forum; (3) the order in which jurisdiction was obtained; (4) the source of the governing law and (5) whether the state court proceedings could adequately protect the federal plaintiff's rights." Id (citing *Martinez v. Newport Beach City,* 125 F.3d 777, 785 (9th Cir.1997)). Additionally, the court may consider whether the plaintiff in the federal action has engaged in forum shopping. *Silvaco Data Systems, Inc. v. Technology Modeling Associates, Inc.,* 896 F.Supp. 973, 975 (N.D.Cal.1995) (citing *Nakash,* 882 F.2d at 1417).

 **\*23** Here, the combination of these factors make a compelling case for abstention under *Colorado River.* First, the state and federal suits involve the same parties and claims and arise out of the same conduct. California law regarding contracts and insurance will

govern both cases. Piecemeal litigation would certainly result if the federal action were to proceed. The state court obtained jurisdiction first; well over two years prior to the federal court. The convenience factor is neutral. With respect to the rights of Vedatech and Subramanian, the court is convinced that the state court is up to the task of deciding state law claims arising from an alleged breach of the duty of good faith and fair dealing. Finally, to say that Vedatech and Subramanian have engaged in forum shopping would be an understatement; they are desperate to obtain a federal forum to prevent the state court from enforcing the settlement agreement, and they have employed several inappropriate means to attain this forum. These reasons, plus an obvious advancement of judicial economy, convince the court it should abstain from adjudicating Vedatech and Subramanian's claim for insurance bad faith to avoid duplicative state proceeding.

 "[D]istrict courts *must* stay, rather than dismiss, an action when they determine that they should defer to the state court proceedings under *Colorado River.*" *Coopers & Lybrand v. Sun-Diamond Growers of California,* 912 F.2d 1135, 1138 (9th Cir.1990) (emphasis added). Accordingly, the court DENIES St Paul's motion to dismiss the claim for insurance bad faith. Rather, the court STAYS adjudication of this claim pending the resolution of Vedatech's and Subrmanian's fourth amended counterclaim in the third action in the Santa Clara superior court.

 Vedatech and Subramanian shall file with the court a status report within 30 days of disposition of the insurance bad faith claim in state court. Failure timely to file such a report shall be deemed a failure to prosecute and result in dismissal of this action. To be clear, Vedatech and Subramanian are *not* to file any other memoranda relating to this cause of action save the above described status report.

### 7

*Unfair Competition*

 Finally, Vedatech and Subramanian assert a claim for unfair competition against St Paul, QAD and QADKK pursuant to Cal Bus & Prof Code § 17200 et seq. Cal Bus & Prof Code § 17203 provides, in pertinent part, that:

   any person who * * * has engaged * * * in unfair competition may be enjoined * * *. The court may make such orders or judgments * * * as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 17
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
(Cite as: 2005 WL 1513130 (N.D.Cal.))

For the purposes of the current claim, the term "unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." Cal Bus & Prof Code § 17200.

According to Vedatech and Subramanian, St Paul, QAD and QADKK have engaged in a "pattern of behavior that is unlawful, unfair or fraudulent," including (as with most other claims in the FAC): (1) St Paul's failure to disclose its prior contacts with Wulff, (2) fraudulently obtaining Vedatech and Subramanian's "consent" to attend the mediation and (3) QAD and QADKK learning of such deception and failing to disclose it in order to "benefit to the tune of $500,000." Doc # 35 (FAC) at 42-46. In essence, Vedatech and Subramanian claim that St Paul and QAD engaged in unfair competition by fraudulently obtaining Vedatech and Subramanian's consent to attend mediation and the resulting injury was the settlement agreement between St Paul, QAD and QADKK which (1) deprived Vedatech and Subramanian of their right to pursue affirmative claims against QAD and QADKK and (2) unjustly enriched QAD and QADKK by $500,000 which belonged to Vedatech and Subramanian.

**\*24** The FAC seeks restitution from QAD and QADKK in the amount of $500,000 and requests (nebulously) the court to order St Paul to disgorge "all benefits that are due to Vedatech under the California Unfair Competition laws." Vedatech and Subramanian are careful to frame all requested relief in the form of equitable remedies, as § 17203 does *not* allow damages to be recovered. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). For several reasons, Vedatech and Subramanian can prove no set of facts to support this cause of action and thus the claim must be dismissed pursuant to FRCP 12(b)(6).

First, as the court discussed above, no fraudulent or unfair practice on the part of St Paul, QAD or QADKK caused Vedatech and Subramanian to attend the mediation; attendance was court-ordered my Judge Komar--twice. Next, assuming arguendo that the alleged non-disclosures did trick Vedatech and Subramanian into attending the Wulff mediation, they cannot prove that the resulting settlement agreement (the geneses of all ensuing "damages") was, in the words of § 17203, "acquired by means of such unfair competition." The settlement agreement explicitly states that "it is not intended to impair the prosecution by Vedatech of any and all affirmative claims that may exists with respect to the First or Second Action * * *." Doc # 35 (FAC), Ex A (Sett

Agreement) at 5 ¶ 8. Moreover, as mentioned above, the settlement agreement was not entered into until *after* Vedatech and Subramanian left the mediation. If Vedatech and Subramanian were not present when the settlement agreement was negotiated, it follows that the settlement agreement could not have been acquired by the means of St Paul, QAD and QADKK's alleged fraudulent scheme to trick Vedatech and Subramanian into attending the mediation.

Finally, even if St Paul, QAD and QADKK engaged in unfair practices (which the court assumes solely for this motion) and even if these practices tricked Vedatech and Subramanian into attending the mediation (which clearly they did not), Vedatech and Subramanian can prove no facts showing that they are entitled to any equitable relief. First, Vedatech and Subramanian's nebulous assertion that they are entitled to require St Paul to "disgorge all such benefits that are due" to Vedatech and Subrmanian is conclusory and unwarranted and thus does not suffice to state a cause of action. St Paul received *nothing* via the settlement agreement that the court can order them to disgorge (if anything, St Paul was forced to pay $500,000). Nor can Vedatech and Subramanian prove that they are entitled to restitution of the $500,000 which was paid to QAD and QADKK by St Paul. "[R]estitution [is an order] compelling a [ ] defendant to return money obtained through an unfair business practice to those persons * * * *who had an ownership interest in the property* * * *." *Korea Supply Co.*, 29 Cal.4th at 1144-45, 131 Cal.Rptr.2d 29, 63 P.3d 937. Vedatech and Subramanian, however, have pled no facts showing that they have any ownership interest in the $500,000 St Paul paid to QAD and QADKK. Rather, the FAC simply states that St Paul paid QAD and QADKK the $500,000 "from funds that [were] held in trust for the Vedatech parties." Doc # 35 at 47. This legal conclusion, however, is not supported by any facts pled in the FAC and legal conclusions, standing alone, cannot suffice to state a cause of action. See *Sprewell*, 266 F.3d at 988 ("the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

**\*25** For the numerous and substantial reasons discussed above, St Paul's, QAD's and QADKK's motions to dismiss with prejudice the FAC's seventh cause of action for unfair competition are GRANTED.

IV

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 18
Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)
**(Cite as: 2005 WL 1513130 (N.D.Cal.))**

*QAD and QADKK Motion for Sanctions*

Finally, QAD and QADKK move this court to sanction Vedatech and Subramanian pursuant to FRCP 11. The court, however, has already sanctioned Vedatech, Subramanian and Gonzaga for the improper behavior each has demonstrated throughout this litigation and the court does not believe any further Rule 11 sanctions are appropriate at this time. Additionally, QAD and QADKK move for sanctions pursuant to § 1927. The court does not believe such sanctions are appropriate. QAD and QADKK have not had to defend two frivolous petitions for removal (at least not in the present action) as St Paul has had to do, nor have QAD and QADKK had to defend a frivolous Rule 11 motion as Wulff has had to do. QAD and QADKK were named in the FAC, they filed a motion to dismiss and the motion is now being adjudicated. No doubt QAD and QADKK have incurred costs and fees in defending against the FAC. But every defendant incurs costs and fees. The costs and fees awarded to St Paul and Wulff above did not stem from simply being named in the FAC and having to defend themselves.

QAD and QADKK's motion to sanction is DENIED.

### V

In sum, the court GRANTS St Paul's motions (04-1403 Docs 11, 40) (C-04-1818 Docs 7, 19) to remand and REMANDS Nos 04-1818 and 04-1403 to Santa Clara superior court. The court ORDERS Vedatech and Subramanian to pay $20,738.75 to St Paul pursuant to 28 USC § 1447(c). Additionally, the court GRANTS St Paul's motion for Rule 11 sanctions (04-1249 Doc # 97) (04-1403 Doc # 52) (04-1818 Doc # 32) and SANCTIONS Subramanian $1,000 and SANCTIONS Gonzaga $5,000. These sanctions are payable to the court on or before July 25, 2005.

The court GRANTS Wulff's motion to dismiss (04-1249 Doc # 52). The court DENIES Vedatech's and Subramanian's motion for Rule 11 sanctions against Wulff (04-1249 Doc # 61). The court ORDERS Vedatech and Subramanian to pay Wulff $15,000 for fees and costs incurred in opposing the Rule 11 motion. Additionally, the court GRANTS Wulff's motion for sanctions pursuant to § 1927 (04-1249 Doc # 86) and ORDERS Vedatech and Subramanian to pay $22,584 to Wulff.

QAD's and QADKK's motions to dismiss with prejudice all claims asserted against them are GRANTED (04-1249 Doc # 44). QAD and QADKK's motion for sanctions are DENIED (04-

1249 Doc # 106). St Paul's motion to dismiss the FAC is GRANTED IN PART (04-1249 Doc # 45). The court STAYS adjudication of Vedatech's and Subramanian's claim for insurance bad faith against St Paul.

Hence, every action and claim (save one) to which Vedatech is a party has been either remanded or dismissed and the one remaining claim has been stayed pending state court resolution. Accordingly, the court does not find it appropriate to rule on Gonzaga's and Knopf's second motion to withdraw as counsel for Vedatech. If they still wish to withdraw as counsel, they should address their arguments to the Santa Clara superior court. Accordingly, the second motion to withdraw is DENIED as moot (04-1249 Doc # 148) (04-1403 Doc # 70) (04-1818 Doc # 51). Gonzaga and Knopf's motions to strike are DENIED as moot. (04-1249 Doc # 154) (04-1403 Doc # 74) (04-1818 Doc # 55). Subramanian and Vedatech's motion for further oral argument are DENIED as moot. (04-1249 Doc # 112) (04-1403 Doc # 63) (04-1818 Doc # 43). Finally, Subramanian and Vedatech's request to remain an e-filer in 04-1403 is DENIED as moot.

**\*26** The clerk shall administratively close the file. This does not represent a final adjudication but an administrative convenience for the court. Upon receipt of the state court's order resolving the insurance bad faith claim in the state court, the clerk shall re-open the file upon a request of one of the parties.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1513130 (N.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT F  -**

**QAD Request for Judicial Notice**

QAD Defendants' Request for Judicial Notice in
Support of Motion to Dismiss [FRCP 12(b)(6)]

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

QAD Inc. et al.,
    Plaintiffs,

v.

SUBRAMANIAN et al.,
    Defendants.        No. CV771638

------------------------

MANI SUBRAMANIAN,
    Plaintiff and Appellant,

v.             No. CV784685

LAI FOON LEE,
    Defendant and Respondent.

Court of Appeal - Sixth App. Dist.

**F I L E D**

OCT 1 3 2006

MICHAEL J. YERLY, Clerk

By _____
           DEPUTY

H030456
Santa Clara County No. CV771638
Santa Clara County No. CV784685

BY THE COURT:

    The appellant having failed to file a certificate of interested entities or persons in compliance with rule 14.5 (c) (1) , California Rules of Court, after notice given pursuant to rule 14.5 (c) (2), the appeal filed on July 24, 2006, is dismissed.

Date: OCT 1 3 2006 _____        RUSHING, P.J.

                    _____P.J.

Court of Appeal, Sixth Appellate District - No. H030456
**S156063**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

QAD INC. et al., Plaintiffs,

v.

SUBRAMANIAN, et al., Defendants.

and COMPANION CASE

The petition for review is denied.

SUPREME COURT
**FILED**

OCT **1 0** 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice